Jody Goodman (DC Bar No. 404879)
(202) 326-3096; jgoodman1@ftc.gov
Elsie Kappler (MA Bar No. 562265)
(202) 326-2466; ekappler@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8533
Washington, DC 20580

Local Counsel
Jeffrey Tang (CA Bar No. 308007)
(310) 824-4303; jtang@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
*Attorneys for Plaintiff*

FILED
CLERK, U.S. DISTRICT COURT
9/9/24
CENTRAL DISTRICT OF CALIFORNIA
BY: MRV DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**Federal Trade Commission**,
Plaintiff,

v.

**Ascend Capventures Inc.**, also doing business as Ascend Ecom LLC; Ascend Ecomm LLC; ACV; ACV Partners; Accelerated Ecommerce Ventures; Ascend Distribution LLC; Ethix Capital; and ACV Nexus, a Wyoming close corporation profit corporation,
**Ascend Ecommerce Inc.**, also doing business as Ascend Ecom LLC, a Wyoming close corporation profit corporation,
**Ascend Administration Inc**., a California general stock corporation,
**Ascend Ecom LLC**, a Wyoming limited liability company,
**Ascend Distribution LLC**, a Texas limited liability company,
**William Michael Basta**, individually and as an officer and/or owner of Ascend

**No.: 2:24-cv-07660SPG(JPRx)**

**FILED UNDER SEAL**

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

Ecom LLC, Ascend Capventures Inc., Ascend Ecommerce Inc., Ascend Administration Inc., and Ascend Distribution LLC, and **Jeremy Kenneth Leung**, individually and as an officer and/or owner of Ascend Ecom LLC, Ascend Capventures Inc., Ascend Ecommerce Inc., Ascend Administration Inc., and Ascend Distribution LLC,

Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended, and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction; monetary relief; and other relief, including an asset freeze, appointment of a receiver, and immediate access to Defendants' business premises, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the Business Opportunity Rule, and the CRFA.

## SUMMARY OF THE CASE

2. Since 2021, Defendants have used deceptive earnings claims to persuade consumers to shell out tens of thousands of dollars each to invest in what Defendants claim is a surefire business opportunity in e-commerce, or online stores. Since about 2023, Defendants' deceptive sales pitch has said their business model is powered by artificial intelligence ("AI"). Defendants claim consumers will quickly earn thousands of dollars in passive income, which will be generated from sales in online stores on e-commerce platforms such as Amazon.com and Walmart.com. After consumers invest, the

promised gains never materialize, and consumers are left with depleted bank accounts and hefty credit card bills. Defendants' scheme has defrauded consumers of at least $25 million.

3. Defendants started their operation as "Ascend Ecom." They have changed the name periodically, including from "Ascend Ecom" to "Ascend CapVentures," "ACV Partners," and recently, "ACV," "Accelerated eCom Ventures," "Ethix Capital by Ascend," and "ACV Nexus." The Ascend entities and operation are referred to collectively as "Ascend." Ascend Capventures Inc., Ascend Ecommerce Inc., Ascend Administration Inc., Ascend Ecom LLC, and Ascend Distribution LLC are also collectively referred to as "Corporate Defendants."

4. Defendants consistently make false and unsubstantiated earnings claims in their marketing. When Ascend clients complain in online reviews that Defendants' marketing claims are false, Defendants have threatened their clients with legal action if they do not retract their honest reviews and have otherwise pressured clients to retract truthful reviews. Defendants have also invoked non-disparagement clauses that appear in their contracts, claiming that negative reviews constitute violation of the contracts and threatening the loss of Ascend's "buyback guarantee" if the contract terms are violated.

5. Through a complicated web of transactions, Defendants use the bulk of consumers' funds not to build actual businesses for the clients, but to enrich themselves. They appear to have dissipated more than $25 million.

6. Defendants' scheme is ongoing and has defrauded individual consumers of tens of thousands of dollars – and sometimes hundreds of thousands – in violation of the FTC Act, the Business Opportunity Rule, and the CFRA.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345. This action arises under 15 U.S.C. §§ 45(a) and 53(b).

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

9. The FTC is an independent agency of the United States government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. *See* 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, which requires specific disclosures and prohibits certain misrepresentations in connection with the sale of a business opportunity. The FTC also enforces the CRFA, 15 U.S.C. § 45b(a)(2), which proscribes standardized provisions that prohibit or restrict the posting of honest reviews.

## DEFENDANTS

10. Led by Individual Defendants Jeremy Leung and William Basta, the Corporate Defendants have worked together to conduct the law violations described below.

*Corporate Defendants*

11. **Ascend Capventures Inc.** ("Ascend Capventures"), also doing business as Ascend Ecom, LLC, Ascend Ecomm, LLC, ACV, ACV Partners, Accelerated eCommerce Ventures, Ascend Distribution LLC, Ethix Capital, and ACV Nexus, is a Wyoming close corporation profit corporation with its principal office address at 1309 Coffeen Ave., Suite 8847, Sheridan, Wyoming 82801. It was incorporated on or about February 15, 2023. In connection with the matters alleged herein, Ascend Capventures transacts or has transacted business in this district and throughout the United States.

12. **Ascend Ecommerce Inc.** ("Ascend Ecommerce"), also doing business as Ascend Ecom, is a Wyoming close corporation profit corporation with its principal office address at 1309 Coffeen Ave., Suite 10354, Sheridan, Wyoming 82801. It was incorporated on or about May 8, 2023. In connection with the matters alleged herein, Ascend Ecommerce transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with

others, Ascend Ecommerce has advertised, marketed, distributed, or sold business opportunities throughout the United States.

13. **Ascend Administration Inc.** ("Ascend Admin") was a California general stock corporation with its principal place of business at 3240 Professional Dr., Auburn, California 95602. It also uses the mailing address 2219 Main St., Santa Monica, California. It was incorporated on or about October 27, 2021, and was dissolved on or about May 2, 2024. William Basta signed and filed a Certificate of Dissolution dated May 2, 2024. Until at least May 2024, Ascend Admin had at least one open bank account. Under California law, "[c]auses of action against a dissolved corporation, whether arising before or after the dissolution of the corporation, may be enforced…[a]gainst the dissolved corporation…." Cal. Corp. Code § 12662(a)(1) (West). In connection with the matters alleged herein, Ascend Admin transacts or has transacted business in this district and throughout the United States.

14. **Ascend Ecom LLC** ("Ascend Ecom") was a Wyoming Limited Liability Company with its principal office address at 1309 Coffeen Ave., Suite 2784, Sheridan, Wyoming 82801. It was formed on or about February 22, 2021, and was dissolved on or about August 21, 2023. Ascend Ecom engaged in financial transactions until at least February 2024. Under Wyoming law, "A claim not barred … may be enforced: (i) Against a dissolved limited liability company to the extent of its undistributed assets." Wyo. Stat. Ann. § 17-29-704(d) (West). In connection with the matters alleged herein, Ascend Ecom transacts or has transacted business in this district and throughout the United States.

15. **Ascend Distribution LLC** ("Ascend Distribution") was a Texas limited liability company with a registered office address of 5900 Balcones Dr., Suite 100, Austin, TX 78731. It was formed on or about October 20, 2021, and its Managing Member was Ascend Ecom LLC at 1309 Coffeen Ave., Ste 2784, Sheridan, Wyoming 82801. The State of Texas entered a forfeiture of the company's charter, certificate, or registration pursuant to Section 171.309 of the Texas Tax Code on or about February 23,

2024. Until at least May 2024, Ascend Distribution had at least one open bank account. Under Texas law, a dissolved corporation "shall continue its corporate existence for a period of three years from the date of dissolution…." Tex. Bus. Corp. Act Ann. Art. 7.01 (Vernon 2023). Moreover, "[w]hen no receiver has been appointed for a corporation which has dissolved, suit may be instituted on any claim against said corporation as though the same had not been dissolved…." Tex. R. Civ. P. 29 (2024). In connection with the matters alleged herein, Ascend Distribution transacts or has transacted business in this district and throughout the United States.

*Individual Defendants*

16. **William Michael Basta** ("Will Basta" or "Basta") is a co-founder, with Jeremy Leung, of the Ascend operation.

- He is President and Chief Revenue Officer of Ascend Capventures and President, Secretary, and Treasurer of Ascend Ecommerce.
- He was Owner and Member and held himself out as the co-founder and Chief Revenue Officer of Ascend Ecom.
- He was a Member and Director of Ascend Distribution.
- He was President of Ascend Admin.
- Basta is or has been a signatory on bank accounts for all Corporate Defendants.
- Basta appears in and narrates advertisements and marketing videos for Defendants' business opportunities, using false and unsubstantiated earnings claims.
- He speaks with potential purchasers one-on-one to close sales deals.
- He signs consumer contracts.
- He knows about routine suspensions of Ascend clients' online stores for policy violations, and clients' numerous complaints and refund requests.
- He has negotiated settlements and contract modifications with Ascend

clients.

- He owns residential property in Venice, California, and, on information and belief, resides part time in a rented apartment in Miami Beach, Florida.
- In connection with the matters alleged herein, Basta transacts or has transacted business in this district and throughout the United States.
- At all times relevant to this Complaint, acting alone or in concert with others, Basta has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint. Through his direct participation in, and control over, the Corporate Defendants, Basta has had knowledge of the acts and practices constituting the violations alleged herein.

17. **Jeremy Kenneth Leung** ("Leung") is the co-founder, with William Basta, of the Ascend operation.

- He is Owner, Director, and Secretary of Ascend Capventures and President and Owner of Ascend Ecommerce.
- He was Director, Chief Operating Officer, Shareholder, and Member of Ascend Ecom.
- He was Managing Member and Shareholder of Ascend Distribution.
- He was Owner of Ascend Admin.
- He is or was a signatory on bank accounts for all Corporate Defendants.
- He appears in marketing videos for Defendants' business opportunities using false and unsubstantiated earnings claims and communicates directly with consumers about their Ascend accounts.
- He is aware of routine suspensions of online stores managed by Defendants for policy violations and clients' numerous complaints and refund requests.
- He has negotiated contract modifications and settlements with consumers on

behalf of Ascend.

- He has threatened customers, demanding that they withdraw complaints and remove online reviews as a condition of obtaining a refund from Ascend.
- Leung is an Australian national who resides outside the United States. However, in connection with the matters alleged herein, he transacts or has transacted business in this district and throughout the United States.
- In an application for an E3-Treaty Aliens in Specialty Occupations U.S. visa in 2022, Defendant Leung listed William Basta as his contact person in the United States, and indicated that Basta was his employer and was affiliated with Ascend Admin. He also indicated that he intended to work as an Operations Manager at Ascend Admin, with an address of 2219 Main St., Santa Monica, California 90405.
- In a B1/B2 Visitor for Business and Pleasure U.S. visa application in 2023, Leung said that starting on February 15, 2023, he was Chief Operation Officer and Partner of Ascend Capventures at 1309 Coffeen Ave., Suite 8847, Sheridan, Wyoming 82801. The application also said he had been Operations Manager of Ascend Admin.
- At all times relevant to this Complaint, acting alone or in concert with others, Leung has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts or practices set forth in this Complaint. Through his direct participation in, and control over, the Corporate Defendants, Leung has had knowledge of the acts and practices constituting the violations alleged herein.

## COMMON ENTERPRISE

18. The Corporate Defendants have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below

through an interrelated network of companies that have common ownership, business functions, employees, and office locations, and that commingled funds.

- Basta and Leung own and operate Ascend Capventures and Ascend Ecommerce.
- Basta and Leung owned and operated Ascend Ecom, Ascend Distribution, and Ascend Admin.
- Basta and Leung are signatories on bank accounts for all Corporate Defendants.
- Corporate Defendants use several addresses in common:

    i. 1309 Coffeen Ave., Sheridan, WY 82801
    Ascend Ecommerce
    Ascend Capventures
    Ascend Ecom
    Ascend Distribution

    ii. 3240 Professional Dr., Auburn, CA 95602-2409
    Ascend Admin
    Ascend Capventures (d/b/a Ethix Capital)
    Ascend Ecom
    Ascend Distribution

    iii. 1939 N Great Southwest Pkwy., Grand Prairie, TX 75050-1516 and 941 Ave. N, Grand Prairie, TX 75050 (Ascend's warehouses)
    Ascend Ecom
    Ascend Distribution

    iv. 2219 Main St., Santa Monica, CA 90405-2217
    Ascend Capventures (also d/b/a Ethix Capital; Ascend Ecomm)
    Ascend Ecommerce
    Ascend Ecom

    v. 1508 Bay Rd., Unit N0903, Miami Beach, FL 33239-3229
    Ascend Ecommerce
    Ascend Admin
    Ascend Capventures
    Ascend Ecom
    Ascend Distribution

- Ascend Capventures and Ascend Ecommerce use the same registered agent: Cloud Peak Law at 1095 Sugarview Dr., Suite 500, Sheridan, Wyoming 82801. Cloud Peak Law was the registered agent for Ascend Ecom. Cloud Peak Law is also the registered agent for multiple other entities that have received and sent money from the Ascend enterprise.
- Ascend Ecommerce and Ascend Capventures—as themselves and doing business as "Ascend Ecom," "ACV," "ACV Partners," and under other names—use the same or similar marketing materials.
- Individual Defendants are named or pictured in marketing materials for Ascend Ecom, Ascend Ecommerce, Ascend Capventures, and multiple related entities. For example, a page on www.acvpartners.ai touts "The Importance of Trustworthy Leadership," with a photo of Jeremy Leung and the claim "Featured In Forbes," and a photo of William Basta and the claim "Featured In Yahoo! finance." The same page also contains a quote ostensibly from Mr. Basta in Yahoo! finance saying, "Ascend Ecom works to Bring Transparency to the Ecommerce Industry."
- Ascend Ecom, Ascend Ecommerce and Ascend Capventures—as themselves and doing business as "Ascend Ecom," "ACV," "ACV Partners," and others—have used the same or a similar Master Services Agreement with consumers.
- Defendants use common phone numbers:

  i. (845) 399-xxxx
     William Basta
     Ascend Ecommerce
     Ascend Admin
     Ascend Capventures
     Ascend Distribution
     Ascend Ecom

ii. (734) 881-xxxx
Jeremy Leung
Ascend Capventures
Ascend Ecommerce
Ascend Ecom
Ascend Distribution

- Defendants use email addresses and domains interchangeably across entities. For example, a client received an email from support@ascendecom.com, directing her to wire an inventory payment to Ascend CapVentures, and Jeremy Leung sent an email from jeremy@ascendecom.com with a signature block that identified him as "COO, Ascend CapVentures." Ascend's email domains include:

  @ascendecom.com
  @ascendcapventures.com
  @ascendventurecapital.com
  @acvpartners.ai
  @veralmagroup.com

  Ascend is still using the "@ascendecom.com" email domain, well more than a year after Ascend Ecom LLC was dissolved.
- The Corporate Defendants use common websites. For example, Instagram promotions for ACV link to the website acvpartners.ai. In February 2024, acvpartners.ai referred to itself as "Ascend" and showed a cartoon image of an "Ascend Capventures" figure assisting a purported client.
- Ascend's sales representatives told consumers that Ascend Ecom changed its name to Ascend Capventures. Consumers have reported to the FTC that Ascend has used multiple names.
- The Defendants created a spider web of bank accounts and companies that obscures the flow of funds the Ascend operation took from consumers. The Corporate Defendants have owned at least 16 different bank accounts at three banks, and money from the Ascend operation flows among the

accounts.

- Of the at least $25 million the Corporate Defendants took in from consumers, approximately $4.3 million traveled through and was commingled among the Corporate Defendants' accounts.
- At least an additional $4.2 million moved between the Corporate Defendants' accounts and accounts belonging to other corporate entities that are related to the Ascend scheme. At least five of those other entities are owned by the Individual Defendants.

19. Because the Corporate Defendants, under the direction of Leung and Basta, have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## COMMERCE

20. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *The Ascend Business Opportunity Scheme*

21. Leung and Basta spearhead the operation of this California-based scheme, falsely promoting themselves as e-commerce experts offering to provide e-commerce stores for consumers, who will soon earn thousands of dollars per month in "passive income" while building a "sustainable asset." Leung and Basta promise to expertly manage the operations of automated online stores on behalf of their clients, including researching and selecting products, fulfilling orders, and handling customer service.

22. Ascend offers clients various "automated" packages of ecommerce stores that typically cost between $30,000 and $80,000 for the initial investment. Ascend claims that after clients pay the hefty start-up fee, Ascend will open a "full service" online store for the client on Amazon or Walmart. According to Defendants, all a client has to do is

provide capital for inventory; Ascend will handle the day-to-day operation of the store, including selecting and buying inventory.

23. Ascend typically requires clients to establish bank accounts or obtain credit cards or loans allowing access to no less than $15,000, which Ascend claims are used to pay for the inventory purchased to fulfill store orders. Clients often spend much more than that on inventory. Thus, in addition to paying tens of thousands of dollars in initial fees to Ascend, many clients also need to borrow or otherwise provide thousands more dollars for their stores to operate.

24. Under the agreement, the client agrees to pay Ascend a percentage of the store's profits; the percentage depends upon the size of the investment, or "package," the client purchases.

25. Defendants advertise online that consumers can make "five figures" or more per month in "passive income" by investing in Ascend's e-commerce business opportunity and that consumers' profit margins can be up to 40% or sometimes even 50%. Defendants claim to use proprietary software and artificial intelligence to maximize clients' business success.

26. In truth, virtually none of Ascend's clients earn the advertised income. Most lose their entire investment, and some are saddled with burdensome credit card debt. Many of the online stores that Ascend established and managed for its clients on Amazon and Walmart have been suspended, and ultimately terminated, by Amazon and Walmart for policy violations, leaving many clients banned from selling on the platforms.

27. In recent promotions under a new name, ACV Nexus, as well as under its prior names, Ascend claims that it will set up Etsy and Tik Tok stores for clients.

***Advertisements for the Ascend Business Opportunity***

28. Ascend advertises its business opportunity online, including on Instagram, on Facebook, on X (formerly Twitter), in YouTube videos, on podcasts, and on Ascend's websites.

29. Consumers seeking investment or ecommerce opportunities typically find Ascend on social media. Ascend's videos, testimonials, and websites promote the company as a multi-million-dollar operation, with decades of managerial experience in e-commerce, high standards of ethics and transparency, hundreds of United States-based employees, hundreds of successful clients, and a money back guarantee.

30. Defendants market their offer as "risk free" because of its "buyback guarantee," which has been a big selling point for consumers. Defendants promise that if a consumer has not recouped their initial investment after 24 (or sometimes 36) months, Ascend will "buy back" the consumer's store for the difference between the investment and the consumer's profits.

31. Defendants' advertising materials, including their websites, make varied claims about their staffing and experience, though all emphasize that Ascend is a leader in ecommerce. For example:

- On a podcast in about April 2022, Will Basta boasted about Ascend's 350 U.S.-based employees and high standards of ethics and transparency.
- In December 2023, www.ascendcapventures.com claimed that "[t]he Ascend CapVentures team has generated over 9 figures in e-commerce revenue . . . . Ascend's executive team have an extensive background working with Silicon Valley tech startups as well as international e-commerce brands."
- In February 2024, Ascend Capventures claimed on acvpartners.ai, "With 4 warehouse facilities, a proven scalable infrastructure and some of the most talented leadership in the industry, ACV is responsible for pulling in millions in revenue for our clients on Amazon alone."

32. Defendants also tout their purported technological savvy and resources, claiming that they have at least five different types of software for research and that they use an A.I. tool that they built themselves.

33. Ascend uses false claims of ethics and transparency as a marketing pitch. For example, in December 2023, www.ascendcapventures said: "We hold ourselves to

the highest operating standards and ensure compliance in everything we do from taxes to trademarks."

34. Ascend's ads show that it uses company names interchangeably:

- A YouTube video captured by an FTC investigator on May 7, 2024, announces "Top Viral News About Ascend Capventures" with an "Ascend Ecom" tag at the bottom:




- Ascend promotional slides given to consumers have stated, "Ascend Distribution is under Ascend Capventures' umbrella."
- In January 2024, Ascend had the following logo on its aelogistics.tech website:

ASCEND

You Partner. AE Logistics Will Build & Scale You A Sustainable E-Commerce Asset

- ACV Partners and Accelerated eCom Ventures use the same logo. The image below is from www.acvpartners.ai, visited on February 9, 2024,



and the image below is from a YouTube page called "ACV: Accelerated eCom Ventures," captured on May 16, 2024:




- The ACV: Accelerated eCom Ventures YouTube page shows that ACV and Accelerated eCom Ventures are one and the same:






***Representations to Prospective Purchasers of the Ascend Business Opportunity***

35. Consumers who indicate interest in Ascend are connected with a sales representative; in some cases, consumers have even spoken with one of the Individual Defendants.

36. Once prospective clients connect with a sales agent, Defendants lure them in through multiple phone and text conversations, sometimes over the course of several months. Sales representatives tell prospective clients that they will reach a five-figure monthly profit in year two, and often sooner.

37. Sales representatives show prospective clients a profit calculator—sometimes called a proforma—that sets out what the consumer could expect to make in twenty-four months, given the number and type of stores they purchased and the amount of "working capital" the consumers have available to use to purchase inventory for the stores. For example, as shown in the excerpted image below, Defendants represent that, by purchasing a single Amazon store from Ascend, a prospective client should expect to make over $200,000 in profit after two years.



| | |
|---|---|
| Starting Period | Q1 |
| Bundle type | Single Amazon Store |
| Working Capital Per Store | 50,000 |
| Reinvest Profits | Yes |
| Management Profit Percentage | 30% |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $581,403 | $1,537,626 | $2,119,029 |
| Expenses | $523,217 | $1,359,385 | $1,882,602 |
| Client's Profit | $58,185 | $154,562 | $212,748 |
| | | | |
| Projected Asset Value at Mo 25 | - | | $392,095 |



38. Sales representatives tell prospective purchasers that Ascend's employees will handle the day-to-day operations of the e-commerce stores and do most of the work. Ascend representatives say Ascend will share the profits from the store with the client, whose main role is providing working capital. The opportunity is presented as a substantial source of passive income for potential purchasers.

39. Throughout the sales process, Defendants' marketing videos, advertisements, telephone consultations, and websites are replete with earnings claims, including that consumers can expect a 5-figure monthly profit, with the correct working capital, within the first 12 to 16 months, and that consumers can passively make $100K a month. Defendants also pitch the stores as a virtual "asset," that, by year two, can be valued at and sold for between $50K and $100K.

40. Sales representatives highlight that the e-commerce store is a "risk free" opportunity. If the client does not earn back the initial investment fee within twenty-four

or sometimes thirty-six months, the client can request a refund. For example, in a TikTok video captured on April 22, 2024, Ascend said:

> Your commitment is our commitment, and is backed by our contract. If you don't have revenue within 30 days, you don't pay (applicable on some but not all programs.) If you don't make 100% ROI on your upfront you don't pay. Unlikely to happen but we will replace you [sic] store if anything unforeseen happens, no questions asked.

41. Sometimes Defendants market the money-back guarantee as part of a "Triple Guarantee." Here is an example from ACV Partners' TikTok account, tiktok.acvpartners.ai, in January 2024:




42. Defendants' deceptive marketing and branding creates the false impression that they have received positive press coverage and even endorsements. The www.ascendcapventures.com website has a "Press" tab at the top; the related page shows a photo of Will Basta with a banner that reads: "Featured in Yahoo! finance." A link to "read article" leads not to a real article, but to content that Ascend created.

43. Similarly, Defendants improperly use logos of well-known media outlets such as Forbes, Business Insider, and Yahoo! finance on their websites and in their email signatures. The following are such examples:

- From jeremy@ascendecom.com, July 7, 2023:



**Jeremy Leung**
**COO, Ascend CapVentures**

www.ascendcapventures.com | jeremy@ascendcapventures.com






Forbes Entrepreneur yahoo! finance Inc. MAGAZINE MarketWatch

- From will@ascendecom.com, March 20, 2023:



**Will Basta**
**Co-Founder & CRO, Ascend Ecom**

www.ascendecom.com will@ascendecom.com
2219 Main St. Santa Monica, CA

ASCEND
SUSTAINABLE·TRANSPARENT·INNOVATIVE



Forbes Entrepreneur yahoo! finance Inc. MAGAZINE MarketWatch

- From ACV Partners' TikTok account, tiktok.acvpartners.ai, in January 2024:



44. Ascend's websites have at times included unclear and inconspicuous purported disclaimer language about Ascend's earnings claims and other promotional materials. These purported disclaimers did not dispel the impact of Ascend's earnings claims. For example, in January 2023, www.ascendcapventures.com had a purported disclaimer at the bottom of its "Service" page, in small font. It said, among other things: "[p]erformance and earnings claims are for illustrative purposes only and should not be interpreted as guarantees or projections of potential income or results."

**Disclaimer**

The following disclaimer applies to all content on the AscendCapVentures.com Website and linked social media content, including all videos on ACV's YouTube channel (collectively, the "Content")

No Investment Advice: The Content is provided for informational purposes only and is not intended to be a substitute for professional legal or financial advice. All business ventures involve inherent risk, and ACV encourages you to seek the advice of qualified, licensed professionals before you assume such risk

Performance and Earnings Claims: Any performance or earnings claims made in the videos are for illustrative purposes only and should not be interpreted as guarantees or projections of potential income or results. Actual results may vary based on various factors, including individual effort, market conditions, and business skills. For any specific earnings claims, you may request an Earnings Claim Statement by emailing us at contact@ascendcapventures.com

Service Agreement and Buyback Clause: The terms and conditions of any buybacks or guarantees referenced in the Content are set forth in and governed by the terms of the service agreement between ACV and the participant

Stop Scroll the conte

© ascend 2022. All Rights Reserved

In February 2024, a similar disclaimer appeared at www.acvpartners.ai/service, at the bottom of the "Service" page, in small font. It said essentially the same thing: "Any performance or earnings claims made in the videos are for illustrative purposes only and should not be interpreted as guarantees or projections of potential income or results."

**Disclaimer**

The following disclaimer applies to all content on the ACV Partners Website and linked social media content, including all videos on ACV's YouTube channel (collectively, the "Content").

No Investment Advice: The Content is provided for informational purposes only and is not intended to be a substitute for professional legal or financial advice. All business ventures involve inherent risk, and ACV encourages you to seek the advice of qualified, licensed professionals before you assume such risk.

Performance and Earnings Claims: Any performance or earnings claims made in the videos are for illustrative purposes only and should not be interpreted as guarantees or projections of potential income or results. Actual results may vary based on various factors, including individual effort, market conditions, and business skills. For any specific earnings claims, you may request an Earnings Claim Statement by emailing us at contact@acvpartners.ai

Service Agreement and Buyback Clause: The terms and conditions of any buybacks or guarantees referenced in the Content are set forth in and governed by the terms of the service agreement between ACV and the participant.

***<u>Ascend's Ever-Evolving Name and Identity</u>***

45. Consumers joining Ascend in 2022 and 2023 typically signed contracts with Ascend Ecom, but starting sometime in 2023, Ascend's contracts were issued under the name Ascend Capventures, and later, ACV.

46. In approximately early 2024, Defendants' marketing shifted from promoting Amazon and Walmart stores to TikTok and Etsy stores. In an image captured by an FTC investigator on January 31, 2024, Ascend Capventures promoted: "How to Make $6000-$9000 Per Month With a 100% Passive Income Generating Etsy Store."

47. Around the same time in January 2024, Ascend's name morphed again, from ACV to ACV Partners, and then to Accelerated eCom Ventures.

48. In January 2024, Ascend also marketed itself as "AE Logistics." Its website, aelogistics.tech, showed an Ascend logo at the top of the home page. The page said: "You Partner. AE Logistics Will Build and Scale You a Sustainable E-Commerce Asset." Another page says: "Partnering with Ascend Gets You More Than Just 'Ecommerce Automation.'" The web page showed that AE Logistics was in fact Ascend, but the website has been taken down.




49. In 2024, Ascend promoted itself as "ACV." In a video captured on April 22, 2024, Defendants stated that the ecommerce market would reach "a staggering $7.4 Trillion by 2025," and declared:

> ACV's proven multi-channel approach … has helped our clients generate millions in combined revenue across platforms like TikTok Shop and Walmart….
> The secret-- our proprietary system leverages Ai-driven creative influencer networks and a decade of data to help you tap into the explosive growth of emerging marketplaces.

50. On April 22, 2024, a video posted on TikTok at tiktok.acvpartners.ai said, "You can get a fully automated TikTok shop to make $10,000+ per month" with ACV Partners. The video promises "profit margins of 20% to 50%" and a "triple money-back guarantee." It says CEO and President Will Basta was "featured in Forbes and Business Insider" and claims that ACV is a "certified partner" of TikTok. Here is an image from TikTok:



51. Sometime in 2024, Ascend also morphed into "Ethix Capital," or "Ethix Capital by Ascend." In a marketing video for Ethix Capital captured on June 25, 2024, a spokesperson gives Ascend's standard pitch: "We have over 300 employees that are working day to day operationally, and our founders Will and Jeremy [have] done over 100,000,000 in sales together…."

52. At the same time, as recently as June 5, 2024, Ascend was still using its old standby names. It sent a proposed Buyback Agreement to a client, identifying itself as: "(b) Ascend CapVentures Inc. (**'Ascend'**) (d)[sic] Ascend Ecomm LLC ('**Ascend Ecomm**') (Ascend, and Ascend Ecomm are sometimes collectively referred to as the '**Ascend Entities'**)" (emphasis in original).

53. In July 2024, a salesperson named "Yas," who marketed Ascend Ecom in 2022 and/or 2023, told a consumer he worked for ACV. When the consumer asked if the company used to be Ascend, Yas said "No," and asserted that ACV has nothing to do with Ascend.

***The Ascend Contracts***

54. Once prospective clients have expressed interest in Ascend's program, sales representatives provide a form contract from Ascend.

55. The contract outlines Ascend's duties, including assisting with building a store; assisting with store approvals; researching, selecting, sourcing, and listing products; providing customer support; and providing general oversight of the store.

56. Contracts also outline the fees prospective purchasers will pay for the business opportunity. In addition to an initial payment for the set-up of the stores, the amount of which is based on the number of stores purchased, the contracts usually require clients to pay a "software fee" of about $80-200 per month.

57. The Ascend contracts contain a clause articulating the client's right to request a "buyback" of their store. Typically, the clause states that after 24 or 36 months,

a client can receive the amount of their initial investment less any net profit the client earned from their store, in certain instances, as discussed below. This is an example:

> Option to Request Buyback. After the initial 36-month term, if the Client has not made back their initial service fee of $60,000 in their allocated share of Net Profits, Client has the option to request the Manager to buy the Client's amazon.com account store within a 45-day period following the 36th month. To exercise this buyback option, Client must notify Manager of that election in writing. Manager will refund the remaining portion of the initial service fee that was not recovered by Client from any Net Profit earned from Client's Amazon.com store business, provided that (1) Client has not engaged in any act that interferes or interfered with the operation of the Client's Amazon.com store or of the Manager's services or which would be in material breach of this Agreement, including, without limitation, a suspension of Client's Amazon.com store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises this refund option. The Parties further agree that under no circumstances shall this refund amount exceed the initial service fee. The Client agrees that this Buyback option begins starting on the first sale of the product on the Amazon.com store and it shall only cover the store price and not the price of any add-on services purchased separately by the Client. In case any inventory remains unsold before the end of this Agreement, it is up to the discretion of the Manager to either buy back the inventory with the business or not.

58. Many of the Ascend contracts contain a "Mutual Non Disparagement" clause, which includes the following language:

> The Client agrees to refrain from any disparagement, defamation, libel, or slander of any of the Service, deliverable, Manager or any of their affiliates and agrees to refrain from any tortious interference with the contracts and relationships of any of the Services provided by the Manager.

***Ascend Did Not Provide Required Disclosures and Earnings Claim Statements***

59. Defendants did not provide prospective purchasers with disclosure documents required under the Business Opportunity Rule. Although Defendants routinely made claims to prospective purchasers about likely earnings, they failed to provide prospective purchasers with an Earnings Claim Statement required by the Rule, which includes the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased the business opportunity and achieved the stated level of earnings.

60. Defendants also failed to comply with the Rule's requirements to provide prospective purchasers with written substantiation of earnings claims, and with a list of purchasers and contact information of individuals who purchased the business opportunity within the last three years.

61. Some consumers' requests for a list of current customers were refused. Other customers who asked for current customers' contact information were given a list of between three and ten names of purported existing clients. When these prospective customers called the people on the list, most of their numbers were inactive. Some of the purported Ascend customers are known associates or employees of Ascend.

62. A lawsuit was filed against Ascend on June 15, 2023, (*Langford v. Ascend Ecom LLC*, Case No. 37-2023-25224 (Cal. Superior Ct., San Diego County)) alleging Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Intentional Misrepresentation, False Promise, Negligent Misrepresentation, Violation of California Penal Code §496, Money Had and Received, Unjust Enrichment, Conversion, and Violation of California Civil Code §1812.200 *et seq*.

63. A lawsuit was filed against Ascend on August 1, 2023, (*Watkins v. Ascend Ecom LLC, Will Basta and Jeremy Leung*, Case No. 23STCV-18082, Cal. Superior Ct., Los Angeles County)) alleging Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, Accounting, and Unfair Business Practices. This matter is in arbitration.

64. An arbitration action was filed against Ascend in January 2024 in Miami, Florida on behalf of approximately 30 Ascend customers. The demand for arbitration was withdrawn in February 2024.

65. In no known instance after June 15, 2023, did Ascend disclose that it had been sued. After June 2023, Defendants have typically not provided prospective purchasers with a document stating whether it or any of its prior or affiliate companies, or any of its officers or directors has been subject to civil or criminal action for misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC rule, within the previous ten years.

***Consumers' Experiences After Joining the Ascend Operation***

66. After signing their contracts with Ascend, clients are usually directed to wire their initial payments to an Ascend bank account, typically in the name of Ascend Ecom or Ascend Capventures. Customers who want to make their initial payments by credit card are typically told that Ascend does not accept credit card payments.

67. Although Ascend sometimes purchases inventory with clients' credit cards, they also send invoices instructing clients to pay for inventory either through a wire transfer or a payment processor such as Stripe or Bill.com. While many of the invoices bear Defendants' names, some invoices bear the names of third-party businesses from which Defendants obtained inventory.

68. Ascend's clients often discover that it takes several months until their stores become operational, if they ever become operational at all. Even when clients' stores are established and operating, the stores have sold nowhere near the amount Defendants represented they would before clients signed the contract, and many clients have lost money.

69. When clients ask questions or raise concerns with Defendants about the operation of their stores, Defendants routinely ignore communications and fail to attend scheduled meetings or phone calls.

70. Amazon and Walmart have suspended Ascend clients' stores for violating dropshipping and intellectual property policies. Although Defendants tell their clients they are appealing these suspensions, the process often takes several months, and it appears that Defendants do little or nothing to successfully appeal the suspensions. Many stores are never reactivated and clients ultimately end up with permanently terminated accounts.

71. Defendants often falsely claim to prospective clients and clients that they have authorization to sell branded merchandise.

72. Defendants submitted at least one fabricated "Brand Authorization" letter to consumers and to Amazon, falsely stating that a brand had given permission for a consumer's store to sell its products.

73. Defendants submitted at least one fabricated invoice to Amazon in an unsuccessful attempt to prove that it had legitimately purchased branded merchandise.

74. Once an account is suspended by Amazon or Walmart, any earnings are locked. Thus, some of Ascend's clients are left with large amounts of credit card debt that they are unable to repay with earnings.

75. More recent Ascend clients have had similar experiences on Etsy. Etsy suspended at least one Ascend investor's store in June 2024 for violating its policies related to customer service and communication.

76. After mismanaging its customers' stores, misplacing inventory, using customers' funds to purchase counterfeit goods, and other malfeasance, Defendants have recently referred several of Ascend's customers' accounts for collections actions or reported them to credit agencies. These collections efforts seek purportedly unpaid fees for shipping and inventory, some of which was never delivered. Consumers now worry whether, in addition to being in debt for their investments with Ascend, their credit ratings will be damaged.

***Earnings Claims for the Ascend Business Opportunity Were False or Unsubstantiated***

77. For more than three years, Defendants have advertised and marketed their online e-commerce automation business opportunities to consumers using the earnings claims described above.

78. Even when clients' stores were not suspended or terminated, Defendants sold nowhere near the amount represented in their marketing. After accounting for the initial fee to Ascend, payments for inventory, refunds, credit card fees, and onboarding and operation costs, most Ascend clients lost money. In other words, not only were clients out the money they paid Ascend, but they also suffered further harm from the additional costs of operating the stores. Of 74 known clients for whom Ascend operated e-commerce stores on Amazon.com between January 2021 and May 2024, approximately 19% of clients' stores had no sales at all. Seventeen clients, or 23%, made sales but grossed less than $5,000. In all or most cases the cost of inventory, refunds for cancelled orders, and the price clients paid for Ascend's services ate up all the money clients realized from sales in their e-commerce stores.

***Consumer Complaints***

79. As the scheme continued, numerous consumers complained about their stores failing and asked Ascend for refunds. Individual Defendants Basta and Leung have known about such complaints and refund requests, and they, along with Jonathan Herpy, Ascend's Chief Compliance Officer and Legal Officer, have been involved in Ascend's responses.

80. If Amazon or Walmart suspend or terminate a client's account, Defendants refuse to issue a refund. Through Herpy, Defendants often offer, as an alternative, a replacement store on the same or a different e-commerce platform. Fearful of walking away and losing their hefty initial fee, some clients opt to try a different store or a store owned by Ascend. However, if these stores were created at all, they have typically fared no better than the initial stores.

81. When clients reject the offer of a new store, they communicate with Jonathan Herpy about a refund or resolution of their complaints. After promising to consider the clients' demands and concerns, Herpy typically stops responding to calls and emails and refunds never materialize.

82. Defendants ignore many client refund requests and string clients on for a long time without responding. Some clients have been unable to reach their account managers by phone or email and managers fail to appear for calls and video conferences.

83. The buyback clause of Ascend's contract provides that clients can, in effect, obtain a refund by selling their store back to Ascend if they have not recouped their initial investment within twenty-four months. Despite this clause, Defendants make it exceedingly difficult to obtain a refund even when clients fulfilled the requirements. For example, a day before one client reached their two-year anniversary of joining Ascend, Ascend declared the account delinquent and placed the client in collections. Ascend told one client who invoked the buyback that he had met the requirements, yet he never recouped his money from Ascend. Defendants just stopped communicating with him.

84. To make matters worse, Ascend's contracts provide—often in obtuse language in the buyback guarantee clause—that suspension of a client's store pauses the clock on the guarantee. Multiple store suspensions can therefore result in significant extensions of the 24- or 36-month window for the purported buyback guarantee. Some consumers did not appreciate this tolling provision until they asked for a buyback or struggled with Ascend over suspended stores.

85. In sum, consumers consistently learned that Ascend's buyback process was largely an illusion and its "risk-free" investment opportunity was nothing of the kind.

86. On the rare occasions when Defendants offer a refund, they demand that clients sign a Buyback Agreement that includes a non-disclosure clause prohibiting the client from discussing with third parties their dealings with Ascend. This is an example of a non-disclosure clause in a "buyback agreement" Ascend sent to a client:

> Non-Disparagement: The Parties agree that none of the Parties hereto will disparage, speak ill of, denigrate or damage the reputation of any of the other Parties to this Agreement for any reason and in any form or medium including, without limitation, verbally, in writing, in interview format or by social media. Specifically, this includes, but is not limited to, the Ascend Entities agreeing not to disparage Client, or otherwise take any action which could reasonably be expected to adversely affect Client's personal or professional reputation. Similarly, this includes, but is not limited to, Client agreeing not to disparage the Ascend Entities, or any entities under the Ascend Entities stewardship, inclusive of but not limited to owners, managers, directors, officers, employees, legal counsel, advisors, agents, family, friends, and/or investors, affiliated with the Ascend Entities numerous entrepreneurial ventures and business entities, including but not limited to Ascend Ecomm LLC, and Ascend CapVentures Inc[.] Additionally, within the boundaries of this non-disparagement provision, the Parties mutually agree to refrain from any actions, remarks, or behaviors that are intended to intentionally disrupt, defame, or interfere with the other party's social media presence, profiles, or online reputation, maintaining a decorum of respect and professional courtesy in all digital interactions and representations. Explicitly, Client is prohibited from making any disparaging remarks or posts on platforms including but not limited to Discord, Facebook, Twitter, Reddit, and other public forums or message boards. Moreover, Client further agrees to remove any existing negative postings on any of the aforementioned social networks or any other online platforms. Furthermore, Client is explicitly required to disassociate, disengage, and deactivate from any and all social media servers he/she is currently a member of, and to refrain from joining or engaging in new social media servers that relate to or discuss the Ascend Entities or any associated individuals or ventures. For purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, made about any of the Parties, and said term is meant to be given its broadest and most inclusive reading.

87. Ascend representatives told clients that signing the Buyback Agreement was a prerequisite to receiving any refund from Ascend.

88. Some consumers have sued or entered into arbitration with Defendants.

89. Sometimes when a consumer posts a negative review about Defendants on TrustPilot.com or other online platforms, Defendants pressure the consumer to remove the review and also engage in review suppression tactics.

- After one consumer posted a negative review, his spouse received a text that showed an image of a severed head and that contained detailed information about the consumer's child. It said: "Your husband has angered some people with his ignorance. The type he does not wish to anger. I suggest you have him remove the reviews. He will know what you mean."

- One consumer who removed negative reviews in exchange for a refund received a threatening email from Jeremy Leung in July 2023, claiming that the client had not transferred the store back to Ascend. The email said, in part:

  > [T]he person who bought the store off you is extremely pissed off and is, a little crazy, and has told us they are going to send you a message which I do not know what means. I googled their name and they have some links to Russian organized crime. I'm just lucky they are not holding me accountable, but just wanted to send you a word of warning.

- One consumer repeatedly posted negative reviews on Trust Pilot and the reviews were removed. That consumer eventually crafted a review that Trust Pilot did not take down, and the next day, Ascend shut down its relevant profile on Trust Pilot.

- One consumer received threatening emails from "Ascend Legal," saying his review violated Ascend's Terms of Service.

- Ascend representatives told some consumers that the consumers' negative reviews violated the terms of their contract with Ascend.

- Shortly after posting negative comments about Ascend online, at least one Ascend client was inundated with spam texts that temporarily disabled his phone.

90. Some consumers were intimidated by Defendants' review-suppression conduct and took their reviews down.

91. Other consumers have said they received full or partial refunds from Ascend in exchange for deleting negative reviews and/or signing non-disclosure agreements.

***Dissipation of Ascend Assets***

92. The Ascend operation has dissipated at least $25 million that it took from consumers.

93. Ascend clients' initial start-up fees and subsequent inventory payments were made to Ascend Ecom or Ascend Capventures accounts at JPM Chase. Bank records show that consumers also paid at least $950,000 directly to a company that is not owned by the Individual Defendants but appears to participate in the shell game of Ascend's finances. Once consumers make their initial payment, the money quickly moves to accounts belonging to other entities, most of which are owned by Leung and Basta. Those entities funnel the money to other related entities, to related third parties, or overseas.

94. On numerous occasions, funds are deposited into an account and immediately transferred out; bank records show that these transactions involve millions of dollars and transfers in and out of an account were frequently for identical sums – often to the penny.

95. As such, Ascend does not invest most of its clients' money in the creation and management of clients' ecommerce stores. Rather, a vast amount of clients' money was dissipated.

96. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

**VIOLATIONS OF THE FTC ACT**

97. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

98. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

99. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n).

100. As set forth below, Defendants have engaged and continue to engage in violations of Section 5(a) of the FTC Act in connection with the advertising, marketing, and sale of their business opportunities and services.

**COUNT ONE**

**False or Unsubstantiated Earnings Claims**

101. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' business opportunities, Defendants have represented, directly or indirectly, expressly or by implication, that purchasers of Defendants' business opportunities and Defendants' services are likely to earn substantial income.

102. The representations set forth in Paragraphs 2, 4, 21, 25, 26, 35-40, 46, 49, 50, above, are false, misleading, or were not substantiated at the time the representations were made.

103. Therefore, the representations of Defendants as set forth in Paragraphs 2, 4, 21, 25, 26, 35-40, 46, 49, 50 above, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT TWO**

**Deceptive Claims of "Risk Free" Offer With Buyback Guarantee**

104. On numerous occasions, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' business opportunities, Defendants have represented, directly or indirectly, expressly or by implication, that purchasing

Defendants' business opportunities and Defendants' services is "risk free" and supported by a buyback guarantee.

105. The representations set forth in Paragraphs 30, 40, 41, and 57 above, are false, misleading, or were not substantiated at the time the representations were made.

106. Therefore, the representations of Defendants as set forth in Paragraphs 30, 40, 41, and 57 above, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT THREE**

**Unfairness**

107. In numerous instances, Defendants have used tactics including threats and intimidation to discourage purchasers from speaking or publishing truthful or non-defamatory comments or reviews about Defendants and their services.

108. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

109. Therefore, Defendants' acts or practices as described in Paragraphs 107 and 108 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE**

110. The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities, became effective on March 1, 2012, and has since that date remained in full force and effect.

111. Defendants are "sellers" who, as described in Paragraphs 2, 3, 21 to 5158, have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity. *See* 16 C.F.R. § 437.1(q). Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the

"prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will . . .[p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. § 437.1(c).

112. Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments. In the disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. *See* 16 C.F.R. § 437.3(a)(1)-(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. *See* 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

113. Defendants, as described in Paragraphs 2, 4, 21, 25, 26, 35-40, 46, 49, 50, have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

114. The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time

frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it. *See* 16 C.F.R. § 437.4(a).

115. Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

116. The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. *See* 16 C.F.R. § 437.4(b).

117. The Business Opportunity Rule prohibits sellers from disseminating industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale. *See* 16 C.F.R. § 437.4(c).

118. Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT FOUR**

**Misrepresentations Regarding Income or Profits**

119. In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have misrepresented the number of sales, or gross or net income or profits, a prospective purchaser may earn or that prior purchasers have earned.

120. Therefore, Defendants' acts and practices, as described in Paragraph 119, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT FIVE**

**Disclosure Document Violations**

121. In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments, within the time period prescribed by the Business Opportunity Rule.

122. Therefore, Defendants' acts and practices, as described in Paragraph 121 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT SIX**

**Earnings Claims to Prospective Purchasers Violations**

123. In numerous instances, Defendants have made earnings claims to prospective purchasers in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to provide an earnings claim statement to the prospective purchasers, as required by the Business Opportunity Rule.

124. Therefore, Defendants' acts and practices, as described in Paragraph 123 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT SEVEN**

**General Media Earnings Claims Violations**

125. In numerous instances, Defendants have made earnings claims in the general media in connection with the offering for sale, sale, or promotion of a business opportunity while failing to state in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

126. Therefore, Defendants' acts and practice, as described in Paragraph 125 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT EIGHT**

**Industry Financial, Earnings, or Performance Information Violations**

127. In numerous instances, Defendants have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience, of purchasers of the business opportunity being offered for sale.

128. Therefore, Defendants' acts and practice, as described in Paragraph 127 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(c) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT**

129. The CRFA defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic

means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

130. The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

131. Subsection (b) of the CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. *See* 15 U.S.C. § 45b(b)(l).

132. The CRFA prohibits any person from offering a form contract containing a provision described as void in subsection (b) of the CRFA. *See* 15 U.S.C. § 45b(c).

133. Pursuant to the CRFA, a violation of subsection (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. *See* 15 U.S.C. § 45b(d).

134. Defendants have offered form contracts, as that term is defined in the CRFA. *See* 15 U.S.C. § 45b(a)(3).

**COUNT NINE**

**Violations of the CRFA**

135. In numerous instances, as described in Paragraphs 4, 16, 17, 58, 86, and 89 to 91, Defendants have offered, in the course of selling their business opportunities, form contracts containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

136. Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

**CONSUMER INJURY**

Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity

Rule, and the Consumer Review Fairness Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, and the Consumer Review Fairness Act by Defendants in accordance with Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

B. Grant temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, and the appointment of a receiver.

C. Award monetary and other relief within the Court's power to grant.

D. Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: September 7, 2024

Jody Goodman
Elsie Kappler
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8533
Washington, DC 20580
(202) 326-3096; jgoodman1@ftc.gov
(202) 326-2466; ekappler@ftc.gov
(202) 326-3395 (fax)

Jeffrey Tang
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4303; jtang@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION