```
 1  Jody Goodman (DC Bar No. 404879)
    (202) 326-3096; jgoodman1@ftc.gov
 2  Elsie Kappler (MA Bar No. 562265)
 3  (202) 326-2466; ekappler@ftc.gov
    Federal Trade Commission
 4  600 Pennsylvania Ave., NW, CC-8528
 5  Washington, DC 20580

 6  Local Counsel
 7  Jeffrey Tang (CA Bar No. 308007)
    (310) 824-4303/jtang@ftc.gov
 8  10990 Wilshire Boulevard, Suite 400
 9  Los Angeles, California 90024

10  Attorneys for Plaintiff
11  Federal Trade Commission
```

FILED
CLERK, U.S. DISTRICT COURT
9/9/24
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MRV___ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**,<br>Plaintiff,<br><br>v.<br><br>**Ascend Capventures Inc., et al.**,<br>Defendants. | No. 2:24-cv-07660SPG(JPRx)<br><br>**RULE 65(b)(1) CERTIFICATION AND DECLARATION OF JODY GOODMAN IN SUPPORT OF PLAINTIFF'S EMERGENCY *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AND PLAINTIFF'S *EX PARTE* APPLICATION FOR AN ORDER TEMPORARILY SEALING THE DOCKET AND ENTIRE CASE FILE** |

I, Jody Goodman, hereby declare as follows:

1. I am over twenty-one years of age and a citizen of the United States. I am one of the attorneys representing the Federal Trade Commission ("FTC" or

1

"Commission") in this action against the Ascend corporate defendants, William Michael Basta, and Jeremy Kenneth Leung (collectively, "Defendants").

2. I am a member in good standing of the District of Columbia bar. My work address is Federal Trade Commission, 600 Pennsylvania Avenue, NW, CC-8533, Washington, D.C. 20580.

3. I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1756 in support of Plaintiff's Emergent *Ex Parte* Application for Temporary Restraining Order, Preliminary Injunction, and Other Equitable Relief ("TRO Application") and its request that the temporary restraining order ("TRO") be issued without notice to Defendants. I also submit this certification in support of Plaintiff's *Ex Parte* Application for an Order Temporarily Sealing the Docket and Entire Case File ("Seal Application"), filed contemporaneously with the FTC's TRO Application.

4. Pursuant to Federal Rule of Civil Procedure 65(b)(1), this Court may issue a TRO without notice to Defendants if "(A) specific facts in an affidavit . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed below, Plaintiff has not provided Defendants with notice of the filing of this action or Plaintiff's application for a TRO, and respectfully submits that the interests of justice support Plaintiff's request for the Court to consider its filings *ex parte*.

5. The evidence set forth in Plaintiff's Memorandum of Law in support of its TRO Application and in Plaintiff's more than 3,000 pages of exhibits demonstrates that Defendants have deceptively marketed e-commerce business opportunities throughout the United States and have bilked at least $25 million dollars from consumers seeking to generate income online.

6. Defendants employ deceptive earnings claims to sell these business opportunities, promising consumers that they can quickly generate thousands of dollars in passive income selling goods on third-party e-commerce sites like Amazon.com and Walmart.com. Consumers pay Defendants tens of thousands of dollars for the business opportunity and then must spend further money for inventory and business expenses. Contrary to Defendants' representations, purchasers of Defendants' business opportunities are unlikely to earn the advertised income—and many, in fact, lose money.

7. Defendants also use form contracts that purport to limit purchasers' ability to share reviews or complaints about Defendants and their services, and they further threaten purchasers with lawsuits and refuse to provide refunds to those who will not remove or withdraw posted complaints or reviews.

8. In perpetuating their scheme, Defendants have violated the FTC Act, the Business Opportunity Rule, and the Consumer Review Fairness Act by, among other things, (1) making false or unsubstantiated earnings claims, (2) failing to furnish prospective purchasers with required disclosure documents, (3) using form contract provisions that restrict individual consumers' ability to review Defendants' products, services, or conduct, and (4) using tactics including threats and intimidation to discourage purchasers from sharing truthful comments or reviews about Defendants and their services.

9. Accordingly, Plaintiff seeks an *ex parte* TRO that: (1) enjoins Defendants from making unsubstantiated earnings claims; (2) enjoins Defendants from using form contract provisions or tactics like threats and intimidation that restrict individual consumers' ability to review Defendants' products, services, or conduct; (3) freezes Defendants' assets; (4) appoints a temporary receiver over Corporate Defendants; (5) grants Plaintiff access to Corporate Defendants'

1  business premises and records; and (6) provides for expedited discovery. Plaintiff
2  also requests that the Court require Defendants to make financial disclosures.
3      10.   As described more fully in the TRO Application memo and its
4  accompanying exhibits, the evidence establishes that the FTC is likely to prevail on
5  the merits of its claims against Defendants and Defendants will be liable for
6  consumer injury resulting from their unlawful scheme. Defendants have ample
7  opportunity and motivation to easily conceal and dissipate assets and to destroy
8  important documents: (1) Defendants operate a pervasively fraudulent enterprise
9  dependent on misrepresentations, (2) Plaintiff seeks monetary relief in the form
10  compensation to consumers under Section 19 of the FTC Act, (3) Defendants'
11  assets can be transferred, hidden, encumbered, or dissipated to avoid discovery,
12  and (4) computer equipment and cloud-based software, including equipment and
13  software Defendants use to run their business, can easily be wiped and business
14  records destroyed.
15      11.   The fact that Defendants have caused at least $25 million in financial
16  harm provides potential motivation for them to conceal or dissipate assets, or
17  destroy documents.
18      12.   Defendants disregard court orders and ignore legal process. They have
19  defaulted on at least one lawsuit filed by Ascend clients. Shortly after Defendants
20  received a demand letter and document preservation request from a lawyer
21  representing Ascend clients, Defendants switched communications platforms and
22  cut off clients' access to their Slack communications with Defendants.
23      13.   Defendants persist in their unlawful conduct despite complaints and
24  lawsuits. Defendants failed to respond to consumer complaints about Ascend and
25  ignored complaints forwarded by the Better Business Bureau. Ascend has been
26  sued at least twice by its customers. *See* EX 34. As consumer complaints and
27
28

refund requests multiply, Defendants change the company's name while continuing to operate the same scheme.

14. Basta and Leung have demonstrated their willingness to misrepresent and mislead to avoid accountability. They run a confusing web of interconnected companies to mask their involvement in and control of the scheme. To hide the ownership of corporate domains, they employ a privacy protection service. Although Basta is an owner or officer of each of the Corporate Defendants, when confronted with a complaint and a refund request, Basta falsely told a consumer that he was no longer in control of the company. An agent for Defendants recently told a prospective customer that he had never worked for Ascend. But several of the declarants in this matter state that that same representative had been involved in their dealings with Ascend. Defendants have told some consumers that they would provide refunds but have failed to do so.

15. Basta and Leung appear to use corporate funds for personal or family expenses. Tracing their funds illustrates the web of companies and accounts Defendants have created to conceal their illegal conduct. For example, Ascend Ecom and Eaglemont Capital (a company owned by Leung) transferred more than $150,000 through Australia and New Zealand Banking Group to "Dr" and "Mrs" Leung and unknown beneficiaries. Funds were transferred from an Ascend Ecom bank account to Charles Schwab with a note stating the payments were "for further credit to Jeremy Leung." Payments totaling about $22,000 were made from an Ascend Administration count to "Porsche." In May 2022, about $650,000 was transferred from an Ascend Ecom account to a real estate escrow company. In October 2023, $510,000 was transferred by wire from a bank account owned by Global Marketing Development Inc. dba Ascend Ecom. The next day, a home was purchased for $510,000 in Placer County, CA; one of Defendants' commonly used addresses, 3240 Professional Drive, Auburn CA, is in Placer County.

16. Consequently, if Plaintiff's present filings are not under seal or if, in any manner, Defendants receive advance notice of any aspect of this enforcement action, there is good cause to believe that immediate or irreparable damage will occur to Plaintiff's ability to obtain, and this Court's ability to craft, complete and effective relief. To my knowledge, Defendants are unaware of Plaintiff's TRO Application.

17. Plaintiff has not made Defendants aware of its undercover investigation into their business practices related to business opportunities for good reason. As illustrated by the following examples, it has been the FTC's experience that defendants who engage in deceptive practices and who receive notice of the filing of an action by the FTC often attempt to undermine the FTC's efforts to preserve the status quo by immediately dissipating and concealing assets, destroying documents, or both. Often defendants or their affiliates who have been served with a TRO attempt to remove assets from their financial institutions or conceal offshore assets. The examples below have been identified within the FTC as incidents in which defendants acted in such a manner, and these are provided on information and belief to illustrate the FTC's previous experiences.

    a. In *FTC v. Educare Centre Services, Inc.*, No. 19-cv-196 (W.D. Tex. 2020), after one of the defendants received notice of the TRO, a user logged into the servers of a corporate defendant's subsidiary using the individual defendant's account and altered and deleted numerous case-related records.

    b. In *FTC v. Critical Resolution Mediation LLC*, No. 20-cv-03932 (N.D. Ga. 2020), the FTC sought and obtained an *ex parte* TRO with an asset freeze. Approximately 90 minutes after receiving notice of the TRO, an individual who owned one of the corporate defendants withdrew $120,000 from a corporate bank account.

c. In *FTC v. Cardiff*, No. 18-cv-02104 (C.D. Cal. 2020), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze over a business owned and controlled by an individual defendant already subject to an asset freeze and personal receivership. When he received actual notice of the TRO, but before he was served, the individual defendant rushed to his bank and withdrew $30,000 in cash and money orders from an account in the name of another company he wholly owned and controlled.

d. In *FTC v. Elite IT Partners, Inc.*, No. 19-cv-125 (D. Utah 2019), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze. On the day the FTC served the defendant with the TRO and the receiver assumed control of the premises, the defendant secretly removed from the premises a hard drive containing evidence inculpating the defendant and his companies in a tech support scam. When the FTC discovered that the hard drive was missing, the defendant lied about the contents of the hard drive, and forensic analysis showed that the hard drive had been modified before its return to the receiver.

e. In *FTC v. Hite Media Group, LLC*, No. 18-cv-02221 (D. Ariz. 2018), the FTC sought and obtained an *ex parte* TRO with an asset freeze. On the day the FTC served the defendant with the TRO, he transferred one of his properties to another individual.

f. In *FTC v. Laptop and Desktop Repair, LLC*, No. 16-CV-3591 (N.D. Ga. 2016), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. On the day that the court entered a preliminary injunction with an asset freeze, the same defendant withdrew $103,369 from his personal, online brokerage account and transferred the money to another personal account.

      g.     In *FTC v. Dayton Family Productions, Inc.*, No. 97-cv-00750 (D. Nev. 2013), the FTC obtained an *ex parte* TRO prohibiting defendants from destroying business records and granting the FTC immediate access to such records. The FTC served the TRO on the defendants' employees at a primary office and then discovered the existence of a second office. Upon arriving at the second location, the FTC learned that an employee served with the TRO that morning had already accessed a computer in that location. FTC forensic examiners confirmed that the computer's hard drive was erased in the hours after the employee received the TRO. The data from the hard drive was never recovered.

      h.     In *FTC v. E.M.A. Nationwide, Inc.*, No. 12-CV-2394 (N.D. Ohio 2012), the court denied the Commission's request for an *ex parte* TRO with an asset freeze and required the Commission to serve the defendants before holding a preliminary injunction hearing. Within days of being served, the individual defendants had withdrawn more than $152,000 from a corporate bank account.

      i.     In *FTC v. Global Marketing. Group, Inc.*, No. 06-cv-02272 (M.D. Fla. 2006), the court granted the FTC's *ex parte* motion for a TRO with an asset freeze, which the FTC served on banks known to hold accounts of defendants. After being served with the order, one of the defendants successfully withdrew over $500,000 from accounts previously unknown to the FTC and wired most of the funds to offshore bank accounts.

      j.     In *FTC v. Connelly*, No. 06-cv-00701 (C.D. Cal. 2006), upon learning of the FTC's action, three defendants withdrew at least $800,000 from their bank accounts, most of which was never recovered.

      k.     In *FTC v. National Consumer Council*, No. 04-cv-00474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* TRO with asset freeze and a temporary receiver against all but one of the corporate defendants. An individual defendant then deleted key electronic files on defendants' shared network server by accessing

his account through a computer controlled by the corporate defendant not under receivership.

l.  In *FTC v. Check Investors, Inc.*, No. 03-cv-02115 (D.N.J. 2003), the FTC filed for an *ex parte* temporary restraining order with asset freeze. The court required the FTC to give the defendants 24 hours' notice before holding a hearing on the motion. At the conclusion of the hearing, the court granted the FTC's motion and ordered the defendants' assets frozen. Documents obtained during discovery showed that the defendants had purchased approximately $650,000 in gold coins, bullion, and certificates, of which approximately $192,000 was found. Records showed that on the same day that the court entered the TRO, the individual defendant's wife visited their safe deposit box. The remaining gold was never recovered.

m.  In *FTC v. Physicians Healthcare Development, Inc.*, No. 02-cv-02936 (C.D. Cal. 2002), the defendants were given advance notice of a TRO hearing. Prior to the hearing and entry of the TRO, the defendants removed from the business premises all business records and computer equipment, none of which was recovered.

18.  The following examples have been identified within the FTC as incidents in which an *ex parte* order helped remedy or mitigate defendants' attempts to dissipate assets or destroy documents, and are provided upon information and belief:

a.  In *FTC v. AWS, LLC*, No. 18-cv-00442 (D. Nev. 2018), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After being served with the TRO, one of the individual defendants attempted to dissipate more than $400,000 in violation of the asset freeze by visiting two local banks, purchasing certified checks, and transferring funds to a business associate via wire. A second individual defendant immediately withdrew $2,400 from his credit union upon

learning of the TRO. The defendants' financial institutions alerted the FTC shortly thereafter, in compliance with TRO asset freeze provisions, and the transactions were successfully reversed.

        b.     In *FTC v. Goldman Schwartz Inc.*, No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an *ex parte* TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account. Shortly thereafter, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from an account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all the money.

        c.     In *FTC v. Lakhany*, No. 12-cv-00337 (C.D. Cal. 2012), the day after the court granted the TRO but before the FTC could effect service, the defendant's employee notified the defendant of the FTC's lawsuit and receivership. The individual defendant proceeded to withdraw $204,000 from corporate bank accounts in violation of the asset freeze. The defendant later stipulated to contempt, and most of the funds were recovered.

        d.     In *FTC v. Prime Legal Plans*, No. 12-cv-61872 (S.D. Fla. 2012), upon hearing that the TRO had been granted, the defendants went straight to the bank and transferred $1.7 million in assets to a girlfriend and a mother. The bank was able to claw most of it back, but the Commission, and thus consumers, ended up losing about $200,000.

        e.     In *FTC v. Khalilian*, No. 10-cv-21788 (S.D. Fla. 2010), the FTC sought and obtained an *ex parte* TRO with an asset freeze. Before the asset freeze could be processed by the banks, one of the defendant's employees withdrew large

amounts of money from the company's bank accounts. The defendant eventually returned some, but not all, of the money. Additionally, the defendant attempted to remove assets located in his personal residence. Because the receiver was monitoring the defendant's residence and observed people removing a number of items under cover of darkness, the receiver was able to halt the defendant's activities.

      f.     In *FTC v. Group One Networks, Inc.*, No. 09-cv-0352 (M.D. Fla. 2009), the court granted the FTC's *ex parte* motion for a TRO with an asset freeze, which the FTC served on banks known to hold defendants' accounts. After being served with the order, one of the defendants successfully cashed two $10,000 checks that were installment payments for an undisclosed $50,000 loan. The FTC, through expedited asset-related discovery, was able to identify the loan payments, and the individual defendant subsequently deposited the $20,000 into a frozen bank account to cure any potential contempt of the asset freeze.

      g.     In *FTC v. Data Medical Capital, Inc.*, No. 99-cv-01266 (C.D. Cal. 2009), the FTC moved for contempt and an *ex parte* TRO, including an asset freeze, against certain defendants. One defendant learned of the FTC's contempt investigation and transferred approximately $1 million to a personal bank account before the FTC filed. The receiver, who was appointed in connection with the *ex parte* TRO, traced the money and returned it to the receivership estate.

      h.     In *FTC v. Latrese & Kevin Enterprises, Inc.*, No. 08-cv-1001 (M.D. Fla. 2008), the FTC sought and obtained an *ex parte* TRO with an asset freeze in conjunction with a motion to show cause why the defendants should not be held in contempt. After being personally served with the TRO, one defendant withdrew $17,800 from a frozen bank account the same day. To avoid being held in contempt of the TRO, the defendant returned all but a few thousand dollars.

i. In *FTC v. American Entertainment Distributors, Inc.*, No. 04-cv-22431 (S.D. Fla. 2004), the court entered an order freezing the assets of ten corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because the asset freeze had been in place, the defendant was compelled to return the money.

j. In *FTC v. Unicyber Technology, Inc.*, No. 04-cv-01569 (C.D. Cal. 2004), the FTC obtained an *ex parte* TRO with asset freeze and appointment of a receiver. Shortly after the defendant was served with the TRO, he directed his wife to violate the asset freeze by transferring $405,000 of corporate funds to her father. With the assistance of the receiver, the FTC was able to recover these funds.

k. In *FTC v. Assail Inc.*, No. 03-cv-0007 (W.D. Tex. 2003), the court issued an *ex parte* TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 within hours of being served with the TRO. After contempt proceedings and a lengthy appeal, the defendant was required to repay these funds.

l. In *FTC v. SkyBiz.com, Inc.*, No. 01-cv-00396 (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1 million from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved and ultimately used to provide $20 million for consumer redress.

m. In *FTC v. Leisure Time Marketing., Inc.*, No. 00-cv-01057 (M.D. Fla. 2000), the court entered a TRO against the defendants with immediate access to the business premises. After an individual defendant was served and acknowledged that he was to preserve all assets and documents, that defendant ordered individuals to remove boxes of documents from one of the business premises.

Fortunately, a police officer assisting the FTC in the immediate access saw this activity, and the FTC was able to contact the defendant's counsel and have the documents returned. That individual defendant also attempted to hide certain documents on the business premises in a room where FTC staff was informed that no business records were stored. Because the FTC had been granted immediate access to the business premises, the FTC found these documents.

19. In fulfilling its mandate to combat fraud in interstate commerce, the FTC has requested—and courts have granted—TROs in appropriate cases, including on an *ex parte* basis, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b. *See, e.g.*, *FTC v. Smith*, No. 23-cv-04848 (E.D. Pa. Dec. 8, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, turnover of business records, and expedited discovery); *FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery); *FTC v. Vision Online, Inc.*, No. 23-cv-01041 (M.D. Fla. June 7, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of monitor, immediate access, and expedited discovery); *FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery).

20. For the above reasons, as contemplated by Fed. R. Civ. P. 65(b)(1), there is good cause to believe that immediate and irreparable damage will result to consumers, including the destruction of Defendants' records and the dissipation or concealment of assets, if Defendants receive advance notice of Plaintiff's application for a TRO. Thus, it is in the interests of justice that this Court grant such application without notice.

21. For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if any of the Defendants receive premature notice of the filing of this action. Thus, the interests of justice would be served if the Court grants Plaintiff's Seal Application.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 7, 2024, in Washington, D.C.

**Jody Goodman**
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8533
Washington, DC 20580
(202) 326-3096 / jgoodman1@ftc.gov