1   Jody Goodman (DC Bar No. 404879)
2   (202) 326-3096; jgoodman1@ftc.gov
    Elsie B. Kappler (MA Bar No. 562265)
3   (202) 326-2466; ekappler@ftc.gov
4   Federal Trade Commission
    600 Pennsylvania Ave., NW, CC-8528
5   Washington, DC 20580

6   Local Counsel
7   Jeffrey Tang (CA Bar No. 308007)
    (310) 824-4303/jtang@ftc.gov
8   10990 Wilshire Boulevard, Suite 400
9   Los Angeles, California 90024
    Attorneys for Plaintiff
10  Federal Trade Commission

11

> LODGED
> CLERK, U.S. DISTRICT COURT
> **9/9/24**
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ MRV _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**, <br> Plaintiff, <br><br> v. <br><br> **Ascend Capventures Inc.**, also doing business as Ascend Ecom LLC; Ascend Ecomm LLC; ACV; ACV Partners; Accelerated Ecommerce Ventures; Ascend Distribution LLC; Ethix Capital; and ACV Nexus, a Wyoming close corporation profit corporation, <br> **Ascend Ecommerce Inc.**, also doing business as Ascend Ecom LLC, a Wyoming close corporation profit corporation, <br> **Ascend Administration Inc.**, a California general stock corporation, <br> **Ascend Ecom LLC**, a Wyoming limited liability company, <br> **Ascend Distribution LLC**, a Texas limited liability company, <br> **William Michael Basta**, individually and as officer and/or owner of Ascend | **No.  2:24-cv-07660SPG(JPRx)** <br><br> **FILED UNDER SEAL** <br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE, AND (2) ORDER WAIVING NOTICE REQUIREMENT** |

i

| 1 | Ecom LLC, Ascend Capventures Inc., |
| 2 | Ascend Ecommerce Inc., Ascend |
|   | Administration Inc., and Ascend |
| 3 | Distribution LLC, and |
| 4 | **Jeremy Kenneth Leung**, individually |
|   | and as officer and/or owner of Ascend |
| 5 | Ecom LLC, Ascend Capventures Inc., |
|   | Ascend Ecommerce Inc., Ascend |
| 6 | Administration Inc., and Ascend |
| 7 | Distribution LLC, |
|   | Defendants. |
| 8 | |

1

## TABLE OF CONTENTS

2   I.     Introduction ............................................................................................. 1

3   II.    Statement of Facts ................................................................................... 3

4          A.     The Ascend Business Opportunity Scheme ................................. 3

5                 1.     Ascend's Deceptive Marketing........................................ 3

6                 2.     Clients' Nightmarish Experience After Joining Ascend............ 5

7                 3.     Clients' Complaints and Defendants' Responses ..................... 7

8          B.     Unfair Practices and Contracts with Non-Disparagement

9                 Clauses ......................................................................................... 8

10         C.     The Defendants ........................................................................... 8

11                1.     The Corporate Defendants............................................... 8

12                2.     The Individual Defendants ............................................. 10

13         D.     Consumer Injury ....................................................................... 11

14  III.   Argument................................................................................................ 11

15         A.     The FTC Act Authorizes the Requested Relief........................... 11

16         B.     A Temporary Restraining Order is Appropriate and Necessary ......... 13

17                1.     The FTC Is Likely to Succeed on the Merits ......................... 13

18                       a.     Defendants Have Violated Section 5 of the FTC

19                              Act .............................................................................. 13

20                       b.     Defendants Violated the Business Opportunity

21                              Rule (Counts IV through VIII)....................................... 19

22                       c.     Defendants Violated the Consumer Review

23                              Fairness Act (Count IX) ................................................ 22

24                       d.     The Corporate Defendants Are Jointly and

25                              Severally Liable as a Common Enterprise..................... 23

26                       e.     The Individual Defendants Are Personally Liable......... 24

27                2.     The Equities Tip Decidedly in the Public's Favor................... 25

28

1

    C.     The Proposed *Ex Parte* TRO Is Appropriate ......................................25

2 IV.    Conclusion....................................................................................27

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2       *Cases*                                                                                  *Page(s)*

3       *AMG Capital Management v. FTC*, 593 U.S. 67 (2021) ........................................ 12

4       *Canada Life Ins. Co. v. LaPeter,* 563 F. 3d 837 (9th Cir. 2009) ............................. 27

5       *In re Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319 (F.T.C. 1984) ............... 14

6       *FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ................. 12, 13, 25

7       *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ............................. 12

8       *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ................. 24

9       *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989)), *aff'd,* 644

10          Fed. Appx. 709 (9th Cir. 2016) ....................................................................... 24

11      *FTC v. Automators LLC*, No. 23-cv-01444 (S.D. Cal. Aug. 11, 2023) ................... 12

12      *FTC v. BCO Consulting,* No. 23-cv-00699 (C.D. Cal.) ........................................... 12

13      *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ........................... 11, 25

14      *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ......................... 14, 15

15      *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ............................. 14

16      *FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ........................................... 14, 15

17      *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ................. 14

18      *FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) ................................ 12

19      *FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) .................................. 23

20      *FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ........................................................ 13-14

21      *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) .................... 23, 24

22      *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal.

23          2012) ............................................................................................................. 24

24      *FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681 (C.D.

25          Cal. Sept. 17, 2013) ....................................................................... 14, 16, 25

26      *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ............ 23, 24, 25

27

28

*FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23,
    2021)................................................................................................. 12

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ................................ 11, 14, 16

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) ............................ 24

*FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018)..................... 17, 18

*FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938 (N.D. Cal.
    Nov. 2, 1995) .................................................................................... 15

*FTC v. Simple Health Plans LLC*, 58 F.4th 1322 (11th Cir. 2023)........................ 12

*FTC v. SL Fin.*, No. 23-cv-00698 (C.D. Cal.) ................................................. 12

*FTC v. Southwest Sunsites, Inc.*, 105 F.T.C. 7, *aff'd*, 785 F.2d 1431 (9th Cir.
    1986)................................................................................................ 14

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ................................................ 13, 14

*FTC v. TheFBAMachine,* No. 24-cv-06635 (D.N.J. June 3, 2024) ........................ 12

*FTC v. Vemma Nutrition Co.*, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015) ... 14, 15

*FTC v. Warner Communications Inc.*, 742 F.2d 1156 (9th Cir. 1984)..................... 13

*FTC v. Wealth Educators, Inc.*, No. 2:15-CV-2357, 2015 WL 11439063
    (C.D. Cal. Apr. 6, 2015) .................................................................... 13

*FTC v. Willms*, No. 2:11-CV-0828, 2011 WL 4103542 (W.D. Wash. Sept.
    13, 2011)........................................................................................... 11

*FTC v. World Patent Mktg., Inc.*, No. 17-cv-20848, 2017 WL 3508639 (S.D.
    Fla. Aug. 16, 2017)........................................................................... 17, 18, 19

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ....................... 13, 25

*In re Int'l Harvester Co.*, 104 F.T.C. 949 (1984)...................................................... 17

*LaBelle v. MarineMax Northeast, LLC*, 2024 WL 185434 (D. Mass. January
    17, 2024)........................................................................................... 23

*SEC v. First Fin. Group*, 645 F.2d 429 (5th Cir. 1981) .......................................... 27

*SEC v. Presto Telecomm., Inc.*, 153 Fed. Appx. 428 (9th Cir. 2005) ..................... 27

*State of Washington v. Alderwood Surgical Center, LLC*, No. 2:22-cv-01835-
　　RSM, 2024 WL 1606143 (W.D. Wash. April 12, 2024) ........................ 22, 23

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir.
　　1987) ........................................................................................................ 13


*Statutes and Regulations*　　　　　　　　　　　　　　　　　　　　*Page(s)*

15 U.S.C. § 45(a) ............................................................................... 2, 13

15 U.S.C. § 45(n) .................................................................................... 16

15 U.S.C. § 45b ............................................................................... 2, 22

15 U.S.C. § 45b(a)(3) .............................................................................. 22

15 U.S.C. § 53(b) .................................................................................... 11

15 U.S.C. § 45b(c) .................................................................................. 22

15 U.S.C. 57b(b) ..................................................................................... 12

16 C.F.R. Part 437 .................................................................................... 2

16 C.F.R. § 437.1(c) ................................................................................ 20

16 C.F.R. § 437.1(d) ............................................................................... 20

16 C.F.R. § 437.1(q) ............................................................................... 20

16 C.F.R. § 437.2 .................................................................................... 20

16 C.F.R. § 437.4 .................................................................................... 20

16 C.F.R. § 437.4(b) ............................................................................... 21

16 C.F.R. § 437.4(c) ............................................................................... 21

16 C.F.R. § 437.6 .................................................................................... 20


*Legislative Materials*

H.R. Rep. No. 114-731, at 5 (2016),
　　https://www.congress.gov/congressional-report/114th-congress/house-
　　report/731 .................................................................................... 18

1

2    *Other Sources*                                                                    *Page(s)*

3    Anderson, K. B., "To Whom Do Victims of Mass-Market Consumer Fraud

4    Complain?" at 1 (May 2021),

5    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3852323 ............................. 11

6

7    *Federal Trade Commission, Consumer Review Fairness Act: What*

8    *Businesses Need to Know*, available at https://www.ftc.gov/business-

9    guidance/resources/consumer-review-fairness-act-what-businesses-need-

10   know....................................................................................................................23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF EXHIBITS**

| EX Number | Description | First Page | Last Page |
|:---:|:---|:---:|:---:|
| 1 | Declaration of Sean Ashby, Consumer | 1 | 121 |
| 2 | Second Declaration of Sean Ashby | 122 | 146 |
| 3 | Declaration of Brian Bowen, Consumer | 147 | 202 |
| 4 | Declaration of Dana Budzyn, Consumer | 203 | 336 |
| 5 | Declaration of Jay Greiner, Consumer | 337 | 442 |
| 6 | Declaration of Branden Lathan, Consumer | 443 | 616 |
| 7 | Second Declaration of Branden Lathan | 617 | 638 |
| 8 | Declaration of Julie Maxwell, Consumer | 639 | 707 |
| 9 | Declaration of Brandon Meyer, Consumer | 708 | 778 |
| 10 | Declaration of Paige Muller, Consumer | 779 | 854 |
| 11 | Declaration of Michael Murphy, Consumer | 855 | 903 |
| 12 | Declaration of Whitney Nilsen, Consumer | 904 | 1112 |
| 13 | Declaration of Brian Novotny, Consumer | 1113 | 1175 |
| 14 | Declaration of Jessica Palmisano, Consumer | 1176 | 1401 |
| 15 | Declaration of Anthony Patti, Consumer | 1402 | 1465 |
| 16 | Declaration of Jamaal Sanford, Consumer | 1466 | 1565 |
| 17 | Second Declaration of Jamaal Sanford | 1566 | 1578 |
| 18 | Declaration of Jeanette Schneider, Consumer | 1579 | 1720 |

| EX Number | Description | First Page | Last Page |
|---|---|---|---|
| 19 | Declaration of Chris Walden, Consumer | 1721 | 1870 |
| 20 | Declaration of Leslie Williams, Consumer | 1871 | 1923 |
| 21 | Declaration of Jason Winsor, Consumer | 1924 | 2016 |
| 22 | Declaration of Blanca Yanez, Consumer | 2017 | 2215 |
| 23 | Declaration of Nima Tahmassebi, Consumer | 2216 | 2508 |
| 24 | Declaration of Michael Kelley, Consumer | 2509 | 2528 |
| 25 | Declaration of Kieran Moore, Consumer | 2529 | 2541 |
| 26 | Documents Produced by Etsy | 2542 | 2552 |
| 27 | Documents Produced by the United States Department of State | 2553 | 2631 |
| 28 | Declaration of Elizabeth Anne Miles | 2632 | 2651 |
| 29 | Declaration of Navid Massarat | 2652 | 2698 |
| 30 | Declaration of Tyler Broome | 2699 | 2727 |
| 31 | Second Declaration of Tyler Broome | 2728 | 2743 |
| 32 | Declaration of MariaRosa Cartolano | 2744 | 2779 |
| 33 | Declaration of Blanca Graham Cordova | 2780 | 3054 |
| 34 | Second Declaration of Blanca Graham Cordova | 3055 | 3087 |

1    **MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION**

2    **I.    Introduction**

3    The Federal Trade Commission ("FTC") respectfully requests that the Court

4    bring an immediate halt to Defendants' fraudulent scheme that preys on consumers

5    nationwide with false promises of earning substantial income through "e-

6    commerce" (online stores).[1] Defendants have bilked at least $25 million from

7    consumers seeking to generate income online.[2] Led by William Basta and Jeremy

8    Leung, Defendants lure consumers into investing in a "100% automated" e-

9    commerce business opportunity with promises that it will generate "passive

10    income" and become a "sustainable investment."[3] Defendants claim that they use

11    artificial intelligence ("AI") in proprietary software to enhance their business

12    opportunity. Defendants continue to injure consumers to this day.[4]

13    Defendants have been using deceptive earnings claims to dupe consumers

14    into spending their hard-earned money on an e-commerce business opportunity:

15    operating stores on Amazon, Walmart, and recently, Etsy and TikTok. Using the

16    names Ascend, ACV, Ethix, Nexus, and others, Defendants have sold online

17    business opportunities at prices ranging from $15,000 to $80,000 and more. Atop

18    that initial fee, purchasers must provide tens of thousands of dollars for "working

19    capital" for the online stores Defendants promise to run for them. Some consumers

20    purchase multiple stores.[5] None of the Ascend client declarants made the promised

21    earnings; instead, they lost their entire investment or more.

22    Defendants started their operation as "Ascend Ecom." They have changed

23    the name periodically, including from "Ascend Ecom" to "Ascend Ecommerce"

24

25    [1] The FTC submits 11 volumes of exhibits, including declarations from 19 consumers, in support of this Application. References to exhibits appear as "EX

26    [number], [page]."
    [2] EX 30, 2707.

27    [3] EX 1, 28; EX 18, 1655, 1657.
    [4] EX 22, 2062.

28    [5] EX 11, 856-57; EX 29, 2653.

1

1   and "Ascend CapVentures," "ACV Partners," and recently, "ACV," "Accelerated

2   eCom Ventures," "Ethix Capital by Ascend," and "ACV Nexus."[6] The Ascend

3   entities and operation are referred to collectively as "Ascend." Ascend Capventures

4   Inc., Ascend Ecommerce Inc., Ascend Administration Inc., Ascend Ecom LLC, and

5   Ascend Distribution LLC are also collectively referred to as "Corporate

6   Defendants."

7         Defendants' conduct violates Section 5(a) of the Federal Trade Commission

8   Act ("FTC Act"), 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled

9   "Disclosure Requirements and Prohibitions Concerning Business Opportunities"

10  ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended; and the

11  Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b. *Ex parte* relief is

12  warranted because Defendants continue to harm additional consumers daily.

13  Among other things, they have dissipated assets, hidden behind a maze of

14  confusingly similar business names, and created a web of companies and bank

15  accounts to hide their ill-gotten gains. Thus, the FTC seeks an *ex parte* temporary

16  restraining order ("TRO") that would enjoin Defendants' illegal practices and order

17  ancillary equitable relief, including an asset freeze, appointment of a temporary

18  receiver, immediate access to business premises, turnover of business records,

19  limited expedited discovery, and an order to show cause why a preliminary

20  injunction should not issue. These measures are necessary to prevent continued

21  consumer injury and the destruction of evidence, and to preserve this Court's

22  ability to provide effective final relief, including redress, to the victims of

23  Defendants' scheme at the conclusion of this litigation.

24

25

26

27    [6] EX 1, 64, 70, 109-12; EX 6, 500, 502, 600; EX 7, 626, 630, 634, 638; EX 10, 780-81.

28

## II. Statement of Facts

### A. The Ascend Business Opportunity Scheme

#### 1. Ascend's Deceptive Marketing

When they started their scheme in 2021, Basta and Leung promoted themselves as ecommerce experts who, through their company, Ascend Ecom LLC, would manage clients' Amazon and Walmart ecommerce stores and create thousands of dollars per month in "passive income" for individual clients.[7] Basta, the face of the company, appears in numerous videos[8] and sometimes speaks directly with prospective clients.[9] Ascend's websites feature photographs and videos of Leung, who has met and corresponded with prospective clients.[10] In their online videos, websites, and advertisements, Basta and sometimes Leung boast about their use of AI,[11] high returns on investment,[12] their high standards of ethics and transparency,[13] and that they have a U.S.-based team.[14]

Consumers typically find Ascend through social media.[15] After clicking a link to request more information or schedule an appointment, they are connected with a sales agent.[16] Sales agents provide marketing materials and sometimes a

---

[7] EX 33, 2788-89.

[8] *E.g.*, EX 1, 2-3; EX 6, 144; EX 18, 1582, 1635-49; EX 22, 2018; EX 29, 2654-55, 2677-83, 2685-98; EX 33, 2789, 3020, 3043.

[9] EX 1, 6; EX 6, 445; EX 14, 1177, 1212-24; EX 19, 1724-25.

[10] EX 14, 1177.

[11] EX 2, 126, 129, 145; EX 22, 2062; EX 33, 2929, 3003 (Att Z at 00:28-00:33).

[12] EX 18, 1630, 1653-5; EX 22, 2032-6, 2040-2, 2044-7; EX 33, 2788, 2789.

[13] EX 1, 16; EX 18, 1633-74; EX 33, 2785.

[14] EX 6, 444; EX 33, 2834.

[15] EX 1, 3-7, 8-16, 18-22.

[16] *Id.* Until about mid-2022, Ascend Ecom partnered with Optimyze Digital LLC ("Optimyze"), another ecommerce company, to handle sales and marketing. EX 9, 709,745-47; EX 31, 2729-30; EX 33, 2788, 3021. Optimyze and Ascend were "affiliated," but some prospective customers thought they were working with Optimyze, only to learn through follow-up questions or when they received a contract that they were actually contracting with Ascend. EX 12, 905, 925-27; EX 13, 1114. Bank records show that Optimyze received more than $2.9 million from Ascend Ecom. EX 30, 2712. Optimyze appears to have worked with Ascend until about mid-2022. Optimyze ceased operations sometime after that.

spreadsheet showing projected earnings and a steady growth of both income and the intrinsic value of the projected store.[17]

Ascend's marketing materials, videos, social media posts, podcasts, purported client testimonials, and websites are replete with earnings claims such as:

- "Here's how you can make an extra 100k per month without having to lift a finger"[18]
- "THIS CLIENT JUST HAD THEIR FIRST 25K WEEK. ON TRACK FOR THEIR FIRST 100K MONTH (REVENUE) 9 WEEKS INTO PROGRAM."[19]
- "$424.9K … 2021 SO FAR FOR THIS CLIENT. AIMING FOR THE 7 FIGURE REVENUE YEAR"[20]
- "First 5 figure profit month for this client. We get our clients there in under 6 months."[21]
- "YOU CAN GET A FULLY AUTOMATED TIKTOK SHOP TO MAKE $10,000+ PER MONTH"[22]
- "91K FOR THIS CLIENT AND THE MONTH ISN'T EVEN OVER…"[23]

Defendants' sales agents and marketing materials also emphasize the security provided by their money-back guarantee.[24] Defendants promise that if a client does not earn back their initial investment fee, which typically ranges between $30,000 and $80,000, most commonly within twenty-four months,[25] Ascend will buy back their store for the difference between the investment and the

---

[17] EX 1, 3-4, 40; EX 6, 445, 472-81; EX 8, 640, 646; EX 9, 709-10, 722; EX 14, 1215-17; EX 15, 1403, 1421.
[18] EX 18, 1651-55.
[19] EX 22, 2035.
[20] *Id.* at 2036.
[21] *Id.* at 2039.
[22] EX 33, 2788, 2980, 2995.
[23] EX 18, 1630; EX 22, 2032.
[24] *E.g.*, EX 4, 104-5; EX 6, 444; EX 18, 1668-9; EX 22, 2019-20.
[25] EX 6, 444; EX 9, 709; EX 18, 1580, 1668-69. Some contracts contained buyout terms of 20 (EX 8) or 36 months (EX 22).

amount the consumer has recouped. This "buyback" offer is a big incentive for consumers to invest.[26]

Defendants rarely provide clients with a disclosure document describing the seller's identity, any earnings claims made, prior legal actions, cancellation or refund policies, and previous purchasers of the business opportunity.[27] Defendants refused some consumers' requests for a list of current customers.[28] When Defendants occasionally did provide contact information for purportedly current clients, some of those "clients" turned out to be associates or employees of Defendants.[29]

Defendants' marketing materials and branding suggest and sometimes directly state that Ascend has been endorsed by or featured in business-related online news platforms such as Yahoo and Forbes.[30] This is misleading. Content about Defendants on Forbes and Yahoo is paid, and neither Yahoo nor Forbes has endorsed Defendants.[31] Yet, Defendants' false use of the brands provides an appearance of legitimacy.[32]

### 2.    Clients' Nightmarish Experience After Joining Ascend

Once a consumer is hooked, an Ascend sales agent sends a contract outlining Ascend's duties, including setting up stores; selecting, sourcing, listing, and shipping products; customer support; and general oversight of the store. The client's role is to pay the initial fee, provide working capital for inventory, and receive a portion of the profits. The contract reflects Ascend's claims that its employees will handle daily operations of the store and 99% of the work. The

---

[26] EX 4, 204; EX 18, 1580; EX 33, 2790-91.
[27] EX 4, 205; EX 5, 338 EX 6, 446; EX 9, 710-11; EX 11, 857; EX 15, 1403; EX 22, 2020-21.
[28] EX 1, 5; EX 22, 2020-21.
[29] EX 14, 1177-78; EX 21, 1925.
[30] EX 2, 127; EX 21, 1961; EX 22, 2025; EX 33, 2785, 2936.
[31] EX 24, 2510-11; EX 32, 2745-46.
[32] EX 9, 710; EX 18, 1582.

1    contract also requires that the client have access to a minimum of $15,000 to

2    $30,000 in working capital.[33]

3        After joining, Ascend clients often experience long delays before their stores

4    become operational, if they get off the ground at all. Frustrated clients are helpless

5    as they see Ascend mismanage stores and lose inventory.[34] Amazon and Walmart

6    have suspended many Ascend clients' stores for violating the companies' policies

7    on dropshipping,[35] failing to deliver products to customers,[36] selling counterfeit

8    products,[37] infringing trademarks,[38] and violating intellectual property rights.[39]

9    Etsy, too, suspended the store of an Ascend client for violating Etsy's "handmade

10   policy."[40] When clients reach out to Ascend for the help and support Ascend

11   promised, they are treated to evasion, obfuscation, and lies. Store managers and

12   "customer support" staff tell consumers their problems are unusual, that Ascend is

13   "working on" the problems or "looking into" the whereabouts of lost inventory,

14   and that their store will soon be doing just fine.[41] Consumers report a constant

15   churn of store managers and other Ascend personnel, repeated switches of

16   communications platforms, and long lag times for responses, making effective

17   communication difficult if not impossible.[42]

18       Ascend also uses forged and fraudulent letters and invoices as proof that its

19   counterfeit goods are legitimate. Ascend told one client to buy merchandise at

20   Target and return it; the client understood that Ascend intended to use the inventory

21

22   [33] *See, e.g.*, EX 1, 57; EX 3, 162; EX 5, 347; EX 6, 491; EX 8, 651; EX 9, 733; EX 11, 873; EX 12, 939.

23   [34] EX 1, 6-8; EX 8, 641-3; EX 14, 1179.
     [35] EX 11, 859. Dropshipping occurs when a third party fulfills an order and ships a product directly to the customer, rather than the seller shipping the product.

24   [36] EX 10, 781; EX 14, 1180.

25   [37] EX 3, 150; EX 6, 453.
     [38] EX 5, 340

26   [39] *E.g.*, EX 3, 150; EX 5, 340; EX 14, 1180.
     [40] EX 26, 2545-48; EX 33, 2793.

27   [41] EX 1, 68-104; EX 5, 393-439; EX 6, 500-36; EX 8, 641-3; EX 9, 746-52; 756-78; EX 14, 1250-79, 1293-1312, 1330-96; EX 15, 1404; EX 21, 1965-99.

28   [42] *See, e.g.*, EX 8, 641-42; EX 21, 1926-29.

purchase receipt to prove that the goods were authentic.[43] Ascend submitted a fabricated "brand authorization letter" from Lululemon[44] and a fake invoice for cosmetics to Amazon.[45]

As a result, clients rarely, if ever, achieve the promised results, and most lose money. In fact, consumers' declarations show that, despite having some gross sales in their stores, after subtracting the initial fee, Amazon or Walmart fees, inventory payments, client refunds, credit card fees, monthly subscription and revenue share fees, and operating costs, not only did clients not earn the promised profits, but they lost money.[46]

Data obtained from Amazon corroborates clients' declarations. Of 74 Ascend clients for whom the FTC was able to obtain data from Amazon, 14 (19%) had no sales at all and 17 (23%) had $0.01-$4,999 in gross sales.[47] Sixty-nine percent made sales of less than $15,000.[48] Yet, consumer declarants have spent thousands of dollars each on inventory and other expenses.[49] Because sales do not create profit unless they exceed overhead and costs, none of the 19 declarants made a profit. Based upon clients' reported experiences, information from Amazon about the 19 declarants and 55 other clients, and additional investigation, Ascend clients clearly do not achieve Ascend's promised results and most lose money.

### 3.    Clients' Complaints and Defendants' Responses

Realizing Defendants' misrepresentations and mismanagement, many consumers have complained to Defendants and requested refunds, and some have posted negative online reviews.[50] Both Leung and Basta are involved with

---

[43] EX 10, 780-81.
[44] EX 6, 450-51, 453, 592-98; EX 25, 2530-41.
[45] EX 16, 1470-71, 1562, 1564-65.
[46] EX 6, 455; EX 9, 713-5; EX 14, 1178; EX 16, 1470; EX 19, 1732.
[47] EX 28, 2634
[48] EX 28, 2635.
[49] *E.g.*, EX 3, 148; EX 4, 208; EX 6, 456; EX 8, 644; EX 9, 715; EX 14, 1178.
[50] EX 6, 451-53; EX 13, 116-17; EX 16, 1469; EX 17, 1567-68.

1   Defendants' responses.[51] They offer various proposals to disgruntled clients,
2   usually assuring clients that they will get their stores working or offering them a
3   new store.[52] The resolution typically involves consumers spending more money,
4   but then Defendants do not follow through on their promises.[53]

5        **B.    Unfair Practices and Contracts with Non-Disparagement Clauses**

6        Defendants' complaint-suppression tactics mean that many prospective
7   customers do not see negative reviews. Defendants have demanded that clients
8   remove negative commentary they posted on the internet in order to get a refund or
9   a buyback of their store.[54] Defendants or their proxies have also threatened and
10  intimidated clients who did not take down their reviews, including by bombarding
11  a client's phone with spam text messages.[55] Defendant Leung threatened legal
12  action against a client who initiated a chargeback for $15,000 of lost inventory.[56]

13       Some of Defendants' contracts contain a non-disparagement clause (*see*
14  Complaint at 24, ¶58).[57] Consumers must sign Defendants' form contract to sign
15  up for the business opportunity and typically have no opportunity to negotiate the
16  contract terms. Defendants have also demanded that, in order to get some of their
17  money back under the money-back guarantee, clients must sign agreements that
18  include another non-disparagement clause.[58]

19       **C.    The Defendants**

20            **1.    The Corporate Defendants**

21       As stated in detail in the Complaint, **Ascend Capventures** and **Ascend**
22  **Ecommerce** are Wyoming corporations.[59] **Ascend Ecom** was a Wyoming LLC

23  _____
24  [51] *See id.*
    [52] *See id.*
25  [53] *E.g.*, EX 6, 452-53
    [54] EX 6, 451-53; EX 15, 1405, 1443-48.
26  [55] EX 7, 620; EX 17,1567-68.
    [56] EX 18, 1583-84, 1688-97.
27  [57] EX 14, 1237; EX 21, 1950; EX 22, 2113.
    [58] EX 15, 1405, 1458-59; EX 29, 2653.
28  [59] Complaint at 4, ¶¶ 11, 12; EX 33, 2782.

1    with the same principal address as Ascend Capventures and Ascend Ecommerce. It

2    was formed on or about August 22, 2021, and was dissolved on or about August

3    21, 2023.[60] Though dissolved, Ascend Ecom had an open bank account until at

4    least August 2023, and engaged in financial transactions until at least February

5    2024.[61] The Ascend operation still uses the name "Ascend Ecom."[62] **Ascend**

6    **Distribution** was a Texas LLC. It was formed on October 20, 2021, and its

7    managing member was Ascend Ecom LLC in Wyoming. The State of Texas

8    entered a tax forfeiture against the company on February 23, 2024.[63] **Ascend**

9    **Admin** was a California corporation. It was incorporated on or about October 27,

10    2021, and was dissolved by William Basta on May 2, 2024.[64] As of May 31, 2024,

11    the most recent date for which the FTC was able to obtain banking information,

12    Ascend Admin and Ascend Distribution each had at least one open bank account.[65]

13       The Corporate Defendants operate as a common enterprise,[66] with shared

14    ownership,[67] addresses, phone numbers, and websites,[68] and intermingled

15    finances.[69] The Corporate Defendants are controlled by William Basta and Jeremy

16    Leung, directly or indirectly, and share a common business purpose: to carry out

17    the scheme.

---

[60] Complaint at 5, ¶ 14; EX 33, 2781.
[61] EX 30, 2707.
[62] EX 7, 630; EX 10, 804-05, 807-09, 814-15, 819-20, 839; EX 19, 1864-46, 1868; EX 21, 2010-11, 2013.
[63] Complaint at 5, ¶ 15; EX 33, 2783.
[64] Complaint at 5, ¶ 13; EX 33, 2782-83.
[65] EX 30, 2707.
[66] *See* III.B.1.d., *infra*; EX 30, 33, 2785-89, 2790-92.
[67] EX 33, Each Individual Defendant is an officer, manager, or signatory for multiple Corporate Defendants. EX 30; EX 33.
[68] EX 30, 2701-02; EX 33, 2785, 2794-96.
[69] EX 30, 2713-19. Corporate Defendants have made and accepted payments on one another's behalf and have sent millions of dollars to each other. *Id*.

### 2.    The Individual Defendants

**William Basta** is a co-founder, with Jeremy Leung, of Ascend.[70] He is an owner or officer of each of the Corporate Defendants.[71] Basta is a signatory on bank accounts for all Corporate Defendants.[72] He appears in and narrates advertisements and marketing videos for Defendants' business opportunities, using false and unsubstantiated earnings claims.[73] He speaks with potential purchasers one-on-one to close sales deals and signs consumer contracts on Ascend's behalf.[74] He knows about routine suspensions of Ascend clients' online stores for policy violations, and clients' numerous complaints and requests for refunds.[75] Basta has communicated with Ascend clients to give the appearance of addressing their complaints.[76]

**Jeremy Leung** is the co-founder, with Basta, of Ascend.[77] He is an owner or officer of each of the Corporate Defendants.[78] He is a signatory on bank accounts for all Corporate Defendants.[79] Leung appears in marketing videos for Defendants' business opportunities and communicates directly with consumers about their Ascend accounts.[80] He is aware of routine suspensions of online stores managed by Defendants for policy violations, and clients' numerous complaints and requests

---

[70] EX 1, 70, 27, 95, 99, 102; EX 4, 221, 256; EX 6, 462, 502, 600; EX 10, 839; EX 13, 1172; EX 14, 1192; EX 16, 1492; EX 22, 2070.
[71] *See id.*
[72] EX 30, 2701-04.
[73] EX 1, 2-3; EX 6, 144; EX 18, 1582, 1635-49; EX 22, 2018; EX 29, 2654-55; EX 33, 2789.
[74] EX 1, 6, 67; EX 6, 445-46, 498; EX 11, 881; EX 22, 2117, 2132, 2151.
[75] EX 1, 68-69; EX 6, 500-36, 557-60; EX 13, 1150-62, 1168-69, 1171-72; EX 18, 1583; EX 22, 2140-41.
[76] *E.g.*, EX 6, 446-49; EX 9, 7112; EX 11, 859.
[77] EX 1, 70, 27, 95, 99, 102; EX 4, 221, 256; EX 6, 462, 502, 600; EX 10, 839; EX 13, 1172; EX 14, 1192; EX 16, 1492; EX 22, 2070.
[78] EX 1, 70, 27, 95, 99, 102; EX 4, 221, 256; EX 6, 462, 502, 600; EX 10, 839; EX 13, 1172; EX 14, 1192; EX 16, 1492; EX 22, 2070.
[79] EX 30, 2701-02.
[80] EX 6, 250; EX 18, 1688-95; EX 31, 2729-30.

1   for refunds.[81] He has negotiated complaint resolutions and settlements with

2   consumers on behalf of Ascend and has threatened customers, demanding that they

3   withdraw complaints and remove online reviews as a condition of obtaining a

4   refund from Ascend.[82]

5       **D.   Consumer Injury**

6       The FTC estimates that, in total, Defendants have defrauded consumers of

7   more than $25 million since 2021.[83] The FTC has received 151 complaints from

8   Ascend clients since December 3, 2022; at least seven of them were filed in August

9   2024.[84] The Better Business Bureau forwarded 58 additional complaints to the

10  FTC.[85] Many reported losses of over $50,000 and some lost $80,000 or more.[86]

11  Because the vast majority of frauds are not reported to the government, these

12  figures reflect just a small fraction of the public harm.[87]

13  **III.   Argument**

14      **A.   The FTC Act Authorizes the Requested Relief**

15      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the Court authority to

16  issue an injunction against violation of any provisions of law enforced by the FTC

17  and "any ancillary relief necessary to accomplish complete justice." *FTC v.*

18  *Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (quoting *FTC v. Pantron*

19  *I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)). This ancillary relief can include,

20

21  [81] EX 1, 7; EX 6, 566; EX 13, 1147-8; EX 14, 1293-1312; EX 18, 1583.
    [82] EX 6, 566-67; EX 13, 1171-72; EX 15, 1405; EX 18, 1584.

22  [83] EX 30, 2707-08.
    [84] EX 33, 2794.

23  [85] EX 33, 2794. "Consumer complaints are highly probative of whether a practice
is deceptive . . . ." *FTC v. Willms*, No. 2:11-CV-0828, 2011 WL 4103542, *5

24  (W.D. Wash. Sept. 13, 2011).

25  [86] *E.g.*, EX 11, 861 ($80,000 plus inventory costs); EX 14, 1178 ($90,000); EX
18, 1585 ($70,000); EX 29, 2653 ($200,000).

26  [87] *See* Anderson, K. B., "To Whom Do Victims of Mass-Market Consumer Fraud
Complain?" at 1 (May 2021), available at

27  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3852323 (study showed only
4.8% of people who experienced mass-market consumer fraud complained to a

28  Better Business Bureau or a government entity).

among other remedies, an *ex parte* TRO, a preliminary injunction, an asset freeze, and appointment of a receiver. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999) (TRO and preliminary injunction, both including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987) (TRO and preliminary injunction including asset freeze and appointment of a receiver).

Although asset freezes premised solely on Section 13(b) liability are no longer available in FTC enforcement actions following *AMG Capital Management v. FTC*, 593 U.S. 67 (2021),[88] this action is brought under both Sections 13(b) and 19 of the FTC Act. Section 19 authorizes relief that includes "rescission or reformation of contracts, the refund of money or return of property, [and] the payment of damages," 15 U.S.C. § 57b(b), for violations of FTC trade regulation rules—here, the Business Opportunity Rule and the Consumer Review Fairness Act ("CRFA"). Numerous district courts in the Ninth Circuit[89] and courts throughout the nation[90] have granted injunctive relief like the relief sought here, premised upon an FTC rule, including in enforcement actions brought after *AMG*.

---

[88] In *AMG*, the Supreme Court held that the FTC does not have authority to obtain equitable monetary relief when proceeding solely under Section 13(b) but noted that "[n]othing we say today . . . prohibits the Commission from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers." 593 U.S. at 75, 82.

[89] *See, e.g., FTC v. BCO Consulting,* No. 23-cv-00699 (C.D. Cal.) (granting *ex parte* TRO post *AMG* in action seeking Section 19 relief); *FTC v. SL Fin.*, No. 23-cv-00698 (C.D. Cal.) (same); *FTC v. Automators LLC*, No. 23-cv-01444 (S.D. Cal. Aug. 11, 2023) (same); *FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) (upholding *ex parte* TRO issued in 2020 but challenged after *AMG*).

[90] *See, e.g., FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1329–30 (11th Cir. 2023) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery that was issued in 2018 but challenged after *AMG*, because complaint alleged violations of Section 19); *FTC v. TheFBAMachine,* No. 24-cv-06635 (D.N.J. June 3, 2024) (*ex parte* TRO granted with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) (same).

1    In determining whether to grant the preliminary relief the FTC seeks, the

2  Court must consider two factors: (1) the FTC's likelihood of ultimate success, and

3  (2) whether the public equities outweigh any private equities. *Affordable Media*,

4  179 F.3d at 1233. Unlike private litigants, the FTC does not need to prove

5  irreparable injury. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.

6  1989).[91] Because irreparable injury is presumed, the burden of establishing success

7  on the merits is decreased, and the Court "need only . . . find some chance of

8  probable success on the merits" in order to award preliminary relief. *World Wide

9  Factors*, 882 F.2d at 347 (quoting *United States v. Odessa Union Warehouse Co-

10  op*, 833 F.2d 172, 176 (9th Cir. 1987)). Moreover, when weighing the equities, the

11  public interest should receive greater weight than private interests. *Id.*

12      **B.    A Temporary Restraining Order is Appropriate and Necessary**

13      The evidence shows that the FTC is likely to succeed on its claims that

14  Defendants have violated the FTC Act and the equities weigh heavily in favor of

15  the requested preliminary relief.

16          **1.    The FTC Is Likely to Succeed on the Merits**

17              **a.    Defendants Have Violated Section 5 of the FTC Act**

18      Section 5 of the FTC Act empowers the FTC to prevent "unfair or deceptive

19  acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Defendants'

20  conduct is both unfair and deceptive.

21      "An act or practice is deceptive if first, there is a representation, omission, or

22  practice that, second, is likely to mislead consumers acting reasonably under the

23  circumstances, and third, the representation, omission, or practice is material."

24  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quoting *FTC v. Gill*, 265

25

26      [91] *See also FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1159 (9th Cir.

27  1984); *FTC v. Wealth Educators, Inc.*, No. 2:15-CV-2357, 2015 WL 11439063, at
     *5 (C.D. Cal. Apr. 6, 2015) (FTC faces "more lenient standard" than private

28  litigants).

1    F.3d 944, 950 (9th Cir. 2001)). A misrepresentation may be either express or

2    implied. *FTC v. Figgie Int'l*, 994 F.2d 595, 604 (9th Cir. 1993). A representation is

3    likely to mislead consumers if (1) the express or implied message conveyed is

4    false, or (2) the maker of the representation lacked a reasonable basis for asserting

5    that the message was true. *Pantron I*, 33 F.3d at 1096. *See also FTC v. Lights of*

6    *America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681, at *40 (C.D. Cal. Sept. 17,

7    2013) (holding defendants liable for claims made without adequate substantiation).

8    Where the maker lacks adequate substantiation evidence, the maker necessarily

9    lacks any reasonable basis for its claims. *FTC v. Direct Mktg. Concepts, Inc.*, 624

10   F.3d 1, 8 (1st Cir. 2010).

11        In determining whether a representation is likely to mislead consumers,

12   courts consider the overall "net impression" it creates. *Stefanchik*, 559 F.3d at 928.

13   Claims of "potential" or "projected" earnings or rewards like those made by

14   Defendants state or at a minimum imply that such earnings are representative of

15   what many consumers have achieved. *See FTC v. Vemma Nutrition Co.*, 2015 WL

16   11118111 at *6 (D. Ariz. Sept. 18, 2015); *FTC v. Five-Star Auto Club, Inc.*, 97 F.

17   Supp. 2d 502, 528 (S.D.N.Y. 2000).

18        A representation, omission, or practice is material if it "involves information

19   that is important to consumers and, hence, likely to affect their choice of, or

20   conduct regarding, a product." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201

21   (9th Cir. 2006) (quoting *In re Cliffdale Assocs.*, 103 F.T.C. 110, 165, 1984 WL

22   565319 (F.T.C. 1984)). If consumers are likely to have chosen differently but for

23   the deception, then a misrepresentation is material. *FTC v. Southwest Sunsites, Inc.*,

24   105 F.T.C. 7, 99-101, *aff'd*, 785 F.2d 1431 (9th Cir. 1986). Express claims are

25   presumed to be material, as are claims that go to the central characteristics of a

26   product or service. *Pantron I Corp.*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL

27   5230681, at *41. Defendants' claims are express and they go to the essence of the

28

1  business opportunity. Consumer reliance is presumed if defendants made material

2  misrepresentations that were widely disseminated, and consumers purchased the

3  defendant's product. *Figgie Int'l*, 994 F.2d at 605-6. Defendants widely

4  disseminate their misrepresentations on several social media platforms, YouTube,

5  podcasts, and their own websites.

6       The FTC is likely to prevail on Count I of the Complaint, which alleges that

7  Defendants have violated Section 5 by misrepresenting the amount of income

8  consumers are likely to earn with Defendants' business opportunity. As described

9  above, Defendants falsely tell consumers that they can expect to earn substantial

10  returns by buying into Ascend—including multiple claims that consumers will earn

11  more than $10,000 a month and will build a "sustainable asset." In reality, most

12  consumers make little or no money and many lose much more than their original

13  investment after spending tens of thousands of dollars on inventory that never

14  appears in their stores. Purported "disclaimers" that Defendants have occasionally

15  made in their marketing, such as, "[p]erformance and earnings claims are for

16  illustrative purposes only and should not be interpreted as guarantees or projections

17  of potential income or results,"[92] are inconspicuous, in small font, and do not

18  diminish the impact of Defendants' earnings claims. *See FTC v. Cyberspace.com*,

19  453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net

20  impression it creates even though the solicitation also contains truthful

21  disclosures."). Defendants' representation that consumers are likely to earn

22  substantial income through Defendants' "program" is false or unsubstantiated.

23  Such sham earnings claims are both likely to deceive and material.[93]

24

25      [92] Complaint at 20, ¶ 44; *see also* EX 33, 2941, 2958.

26  [93] "Courts consistently conclude that misrepresentations regarding income potential are material …. [and] deceptive under the FTC Act." *Vemma Nutrition*,

27  2015 WL 11118111, *5 (citing *Five-Star Auto*, 97 F. Supp. 2d at 528-29 & 532-33); *see also FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938, *3-5 (N.D.

28  Cal. Nov. 2, 1995) (misrepresentations about potential earnings were material).

1    The FTC is also likely to prevail on Count II of the complaint, which alleges

2   that Defendants made misrepresentations that purchasing Defendants' business

3   opportunity is "risk free" because of Defendants' buyback guarantee. The

4   guarantee is a major selling point for consumers.[94] But the "risk-free" promise is

5   hollow. Consumers who hemorrhage money and watch their stores struggling are

6   loath to keep throwing money into more inventory, yet Defendants tell them that if

7   they don't invest in more inventory, they will have breached their contract and

8   invalidated the buyback clause.

9    Moreover, consumers are often unaware that Ascend stops the buyback

10   clock when stores are suspended. Thus, when Amazon suspends a store because of

11   Ascend's misconduct, the client's progress towards the end of the buyback period

12   is stalled, sometimes permanently. These factors, plus Defendants' general

13   unwillingness to give refunds, mean that most consumers who have tried to get the

14   promised buyback are unsuccessful.[95] Consumers therefore do not receive the

15   product they thought they had purchased—a guaranteed, successful business

16   opportunity. Defendants' false claims are presumed material for two independent

17   reasons: they are express and they go to the central characteristics of the product.[96]

18    The FTC is likely to prevail on Count III, which alleges that Defendants' use

19   of threats and intimidation to discourage purchasers from speaking or publishing

20   truthful or non-defamatory comments or reviews about Defendants and their

21   services are unfair practices under Section 5 of the FTC Act. Under Section 5, an

22   act or practice is unfair if it "causes or is likely to cause substantial injury to

23   consumers which is not reasonably avoidable by consumers themselves and not

24   outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.

25   § 45(n). In determining whether an act or practice is unfair, the FTC "may consider

26

27   [94] EX 8, 640-41; EX 9, 709; EX 11, 856; EX 12, 905; EX 13, 1114; EX 15, 1403.
     [95] *See supra* Section I.A.
28   [96] *See Pantron I*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41.

1  established public policies." *Id.* Unfairness actions are brought "to halt some form

2  of seller behavior that unreasonably creates or takes advantage of an obstacle to the

3  free exercise of consumer decisionmaking." Unfairness Policy Statement,

4  appended to *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1074 (1984). Courts have

5  determined that complaint suppression tactics like those used by Defendants are

6  unfair under Section 5 of the FTC Act.[97]

7          Here, Defendants have engaged in complaint-suppression tactics that harm

8  both their clients and prospective purchasers of Defendants' services.[98] In a

9  stunning example of harm to clients and prospective clients, one client posted a

10  negative review on TrustPilot, after which the client's spouse received a text with a

11  picture of a severed head and the message:

12          Your husband has angered some people with his
        ignorance. The type he does not wish to anger. I suggest
13          you have him remove the reviews.[99]

14  The client had not posted reviews of any companies other than Ascend.[100] Not only

15  was this terrifying to the client, but the suppression of his honest review deprived

16  prospective clients of accurate information about Defendants.

17          Another example of harm to prospects occurred when an Ascend

18  representative named Jacob told a client that in order to start the buyback process,

19

20

21          [97] *See FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1393 (M.D. Fla. 2018)
    (granting summary judgment to FTC on unfairness count based on contract gag
22  clauses); *FTC v. World Patent Mktg., Inc.*, No. 17-cv-20848, 2017 WL 3508639, at
    *18 (S.D. Fla. Aug. 16, 2017) (granting preliminary injunction to halt defendants'
23  use of threats and intimidation in response to complaints or comments about their
    products, including requests to withdraw or remove negative comments from
24  public sites).
        [98] These unfair practices include Defendants' use of clauses in form contracts that
25  aim to suppress complaints or negative reviews. As discussed below in Section
    III.B.1.c, such provisions also violate the CRFA.
26          [99] EX 16, 1469-70, 1516. The client also received a threatening email from
27  vladkovik@genocide.fun demanding that he "remove all negative reviews [he] has
    left of businesses in the past year on trustpilot and facebook." EX 17, 1567.
28          [100] *Id.* at 1568.

the client needed to remove the negative review he had posted on TrustPilot.[101] Consumers often look to online reviews as reliable indicators of the quality of a product or service, as Ascend's clients did.[102] *See, e.g.*, H.R. Rep. No. 114-731, at 5 (2016), available at https://www.congress.gov/congressional-report/114th-congress/house-report/731. "By depriving consumers of truthful, critical customer reviews and testimonials, Defendants' complaint suppression practices enabled them to deceive more consumers with their misrepresentations and sell more . . . services that they might have otherwise." *World Patent Mktg.*, 2017 WL 3508639, at *15. Accordingly, Defendants' complaint-suppression practices cause substantial tangible harm to prospects as well as clients.

Consumers cannot reasonably avoid this harm—they simply cannot *find* negative reviews that Defendants have suppressed. "It has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions. . . . Some [sellers] may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for comparisons." Unfairness Policy Statement, 104 F.T.C. at 1074. "[W]ithout any or very little access to consumers' negative experiences, prospective buyers . . . are prohibited from making an informed choice. *Roca Labs*, 345 F. Supp. 3d at 1395; *see also World Patent Mktg.*, 2017 WL 3508639, at *15 ("Defendants' consumer complaint suppression tactics keep material, negative information hidden from consumers, and such obstacles make it nearly impossible for consumers to make informed decisions.") (citing Unfairness Policy Statement, 104 F.T.C. at 1074). Consumers thus cannot reasonably avoid the harm caused by Defendants' practices.

---

[101] EX 15, 1405, 1443-48.
[102] *E.g.,* EX 22, 2018.

18

1    Finally, the injury from Defendants' practices is not outweighed by any

2    countervailing benefits to consumers or to competition. As the court in *World*

3    *Patent Marketing* recognized, "existing customers do not benefit from having their

4    complaints suppressed and prospective consumers do not benefit from being

5    denied access to material information." 2017 WL 3508639, at \*16. The net effects

6    of Defendants' complaint suppression "prevent consumers from effectively making

7    their own decisions" and "undermine[] an essential precondition to . . . free and

8    informed consumer transaction[s]." Unfairness Policy Statement, 104 F.T.C. at

9    1074. Moreover, Defendants' practices "hinder competition and harm legitimate

10    competitors in the marketplace." *World Patent Mktg.*, 2017 WL 3508639, at \*16.

11    Here, there are no countervailing benefits to Defendants' complaint suppression.

12    Because the evidence demonstrates that Defendants' complaint-suppression

13    strategy causes harm to consumers that they cannot reasonably avoid and such

14    harm is not outweighed by countervailing benefits to consumers or competition,

15    the FTC is likely to prevail on its unfairness claim against Defendants.

16    **b.    Defendants Violated the Business Opportunity Rule**

17    **(Counts IV through VIII)**

18    The Business Opportunity Rule ("BOR" or "Rule") is designed to ensure

19    that sellers of certain business opportunities, such as Defendants, provide material

20    information about the business before purchasers spend any money, so they can

21    make an informed purchase decision. The Rule defines a "business opportunity" as

22    a "commercial arrangement" in which a "seller solicits a prospective purchaser to

23    enter into a new business"; the "prospective purchaser makes a required payment";

24    and the "seller, expressly or by implication, orally or in writing, represents that the

25    seller or one or more designated persons will …[p]rovide outlets, accounts, or

26    customers, including, but not limited to, Internet outlets, accounts, or customers,

27    for the purchaser's goods or services." 16 C.F.R. § 437.1(c).

28

1        Under the Rule, Defendants are "sellers" who have sold or offered to sell

2  "business opportunities." *See* 16 C.F.R. § 437.1(c) and (q). Their marketing and

3  sale of the ecommerce stores satisfy the first prong of the Rule; the prospective

4  purchaser's initial fee for the store is "required payment." A "designated person" is

5  "any person, other than the seller, whose goods or services the seller suggests,

6  recommends, or requires that the purchaser use in establishing or operating a new

7  business." 16 C.F.R. § 437.1(d). Here, Defendants have said they or one or more

8  designated persons will provide Internet outlets for consumers—the stores—

9  including finding products and suppliers, fulfilling orders, and handling customer

10  service.

11        The BOR prohibits misrepresentations regarding income and profits and

12  requires sellers to provide prospective purchasers with a disclosure document

13  describing the identity of the seller, any earnings claims made, prior legal actions,

14  cancellation or refund policies, and previous purchasers of the business

15  opportunity. 16 C.F.R. §437.2. A violation of the Rule constitutes a violation of

16  Section 5(a) of the FTC Act. 16 C.F.R. §§ 437.2, 437.4, 437.6.

17        Count IV alleges that Defendants have misrepresented the number of sales,

18  or gross or net income or profits, a prospective purchaser may earn or that prior

19  purchasers have earned. Each of the 19 consumer declarants attests that Ascend's

20  representatives and marketing materials made earnings claims and showed profit

21  projections that did not materialize. Data from Amazon corroborates consumers'

22  statements that their stores typically did not have sales that even equaled—let

23  alone exceeded—their investment.[103] Defendants' marketing materials are riddled

24  with misrepresentations.[104]

25

26

27    ―――――――――――――

[103] EX 28, 2634-35.

28  [104] *See supra* Section II.A.

1    Count V alleges, and the declarations prove, that Defendants have not

2    furnished prospective purchasers with a disclosure document and any required

3    attachments within the time period prescribed by the BOR.

4    Count VI alleges that Defendants made earnings claims while (1) lacking a

5    reasonable basis for them; (2) lacking written substantiation for earnings claims at

6    the time they were made; or (3) failing to provide an earnings claim statement to

7    the prospective purchasers. Documentation that Defendants provided to

8    prospective purchasers—and that many consumers erroneously thought constituted

9    substantiation for Defendants' claims—consisted of a sales deck with marketing

10    claims and an earnings projections spreadsheet. That is not substantiation for

11    Defendants' outlandish earnings claims—*and* the forecasts were false.

12    Count VII alleges that Defendants made general media earnings claims

13    without providing the context and support required by the BOR.[105] Defendants'

14    videos, posted on social media platforms Facebook, Instagram, and TikTok,

15    encourage consumers to (for example) "tap into the lucrative TikTok marketplace"

16    where "clients have seen transformative results, launching six and seven-figure

17    businesses effortlessly."[106]

18    Count VIII alleges that Defendants disseminated industry financial,

19    earnings, or performance information in connection with the offering for sale, sale,

20    or promotion of their business opportunity while lacking the requisite

21    substantiation.[107] For example, a recent video says: "Did you know that the e-

22    commerce market is expected to reach a staggering $7.4 trillion by 2025?" The

23    video invites consumers to "unlock your share" of that market with ACV.[108]

24

25

26    [105] 16 C.F.R. § 437.4(b).
27    [106] EX 33, 2788, 2999, 3003, 3012-13.
       [107] 16 C.F.R. § 437.4(c).
28    [108] EX 33, 3002, 3006.

21

1  Nowhere in Defendants' extensive marketing materials is there even a suggestion

2  that Defendants can substantiate this claim.

3      **c.**  **Defendants Violated the Consumer Review Fairness**

4        **Act (Count IX)**

5     The FTC is likely to prevail on Count IX, alleging violations of the

6  Consumer Review Fairness Act, 15 U.S.C. § 45b. The CRFA prohibits the offering

7  of provisions in form contracts that prohibit or restrict individual consumers'

8  ability to communicate reviews, performance assessments, and similar analyses

9  about a seller's goods, services, or conduct; or that impose a penalty or fee against

10  individual consumers who engage in such communications.[109] The CRFA defines

11  "form contract" as "a contract with standardized terms (i) used by a person in the

12  course of selling or leasing the person's goods or services; and (ii) imposed on an

13  individual without a meaningful opportunity for such individual to negotiate the

14  standardized terms." 15 U.S.C. § 45b(a)(3). Section 2(b) of the CRFA renders such

15  contract provisions void. The CRFA prohibits any person from offering a form

16  contract containing a provision described as void in subsection (b) of the CRFA.

17  *See* 15 U.S.C. § 45b(c).

18     The service agreements that Defendants' customers sign are form contracts

19  that prohibit or restrict covered communications under the CRFA. *See State of*

20  *Washington v. Alderwood Surgical Center, LLC*, No. 2:22-cv-01835-RSM, 2024

21  WL 1606143 (W.D. Wash. April 12, 2024) (granting partial summary judgment and

22  finding contract violated CRFA). Defendants use the contracts in the course of

23  selling their business opportunity. And the contracts are typically non-negotiable.

24  Contracts attached to consumer declarations filed with this memorandum appear

25

26

---

27   [109] The policy underlying the CRFA and the unfairness count (Count III) is the same. The unfairness count, however, reaches misconduct beyond the use of form

28  contracts.

1    on their face to be forms.[110] Each client's fee (for the package the client has

2    selected) is filled into a blank left for the number. Consumers state that after they

3    tell Ascend they are ready to join, a sales representative simply sends them a

4    contract to sign.[111] The "Mutual Non Disparagement" clause in the Ascend

5    contracts[112] is very broad, prohibiting "any disparagement" of Defendants or their

6    services.[113] This is precisely the type of contract the CRFA renders unlawful.[114]

7              **d.**     **The Corporate Defendants Are Jointly and Severally**

8                           **Liable as a Common Enterprise**

9         The Corporate Defendants have operated as a common enterprise and thus

10   "each may be held liable for the deceptive acts and practices of the others." *FTC v.*

11   *Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing *FTC v. Network*

12   *Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (shared resources, staff,

13   funds, ownership, and management)); *see also FTC v. J.K. Publ'ns, Inc.*, 99 F.

14   Supp. 2d 1176, 1202 (C.D. Cal. 2000) ("maze of interrelated companies").[115] As

15

16     [110] Several of the contracts attached as exhibits are very similar; some look identical. *Compare* EXs 1, 54; 3, 159; 5, 344; 6, 488; 8, 648; 9, 724; 10, 786; 11, 866; 12, 929; 15, 1423; 16, 1476; 18, 1588; 19, 1767; 20, 1881.

17     [111] EX 3, 158 (Direction to "Click the link to view agreement and sign").

18     [112] Three declarants' contracts contained this clause. *See* EX 14, 1237; EX 21, 1950; EX 22, 2113.

19     [113]"The Client agrees to refrain from any disparagement, defamation, libel, or slander of any of the Service, deliverable, Manager or any of their affiliates and agrees to refrain from any tortious interference with the contracts and relationships of any of the Services provided by the Manager." EX 22, 2113.

20

21     [114] *See Federal Trade Commission, Consumer Review Fairness Act: What Businesses Need to Know*, available at https://www.ftc.gov/business-guidance/resources/consumer-review-fairness-act-what-businesses-need-know; *see also Washington v. Alderwood Surgical Center,* 2024 WL 1606143 at *4; *LaBelle v. MarineMax Northeast, LLC*, 2024 WL 185434 at *1 (D. Mass. January 17, 2024) (denying defendant's motion for summary judgment where plaintiff sought declaratory judgment that contract violated CRFA; non-disparagement clause in form contract stated buyer "would not make disparaging comments in the media, on the internet, or in 'any source likely to result in publication'").

22

23

24

25

26     [115] Courts weighing a claim of common enterprise consider non-exclusive factors such as whether the companies were under common ownership and control; whether they pooled resources and staff; whether they shared marketing and phone numbers; and whether they jointly participated in a common venture and benefitted from a shared business scheme. *Network Servs.*, 617 F.3d at 1136, n.6 and 1143.

27

28

1   shown in the declaration of FTC investigator Blanca Graham Cordova (EX 33) ,

2   the Corporate Defendants share ownership, addresses, phone numbers, and

3   websites. Defendants use their names interchangeably: emails from Ascend

4   Capventures sometimes come from an @ascendecom.com address[116]; marketing

5   materials for ACV might also be branded "Ascend"[117]; a video marketing Ethix

6   Capital has images from an Ascend video used at least a year prior.[118] Likewise,

7   the Corporate Defendants commingle funds.[119] The Corporate Defendants operate

8   for a common, singular purpose: executing the scam at issue here. Each of the

9   Corporate Defendants is therefore liable for the total injury caused by the scam.

10              **e.     The Individual Defendants Are Personally Liable**

11          The Individual Defendants are liable for injunctive relief because they

12   directly participated in the unlawful acts or had control over the acts. They are

13   liable for monetary relief because they knew of the unlawful acts.[120] As shown in

14   Section II.C.2 above, the Individual Defendants are officers and owners of the

15   Corporate Defendants through which they execute the scam, and so should be held

16   to have control and knowledge of the scheme's fraudulent activity.[121] The

17

18   [116] *See* EX 1, 102, 109, 115, 119; EX 4, 292, 317-8; EX 6, 566, 615-16; EX 7,
     630-32; EX 8, 705-07; EX 10, 800, 804-06, 808-12, 814-18, 819, 841-44; EX 13,
19   1172; EX 14, 1243-44; EX 16, 1559-60; EX 18, 1694-96, 1709; EX 22, 2136-38,
     2141.
20   [117] EX 2, 139-46; EX 10, 851-4; EX 22, 2057-63.
     [118] EX 29, 2654 and Att G at 03:44-59, 07:07-34, 12:04-32, 20:23-21:00.
21   [119] EX 30, 2713-14.
     [120] An individual defendant is liable (1) for injunctive relief if he directly
22   participated in the unlawful acts or had some control over the acts, and (2) for
     monetary relief if he also possessed actual or constructive knowledge of the
23   unlawful acts. *Network Servs.*, 617 F.3d at 1138-39; *FTC v. Publ'g Clearing
     House*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).
24   [121] "Status as a corporate officer is sufficient to establish individual liability."
     *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal.
25   2012) (granting summary judgment for FTC) (citing *FTC v. Amy Travel Service,
     Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)), *aff'd*, 644 Fed. Appx. 709 (9th Cir. 2016);
26   *J.K. Publ'ns*, 99 F. Supp. 2d at 1204 ("[S]tatus as a corporate officer and authority
     to sign documents on behalf of the corporate defendant can be sufficient to
27   demonstrate the requisite control."); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp.
28   1080, 1089 (C.D. Cal. 1994) ("Authority to control the company can be evidenced

1  Individual Defendants control and participate in the unlawful acts, and have actual

2  or constructive knowledge that they are unlawful.[122] They are therefore personally

3  liable, jointly and severally, for the total injury caused by their scam. *See*

4  *Commerce Planet*, 815 F.3d at 600.

5             **2.**    **The Equities Tip Decidedly in the Public's Favor**

6        "[W]hen a district court balances the hardships of the public interest against

7  a private interest, the public interest should receive greater weight." *Affordable*

8  *Media*, 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347). The

9  public interest in this case is compelling—halting unlawful and injurious conduct

10  and preserving assets for restitution to injured consumers. Defendants, by contrast,

11  have no legitimate interest in continuing their scam.[123]

12        **C.**    **The Proposed *Ex Parte* TRO Is Appropriate**

13        The FTC has filed this action to stop the Defendants' unlawful conduct and

14  to obtain restitution for their victims. If Defendants receive advance warning of the

15  FTC's action, they are likely to dissipate assets or destroy evidence, which will

16  frustrate the Court's ability to grant relief.[124]

17        Ascend's business is riddled with fraud. Not only is it premised on a lie

18  about the essence of its product—the income consumers will likely earn—its

19

20  by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.").

21  [122] The knowledge element is satisfied if the individual was recklessly indifferent to the possibility the business was fraudulent or was aware of a high probability

22  that the business was engaged in fraud and intentionally avoided learning the truth. *Network Servs.*, 617 F.3d at 1138-39. A showing that an individual has willfully

23  ignored warning signs can meet this standard. *Id*. at 1141 (finding reckless indifference for ignoring "numerous warning signs" including "multiple customer

24  complaints" and "suspicious financial practices"). Similarly, "awareness of consumer complaints is sufficient to establish" knowledge. *Lights of Am.*, 2013 WL

25  5230681, at *50.

26  [123] *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent

27  representation or preserve their assets from dissipation or concealment") (quotation marks omitted).

28  [124] *See* Certification and Declaration of Counsel, filed herewith.

business, day in and day out, is to lie to and cheat its customers. Ascend's employees and representatives tell clients that their stores' struggles are anomalous, but data provided by Amazon shows that problems are in fact the norm.[125] Defendants repeatedly change their name, likely so consumers won't see negative reviews. Defendants use a web of corporations and bank accounts to hide their money.[126] All of this points toward likely dissipation of assets.

Ascend's transitions among communications platforms, and their timing, suggest that Ascend cannot be relied upon to preserve documents. In November 2023, attorney Nima Tahmassebi sent a demand letter to Ascend's Chief Compliance Officer and Legal Officer, Jonathan Herpy, seeking redress for 31 Ascend clients and, *inter alia*, requesting that Ascend preserve all documents and electronically stored information in anticipation of litigation or arbitration.[127] Mr. Herpy responded on December 6, 2023, saying Ascend would comply with the preservation demand. Eight days later, however, on December 14, 2023, several clients told Mr. Tahmassebi they had received an email from Ascend informing them the company was switching from Slack to email for communications. The clients were locked out of their Slack accounts and therefore could not preserve their own communications. Mr. Tahmassebi immediately emailed Mr. Herpy to ensure that the clients' Slack communications were preserved. Mr. Herpy did not respond.[128]

To preserve the possibility of effective final relief, including restitution to the consumers who have collectively lost millions of dollars to Defendants' fraud, the proposed *ex parte* TRO would: (1) freeze the Individual and Corporate Defendants' assets; (2) appoint a temporary receiver over the Corporate

---

[125] *See generally* EX 28.
[126] EX 30, Tables 1, 2, & 3.
[127] EX 23, 2219-20.
[128] *Id*. at 2221-22.

1    Defendants; (3) grant the FTC and the temporary receiver immediate access to

2    Defendants' business premises; and (4) provide for limited expedited discovery.

3         Appointing a temporary receiver is critical. Where corporate defendants and

4    their managers and officers have engaged in deception, "it is likely that, in the

5    absence of the appointment of a receiver to maintain the status quo, the corporate

6    assets will be subject to diversion and waste to the detriment of" consumers

7    victimized by the fraud. *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir.

8    1981); *see also Canada Life Ins. Co. v. LaPeter,* 563 F. 3d 837, 845 (9th Cir. 2009)

9    (receiver appropriate to avert "danger of substantial waste and risk of loss"); *SEC*

10   *v. Presto Telecomm., Inc.*, 153 Fed. Appx. 428, 430 (9th Cir. 2005) (receiver

11   "necessary to prevent further dissipation of [defendant's] assets and to protect the

12   interests of its investors"). The receiver will help ensure that the Corporate

13   Defendants do not dissipate their ill-gotten gains by identifying and securing their

14   assets and records, and may also help determine the full extent of the fraud and

15   identify victims.[129]

16        Accordingly, the FTC requests that this Motion be filed under seal and that a

17   TRO be issued without prior notice to Defendants, and that the FTC and the

18   temporary receiver be granted immediate access to the business premises, to

19   prevent Defendants from moving, destroying, or secreting evidence and dissipating

20   or concealing assets.

21   **IV.    Conclusion**

22        For all the foregoing reasons, the FTC respectfully requests that the Court

23   grant this Motion, issue the proposed TRO, and require Defendants to show cause

24   why a preliminary injunction should not issue against them.

25

26

27

28   [129] *See id.*

1

Respectfully submitted,

2

Dated: September 9, 2024



3

4

**Jody Goodman**
**Elsie B. Kappler**
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580
(202) 326-3096 / jgoodman1@ftc.gov
(202) 326-2466 / ekappler@ftc.gov
(202) 326-3395 (fax)

5

6

7

8

9

**Attorneys for Plaintiff**
**Federal Trade Commission**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28