# Revenue Goal for Your Stores

On Amazon Marketplace, the most important variable for growing a store is the availability of working capital.

Because Amazon pays you for your sales every two weeks, you need access to Working Capital to place inventory orders and purchase from wholesalers or manufacturers in-between payouts. Product inventory sells within 30 days and average margins are 20% net on inventory spend.(30K inventory will yield 6K net).

With our partnerships such as Amex and fundwise we help our clients build their pool of working capital to scale their stores to full capacity

**\*Numbers per store - $25k working capital (have by month 3-4 the latest)**

## $ 5 Figure monthly profit

With the correct working capital, the goal is to get you there within the first 12-16 months at most

## Fast Results:

Average break-even in 12 – 14 months

## $50k-$100k

Average store valuation at year two (range due to rev model valuation)

ASCEND

# TWO YEAR TIMELINE

Build an asset you can sell at the 24 Month mark for an exit.
Or keep the cash cow driving monthly passive revenue.

Your call!




| 1 Month | 1 Year | 2 Years | 2-3 Years |
|---|---|---|---|
| Store set-up go live, stores are live within 1st mo | Break-even point, 12-16 mo avg. break even point across 100+ stores | Money-back Guarantee, If you do not see net profit, full money back at 24 mo | Years: Sell or Scale, Sell for 2-4x annual revenue or scale for monthly $$ |

A S C E N D

Digital Real Estate

# It's not just sales that can make money in eCommerce anymore - You can sell your mature store for a big pay-day

While most investors and entrepreneurs have known about the growth of eCommerce in the last decade. its the new wave of money entering the discussion that is making eCommerce store owners big profit.

For perspective: You can sell your store to a buyer on Empire Flippers for 2-4x annualized profit within two years, where the buyer purchases 100 stores and IPOs for 20-30x annualized profit. That's a lot of room for profit on both sides!

Thrasio - the fastest US company to reach a $1B valuation - led the charge of, to date, 28 companies acquiring established eCommerce stores (specifically Amazon FBA). This flagship model has surged the demand for quality stores, and our programs are designed for our clients to enter on the ground level and sell big into this wave within a two year timeline.

MORE INFO ON THRASIO

Thrasio Reaches **$1B** Valuation

# Pricing

Programs for all budgets. All include money-back guarantee. The more you spend upfront, the higher level of diversification you establish.

Ask us about our custom offerings, private label add-ons + Walmart packages



**Amazon FBA Store Base**
**$20K**

Online arbitrage FBA
Profit share fee~50%

**Amazon FBA Store hybrid**
**$30K**

Wholesale, Online
Arbitrage ~FBA Hybrid
Profit share fee~40%

**Amazon FBA Store Hybrid**
**$ 5K**

Wholesale, Online
Arbitrage ~FBA Hybrid
Profit share fee~35%

**Premier FBA Hybrid Package**
**$ 4...**

Wholesale, Online
Arbitrage - FBA Hybrid
Profit share fee~30%

*Portfolios of $30k+ qualify for exclusive warehouse tours at our Dallas Facility

ASCEND



# Thank You

For more information please contact your Ascend Ecom representative, or message us via email, website, or social!

WWW.ASCENDECOM.COM

EX 15
1419

# Attachment B



Attachment C

**EX 15**
**1422**



# Amazon FBA Management Agreement

**Prepared for:**
Anthony Patti
**Created by:**
Ascend Ecom LLC

Document Ref: UO6TS-CKYKR-6CBWT-SMLZV

# 1. Services & Deliverables

The Manager agrees that it shall provide the Client with Management services including the skills, guidance, expertise, know-how, and deliverables for which it is commissioned.

As part of this Management agreement, the Manager agrees to the following deliverables:

| Services (from Manager) | Cost (to client) |
|---|---|
| Amazon Store Build + FBA product sourcing | $40000 |
| Amazon Store Management + Growth | 30% Of Monthly Net Profits" |
| Reseller Certificate | $50.00-100.00 |
| Ungating | $5,000 |
| Private Label Product ( Optional) | N/A |
| Monthly Software fee (subject to change, first two months waived) | $89-$300 |

By signing this Consulting Agreement, it is the agreement of both parties that the services and deliverables listed above represent an accurate scope of work as defined by the terms of this agreement.

**AMAZON MASTER SERVICES AGREEMENT**

This Amazon Master Services Agreement (this "Agreement"), dated and effective as of the last date identified on the signature page below to this Agreement ("Effective Date"), is entered into by and between Ascend Ecom LLC, a Wyoming Limited Liability Company (hereafter referred to as "Manager"), and the individual or entity set forth on the signature page attached hereto (hereafter referred to as "Client").    Manager and Client are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

**BACKGROUND**

WHEREAS, Amazon.com is a website that allows users to buy and sell products. Amazon.com uses an infrastructure that permits, buying, selling, storage, and shipping.

WHEREAS, Manager is engaged in providing Amazon.com seller account management services. Manager desires to provide Client with  Amazon.com seller account management services, and Client is willing and desires to retain Manager to provide Amazon.com seller account management services as outlined in this Agreement.

NOW, THEREFORE, for and in consideration of mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties here to, intending to be legally bound, hereby agree as follows:

# AGREEMENT

## 1. MANAGER SERVICES

**1.1   Services.**   The Manager agrees to provide, but is not limited to, the following services to fully prepare, manage, and operate a Amazon.com store on behalf of Client:

· Amazon.com Store Approval Services

· Reseller Certificate Services

· Product research, sourcing, selecting and listing of products for sale on amazon.com

· Sourcing Wholesale Contracts on behalf of client,  (tracked via CRM)

· Handling customer service, returns, issuing refunds, bookkeeping, and handling all issues that arise concerning Client's Amazon.com seller account including customer claims, chargebacks, and negative feedback

· Provide oversight of the store and its financial performance and provide proper billing for account management services as described in Section 2.5.

· In the rare and unlikely event Client's amazon.com store becomes suspended, Manager will handle all duties to reinstate store for active sales, but there are no guarantees of reinstatement.  If amazon.com permanently suspends Client's store for any reason, Manager will build Client another e-commerce store (whether that be another amazon.com store, Walmart Store or other) at no additional cost.

The Manager retains the right to provide and use an outside contractor at the Manager's discretion without notifying the Client as long as the services are being provided as stated above (the "Services").

**1.2  Independent Contractor Status.** The Parties are not entering into a partnership or joint venture by virtue of this Agreement. In all matters covered by this Agreement, Manager will act as an independent contractor. Accordingly, Manager will not be required to devote its full time to representing Client. Manager may perform the same or similar services for others, as well as engage in any other business activities.

**1.3  Non-Exclusive Services.** Manager's services hereunder shall not be exclusive to Client, and at all times Manager shall be free to perform the same or similar services for others, as well as to engage in any and all other business activities, provided that such other activities do not interfere with Manager's services to Client hereunder.

**1.4  No Financial Responsibility.** In no event shall Manager be responsible for payment of any kind or any other obligation under Client's credit cards or working capital, all of which payment obligations shall be solely that of Client.  Manager also does not provide financial or tax advice to Client.

**1.5  Best Efforts.** Manager will service Client in a professional manner and to the best of its abilities. Manager cannot and does not guarantee the outcome of its services. Manager cannot and does not guarantee that Client will generate a certain amount of income.

## 2. CLIENT REQUIREMENTS

**2.1 Account Setup Requirements.** Prior to Manager's performance of the Services outlined above, Client shall assist Manager with establishing a Amazon.com seller account (the "Account") to be owned by Client and prepare and execute the necessary documentation and fulfill all other requirements necessary in order to establish Manager and its representatives as an "authorized user" on the Account, with full access and privileges to the Account.

**2.2 Access to Working Capital.** Client will use best efforts to obtain and maintain, for the duration of this Agreement, credit cards issued through the United States federally insured banking institution or other working capital with a minimum credit line of at least $30,000 USD to be used to purchase goods for resale on Client's amazon.com store.  Client shall notify Manager if Client uses this credit / working capital for any reason outside the scope of this agreement.  This minimum credit must be maintained and fully accessible to Manager throughout the duration of the term in order for the buyback guarantee to remain valid.  Client must provide the Manager with credit/debit card and billing information for the Manager to fulfill orders and monthly supplier / third party software and Amazon.com professional seller fees. Client shall pay off the credit cards / working capital fully to the extent possible from

Amazon.com store revenues within 3 business days after Amazon.com remits payments to Client, typically every two weeks.

**2.3 Initial Service Fee.**    Client will pay Manager an initial service fee of $    45000                USD, of which $  45000      is due upon signing of this agreement to initiate Manager's services to build Client's Amazon.com store and obtain Amazon.com store approval, in conjunction with Section 2.1 above.   This initial service fee is fully refundable if client is unsuccessful  obtaining approval to become an Amazon.com Seller.   Manager is not obligated to initiate any work until this upfront service fee is paid by Client.

**2.5 Ongoing Compensation.**    Manager provides ongoing services to maintain and operate Client's Amazon.com store in exchange for a commission share of Net Profits, as defined below. Commission is payable on all net compensation/profits when it is received by Client or by any third Party on Client's behalf minus returns & supplier software cost. Manager will provide the Client with a written statement of account showing the net compensation/profits received by Manager on Client's behalf and the expenses (if any) incurred by Manager under this Agreement. Client's payment to Manager is due upon receipt that is earned from selling on Amazon.com.

**2.6 Optional Payment for Additional Profit Share.**    After Client's Amazon.com store has been operational for at least 3 months, Client has the option to pay Manager an additional $5,000 to reduce Manager's ongoing compensation commission share by 5%.    Client may additionally offer to pay Manager an additional $5,000 for another 5% commission share, which Manager has sole discretion whether to accept.  To enact this optional payment to reduce Manager's commission share, Client must submit this notice in writing and submit payment to Manager no less than 30 days prior to enactment, but in all cases the change in Manager's commission share will be enacted at the beginning of the following month after 30 days from Client's written request.

**2.7 Store Access and Functionality.**  Client must provide Manager with full access to its Amazon.com account via Amazon.com's "User Permissions" to grant Manager "admin access" to the Amazon.com account.  Unless Manager provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the amazon website or in other written materials made available to Client, and (ii) Client shall not allow its Store to remain shut down for more than sixty (45) days during the term of this Agreement.

**2.8 Engagement.**  Client agrees to not engage any other person or entity to act for Client in the same capacity in which Client has engaged Manager for Amazon.com account management services or

Document Ref: UO6TS-CKYKR-6CBWT-SMLZV

otherwise. Client shall reasonably inform Manager of inquiries concerning Manager's services so that Manager may advise Client whether the same are compatible with and in the interests of Client's.

**2.9 Entity Formation.** Client is responsible for any business formation/management concerning its own affairs, including but not limited to: entity formation, obtaining an employer identification number, and obtaining a resale certificate.

## 3. TERM, TERMINATION, AND REFUND OPTION

**3.1 Term and Termination.**   The initial term of this Agreement will be for 24 months to begin once Client's Amazon.com store has been approved and launched with products actively listed for sale.  The term shall pause if for any reason the Client's Amazon.com store becomes suspended or no longer active, or if client is not providing at least $30,000 in working capital monthly for inventory after the 6 month mark since launch, the term will then continue to run once Client once again has an active ecommerce store operating with products actively listed for sale and sufficient working capital of $30,000.  The term will automatically renew for an additional 12 months, unless Client or Manager provide written notice of termination for any reason with 60 days notice.

 **3.2 Option to Request Buyback.**  After the initial 24-month term, if the Client has not made back their initial service fee of $  40000        in their allocated share of Net Profits, Client has the option to request the Manager to buy the Client's amazon.com account store within a 45-day period following the 24th month.  To exercise this buyback option, Client must notify Manager of that election in writing.  Manager will refund the remaining portion of the initial service fee that was not recovered by Client from any Net Profit and "cash back" credits earned from Client's credit cards used on Client's Amazon.com store business, provided that (1) Client has not engaged in any act that interferes or interfered with the operation of the Client's Amazon.com store or of the Manager's services or which would be in material breach of this Agreement, including, without limitation, a suspension of Client's Amazon.com store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises this refund option.   The Parties further agree that under no circumstances shall this refund amount exceed the initial service fee.

**3.3 Client's Sale of Store.**  If Client decides to sell the store to a buyer at any time during or after term of agreement, Manager will provide a " transitional period" of 45 days where Manager will provide business plan and educational /transfer services of Amazon operation to said buyer as well as assistance in sourcing a buyer. Manager will be owed 10% commission of the sale of the store.

## 4. NET PROFIT STATEMENT

**4.1    Statement of Invoice.**  Clients will receive a statement with an invoice on the first of the month detailing Client's Net Profits and Manager's commission share to be paid by Client. Payment to Manager from Client will be due no later than 5 days (five days) from receipt of invoice. If client fails to pay within 5 days (five days) a late fee of 5% (five percent) will be incurred on payment due.

**4.2 Net Profit.**  Net Profit is defined as total sales, less cost of goods sold, less Amazon.com professional seller fees, less supplier / third party software costs, multiplied by the commission percentage as per Section 2.5 of this Agreement.

**4.3 Seller Fees and Software Costs.**  The Amazon.com professional seller fees and supplier / third party software costs are taken into account within the Net Profit calculation before Manager's commission rate as stated in Section 2.5 is applied. Amazon.com professional seller fees are outlined on Amazon.com's seller website and are not subject to Manager's control.  The supplier / third party software costs start at $0/month for the first 30 days but are not guaranteed to remain constant throughout the term.

## 5. DEFAULT

**5.1 Manager Default.**   Manager will not be liable or deemed in default under this agreement for any failure to perform or delay in performing any of its obligations due to, or arising out of any act not within its control, including, without limitation, unexpected Amazon Seller Central termination or suspension of clients store by Amazon.com.  No refunds will be given; Client will be provided alternative options such as a new ecommerce store with no upfront commission cost.

**5.2 Client Default.**  Client shall be considered in default and material breach of this contract if it engages or permits any conduct that results in Manager being unable to access Client's Amazon.com account for a period of three (3) days, or does not pay Manager the ongoing commission share earned within thirty (30) days of invoice.

## 6. MISCELLANEOUS

**6.1 Authority to Act.**  Client authorizes Manager to act for Client by doing the following: product research; listing products for sale; fulfilling orders when products are sold; handling customer service; handling returns; issuing refunds; bookkeeping; and handling all issues that arise concerning Client's Amazon.com account including A to Z claims, chargebacks, and negative feedback.

**6.2 Rescission and Refund.**  Client is entitled to a three (3) calendar day rescission period and entitled to cancel the contract. After the three (3) calendar day rescission period has passed the Client will not be entitled to a refund.

**6.3 Assignment.**   Neither Client nor Manager has the right to assign this Agreement or any rights or obligations under the Agreement without the express written consent of the other, except that Manager may assign this Agreement without Client's consent to any firm, corporation or other entity of which Manager is an officer, partner, employee, or consultant.

**6.4 No Encumbrances.**   Each Party warrants that it is free to enter into and to perform under this Agreement and to grand the rights, options, powers and privileges herein granted, and to perform every service described in this Agreement, and neither Party is a party to any presently existing contract, nor has or will have any obligation, that would interfere with full performance of the terms of this Agreement.

**6.5 Indemnification.**   In the event that either Party hereto does not fully perform or cause to be performed any agreement or obligation undertaken by such Party hereunder (the "Indemnitor"), the Indemnitor agrees to indemnify, defend and hold the other Party hereto (the "Indemnitee") harmless from any and all claims, demands, actions, judgments and awards against the Indemnitee by third Parties in connection with such non-performance. In connection with the foregoing indemnity, the Indemnitee agrees to give the Indemnitor prompt written notice of any claim against the Indemnitee. Further, the Indemnitor shall not be liable for such indemnity unless such claim has been adjudicated in a court of competent jurisdiction and reduced to a final adverse judgment, arbitrated pursuant to any agreement requiring arbitration and resulting in a final binding award, or settled with the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

**6.6 Additional Services.**  All services outside the scope of this Agreement that are requested by Client and which Manager agrees to perform will be billed at a separate negotiated rate.  Client will be notified and must approve in writing additional services before they will be performed, although Manager may not necessarily be able to inform Client in advance of the total cost of such additional services.  These additional services include but are not limited to; dropshipping, private label , additional wholesale brands.

**EX 15**
**1430** Page 8 of 10

**6.7 Limitation of Liability.**  Manager shall not be liable for any incidental, consequential, indirect or special damages, or for the loss of profits or business interruptions caused or alleged to have been caused by the performance or nonperformance of Manager's services.  Client agrees that, in the event that Manager is determined to be liable for any such loss, Client's sole remedy against Manager is limited to a refund of payments made by Client for services, less expenses paid to subcontractors or to third parties.  Manager is not responsible for errors which result from faulty or incomplete information supplied to Manager by Client.   Client also agrees to not seek damages in excess of the contractually agreed upon limitations directly or indirectly through suits by or against other parties.  Manager shall not be liable to Client for any costs, damages or delays due to causes beyond its control, expressly including without limitation, unknown site characteristics; changes in policies, changes in terms of service, and viruses.

**6.8 Disputes and Governing Law.**  The Parties agree that any dispute regarding this Agreement, and any claim made by Client for return of fees paid to Manager, shall be handled in accordance with applicable State and Federal Laws.  This Agreement and the rights and obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the laws of Sheridan County in the State of Wyoming applicable to contracts made and to be performed wholly within such state.

**6.9 Arbitration.**  Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, on behalf of the Client shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**6.10 Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force and effect. Any amendment to this Agreement shall be of no force and effect unless it is in writing and signed by the Parties.

**6.11 Severability.**  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, and shall not in any manner affect the remaining provisions hereof in such jurisdiction or render any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**6.12 Independent Counsel.**  The Parties acknowledge that they had the right and adequate time to have independent legal counsel of their own choosing review and advise on this Agreement prior to

**EX 15**

**1431** Page 9 of 10

execution.

**6.13 Counterparts.**  This Agreement may be executed in one or more counterparts.  All such counterparts shall constitute one agreement binding on the Parties notwithstanding that both of the Parties are not signatories to the original or same counterpart. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the Parties. The Agreement shall be considered executed and binding once one of the Parties possesses an Agreement that expresses signatures by all Parties.

By signing below, the undersigned acknowledge reading, understanding, and agreeing to the terms of this Agreement thereby causing it to be executed once signed by all Parties.

**IN WITNESS WHEREOF**, by the execution of both parties below, this consulting agreement is declared valid and will form a part of the Contract in conjunction with any other relevant documents and agreements presented on behalf of either party.

**Client**

X        *Anthony Patti*

By:      Anthony Patti

Date:    2022-03-15

**Ascend Ecom LLC**

X

By:      Ascend Ecom LLC

Date:    2022-03-15

Document Ref: UO6TS-CKYKR-6CBWT-SMLZV

# Signature Certificate

Reference number: UO6TS-CKYKR-6CBWT-SMLZV

| Signer | Timestamp | Signature |
|---|---|---|
| **Anthony Patti**<br>Email: ▊▊▊▊▊ | | |
| Sent:<br>Viewed:<br>Signed: | 03 Mar 2022 18:49:30 UTC<br>03 Mar 2022 22:08:49 UTC<br>15 Mar 2022 21:57:15 UTC | *Anthony Patti*<br>IP address: ▊▊▊▊<br>Location: San Diego, United States |
| **Will Basta**<br>Email: will@ascendecom.com | | |
| Sent:<br>Viewed:<br>Signed: | 03 Mar 2022 18:49:30 UTC<br>03 Mar 2022 18:49:36 UTC<br>16 Mar 2022 19:34:09 UTC | IP address: 49.145.245.44<br>Location: Cagayan de Oro, Philippines |

Document completed by all parties on:
16 Mar 2022 19:34:09 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



Attachment D

**Ascend Ecom**
1309 Coffeen Avenue, Suite 2784
Sheridan, WY 82801
8453990676

# INVOICE

| | |
|---|---|
| **Invoice #:** | 031622-02 |
| **Invoice Date:** | 03/16/22 |
| **Amount Due:** | $45,000.00 |

**Bill To:**

Tony Patti
United States

| **Due Date** |
|---|
| 03/19/22 |

| Item | Description | Quantity | Price | Amount |
|---|---|---|---|---|
| AMZ Automation | Amazon Wholesale Services | 1 | $40,000.00 | $40,000.00 |
| AMZ Ungating | Amazon Ungating Service | 1 | $5,000.00 | $5,000.00 |

Bank Details:
Chase
Account Name: Ascend Ecom LLC
Account Number: �no 7352
Routing Number:
▭ (if ACH or direct deposit)
▭ (if wire)
Address:
1309 Coffeen Avenue, Suite 2784
Sheridan, WY, 82801

| | |
|---|---|
| **Subtotal:** | $45,000.00 |
| **Sales Tax:** | $0.00 |
| **Total:** | $45,000.00 |
| **Payments:** | $0.00 |
| **Amount Due:** | $45,000.00 |

To pay online, go to https://app02.us.bill.com/p/ascendecom

Attachment E

×   **Payment out # P22031602 - 7167081**                                      More actions  



‹ Previous Payment                                                          Next Payment ›

| Processed | Sent | Received |
|-----------|------|----------|
| 03/17/22 | 03/21/22 | 03/22/22 |

EPAYMENT   CLEARED

## USD 45,000.00 ePayment to Ascend Ecom
PAYMENT OUT # P22031602 - 7167081

| PROCESS DATE | ARRIVAL DATE  *i* | TOTAL PAYMENT AMOUNT |
|--------------|-------------------|----------------------|
| 03/17/22 | 03/22/22 | USD 45,000.00 |

| PAID FROM | MEMO | TOTAL VENDOR CREDITS APPLIED |
|-----------|------|------------------------------|
| | Inv #031622-02 | USD 0.00 |

ACCOUNT
No account specified

| REFERENCE ID | BANK ROUTING NUMBER | BANK ACCOUNT NUMBER |
|--------------|---------------------|---------------------|
| 025MHEJCVJ6H3ST | | |

### PAID BILLS

| INVOICE # ⇕ | CHART OF ACCOUNT ⇕ | DUE DATE ⇕ |
|-------------|--------------------|-----------|
| 031622-02 | | 03/19/22 |

**EX 15**
**1437**



**WALZON LLC**
29707 Foliage lane
Katy, TX, 77494
13198576670
Account number ▮▮▮▮▮▮▮▮▮
Routing number ▮▮▮▮▮ (paper & electronic)
Wire Transfer ▮▮▮▮▮ (wires)
SWIFT Codes:

# Invoice
Submitted on 01/26/2024

**Invoice for**
Nice Products LLC

**Delivery Address**
Nice Products LLC

**Invoice #**
35250172702346A
**Due date:**
02/02/2024

| Row Number | Company Name | Description | Qty | Unit price | Total price |
|---|---|---|---|---|---|
| | | Variety Products For FBA | 5000 | $5.00 | $25,000.00 |
| | | FBA 1 Unit Prep | 5000 | $1.00 | $5,000.00 |

**Notes:**
Ascend Tax Exempt Number ▮▮▮▮▮▮▮ 9941-6 App ied

"By paying inventory with credit card, c ient agrees not to initiate a chargeback or credit card dispute. In the event a client files a credit card dispute, Ascend Capventures will authorize the refund of inventory money and this act will be considered as chargeback fraud and the client's contract will be rescinded immediately with absolutely no refunds issued." Delivery Time 10-20 Business Days after Invoice is paid.

| | | |
|---|---|---|
| | Subtotal | $30,000.00 |
| | Tax | $0.00 |
| | | **$30,000.00** |

**EX 15**
**1438**

# Anthony Patti

San Diego, CA

@gmail.com

April 3, 2024

Will Basta & Jeremy Leung
Ascend E-commerce
Ascend CapVentures
ACV Partners

To Whom It May Concern,

I am writing to formally request the initiation of the contractually obligated buyback of my business as outlined in our agreement dated 22 March, 2022, due to the failure to meet the agreed-upon performance benchmarks. Despite considerable efforts, the business has not achieved the set benchmarks, necessitating the invocation of the buyback clause, specifically section 3.2 of the contract which states "Client has the option to request the Manager to buy the Client's amazon.com account store within a 45-day period following the 24th month."

I am hopeful for a resolution by 30 April, 2024 and look forward to your swift response and cooperation towards an amicable resolution.

Sincerely yours,

Anthony Patti



**Nice Products**
8 messages

**Tony Patti** [redacted]@gmail.com>                    Wed, Jun 5, 2024 at 12:53 PM
To: buyback@ascendecom.com

See attached.

📄 Ascend Buyback Letter.pdf

Tony

Sent from my mobile phone.

**Tony Patti** [redacted]@gmail.com>                    Wed, Jun 5, 2024 at 12:56 PM
To: buyback@ascendecom.com

Also confirmation of deleting my review per your text message.



12:54



# Anthony

United States  |  ✅ VERIFIED USER

| 0 | 0 | 0 |
|---|---|---|
| ☆ Reviews | 👁 Reads | 👍 Useful |

# Write your first review

Share your experience! Your feedback will empower others to shop with confidence and help companies improve.



EX 15
1442

12:55

< 4

+1 ( )

Text Message
Today 12:27 PM

Hello Anthony ,

Jacob here , administrative team from the executive team at Ascend. My job is to help mediate and clean up past client concerns. We noticed that you reviewed a sister company of Ascend online. We understand you've had some issues with communication and getting your buyback.

We apologize that your buyback requests were not addressed promptly.

While there was a delay here, we are ready to start the process for

**EX 15**
**1443**

you. Normally, it can take up to 30 days, but we will expedite yours to 15 business days for the audit, assessment, and exit agreement terms to be presented to you for your buyback.

For us to begin, and in accordance with company policy and compliance reasons, we need you to remove the review(s) as it

 Text Message 




**12:55**

+1 (

For us to begin, and in accordance with company policy and compliance reasons, we need you to remove the review(s) as it pertains to a different company and is against our TOS.

Once the review is removed, please reply with confirmation here and as well, please send your formal written buyback request to buyback@ascendecom.com. We will then set up a close-out call to discuss the buyback results and terms. This will be scheduled within 15 business days of receipt of both of the above.

Thank you.

Jacob
Admin to Executive team

Which review do you want me to remove? Sent me a link.

Send*

12:54

★ Trustpilot

+ Text Message

12:55

4

+1 (

Admin to Executive team

Which review do you want me to remove? Sent me a link.

Send*



Never mind. I know what you want.

Reviews are deleted and I have sent the letter to the email address above.

Tony

Sent from my mobile phone.

[Quoted text hidden]

**Tony Patti** [REDACTED]@gmail.com>                                    Mon, Jun 10, 2024 at 6:14 AM
To: buyback@ascendecom.com

I've done everything you asked. When can we schedule the close out call?

Tony

Sent from my mobile phone.

[Quoted text hidden]

**Buy Back Ascend** <buyback@ascendecom.com>                            Fri, Jun 14, 2024 at 7:02 AM
To: Tony Patti [REDACTED]@gmail.com>

Hi Tony,

Thank you for your response. We are conducting an audit on your store now. If you could please share the amount you are showing on your end as owed it will allow us to expedite the process with cross referencing. Thank you!

[Quoted text hidden]

---

**Tony Patti** < ████████ i@gmail.com>                                Fri, Jun 14, 2024 at 8:13 AM
To: Buy Back Ascend <buyback@ascendecom.com>

Hello,

The audit was completed on May 9, 2024: Client Copy of Nice Products LLC | P&L Account Audit & Analysis

According to the audit, our total loss is -$1,952.85.  There has been no activity on my store since the audit was completed.

Adding to the $45,000 I've paid Ascend/ACV, that makes the total owed for a buyback **$46,952.85**

Tony Patti

[Quoted text hidden]

 **Client Copy of Nice Products LLC _ P&L Account Audit & Analysis - Google Sheets.pdf**
1092K

---

**Tony Patti** ████████ @gmail.com>                                Mon, Jun 17, 2024 at 11:08 AM
To: Buy Back Ascend <buyback@ascendecom.com>

Hello

Following up.

When can we schedule a call to discuss buyback terms?

Tony

Sent from my mobile phone.
[Quoted text hidden]

---

**Buy Back Ascend** <buyback@ascendecom.com>                        Fri, Jun 21, 2024 at 6:12 AM
To: Tony Patti ████████ @gmail.com>

Hi Tony,
Your buyback has been approved! We have sent the contract with the terms via email, please let us know if you have any questions.

Best Wishes,
Ascend Buyback Team
[Quoted text hidden]

---

**Tony Patti** < ████████ @gmail.com>                                Fri, Jun 21, 2024 at 8:02 AM
To: Buy Back Ascend <buyback@ascendecom.com>

Signed today at 8AM Pacific.
[Quoted text hidden]

**EX 15**
**1449**

Attachment F

EX 15
1450

**CONFIDENTIAL BUYBACK AGREEMENT**

**AND GENERAL RELEASE OF ALL CLAIMS**

This Confidential Buyback Agreement and General Release of All Claims (this "**Agreement**") is made and entered into by and between (a) Anthony Patti ("**Client**"), on the one hand, and (b) Ascend CapVentures Inc. ("**Ascend**") (d) Ascend Ecomm LLC ("**Ascend Ecomm**") (Ascend, and Ascend Ecomm are sometimes collectively referred to as the "**Ascend Entities**"), on the other hand. Client, Ascend, and Ascend Ecomm are referred to collectively herein as the "Parties" and are referred to individually herein as a "Party."

**RECITALS**

WHEREAS, to avoid the cost, distraction, and uncertainty of litigation, the Parties have conducted an arm's-length negotiation through counsel and have concluded that it is in their respective best interests to compromise, settle, and resolve all disputes between them in accordance with the terms of this Agreement; and,

WHEREAS, the Parties have determined that the Buyback contemplated herein is fair, reasonable, adequate, and in the best interests of all Parties; and

WHEREAS, as part of their business relationship, the Client participated in the Ascend CapVentures Inc.'s Buyback Program, which provides a mechanism for clients to recover their Initial Services Fee ("ISF") if their Net Profits do not meet the ISF amount within the first 36 months of their Store Opening; and

WHEREAS, the Client has fulfilled all necessary conditions to enact the Buyback Program, including maintaining their Store operations, providing required funds for inventory, and complying with all terms of the Services Agreement; and

WHEREAS, it has been determined that the Client's total Net Profits within the first 36 months after the Store Opening were less than the ISF, thereby entitling the Client to a Buyback

**EX 15**
**1451**

CONFIDENTIAL

payment under the terms of the Buyback Program; and

WHEREAS, the Parties acknowledge that the Buyback payment will serve as the settlement amount to resolve all disputes related to the Client's participation in the Ascend CapVentures Inc. services and Buyback Program.

NOW, THEREFORE, in consideration of the promises, representations, and covenants set forth herein, the Parties agree as follows:

<u>**AGREEMENT**</u>

1.      **<u>Effective Date</u>:** This Agreement shall be binding upon each Party upon execution and shall take effect as of the date on which the last of the Parties executes a copy of the Agreement (the "**<u>Effective Date</u>**").

2.      **<u>Fixed Buyback Payment</u>:** The Ascend Entities agree to pay the Client an amount determined under the terms of the Buyback Program (the "Fixed Buyback Amount"). The Fixed Buyback Amount is calculated as the difference between the Initial Services Fee ("ISF") paid by the Client and the total Net Profits generated by the Client's Store within the first 36 months after the Store Opening, as detailed below:

a.   Initial Services Fee ("ISF") paid by the Client: <u>$45,000</u>.

a.   Total Net Profits generated within the first 36 months: <u>$-1,952.85.</u>

a.   Difference (Fixed Buyback Amount): <u>$46,952.85.</u>

a.   The Fixed Buyback Amount shall be paid in full via wire transfer to the Client on or before 90 days from signature.

**EX 15**
**1452**

CONFIDENTIAL

a.  In no event shall the Fixed Buyback Amount be less than or greater than the calculated difference between the ISF and the total Net Profits, as stipulated in subsection (a) above.

a.  The Fixed Buyback Payments shall be paid via wire transfer to the following account, or such other account as is designated in the future by Client.

Coastal Community

Nice Products LLC

| | |
|---|---|
| Bank Name: | |
| Account Name: | |
| Account Number: | N/A |
| Routing or ABA Number: | N/A |
| Reference: | |
| Swift Code: | |

3.    Transfer of Interests in Assets: Upon the receipt of the Fixed Buyback Payment as detailed in Section 2(a), the Client unequivocally and irrevocably transfers, assigns, and conveys all rights, titles, interests, claims, and ownership pertaining to any and all assets. For the purposes of this agreement, "Assets" are defined as: (i) any tangible or intangible items or rights associated with or arising from any past, present, or future contracts or agreements between any of the Ascend Entities and the Client, (ii) any and all products, goods, or services linked to Amazon, Walmart, or other platforms, irrespective of their current status - whether identified, researched, procured, or otherwise sourced, and/or (iii) this explicitly includes Amazon store(s) with ID Nice Products LLC, Walmart listings, or any related identifications with other platforms. Client undertakes to ensure the immediate, complete, and unobstructed transfer of all such Assets to the Ascend Entities, as specified by the Ascend Entities. This entails providing all essential credentials, information, permissions, and fulfilling any other conditions necessary to guarantee a smooth transition. The Client further agrees not to stake any future claims, demands, or assertions of interest over these Assets. Any delay, resistance, or hindrance instigated by the Client during this transfer process will constitute a breach of this agreement.

4.        No Claim of Ownership, Management, Investment Characterization, or Business Opportunity: Client agrees that, as of the Effective Date, he has no claim or right to any ownership, economic, equitable, and/or other beneficial interest or management rights in the Ascend Entities or its subsidiaries, affiliates, successors (by merger, acquisition, asset sale, or otherwise) or assigns, whether now in existence or hereinafter acquired, except for any claims or rights that arise after the Effective Date due to the actions or omissions of the Ascend Entities, changes in the law, or other circumstances not contemplated by this Agreement. Furthermore, Client acknowledges and agrees that, notwithstanding any prior representations or characterizations, any money paid to the Ascend Entities was not an "investment" as defined under the U.S. Securities Exchange Act of 1934 and the regulations promulgated thereunder, specifically Rule 501 of Regulation D [17 CFR 230.501] or any other applicable provisions of the U.S. Securities and Exchange Commission (SEC) regulations. Additionally, Client recognizes that this arrangement does not constitute a "business opportunity" as defined by the Federal Trade Commission (FTC) in the Business Opportunity Rule, 16 CFR Part 437. In the event that it is later discovered and/or determined that Client does own such an interest, Client agrees to take whatever steps may be necessary to transfer or convey, at the Ascend Entities' expense, such an interest or right to the Ascend Entities or its subsidiaries, affiliates, successors (by merger, acquisition, asset sale, or otherwise) or assigns for no additional consideration. Client further agrees to cooperate with the Ascend Entities and its subsidiaries and affiliates to promptly effectuate any transfer of any such interest which may be held by Client.

5.        Indemnification:  The Ascend Entities hereby agree to indemnify, hold harmless, and defend Client (including the payment of reasonable legal fees and expenses as they arise) against any and all judgments, claims, liabilities, or damages arising from or related to any issues, legal or otherwise, associated with the Amazon store previously managed or operated by the Ascend Entities on behalf of Client, provided that such issues did not result from the Client's gross negligence, willful misconduct, or breach of any laws or regulations. This indemnification extends to issues concerning products that were

purchased, allocated, or sold on the Amazon store under the direction or management of Client and or the Ascend Entities. This includes, but is not limited to, any act performed or omitted to be performed in connection with the store and its product transactions, as well as the right of advancement to reasonable attorneys' fees incurred in connection with the defense of any threatened or actual claim, suit, proceeding, or action.

6.        <u>Successors and Assigns:</u>  Except as set forth herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, assigns, heirs, and administrators.  The Ascend Entities (for itself and all of its affiliates and subsidiaries) agrees that it shall not assign its rights under this Agreement or sell substantially all of its assets to a third party until the Fixed Buyback Payment has been made unless (a) the third party ("**<u>Third Party</u>**") is capable of performing the Ascend Entities obligations under this Agreement, (b) the Third Party  memorializes in writing its agreement to be bound by this Agreement, and (c) the Ascend Entities provides the Third Party's executed acknowledgement to Client within five (5) business days of any transaction subject to this Section 6.  The Ascend Entities acknowledges that, if a court of competent jurisdiction finds the Third Party to not be capable of performing the Ascend Entities obligations under this Agreement ("Ruling"), then Client's remedies will include either (1) the rescission of any transaction subject to this Section 6, or (2)  payment of any and all outstanding Fixed Buyback Payment, accelerated and whether or not due and owing as of the time of a third party transaction that is within the parameters of this Section 6,  within then (10) business days of any Ruling. Notwithstanding anything to the contrary herein, the Parties explicitly acknowledge and agree that this Agreement does not create, and shall not be construed as creating, any personal liability or personal guarantee on the part of any signatory, officer, director, or agent of the Ascend Entities. In the event of any bankruptcy, insolvency, or similar proceedings involving the Ascend Entities, the enforcement of this Agreement shall be limited to the assets of the Ascend Entities, and no recourse shall be had against any individual person or their personal assets.

7.     **<u>Consideration and Release of Claims:</u>** For good and valuable consideration, as described throughout this Agreement, the sufficiency of which is hereby acknowledged by all Parties, as of the Effective Date, all claims are fully and completely settled and released, as well as any claims or counterclaims that could have been brought:

a.     <u>Client Release Parties And Ascend Entities Release Parties</u>: As of the Effective Date, Client, for him/herself and on behalf of his/her respective past, present and future heirs, executors, administrators, members, managers, directors, employees, attorneys, advisors, agents, insurers, successors and assignees, (the "**Client Release Parties**"), do hereby forever release and discharge the Ascend Entities, and their respective past, present, and future subsidiaries, affiliates, heirs, executors, administrators, members, managers and/or management by contract or otherwise, employees, directors, attorneys, advisors, agents, insurers, successors, and/or assignees (the "**<u>Ascend Entities Release Parties</u>**") from any and all suits, liabilities, claims, counterclaims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses, and any compensation whatsoever (collectively, "**<u>Claims</u>**"), which the Client Release Parties have or had, whether known or unknown, whether contingent or otherwise, in law or in equity, from the beginning of the world to the Effective Date, including but not limited to, all claims, demands, and causes of action asserted or which could have been asserted in any contemplated lawsuit.  This release shall not apply to Claims that accrue or arise after the Effective Date. Nothing herein contained releases the Ascend Entities Release Parties' obligations under this Agreement. The Client Release Parties represent that, to the best of their knowledge as of the Effective Date, they do not have actual knowledge of any claims against any of the Ascend Entities Parties that would fall outside the scope of this release.

As of the Effective Date, the Ascend Entities Release Parties do hereby forever release and discharge the Client Release Parties from any and all Claims which the Ascend Entities Release Parties have or had, whether known or unknown, in law or in equity, from the beginning of the world to the Effective Date, including but not limited to, all claims, demands, and causes of action asserted or which could have been asserted in any

**EX 15**
**1456**

CONFIDENTIAL

contemplated lawsuit. This release shall not apply to Claims that accrue or arise after the Effective Date. Nothing herein contained releases the Client Release Parties' obligations under this Agreement. The Ascend Entities Release Parties represent that, to the best of their knowledge as of the Effective Date, they do not have actual knowledge of any claims against any Client Release Parties that would fall outside the scope of this release.

b.    The Parties further agree that they have accepted their respective consideration as a complete compromise of any controversy between the Parties involving disputed issues of law and fact up to the Effective Date of this Agreement. Each Party fully assumes the risk that the facts or the law may be other than they believe. It is expressly understood and agreed that this Buyback is in full accord and satisfaction of all disputed claims and controversies regarding any claim released in this Agreement up to the Effective Date. This does not preclude any party from making claims for disputes that may arise after the Effective Date of this Agreement.

8.    <u>No Admission of Liability</u>: The Parties acknowledge that this Agreement has been executed in connection with the compromise and settlement of disputed claims. This Agreement and the actions taken pursuant thereto do not constitute an acknowledgement or admission on the part of any Party for liability for any matter upon which liability may be assessed. Furthermore, the Parties acknowledge that the execution of this Agreement shall not be construed as an admission by any Party and that the Agreement has been entered into solely for the purpose of avoiding costly and time-consuming litigation of disputed claims.

9.    <u>Costs</u>: Except as otherwise stated herein, the Parties agree that they will be responsible for their own costs, fees, and expenses, including but not limited to, legal fees, administrative costs, and any costs associated with the enforcement of this Agreement.

10.    <u>Confidentiality</u>: Recognizing the confidentiality of the information contained herein, it is understood and agreed by each Party and their respective counsel and agents that they will agree to keep the terms of this Agreement strictly confidential and agree not

to disclose them to any other person, excluding legal counsel and necessary financial advisors, except as follows:

> All Parties may disclose or discuss any matters relating to this settlement and the terms of this Agreement as may be reasonably required (i) in connection with the preparation and filing of income tax returns or other financial disclosures or statements, (ii) in responding to a duly authorized subpoena or order of a court of competent jurisdiction, (iii) to comply with any applicable law, (iv) to their spouses or significant others, or (v) to enforce rights under this Agreement, including in a court of law without having to file any portion of this Agreement under seal.

Further, the Parties and their attorneys shall be permitted to, whether in response to an inquiry, or affirmatively, say only that: "This matter has been settled amicably".

Any copy of this Agreement shall not be distributed, disseminated, or shared, except as allowed pursuant to this Section 10.

11.    <u>Non-Disparagement:</u> The Parties agree that none of the Parties hereto will disparage, speak ill of, denigrate or damage the reputation of any of the other Parties to this Agreement for any reason and in any form or medium including, without limitation, verbally, in writing, in interview format or by social media. Specifically, this includes, but is not limited to, the Ascend Entities agreeing not to disparage Client, or otherwise take any action which could reasonably be expected to adversely affect Client's personal or professional reputation. Similarly, this includes, but is not limited to, Client agreeing not to disparage the Ascend Entities, or any entities under the Ascend Entities stewardship, inclusive of but not limited to owners, managers, directors, officers, employees, legal counsel, advisors, agents, family, friends, and/or investors, affiliated with the Ascend Entities numerous entrepreneurial ventures and business entities, including but not limited to Ascend Ecomm LLC, and Ascend CapVentures Inc.

**EX 15**
**1458**

Additionally, within the boundaries of this non-disparagement provision, the Parties mutually agree to refrain from any actions, remarks, or behaviors that are intended to intentionally disrupt, defame, or interfere with the other party's social media presence, profiles, or online reputation, maintaining a decorum of respect and professional courtesy in all digital interactions and representations. Explicitly, Client is prohibited from making any disparaging remarks or posts on platforms including but not limited to Discord, Facebook, Twitter, Reddit, and other public forums or message boards. Moreover, Client further agrees to remove any existing negative postings on any of the aforementioned social networks or any other online platforms. Furthermore, Client is explicitly required to disassociate, disengage, and deactivate from any and all social media servers he/she is currently a member of, and to refrain from joining or engaging in new social media servers that relate to or discuss the Ascend Entities or any associated individuals or ventures. For purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, made about any of the Parties, and said term is meant to be given its broadest and most inclusive reading.

12.    <u>Choice of Law</u>: The interpretation and enforcement of this Agreement shall be governed by the laws of the State of Delaware, without respect to the choice of law rules of the State of Delaware.  Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Chicago, Illinois before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

13.     Entire Agreement: This Agreement, along with any exhibits, schedules, and attachments hereto, constitutes the entire agreement and understanding of the Parties and supersedes any and all prior negotiations and proposed agreements, written and/or oral, between or among them. Except for this Agreement, any and all agreements or alleged agreements by and between Client on the one hand and the Ascend Entities on the other hand, are hereby terminated.  Except as otherwise provided in this Agreement, each of the Parties mutually and reciprocally acknowledges that no one has made any promise, representation, or warranty whatsoever, expressed or implied, written or oral, concerning the subject matter hereof, to induce it to enter into this Agreement, and each of the Parties hereto acknowledges that it has not executed this Agreement in reliance on any promise, representation, and/or warranty not contained herein.

14.     Headings: The headings contained in this Agreement are merely for convenience of reference and shall not affect the interpretation of any of the provisions of this Agreement.

15.     Drafting And Ambiguity: This Agreement is deemed to have been drafted jointly by the Parties and their counsel and any uncertainty or ambiguity shall not be construed for or against any Party as an attribution of drafting to any Party.

16.     Counterparts: The Parties agree that this Agreement may be executed in one or more counterparts; each counterpart shall be deemed to be an original; and all such counterparts shall constitute one and the same instrument. A copy of this Agreement may be executed by each Party, separately, and when each Party has executed a copy thereof, such copies taken together shall be deemed to be a full and complete contract between the Parties. The executed copy of this Agreement may be delivered in electronic form by facsimile transmission or email and such delivery shall be deemed effective upon receipt.

**CONFIDENTIAL**

17.     <u>Further Assurances</u>: Each Party agrees that it will execute, acknowledge and deliver all such additional instruments and further assurances and will do or cause to be done all such further acts and things as may reasonably be necessary fully to effectuate the intent of this Agreement.

18.     <u>Timing</u>:  Time is of the essence in the performance of this Agreement.

19.     <u>Tax Matters; Allocation Of Redemption Consideration</u>:  For all income tax purposes, both the Ascend Entities and Client agree that all amounts paid to Client under the terms of this Buyback Agreement, in settlement of any and all claims arising out of or related to Client's association with the Ascend Entities, shall be treated as a distribution unrelated to Client's prior or potential interest in the property or assets of the Ascend Entities, including any interest in the Ascend Entities' goodwill, and shall be reported as such on all applicable tax forms and documents. For the avoidance of doubt, such amounts shall not be treated as wages, compensation, or payments derived from Client's previous association with the Ascend Entities. Both the Ascend Entities and Client further concur that: (a) None of the amounts paid under this Buyback Agreement represent Client's share in the Ascend Entities' assets, profits, gains, losses, deductions, and distributions; and (b) Following the Effective Date of this Buyback Agreement, Client shall be considered as having no further economic or financial interest, including but not limited to a zero percent (0%) interest, in the Ascend Entities' profits, gains, losses, deductions, and distributions. Both parties hereto commit to not taking any tax position inconsistent with this Section 19 in any tax returns, audit, examination, judicial, administrative, or any other proceedings by any taxing authority, including, but not limited to, any reports or forms required by the Internal Revenue Service

20.     <u>Prevailing Party Attorneys' Fees; Reimbursement of Enforcement Costs.</u> In addition to all other remedies available at law or equity, the prevailing party in any

CONFIDENTIAL

litigation in connection with the enforcement of this Agreement shall be entitled to recover from the non-prevailing party all costs and expenses including, but not limited to, reasonable attorneys' and paralegals' fees and costs incurred by the prevailing party in connection with such litigation. In the event that any of the Ascend Enities is the prevailing party, the Client shall also be responsible for reimbursing any one of the Ascend Entities for any costs associated with the enforcement of this clause.  In addition, in the event that a Party incurs out of pocket costs, including, without limitation, legal fees in order to compel a person or entity obligated under this Agreement to perform, such Party that incurs such cost shall be reimbursed for such cost by the person or entity so obligated under this Agreement to perform.

21.    <u>No Oral Modifications or Waivers</u>. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the Party against whom the waiver or modification is sought to be enforced.

22.    <u>Notice</u>.  All notices, notifications of events, and/or transmissions related to this Agreement in any way shall be transmitted by electronic mail, read and delivery receipts requested by sender, to the following:

a.    <u>To Client</u>:
Name: Anthony Patti
     Email: ████████@gmail.com

b.    <u>To the Ascend Entities</u>:
Ascend CapVentures Inc.
legal@ascendcapventures.com

CONFIDENTIAL

23.    <u>Attorney Liability Waiver.</u> All parties involved in this agreement expressly acknowledge and agree that no liability shall attach to any attorneys or law firms involved in the construction, drafting, negotiation, or execution of this Buyback agreement. Any claim, dispute, or potential conflict of interest, whether perceived or actual, that may have arisen or may arise in the future, in the course of the representation of the Parties in connection to this agreement, is hereby unreservedly and irrevocably waived. The Parties affirm that they have been advised of the potential for such conflicts and that they had the opportunity to seek independent legal advice regarding such conflicts. This waiver extends to any and all claims, whether known or unknown, against the attorneys or law firms representing any party in this Buyback agreement. The attorneys, by virtue of their participation in the drafting or negotiation of this Buyback agreement, are hereby absolved from all potential claims, liabilities, responsibilities, or obligations arising from this agreement or the process leading to its formation and execution. This absolution of responsibility extends to, but is not limited to, any alleged misrepresentations, omissions, errors, negligence, or breaches that may have occurred during the negotiation, construction, drafting, or execution of this agreement.

24.    **<u>Not Fiduciaries; No Reliance</u>:  THE PARTIES HAVE BEEN ADVISED BY THEIR OWN RESPECTIVE ATTORNEYS AND ADVISORS AS TO THE MERITS OF THIS AGREEMENT, AND HEREBY ACKNOWLEDGE AND AGREE THAT THEY ARE NOT RELYING UPON ANY PROMISE, INDUCEMENT, REPRESENTATION, STATEMENT, DISCLOSURE OR DUTY OF DISCLOSURE OF ANOTHER PARTY IN ENTERING INTO THIS AGREEMENT, EXCEPT THOSE SET FORTH IN THIS AGREEMENT.  THE PARTIES TO THIS AGREEMENT AGREE THAT THEY ARE NOT FIDUCIARIES TO EACH OTHER (EXCEPT AS TO COUNSEL FOR EACH PARTY AS TO COUNSEL'S RESPECTIVE CLIENT(S)) WITH RESPECT TO THE NEGOTIATION, PREPARATION AND EXECUTION OF THIS AGREEMENT._**

CONFIDENTIAL

25.     **THIS AGREEMENT REFLECTS THE AMICABLE SETTLEMENT OF HONEST DIFFERENCES BETWEEN THE PARTIES. THE PARTIES AND ALL SIGNATORIES TO THIS AGREEMENT ACKNOWLEDGE AND AGREE THAT THEY HAVE READ THIS AGREEMENT IN ITS ENTIRETY, THAT THEY UNDERSTAND ITS TERMS AND THAT ITS TERMS ARE FAIR AND LEGALLY ENFORCEABLE, THAT THEY HAVE HAD AMPLE OPPORTUNITY TO NEGOTIATE THROUGH THEIR RESPECTIVE COUNSEL WITH EACH OTHER WITH REGARD TO ALL OF ITS TERMS, THAT THEY HAVE ENTERED INTO THIS AGREEMENT FREELY AND VOLUNTARILY, THAT THEY HAVE CONSULTED WITH COUNSEL CONCERNING THIS AGREEMENT, AND THAT THEY HAVE THE FULL RIGHT, POWER, AUTHORITY, AND CAPACITY TO ENTER INTO AND EXECUTE THIS AGREEMENT AND TO BIND ANY ENTITY ON BEHALF OF WHICH THEY EXECUTE THIS AGREEMENT**.

[SIGNATURE PAGE FOLLOWS]

**CONFIDENTIAL**

**IN WITNESS WHEREOF**, the undersigned represent that they are fully authorized to enter into and bind the Parties to this Confidential Buyback Agreement.

**ANTHONY PATTI**

*Anthony Patti*

By: _____

Name:  Anthony Patti

Dated:  2024-06-21

**ASCEND CAPVENTURES INC.**

By: _____

Name:  William Basta

Title:  Co-Founder

Dated:

EX 15
1465