1  Jody Goodman (DC Bar No. 404879)
2  (202) 326-3096; jgoodman1@ftc.gov
   Elsie Kappler (MA Bar No. 562265)
3  (202) 326-2466; ekappler@ftc.gov
   Federal Trade Commission
4  600 Pennsylvania Ave., NW, CC-8528
5  Washington, DC 20580

6
   Local Counsel
7  Jeffrey Tang (CA Bar No. 308007)
8  (310) 824-4303; jtang@ftc.gov
   Federal Trade Commission
9  10990 Wilshire Boulevard, Suite 400
   Los Angeles, California 90024
10 *Attorneys for Plaintiff*

11

12            **IN THE UNITED STATES DISTRICT COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
13

14  **Federal Trade Commission**,
                          Plaintiff,          **No. 2:24-cv-07660SPG(JPRx)**
15  v.
16  **Ascend Capventures Inc.**, also doing     **FILED UNDER SEAL**
    business as Ascend Ecom LLC; Ascend
17  Ecomm LLC; ACV; ACV Partners;              **PLAINTIFF FEDERAL TRADE**
    Accelerated Ecommerce Ventures;            **COMMISSION'S EXHIBITS**
18  Ascend Distribution LLC; Ethix Capital;
19  and ACV Nexus, a Wyoming close             **VOLUME VIII**
    corporation profit corporation,
20  **Ascend Ecommerce Inc.**, also doing       **Exhibit 23**
    business as Ascend Ecom LLC, a
21  Wyoming close corporation profit           Pages 2216 to 2508
22  corporation,
    **Ascend Administration Inc**., a California
23  general stock corporation,
24  **Ascend Ecom LLC**, a Wyoming limited
    liability company,
25  **Ascend Distribution LLC**, a Texas
26  limited liability company,
27  **William Michael Basta**, individually and
    as officer and/or owner of Ascend Ecom
28

FILED
CLERK, U.S. DISTRICT COURT

9/9/24

CENTRAL DISTRICT OF CALIFORNIA
BY:        MRV        DEPUTY

LLC, Ascend Capventures Inc., Ascend
Ecommerce Inc., Ascend Administration
Inc., and Ascend Distribution LLC, and
**Jeremy Kenneth Leung**, individually and
as an officer and/or owner of Ascend
Ecom LLC, Ascend Capventures Inc.,
Ascend Ecommerce Inc., Ascend
Administration Inc., and Ascend
Distribution LLC,

                    Defendants.

## Volume VIII – Exhibit List

| Ex. | Description | Beginning Page # | Ending Page # |
|-----|-------------|------------------|---------------|
| 23  | Declaration of Nima Tahmassebi | 2216 | 2508 |

# Exhibit 23

## DECLARATION OF NIMA TAHMASSEBI

1.      My name is Nima Tahmassebi. I live in Miami, Florida, and I am over the age of eighteen. The following statements are within my personal knowledge, and if called as a witness, I could and would testify as set forth herein.

2.      I am an attorney at law and founding attorney at the law firm NT Legal, located in Miami, Florida. Before founding NT Legal in March 2024, I was a partner at the law firm Perlman, Bajandas, Yevoli & Albright, P.L.

3.      I focus my practice, in part, on civil and commercial litigation and domestic arbitration, with an emphasis on e-commerce issues, representing both consumers and companies in the industry.

4.      I first heard of Ascend[1] in July 2023, when one of its aggrieved clients, referred to here as Client 1, contacted me for legal representation. Client 1 told me that Ascend's mismanagement of her online store led to its deactivation by Amazon and resulted in her receiving a cease-and-desist letter from Fiskars Brands, Inc. d/b/a Gerber Gear ("Gerber") demanding $25,000 for selling counterfeit Gerber products through her store. **Attachment A** is a copy of Gerber's cease-and-desist letter.

5.      For added context, back in December 2022, I initiated an e-commerce-related lawsuit on behalf of certain clients against Roman Cresto and John Cresto that resulted in the U.S. Federal Trade Commission ("FTC") getting involved and ultimately bringing a separate federal action against them. In August 2023, the FTC initiated its lawsuit against Roman Cresto, John Cresto, Automators LLC, and others (the "Automators Lawsuit"). As part of the Automators Lawsuit, FTC investigator Reeve Tyndall provided his sworn declaration where he explained that "Automators currently worked with two Amazon service providers – Ascend Ecom and Activ8." As an exhibit

---

[1] Any reference to Ascend is a reference to Ascend Ecom, Accelerated eCom Ventures, Ascend CapVentures, EcomwithACV, or any other e-commerce company led by Will Basta and Jeremy Leung.

to his declaration, Mr. Tyndall submitted transcripts of calls with John Cresto that referred to his business relationship with Ascend and its principals "Will" and "Jeremy." After reviewing Mr. Tyndall's declaration, and hearing Client 1's story, I agreed to represent Client 1 as her lawyer against Ascend.

6.      On September 14, 2023, I sent a demand letter on behalf of Client 1 to Ascend Ecom, Will Basta, and Jeremy Leung containing a monetary demand. **Composite Attachment B** is a copy of my e-mail and demand letter to Ascend and others on behalf of Client 1. In this letter, I demand Ascend's professional liability insurance information and that the company immediately take affirmative steps to preserve all documents and electronically stored information ("ESI"). *See id.*

7.      On September 21, 2023, I sent a second demand letter on behalf of a separate client, Client 2, to Ascend Ecom, Will Basta, Jeremy Leung, and Colin Matthew d/b/a Colin Matthew Marketing LLC containing a monetary demand. Client 2's online store was also deactivated by Amazon due to Ascend's mismanagement. **Composite Attachment C** is a copy of my e-mail and demand letter to Ascend and others on behalf of Client 2. In this letter, I also demand Ascend's professional liability insurance information and that Ascend immediately take affirmative steps to preserve all documents and ESI. *See id.*

8.      On September 25, 2023, I received an e-mail from Ascend's counsel, Jonathan D. Herpy of the firm Hart David Carson LLP, requesting an opportunity to speak with me on a call about Client 1 and Client 2's respective disputes with Ascend. Thereafter, Mr. Herpy and I spent the next month engaging in back-and-forth negotiations over video calls and e-mails to try to amicably resolve these disputes. **Attachment D** is a copy of the series of e-mail exchanges with Mr. Herpy.

9.      On October 25, 2023, after a week of no response from Mr. Herpy, I sent him a follow-up e-mail (i) requesting an update on Ascend's latest settlement position,

-2-
DECLARATION OF NIMA TAHMASSEBI

(ii) asking whether he was authorized to accept service on behalf of Ascend should negotiations reach an impasse, and (iii) reiterating my previous demand made in both demand letters for Ascend's professional liability insurance. Mr. Herpy never responded to this e-mail, marking the first of several instances where he abruptly stopped communicating with me during my good faith attempts to negotiate certain settlements.

### *Mass Arbitration Against Ascend*

10.    In or around October 2023, Client 1 informed me that there was a Facebook group[2] comprising dozens of victims of Ascend (the "Ascend Facebook Group"). After having my calls and e-mails repeatedly ignored by Mr. Herpy, I asked  Client 1 to help connect me to members of the Ascend Facebook Group.

11.    Client 1 facilitated introductions to certain members of the Ascend Facebook Group and I ultimately spoke one-on-one with more than fifty current or former Ascend clients to see whether they would be interested in pooling their collective resources to initiate a mass arbitration against the company. After several weeks, I engaged thirty-one individuals as clients for the mass arbitration.

12.    Before expending substantial time and resources on a mass arbitration, my clients and I decided to send Ascend one final demand letter offering a pre-suit settlement. On November 29, 2023, I e-mailed Mr. Herpy a demand letter on behalf of my thirty-one clients alleging fraud-based claims and contractual violations against Ascend and containing a monetary demand equaling actual estimated damages suffered by my 31 clients (the "November Demand"). **Composite Attachment E** is a copy of my e-mail to Mr. Herpy and the November Demand. The November Demand also

---

[2] This Facebook group can be viewed at https://www.facebook.com/groups/6183085168439841.

contained my third request in four months that Ascend preserve all documents and ESI in anticipation of litigation/arbitration. *See id.*

13.     In the November Demand, I raised points about Ascend's gross mismanagement of my clients' online stores, their deceptive marketing practices, and certain threatening communications directed to my client, Jamaal Sanford, after he posted negative reviews about Ascend online. *See id.*

14.     The threatening communications highlight an incident that started with a text message sent to Mr. Sanford's wife. On or around May 30, 2023, Mrs. Sanford received a text message from an unknown number that disturbingly begins with an image of a severed human head, followed by a suggestion that she make her husband remove his reviews. Then, in a separate e-mail sent that same day from vladkovik@genocide.fun, a group claiming to be a "russian shadow team" e-mailed Mr. Sanford and told him he had 48 hours to remove "all negative reviews . . . left of businesses in the past year on trustpilot and facebook." The e-mail details personal information about Mr. Sanford and his family, including their home address, his date of birth, social security number, job description, where his daughter went to school, and her college major. The author of the e-mail warns of physical harm if his negative reviews were not removed from Trustpilot and Facebook (¶15 is "Cyberattack 1"). *See id.*

15.     Cyberattack 1 was the first of four separate instances I either learned about or personally experienced where the evidence strongly suggests that Ascend resorted to cyber-harassment to intimidate and threaten anyone it perceived as a threat to its business.

16.     On December 6, 2023, Mr. Herpy e-mailed me Ascend's response to the November Demand (the "December Response"). This was the first time Mr. Herpy contacted me since October 17, 2023. In the December Response, Mr. Herpy said that

EX 23
2220

Ascend categorically denied my client's allegations of threatening communications and cautioned that my making such claims could lead to legal ramifications under the laws of defamation and professional conduct. He proposed a 120-day Negotiation Period. He also acknowledged that my arbitration hold notice had been received and that Ascend would comply.

17.    On December 8, 2023, Mr. Herpy spoke to me and my then-colleague and associate, ███████████, on a video call about logistics related to settlement discussions.

18.    For the next two weeks, Mr. Robbins and I spent considerable time meeting with our clients to prepare for negotiations and possible arbitration. During that same time, we also exchanged regular e-mails and scheduled weekly video calls with Mr. Herpy regarding each side's latest settlement position.

19.    On or around December 14, 2024, several of my clients informed me that they received an e-mail from Ascend informing them that the company was moving away from Slack to e-mail communications and that they were locked out of their Slack accounts. Multiple clients told me they were concerned that Ascend was deleting evidence.

20.    On December 14, 2024, I e-mailed Mr. Herpy to, among other things, inform him that we expected Ascend to preserve all client communications in its Slack channel. More specifically, I said

> [I]t's come to our attention that your client recently notified its customers that it is moving away from Slack to e-mail communications. We expect that all of our clients' communications in Ascend's Slack channel will be preserved, as we provided Ascend with ample notice of our litigation hold and received your confirmation of the same. We ask that you please notify your client of the aforementioned individuals that have joined our side and

EX 23
2221

1
2
ensure that their records are preserved as we attempt to move these disputes forward towards what we hope are amicable resolutions.

3
4
**Attachment F** is a copy of my e-mail to Mr. Herpy. Mr. Herpy never responded to or acknowledged this e-mail.

5
6
7
8
21.    On December 26, 2023, Mr. Herpy e-mailed me that he had not yet heard back from his client regarding updated settlement positions, but that he expected to hear from them the next day and would email me the next day. **Attachment G** is a copy of my and Mr. Herpy's e-mail exchange.

9
10
22.    On January 3, 2024, after not hearing back from Mr. Herpy for eight days, I sent him a follow-up e-mail requesting an update. *See id.*

11
12
13
14
23.    On January 5, 2024, after not receiving a response to my last e-mail, I sent Mr. Herpy another e-mail requesting that he provide us with a meaningful update by the morning of Tuesday, January 9, 2024, otherwise we may need to initiate arbitration proceedings. *See id.*

15
16
17
18
24.    On January 8, 2024, Mr. Herpy e-mailed me that he was "confident Tuesday morning is achievable" and that the holiday was the issue with getting his client to move forward with their latest settlement position. *See id.* However, Mr. Herpy failed to provide a response by Tuesday, January 9, 2024.

19
20
21
22
23
25.    In or around early-January 2024, several of my clients expressed their frustration to me regarding Ascend's repeated delays during the Negotiation Period and told me that Ascend was only engaging in these discussions to intentionally delay arbitration. Ultimately, after repeated delays and Mr. Herpy's failure to respond by January 9, 2024, my clients and I decided to initiate arbitration.

24
25
26
27
26.    On Thursday, January 11, 2024, Mr. Herpy e-mailed me that Ascend accepted proposed settlements on behalf of three different clients. That same day, I responded to Mr. Herpy telling him that those three clients were ready to move forward

28

with their respective settlements, but that later that day we would be initiating arbitration on behalf of our 30 other clients against Ascend, Will Basta, and Jeremy Leung due to his and his client's "repeated delays." *See id.*

27.     On January 11, 2024, I submitted a Demand for Arbitration to the American Arbitration Association ("AAA") on behalf of 30 Claimants. I added 3 more Claimants to the Ascend Arbitration shortly after filing the initial Demand for Arbitration.

28.     On January 18, 2024, the Daily Business Review ("DBR") published an online article about the Ascend Arbitration (the "Ascend Article"). **Attachment H** is a copy of the Ascend Article. Mr. Herpy did not respond to the author of the Ascend Article's request for comment.

29.     On January 22, 2024, following a AAA status conference for the Ascend Arbitration, I spoke with litigation counsel for Ascend, Jeremy Ross. On our call, I explained to Mr. Ross that I still hadn't heard from Mr. Herpy regarding draft documents to finalize settlement for the three individuals who agreed to settle in principle. I then told Mr. Ross that if I didn't receive any kind of meaningful update from him by January 25, 2024, I would need to add those three individuals back into the group of Claimants in the Ascend Arbitration.

30.     On February 20, 2024, I e-mailed the AAA case administrator that Claimants were withdrawing their Demand for Arbitration and sought to end proceedings in order to "explore legal alternatives to arbitration." **Attachment I** is a copy of my e-mail to the AAA. After sending this e-mail, Mr. Herpy and Mr. Ross both attempted to contact me to discuss why I dropped the Ascend Arbitration, but I did not respond to their inquiries.

31.     On February 27, 2024, the DBR published a follow-up article detailing how the Ascend Arbitration had been withdrawn. **Attachment J** is a copy of the follow-

up DBR article. In this article, I confirmed that my clients withdrew their demand for arbitration and that we would "gladly provide more context to our decision when the time is right." In the same article, Mr. Herpy is quoted blaming Amazon for the issues surrounding the Ascend Arbitration. More specifically, he said

> a.    "his clients fell victim to the change in Amazon's algorithmic behavior, which allowed competitors to file false reports to eliminate competition";

> b.    "We didn't fail you—Amazon did,";

> c.    "Are [we] supposed to go up against and fight the dragon, which is Amazon?"; and

> d.    "the company is willing to revisit prior efforts to try and make amends to the disgruntled clients on a case-by-case basis."

*See id.*

32.    A month later, on March 18, 2024, Mr. Herpy e-mailed me again saying that his client wanted to continue to discuss each client and determine a strategy forward. In response, I told Mr. Herpy that his client's repeated delays in past negotiations ultimately led to a waste of time and resources, and that if he wanted to provide me with an actual settlement offer for a global resolution, I would take it to my clients. Mr. Herpy replied to my e-mail saying "Fair enough. Will bring that to the team and see what their thoughts are" and I did not hear from him again for a couple of months. **Attachment K** is a copy of my and Mr. Herpy's e-mail exchange.

### *Ascend's Fake Reviews Against Ecom Authority*

33.    On May 23, 2024, my client, Ecom Authority ("EA"), an e-commerce management company in the e-commerce industry, received a one-star review on its Trustpilot page. **Composite Attachment L** is a copy of the Reviews as defined below. The poster of this one-star review used the name "SD F", which made it impossible to

-8-
DECLARATION OF NIMA TAHMASSEBI

identify whether he or she was a real EA client. Prior to this review, EA had only had one other one-star review on its Trustpilot page in the last two years.

34.     Thereafter, between May 31, 2024 through June 6, 2024, I personally observed EA's Trustpilot page receive 27 one-star reviews (the "Reviews" or "Cyberattack 2"). The substance of the Reviews all carried a common element—they contained intimate knowledge of EA that a current or former employee would know. For example, the reviews contained comments like:

    a.     "they will only communicate on a chat portal" (SD F);

    b.     "one of their employees quit and expose them for all of the bad practices" (Shiv Patel);

    c.     "I REACH OUT THROUGH THEIR STUPID TICKET PORTAL AND ALL THEY DO IS GIVE ME GENERAL ANSWERS OVER AND OVER AGAIN" (Karate Walt); and

    d.     "Their support is only over some ticketing system, sounds like it's AI generated or templated." (ramkali)

*See id.*

35.     Between May 31, 2024 and June 6, 2024, I personally observed many of the Reviews being posted on EA's Trustpilot page in real time. At one point, I saw the name "Kacie Kelly" was liking most of the negative reviews, sometimes within 30 minutes after they were posted. *See id.*

36.     I knew "Kacie Kelly" to be a former employee of EA's sales and marketing arm, GNA Investments LLC ("GNA"). Mr. Kelly left GNA to join Ascend, and was later sued by GNA for breaching his non-solicitation agreement when he attempted to solicit GNA and EA's current workers to join him at Ascend (the "Lawsuit").

37.     Mr. Kelly was served with the Lawsuit on May 18, 2024. The first one-star Review was posted on EA's Trustpilot page five days later on May 23, 2024.

DECLARATION OF NIMA TAHMASSEBI

EX 23
2225

38.     On June 7, 2024, my former colleague Benjamin L. Reiss and I spoke with Mr. Kelly's attorney, Martin Carroll, of the firm of Fox Swibel Levin & Carroll LLP (the "Call"). During the Call, I told Mr. Carroll what I knew about the Reviews and asked him why Mr. Kelly liked every single review as they were being posted over the weekend. Mr. Carroll told me that the person I knew to be "Kacie Kelly" was actually Kenneth or "K.C." Kelly, and that his wife was Kacie Kelly. He further indicated that GNA had named the wrong defendant in the Lawsuit.

39.     In fact, "Kenneth Kelly" had represented himself to be "Kacie Kelly" on legal and business documents, including IRS forms, when he was at GNA.

40.     I then asked Mr. Carroll how "Kacie Kelly" knew to be on EA's Trustpilot page between Friday, May 31, 2024 to Monday, June 3, 2024, when many of the Reviews were posted. Mr. Carroll told me that Mr. Kelly's wife had learned about the Reviews from him, and that he had learned about them from a colleague at Ascend. I then asked Mr. Carroll how the colleague at Ascend could have known about the Reviews, and Mr. Carroll said he did not know.

41.     During the Call, I asked Mr. Carroll whether he represented Kenneth Kelly or Ascend, and he stated that he represented both parties. When I pressed Mr. Carroll further and told him I would file a lawsuit on behalf of EA against Mr. Kelly and Ascend unless the Reviews stopped, Mr. Carroll threatened to "go after" me. When I asked him to clarify what that meant, he said that if I filed a lawsuit against Ascend or Mr. Kelly over the Reviews he would pursue sanctions against me and my client. Following the Call, the Reviews stopped and EA has not dealt with this issue since then.

42.     EA informed me that the Reviews caused the loss of at least five prospective clients, costing the company a total of at least $375,000 in damages, $225,000 of that consisting of clients who rescinded their agreements after reading the Reviews.

-10-
DECLARATION OF NIMA TAHMASSEBI

***Ascend's First Cyberattack Against Me***

43.    On June 13, 2024, my personal cell phone received approximately 100 text messages at or around the same time (the "Spam Texts"). **Composite Attachment M** is a sample copy of the Spam Texts. Prior to this date, I had never received anything resembling Spam Texts on any electronic device.

44.    Based on my review of the Spam Texts, I was able to conclude that my personal cell number was signed up to receive text messages from various senders from across the world including, but not limited to, various brands, companies, educational institutions, and more. *See id.*

45.    On June 17, 2024, I received an additional 616 Spam Texts. That same day, my work e-mail received a sudden influx of 412 spam e-mails (the "Spam E-mails"). The substance of the Spam E-mails often indicated that I had signed up to receive emails from a specific entity or that I had requested a password reset from an entity I never personally signed up for in the first place. **Composite Attachment N** is a sample copy of the Spam E-mails.

46.    Each time the Spam Texts or the Spam E-mails were sent to me, they would arrive all at once and cause my electronic devices to freeze and become unusable until the inflow of messages stopped.

47.    From June 17, 2024 to June 28, 2024, I received thousands of Spam Texts and Spam E-mails on a near daily basis. Since I regularly attempted to block the senders of the Spam Texts and Spam E-mails, I am unable to determine the exact number of messages I received. I temporarily stopped receiving Spam Texts and Spam E-mails after June 28, 2024 (¶¶45-50 are "Cyberattack 3").

***Bad Faith Settlement Negotiation***

48.    On May 23, 2024, Mr. Herpy e-mailed me for the first time in two months and said that his client wanted to offer my client, Branden Lathan, a settlement, payable

EX 23
2227

in full on September 1, 2024. **Attachment O** is a copy of my and Mr. Herpy's e-mail exchange.

49.     Mr. Lathan is the administrator of the Ascend Facebook Group. Mr. Lathan told me he spoke to certain prospective customers of Ascend around this time and dissuaded them from joining the company after sharing his personal experience. He also told me he left negative reviews about the company on Trustpilot.

50.     After speaking to Mr. Lathan, I responded to Mr. Herpy and informed him that my client rejected Ascend's initial settlement proposal. Through additional e-mails, Mr. Herpy continued to provide settlement offers that would make Mr. Lathan take affirmative steps to disband the online Facebook group and cease any disparaging comments, but not receive his full settlement payment for an extended period. *See id.*

51.     On June 10, 2024, Mr. Lathan accepted Ascend's settlement offer which included a payment of 25% of the settlement amount within 24 hours of the execution of the settlement agreement, and a subsequent payment of the remaining amount to be made upon Mr. Lathan's complete removal of all negative social media posts, accounts, comments, and any other related content pertaining to Ascend. To ease concerns that Ascend would not remit the entirety of funds, Mr. Herpy said his firm would escrow the balance, "and can execute an escrow agreement among the parties to trigger the transfer upon all accounts being down." *See id.*

52.     On June 19, 2024 at 9:37 AM EST, Mr. Herpy provided me with a draft settlement agreement for Ascend and Mr. Lathan. Later that same day at 6:50 PM EST, I provided Mr. Herpy with my redline edits to the settlement agreement. *See id.*

53.     On June 27, 2024, I sent Mr. Herpy a follow-up e-mail asking the reason for his delay in finalizing the settlement agreement. *See id.*

54.     On July 2, 2024, I sent Mr. Herpy a final e-mail informing him that if I had not heard from him by the end of the week, my client would move on as though there

was no settlement between the parties. The last communication I received from Mr. Herpy was on June 19, 2024 when he provided me the draft settlement agreement. *See id.*

55.     Based on my personal interactions with Mr. Herpy, I do not believe that he or Ascend ever intended to remit any type of settlement payment to Mr. Lathan. Instead, I believe their goal was to simply make Mr. Lathan delete the Ascend Facebook Group, take down his negative reviews, and never remit payment.

### *Ascend's Second Cyberattack Against Me*

56.     On July 12, 2024, Ascend e-mailed my client, Branden Lathan, a debt collection notice of $3,566.15. Ascend knows Mr. Lathan is represented by counsel because he was one of the Claimants in the Ascend Arbitration and I was in the middle of trying to resolve his dispute with Mr. Herpy at this time. Despite these facts, Ascend still directly contacted my client with a debt collection notice. **Attachment P** is a copy of my e-mail exchange with Ascend. That same day, Branden brought this issue to my attention and I e-mailed Ascend legal and collections informing them that the amounts purportedly owed are in dispute and not to contact my client directly again. I did not receive a response to my e-mail. *See id.*

57.     The next day, on July 13, 2024, I received 632 Spam Texts to my personal cell and 728 Spam E-mails to my work e-mail address.

58.     On July 15, 2024, I received 500 Spam Texts and 335 Spam E-mails.

59.     When I spoke with Mr. Lathan about the Spam Texts and Spam E-mails, he stated that he believed this was Ascend doing this because he was also getting the same spam texts to his e-mail and phone and had "received easily over 25,000 spam text messages as well as thousands of emails."

**EX 23**
**2229**

60.    From July 13, 2024 through the undersigned date, I have received thousands of Spam Texts and Spam E-mails to my personal phone and work e-mail, respectively ("Cyberattack #4").

61.    Based on my observations and experiences with Cyberattack 1, Cyberattack 2, Cyberattack 3, and Cyberattack 4, I believe Ascend is actively targeting and cyber-harassing anyone it deems a threat to its business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  22  day of August 2024 at Miami-Dade County, Florida.

_____

Nima Tahmassebi

EX 23

2230

# Attachment A

**EX 23**
**2231**



# K&L GATES

August 10, 2023

**By First Class Mail**

Amazon seller Class Trend
Pro Venture LLC

Lakewood, CO 80228

Re: **Fiskars Brands, Inc. d/b/a Gerber Gear — Cease and Desist — Sale of Counterfeit Products, False Advertising, Unfair and Deceptive Trade Practices**

To Whom It May Concern:

We have been retained by Fiskars Brands, Inc. d/b/a Gerber Gear ("Gerber") with respect to your improper sale and commercial distribution of counterfeit Gerber products, false advertising, and unfair and deceptive trade practices. As you are aware, Gerber develops, manufactures, and sells products throughout the world, including the United States. Gerber has and continues to designate significant resources to develop and maintain its products' national and international image. Through advertising and promotional efforts, Gerber has ensured that its products and brand have become renowned in the industry and with the consuming public.

To this end, Gerber sells products bearing severally registered trademarks, including, but not limited to, the "GERBER" mark, Registration No. 4,481,628, for "sport knives, hunting knives, fishing knives and camping knives," among other things (the "Gerber Marks"). Gerber advertises, distributes, and sells various products to consumers under the Gerber Marks.

An investigation has revealed that you are currently involved in the distribution and sale of counterfeit Gerber products and accessories bearing the Gerber Marks, infringing upon Gerber's trademarks, and engaging in false advertising of directed at the consuming public, all in violation of the Lanham Act. § 1051, *et seq.* Furthermore, all of the aforementioned acts constitute unfair and deceptive business practices under various state laws throughout the United States.

Accordingly, Gerber demands that you **IMMEDIATELY** cease and desist from the use of the Gerber Marks in connection with your sale of counterfeit products and false advertising. Should you fail to do so, Gerber would be entitled to statutory damages of up to **two million dollars ($2,000,000.00) per mark infringed** should this matter proceed to litigation.

L GATES LLP
E CONGRESS STREET SUITE 2900  BOSTON  MA 02114
1 617 261 3100  F +1 617 261 3175  klgates.com

1

**EX 23**
**2232**

## I.    Trademark Counterfeiting and Infringement

An investigation has revealed that you are currently advertising, offering for sale, and selling various products bearing the Gerber Marks on the Internet, including, but not limited to, Amazon.com. An example of your Gerber product listings is copied below:



An examination of these products immediately revealed that the Gerber products you are selling are materially different from genuine Gerber products and are thus counterfeit goods, as they are not manufactured by Gerber despite bearing the Gerber Marks. Because the products offered by you are not genuine Gerber products manufactured by Gerber, they constitute counterfeit goods under the trademark laws of the United States.[73]  At all times while you distributed, promoted, sold, or offered for sale counterfeit Gerber products, you passed them off as genuine Gerber products, which they are not.  Accordingly, your conduct constitutes a straightforward case of trademark counterfeiting and infringement.

Additionally, your sale of materially different Gerber products constitutes trademark dilution under the Lanham Act.[74]  Through the sale of counterfeit goods, you have both tarnished and blurred the reputation of Gerber's trademarks amongst the consuming public. By using the Gerber Marks to sell counterfeit goods, you have placed inferior products bearing Gerber's trademarks into the

---

[73] To succeed on a counterfeiting claim under the Lanham Act, a plaintiff must prove that a seller is "(1) intentionally using a mark or designation; (2) knowing such mark or designation is a counterfeit mark....; (3) in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(b). There is no separate cause of action for counterfeiting under the Lanham Act; "rather, it provides for specific kinds of relief for trademark infringement claims based on the sale of counterfeit goods." Rovio Entert., Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 545, n.2 (S.D.N.Y. 2015) (citations omitted).

[74] Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 826 (5th Cir. 1998).

2

EX 23
2233

stream of commerce. Consumers, expecting to receive genuine Gerber products and the goodwill and advantages that are associated with Gerber's trademarks, will instead get products that are inferior and lacking the warranty and customer service associated with Gerber's trademarks. This experience threatens to tarnish Gerber's trademarks in the eyes of consumers and creates negative associations with Gerber's trademarks.[75] Moreover, the misuse of Gerber's trademarks in commerce alters consumers' ability to identify goods as true Gerber products. This blurring of Gerber's brand creates confusion with consumers and is the proximate cause of Gerber's trademarks losing the value that Gerber has expended significant resources and worked diligently to maintain. Your trademark counterfeiting and infringement is likely to cause and is actually causing confusion, mistake, and deception amongst consumers.

Because of your counterfeiting and infringement, Gerber would be entitled to statutory damages of up to **two million dollars ($2,000,000.00) per mark infringed** should this matter proceed to litigation.[76] There is little doubt that your counterfeiting and infringing use of the Gerber Marks would be found willful in this case.

## II.    False Advertising

Furthermore, trademark law, specifically the Lanham Act, also prohibits false advertising and, specifically, "any *false designation of origin*, false or misleading description of fact, or false or misleading representation[s] of fact, which... in commercial advertising or promotion, *misrepresents the nature, characteristics, [or] qualities... of his or her or another person's goods,* services, or commercial activities...."[77]

The Supreme Court recently added that the Lanham Act utilizes businesses engaged in commerce as its enforcement mechanisms for such false advertising. The Court explained:

> Competitors who manufacturer or distribute products have detailed knowledge regarding how consumers rely upon certain sales and marketing strategies. Their awareness of unfair competition practices may be far more immediate and accurate than that of agency rulemakers and regulators.... Lanham Act suits draw upon this market expertise by *empowering private parties to sue competitors to protect their interests on a case-by-case basis.*[78]

---

[75] *See* Hormel Foods Corp. v. Jim Henson Prods., 73 F.3d 497, 507 (2d Cir. 1996) (holding that tarnishment occurs when the use of the claimant's mark creates negative associations with the claimants mark).

[76] *See* 15 U.S.C. § 1117(c)(2).

[77] 15 U.S.C. § 1125(a)(1)(B) (emphasis added).

[78] POM Wonderful LLC v. Coca-Cola Co., 573 US 102, 115 (2014) (emphasis added).

3

Accordingly, Gerber has a cause of action for trademark infringement arising out of your false advertisements.[79]

Your use of the Gerber Marks in the advertising of your counterfeit products constitutes a false designation of origin. By using the Gerber Marks, you intend to deceive consumers into believing that your non-genuine, counterfeit products originate from, or are affiliated, authorized, sponsored, or approved by Gerber, or that you and Gerber are otherwise associated, which you are not.

For the foregoing reasons, your actions constitute false advertising and a false designation of origin in violation of federal and state laws, including the Lanham Act, 15 U.S.C. § 1125.

### III.    Unfair Competition and Deceptive Business Practices

In addition to the foregoing, your trademark counterfeiting, infringement, and false advertising constitute unfair methods of competition and deceptive business practices pursuant to various state laws.[80] Certain states provide for double or treble damages, as well as attorney's fees, for violations of unfair competition laws.

### CONCLUSION

In order to avoid the time and expense of litigation and to ensure that your infringing and unlawful conduct immediately and forever ceases, Gerber demands the following:

1.  Immediately remove any and all product listings and advertisements offering Gerber products from the Internet, including, but not limited to, Amazon.com;

2.  Turn over to Gerber all information in your possession relating to the purchase and sale of Gerber products or counterfeit versions thereof that you obtained either domestically and/or abroad, including all source information indicating where such products were obtained, as well as any customer lists and pricing data;

3.  Return to Gerber, at your own cost and expense, all Gerber products and counterfeit versions thereof in your possession;

4.  Agree that you will never sell or deal in counterfeit or authentic Gerber products in the future, either domestically or abroad; and

---

[79] Id. at 116.

[80] See, e.g., R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (finding a 93A violation where Lanham Act violation established); Mobil Oil Co. v. Auto-Brite Car Wash, Inc., 615 F. Supp. 628, 631 (D. Mass. 1984) (finding defendant's trademark infringement constitutes an unfair method of competition or an unfair trade practice)

4

EX 23
2235



5.    Issue Gerber payment of $25,000.00 to cover its investigation and attorney's fees.

These demands are reasonable in light of your conduct.

I strongly urge you not to contact the counterfeit manufacturer or take any action that would interfere with Gerber's ability to eliminate infringing merchandise from the marketplace. Gerber will hold you responsible for its complicity in any such actions to the maximum extent provided by law. Please be advised that any attempt to destroy evidence that is material to this matter may subject you to additional sanctions.

Please confirm within **five (5) days of the receipt of this letter** whether you will comply with Gerber's demands.

This letter does not constitute an exhaustive statement of Gerber's legal position, and nothing contained herein is to be deemed or construed to be a waiver or relinquishment of any of the rights and remedies available to Gerber, all of which are hereby expressly reserved. Should we fail to quickly reach a resolution, Gerber reserves its right to fully protect its intellectual property rights to the fullest extent allowed under the law.

Sincerely,

5

**EX 23**
**2236**

# Composite Attachment B

EX 23
2237

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

Reply to: Coral Gables office

Sender's Email: ██████████@pbyalaw.com

September 14, 2023

**Via Email & FedEx**

Ascend Ecom, LLC d/b/a Ascend CapVentures
2219 Main Street
Santa Monica, California 90405
Attention: Will Basta
Email: support@ascendecom.com
       will@ascendecom.com
       jeremy@ascendecom.com

**Re: Demand for Payment, Demand for Insurance Information, and Litigation Hold**

Mr. Basta,

This firm represents K██ B████ d/b/a Pro Venture LLC in connection with the matters addressed herein. As explained below, Ms. B████ demands payment of ████ (the "Payment") as a result of Ascend Ecom, LLC's ("Ascend") wrongful conduct leading to the gross mismanagement of Ms. B████'s online store.

## I.    Demand for Payment

### A.    *Contractual Violations*

Ms. B████ is a single mother of two teenagers. Her hope was that Ascend would be able to assist her in opening, managing, and operating an online store that could help fund her kids' college education. Unfortunately, as further explained below, her experiences with Ascend have worsened her financial situation and left her regretting ever having engaged your company in the first place.

On June 22, 2022, during Ascend's initial sales pitch to Ms. B████ over a phone call, Ascend's then-Online Sales Specialist, Cole Angelle, represented to Ms. B████ that Ascend could help her meet her goal of funding her kid's college education. More specifically, Mr. Angelle told Ms. B████ that by signing up with Ascend she "can expect to break even in year one, and by year two, with [her] providing the right capital, [she] would make six-figures with five-figure profit each month, plus the store appreciation factor." Then, Mr. Angelle represented that Ms. B████ would achieve "10-15K profit per month if [she] spent 50-70K on inventory and working capital." These representations, among others, would ultimately prove to be false, and information learned shows that Ascend knew or should have known these representations were false when they were made.

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

**EX 23**
**2238**

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

On September 22, 2022, Ms. B███ and Ascend executed the Amazon FBA Management Agreement (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit A**. In early-October 2022, shortly after executing the Agreement, Ms. B███ paid Ascend $40,000 for her online store and private label designation.

By December 2022, three months after the Agreement was executed, Ms. B███ began asking Ascend when she could anticipate seeing sales in her online store. Ms. B███ sent multiple correspondences and, incredibly (and evidencing that from the onset Ascend never intended to live up to its promises), Ascend did not respond until February 1, 2023. On that day, Robert Comanda, a Client Relations Agent at Ascend, responded via Click-Up and said:

> we are frequently communicating with your store managers and reiterating to them the urgency of the concern. We are reminding them to hasten the process to get more items to be sold in your store. We are trying to get a clear timeline from them. I will let you know asap.

Two weeks later, Ms. B███ followed up again requesting a status update. Mr. Comanda again responded and explained that there were "hiccups" in the FBM method in Ms. B███'s store, and refused to further elaborate. Not long thereafter, Ascend informed its customers that it was moving away from Click-Up, and then blocked its customers' ability to log-in and access their prior communications with your company. This conduct further shows that Ascend never intended to live up to its promises. A copy of the communications memorializing this timeline are attached hereto as **Composite Exhibit B**.

On March 12, 2023, Ms. B███ received invoices from Ascend for $30,000 to purchase inventory for her store. Still believing Ascend's representations that her sales would soon begin, Ms. B███ purchased tens-of-thousands of dollars of inventory on her credit card. However, Ms. B███'s store was not in fact eligible to sell the items selected by Ascend because her store was considered to be a new seller. Ascend had not informed Ms. B███ of this ineligibility. Acknowledging its negligence, Ascend ultimately agreed to fully replace the store's ineligible merchandise.

On or around March 23, 2023, in an attempt to remediate the initial issues associated with setting up Ms. B███'s online store, Ascend agreed to (i) decrease its profit split to 25% until the end of 2023, (ii) assign a new performance manager to her store, (iii) have the "***first batch of purchases . . . assessed and done by next week***", and (iv) create a WhatsApp group chat for more effective communication. *See id.* (emphasis added). Subsequently, Ms. B███ spoke to you, Mr. Basta, on the phone and you personally assured her that her sales would start within the next three weeks. Despite these representations by you and Ascend, these sales did not occur when promised.

In July 2023, Ms. B███ informed Ascend that its gross mismanagement of her store placed the company in breach of the Agreement and requested that her Agreement be terminated. In response, Jeremy Leung, one of the founders of Ascend, represented that $5,000 of replacement inventory had already been shipped to her store, approximately $9,000 in additional inventory would be shipped the next week, and a full replacement of her store's inventory would

**EX 23
2239**

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

be made the following week. However, when Ms. B▮▮▮▮ asked Ascend to confirm shipment of this replacement merchandise, Ascend could not confirm that it shipped any replacement merchandise to her store.

On August 6, 2023, Ms. B▮▮▮▮ received an email from Amazon notifying her that the intended replacement merchandise in her store consists of counterfeit products, including counterfeit Porsche hats, Gerber knives, and a tanning mitt. A true and correct copy of Amazon's email notifying Ms. B▮▮▮▮ of the counterfeit goods is attached hereto as **Exhibit C**. Four days later, on August 10, 2023, Ms. B▮▮▮▮ received a Cease-and-Desist letter from Gerber demanding $25,000 and threatening that she immediately stop selling counterfeit Gerber marks through her store or else Gerber would initiate a lawsuit against her. A true and correct copy of Gerber's Cease and Desist letter is attached hereto as **Exhibit D**. Ms. B▮▮▮▮ brought this issue to your attention personally, Mr. Basta, and you did nothing to assist her and left a single mother of two to fend for herself. Ultimately, as a result of your willful inaction, Ms. B▮▮▮▮ received the following correspondence from Amazon on September 11, 2023:

> Your Amazon selling account has been deactivated. Your listings have been removed in accordance with section 3 of the Amazon Services Business Solutions Agreement. We leveraged a combination of automated means and expert human review to make this decision. We are withholding any funds available in your account. If you have FBA inventory of the items causing "inauthentic" complaints, they are currently ineligible for removal.

A true and correct copy of Amazon's e-mail to Ms. B▮▮▮▮ is attached hereto as **Exhibit E**. Now that Ms. B▮▮▮▮'s store is shut down, she has no way to recoup the funds she invested in inventory or the upfront costs she paid Ascend to run her store.

Based on the forgoing, there is clear evidence proving that Ascend willfully mismanaged Ms. B▮▮▮▮'s store and breached the Agreement. For example, the Agreement expressly requires that Ascend will research products and provide quality assurance for product services. *See* **Exhibit A** at § 1.1. The Agreement also provides that Ascend will build and manage the store in a "professional manner" and to the "best of its abilities." *See id.* at § 1.5. Ascend has not only failed to meet these basic performance thresholds, it has failed to use even reasonable efforts to manage Ms. B▮▮▮▮'s store. Simply put, Ascend has woefully failed to uphold its end of the bargain and is in clear breach of the Agreement.

### B.  Violations of Federal Consumer Protection Laws

Ascend not only failed to uphold its obligations under the Agreement but it also flagrantly disregarded well-established federal consumer protection laws. It has come to our attention that Ascend is currently under scrutiny by the Federal Trade Commission ("FTC") as part of an ongoing investigation into Roman Cresto and John Cresto, the founders of Automators.AI. In its recent lawsuit against the Crestos, the FTC not only highlights Ascend's role as the FBA-provider for Automators.AI, but also Ascend's numerous consumer issues. More specifically, the FTC provides that since "August 1, 2023, the FTC has received approximately

3

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2240

# PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
### ATTORNEYS AT LAW

18 consumer complaints against Ascend Ecom. Consumers reported poor sales in their Amazon stores and issues with suspended and/or terminated stores."

Ascend's misconduct associated with Ms. B░░░░ constitutes violations of the Business Opportunity Rule, 16 C.F.R. § 437, and the FTC Act, 15 U.S.C. § 45. For example, around when Ms. B░░░ first considered doing business with Ascend, she expressly requested return-on-investment information from Mr. Angelle and others in order to confirm Ascend's purported management capabilities. Ascend, however, flatly refused to provide Ms. B░░░ with such information and instead represented to her that she can expect to break even in one year.

The Business Opportunity Rule requires sellers, such as Ascend, to provide prospective purchasers with a disclosure document form together with any required attachments. In this disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). This information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. Ascend failed to adhere to any of these clear federal protocols when it fraudulently induced Ms. B░░░ into entering into the Agreement.

Further, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." The fraudulent and deceptive representations made by Cole Angelle, Robert Comanda, Jeremy Leung, and you (collectively, Ascend's "Agents"), as outlined in this demand, constitute a clear violation of the FTC Act.

## C.  Demand for Damages

As demonstrated herein, there is clear evidence that the representations and omissions made by Ascend—which includes, for the avoidance of doubt, misrepresentations made by Cole Angelle, Robert Comanda, Jeremy Leung, and you, personally—were fraudulent and deceptive. The direct result of this fraudulent activity is that Ms. B░░░ has and continues to accrue considerable damages amounting to ░░░░. A breakdown of my clients' damages calculation is provided as follows:

| Damages Category | Amount |
| --- | --- |
| Payment to Ascend for Non-Private Label Store | $30,000.00 |
| Payment to Ascend for Private Label Store | $10,000.00 |
| Legal Fees for Setting Up LLC and Operating Agreement | ░░░░ |
| Payments to CPA to file Quarterly Taxes | |
| Payments to CPS for TX and CO Sales Tax | $60.00 |
| Ascend Billing for Inventory (Slim Jims) for Non-Private Label Store | $9,646.97 |
| Ascend Billing for Inventory (Nestle Coffee Mate, Cesar Dog Food, Vitafusion Gummies, and Merchant Fee) for Non-Private Label Store | $21,378.80 |
| Payment to Alibaba for Design of 2-in-1 Car Desk for Private Label Store | $2,063.52 |

4

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2241

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

| | |
|---|---|
| Payment Made to TopWin Inspection to Inspective Private Label Store Item | $200.00 |
| Lost Profits from Alternative Business Opportunities | |
| **Total Damages to Date:** | |

    The aforementioned documents, representations, and omissions made by Ascend against Ms. B▊▊▊ serves as clear evidence of fraud, and we have no doubt that we will not only be successful in pursuing claims against Ascend, but also in piercing the corporate veil and bringing individual claims against each of its Agents for your participation and furtherance of Ascend's fraudulent scheme. Further, the actions of Ascend and its Agents constitute a violation of Florida's Deceptive and Unfair Trade Practices act, § 501.211(2), Fla. Stat. (thereby entitling my client to attorneys' fees in a lawsuit).

    With that said, while my client recognizes the strength of her case, she also acknowledges the benefit of a pre-suit settlement. **If you wish to avoid parties expending substantial funds litigating this matter, we demand that you remit Payment to my clients no later than by Friday, September 22, 2023**. If you fail to comply with this demand, my client shall pursue all available legal and equitable remedies against Ascend and its Agents. Your prompt response is anticipated and encouraged.

## II.    Demand for Insurance Information

    Ms. B▊▊▊ is also hereby serving a statutory demand for professional liability insurance information and documentation on Ascend.  Please be advised that Section 627.4137(1), Florida Statutes, provides as follows:

Disclosure of certain information required.

1. Each insurer which does or may provide liability insurance coverage to pay all or a portion of any claim which might be made shall provide, within 30 days of the written request of the claimant, a statement, under oath , of a corporate officer or the insurer's claim manager or superintendent setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance:

a.     The name of the insurer.
b.     The name of each insured.
c.     The limits of the liability coverage.
d.     A statement of any policy or coverage defense, which such insurer reasonably believes is available to such insurer at the time of filing such statement.
e.     A copy of the policy.

In addition, the insured, or her or his insurance agent, upon written request of the claimant or the claimant's attorney, shall disclose the name and coverage of each known insurer to the claimant and shall forward such request for information as

5

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2242

required by this subsection to all affected insurers. The insurer shall then supply the information required in this subsection to the claimant within 30 days of receipt of such request.

2.      The statement required by subsection (1) shall be amended immediately upon discovery of facts calling for an amendment to such statement.

3.      Any request made to self-insured corporation pursuant to this section shall be sent by certified mail to the registered agent of the disclosing entity.

We look forward to timely compliance with the above statutory demand.

## III.      Litigation Hold to Preserve Documents and ESI

In anticipation of litigation, this communication also constitutes a demand that Ascend immediately take affirmative steps to preserve all documents and ESI.

This letter also constitutes my client's formal demand that you immediately take all steps necessary to identify, retain, and preserve all documentary evidence and all electronic media in your possession, custody, or control that contain information or data relevant to any statements you have made verbally or in writing regarding the issues referenced herein, ***including any emails or text messages related to the specific conduct mentioned in this letter (including such emails or text messages between Ascend's Agents and Ms. B_____)***. My client further demands that you avoid spoliation of all such relevant information and data. Data includes not only information that can be perceived and read by Ascend and/or its Agents' computers, computer systems, and programs installed thereon (including any personal computers, tablets and smart phones which you hold and/or use), but also all data on relevant electronic media that cannot be perceived by Ascend and/or its Agents' computers, computer systems, or programs but can be recovered and analyzed using computer forensic techniques. Data that cannot be perceived by the computer operating systems include deleted, hidden, and orphaned data and artifacts and residual data created in the normal course of using a computer system.

Further, this communication constitutes formal notice and demand that all relevant data, information, records, invoices, and any other media that may contain or reference content relevant to the matter referenced above be safeguarded from destruction from any cause, including destruction caused by any of their policies related to retention of electronic data, including backup, restoration, deletion, destruction, and tape recycling. Destruction of relevant data under any professed corporate document retention policy may be spoliation.

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

# PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

ATTORNEYS AT LAW

**Nothing herein is intended to limit, waive, restrict or otherwise alter any of the Ms. B████'s rights and/or remedies under any applicable agreement, at law, and/or in equity, and same are hereby expressly reserved and preserved.**

Sincerely,

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L

Nima Tahmassebi

Cc:     K██  B██████

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

**EX 23**
**2244**

# Composite Attachment B
## *Exhibit A*

EX 23
2245



# Amazon FBA Management Agreement

**Prepared for:**
K███ B███████
**Created by:**
Ascend Ecom LLC

# AMAZON MASTER SERVICES AGREEMENT

This Amazon Master Services Agreement (this "**Agreement**"), dated and effective as of the last date identified on the signature page below to this Agreement ("**Effective Date**", is entered into by and between Ascend Ecom LLC, a Wyoming Limited Liability Company (hereafter referred to as "**Manager**"), and the individual or entity set forth on the signature page attached hereto (hereafter referred to as "**Client**").    Manager and Client are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

# RECITALS

WHEREAS, Amazon.com is an eCommerce website that allows customers to buy and sell products. Amazon.com provides a platform called Amazon Seller Central for prospective Sellers of Products, that permits, buying, selling, storage, and shipping of goods on the Amazon.com eCommerce website and Amazon.com FBA warehouses. Amazon.com allows individuals and businesses to create an Amazon Seller Central account (herein referred to as the "**Account**") This Account allows a seller of products to generate a monthly amount of product sales revenue (herein referred to as "**Gross Revenue**").

WHEREAS, Manager is engaged in providing Amazon.com Seller Central account management services (herein referred to as the "**Services**"). Manager desires to provide Client with these Services;

WHEREAS, Client desires to retain Manager to provide the Services as outlined in this Agreement.

NOW, THEREFORE, for and in consideration of mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties here to, intending to be legally bound, hereby agree as follows:

# AGREEMENT

## 1. MANAGER SERVICES

**1.1 Services.**   Manager agrees that it shall provide the Client with the Services, which will include the skills, guidance, expertise, know-how, and deliverables for which it is commissioned as set forth in the

statement of work ("**SOW**") in Exhibit A hereto and in addition to the SOW, Manager agrees to the following duties and deliverables:

- Amazon.com Seller Central Approval Services
  - Manager will assist Client in applying for approval to open an Account.
- Reseller Certificate Services
  - Manager will assist Client in applying for the necessary Reseller Permit for the required region.
- Product Services
  - Manager will research all products listed on Clients Account prior to listing. The research will consist of analysis of market trends, quality assurance, product analysis, etc.
  - Manager will source products from its suppliers, if necessary, on behalf of the Client.
  - Manager will list products for sale on behalf of Client.
  - Manager will receive shipments of products from Wholesale Suppliers, prior to any Amazon.com shipments. These shipments can be received at the predefined warehouse managed by the Manager.
  - Manager will repackage any product containers sent to its warehouse on behalf of Client. The product containers will be repackaged to the specifications and requirements of Amazon.com Packaging and prep requirements, as defined on https://sellercentral.amazon.com/gp/help/external/200141500 or as may be defined by Amazon.com at a later date.
  - Manager will ship repackaged product containers to approved Amazon.com FBA warehouses, on behalf of Client, to be listed for sale on the Client's Account. In case of damage and/or losses, amounts will be noted and deducted from Manager's profit split.
  - Manager will provide all necessary elements of listing an item on Amazon.com. These elements may include, but are not limited to, Product Title, Brand Name, Color, Variant, Unit Size, Weight, Quantity, Keywords, Product Images, Bullet Points and Product Description.
- Technology Services
  - Manager will provide Client with access to the CRM used by Manager to track various elements of the different stages during the term of the Services.
- Wholesale Contract Services
  - Manager will source new Wholesale contracts on behalf of Client. These details will be tracked via the CRM.
- Customer Support Services
  - Manager will maintain bookkeeping based on all transactions under its purview.
- Account Services
  - Manager will provide general oversight of the Account and its financial performance.
  - Manager will provide proper and accurate billing for the Services as set forth in Section 2.4.
- Reinstatement Services
  - In the rare and unlikely event Client's Account becomes suspended, Manager will handle all duties to reinstate store for active sales, but there are no guarantees of reinstatement. If Amazon.com permanently suspends Client's store for any reason, Manager will build

Document Ref: 8LVKU-S6EXO-8NFRK-YI2PV

Client another e-commerce store (whether that be another Account, Walmart Store or other) at no additional cost.

In the event the provisions set forth above conflict with the provisions set forth in the SOW, the provisions of the SOW will control.

The Manager retains the right to provide and use an outside contractor at the Manager's discretion without notifying the Client as long as the services are being provided as stated above; provided that Manager controls the delivery of such Services to Client and remains responsible to Client for the delivery of such Services and the compliance by any such outside contractor with the terms of this Agreement and any applicable SOW in the same manner and to the same extent as applicable to Manager.

**1.2 Independent Contractor Status.**  The Parties are not entering into a partnership or joint venture by virtue of this Agreement. In all matters covered by this Agreement, Manager will act as an independent contractor. Accordingly, Manager will not be required to devote its full time to representing Client. Manager may perform the same or similar services for others, as well as engage in any other business activities.

 **1.3 Non-Exclusive Services.**  Manager's services hereunder shall not be exclusive to Client, and at all times Manager shall be free to perform the same or similar services for others, as well as to engage in any and all other business activities, provided that such other activities do not interfere with Manager's services to Client hereunder.

**1.4 No Financial Responsibility.**  In no event shall Manager be responsible for payment of any kind or financial obligation to Client's credit lines or working capital balances. All payment obligations for any credit lines or working capital balances shall be solely that of Client. Manager also does not provide financial or tax advice to Client.

**1.5 Best Efforts.**   Manager will service Client in a professional manner and to the best of its abilities. Manager cannot and does not guarantee the outcome of its services. Manager cannot and does not guarantee that Client will generate a certain amount of income.

## 2. CLIENT REQUIREMENTS

**2.1 Account Setup Requirements.**    Prior to Manager's performance of the Services outlined above, Client shall establish an Account. Manager may assist Client in this process. This Account will be owned

**EX 23**
**2249** Page 4 of 15

by Client and Client will establish Manager and its representatives as an "authorized user" on the Account, with admin access.

**2.2 Access to Working Capital.**    Client will use their best efforts to obtain and maintain, for the duration of this Agreement, credit lines issued through the United States federally insured banking institution or other working capital (herein referred to as "**Capital**") with a **"Minimum Monthly Available Capital Balance**", as defined in the SOW. This capital will be used to purchase goods for resale on Client's Account. Client shall notify Manager if Client uses this capital for any reason outside the scope of this agreement. This Minimum Monthly Available Capital Balance, as defined in the SOW, must be maintained and fully accessible to Manager throughout the duration of the term of this agreement, in order for the Buyback Option provided in Section 3.2 to remain valid. Client must provide the Manager with any card numbers and/or billing information for the Manager to fulfill orders, pay suppliers, pay third party software fees and pay Amazon.com professional seller fees. Client will endeavor to pay off the full balance of the capital, within 7 days of receipt of Gross Revenue. Client will promptly communicate with Manager if the Client is unable to pay off the full Capital balance, within 7 days, for any reason.

**2.3 Initial Service Fee.**    Client will pay an Initial Service Fee to Manager, as referenced in the SOW, which is due in full upon signing of this agreement. This payment will initiate the Manager services to build Client's Account and obtain Account approval, in conjunction with Section 2.1 above. This initial service fee is fully refundable at the earlier of (i) two weeks from the date Manager applies for Amazon Approval or (ii) anytime thereafter if client is unsuccessful obtaining approval to become an Amazon.com Seller. Manager is not obligated to initiate any work until this upfront service fee is paid by Client.

**2.4 Revenue Share.**    Manager provides ongoing services to maintain and operate Client's Account in exchange for a percentage of Net Profits, as defined in Section 4.2 below (herein referred to as "**Revenue Share**"). The Revenue Share percentage, as defined in the SOW, is payable on all Net Profit within 30 days from the date the Gross Revenue is received by Client or by any third Party on Client's behalf. Manager will provide the Client with a written statement of account showing any Gross Revenue produced by Manager on Client's behalf and the expenses (if any) incurred by Manager under this Agreement, subject to section 4.2 below.

**2.5 Optional Payment to Reduce Revenue Share.**    Any time after Client's Account has been operational for at least 3 months Client has the option, at Client's sole discretion, to pay Manager an additional $5,000 to reduce Manager's Revenue Share by 5%. Any time after Client's Account has been operational for at least 6 months Client has the option, at Client's sole discretion, to pay Manager an additional $5,000 to reduce the Manager's Revenue Share by an additional 5%. To enact these optional payment(s) and reduce Manager's Revenue Share, Client must submit this notice in writing and submit payment to Manager and is subject for

Document Ref: 8LVKU-S6EXO-8NFRK-YI2PV

**EX 23
2250**

approval. Once approved, the reduction of Manager's Revenue Share will be implemented no more than 30 days from Client's written request.

**2.6 Store Access and Functionality.**    Client must provide Manager with admin level access to its Account via the "User Permissions" section of https://sellercentral.amazon.com/. Unless recommended by Manager, (i) Client should refrain from disabling any Account functionality, including Pausing its Store, allowing for a Suspension, or placing its Account or Store in Vacation Mode, such terms being defined or referenced on the amazon website or in other written materials made available to Client, and (ii) Client should not allow its Store to remain shut down for more than sixty (60) days during the term of this Agreement. Manager shall not be held responsible for any loss of revenue due to the disabling of Amazon.com functionality or the actions of any additional client-authorized users of the Account.

**2.7 Engagement.**    During the term of this Agreement, Client agrees to not simultaneously engage any other person or entity to act for Client in the same capacity and on the same Account in which Client has engaged Manager for Account Services.

**2.8 Entity Formation.**    Client is responsible for any business formation/management concerning its own affairs, including but not limited to: entity formation, obtaining an employer identification number, and obtaining a resale certificate.

## 3. TERM, TERMINATION, AND REFUND OPTION

**3.1 Term and Termination.**    The initial term of this Agreement will be for 24 (Twenty-Four) months to begin on the date that the Client's Account has been approved and launched with products actively listed for sale. The term shall pause if for any reason the Client's Account becomes suspended or no longer active, or if client fails to meet the Minimum Monthly Available Capital Balance, as defined in the SOW, to be used for purchasing inventory. The term will continue at any time that Client has an active Account operating with products actively listed for sale and a sufficient Minimum Monthly Available Capital Balance. The term will automatically renew on a month-to-month basis thereafter, until Client or Manager provides written notice of termination for any reason with 30 days' notice.

**3.2 Option to Request Buyback.**    After the initial 24-month term, if the Client has not made a total amount of Net Profit equal to the **amount of the Initial Service Fee only**, referenced in the SOW, in Client's allocated share of Net Profit, Client has the option to request the Manager to buy the Client's Account within a 45-day period following the 24th month. To exercise this buyback option, Client must notify Manager of that election in writing. Manager will refund the difference between the Initial Service Fee and the total Net Profit earned during the Term, provided that this Agreement remains in

**EX 23**

Document Ref: 8LVKU-S6EXO-8NFRK-YI2PV

full force and effect at the time Client exercises this refund option. The Parties further agree that under no circumstances shall this refund amount exceed the Initial Service Fee.

**3.3 Client's Sale of Store.**    If Client decides to sell the Account to a buyer at any time during the term of the agreement, Manager will provide all necessary documents and reporting for the managed Account.  During this "transitional period" Manager will have 45 days from the date of the notice to provide a business plan, educational services,  and transfer services of all Amazon operations to any new buyer. Manager may also provide assistance in sourcing a buyer upon Client's request. In exchange for these services, Manager will receive a 10% commission of the sale price of the Account to the new buyer if Manager is involved in brokering the sale. This 10% commission will only be payable to Manager regardless of handling management.

## 4. NET PROFIT STATEMENT

**4.1 Statement of Invoice.**    Client will receive a statement with an invoice on the first of every month, detailing Client's Net Profits and Manager's Revenue Share to be paid by Client. Payment to Manager from Client will be due no later than 30 days (thirty days) from receipt of invoice. In addition to the amount invoiced, if any payment is not timely made by the aforementioned timeframe, in addition to the sum due there shall be a late payment penalty due in an amount equal to one and one half percent (1.5%) of the payment due for each day after the date due through and including the date paid.

**4.2 Net Profit.**    Net Profit is defined as Gross Revenue, less cost of goods sold, less Amazon.com professional seller fees, less supplier and/or third party software costs; provided that, as a condition to deducting supplier or third party software costs, Manager shall provide Client with invoices substantiating such deductions prior to deducting them as expenses in calculating the Net Profit.

**4.3 Seller Fees and Software Costs.**  The Amazon.com professional seller fees and supplier/ third party software costs are deducted from the Gross Revenue, as defined in section 4.2. Amazon.com professional seller fees are outlined on the Account and are not subject to Manager's control. The supplier/third party software costs start at $0/month for the first 30 days but costs are not guaranteed to remain consistent throughout the term.

## 5. FORCE MAJEURE

Neither party shall bear responsibility for the complete or partial non-performance of its obligations if the non-performance results from causes, events, conditions or circumstances beyond its reasonable control that were not reasonably foreseeable, such as (each a "**Force Majeure Event**") acts of God, war, civil disturbance, insurrection, terrorism, fire, flood, earthquake, acts of default of common carriers, strikes, boycotts, public pandemic, Laws or orders (and changes thereto), or other similar

circumstances. The party for whom it has become impossible to meet its obligations under this Agreement shall immediately advise the circumstances preventing the fulfillment of its obligations and shall take all reasonable actions to cure the force majeure event(s). In such event, the time for performance will be extended for the period of time equal to the time lost by reason of such occurrence.

## 6. SECURITY

In providing its Service, Manager will:

6.1    Limit use of its access to Client's Account to providing the Service and also restrict this access to the Manager employees specifically authorized to provide the Service.

6.2    Copy certain data from the Account ("Client's Data") to Manager's technical platform where the Client's Data will be stored, formatted and compiled with other data.

6.3    Display certain of Client's Data as well as information about Manager's activities in performing the Services on the Manager Client Portal website ("Client Portal").

6.4    Undertake its best efforts to ensure the security of its access to Client's Account, Client's Data on the Manager platform and Client's access to the Client Portal.

6.5    Protect and preserve the confidentiality of Client's Data, including by not sharing Client's Data with any party, except as authorized in Section 1.1.

6.6    Be in compliance with all applicable data laws, rules and regulations for the management and storage of protected data.

## 7. CONFIDENTIALITY

Manager will not in any time or in any manner, either directly or indirectly, use for the personal benefit of the Manager, or divulge, disclose, or communicate in any manner any information that is proprietary to the Client (e.g., trade secrets, know-how and confidential information). Manager will protect such information and treat it as strictly confidential. This provision shall continue to be effective after the termination of this agreement. The Client may seek and obtain injunctive relief against the release or threatened release of such information in addition to any other legal remedies, which may be available.

## 8. IP AND CLIENT ACCOUNT OWNERSHIP

Client and its licensors are, and will remain, the sole and exclusive owners of all right, title, and interest in and to all Client materials provided to Manager for inclusion in the Amazon Store, including all

**EX 23**
**2253**

Intellectual Property Rights therein, including, but not limited to, all customer data, order data, all customer accounts and all other content used in the Amazon Store.

## 9. BREACH

The Manager acknowledges and agrees that any breach or threatened breach of Sections 7 and 8 of this Agreement would cause immediate and irreparable harm to Client, which would not be adequately compensated by damages. Manager therefore agrees that in the event of such breach or threatened breach and in addition to any other remedies available under this Agreement or at law, the Client shall have the right to secure equitable and injunctive relief, without bond, in connection with such a breach or threatened breach.

## 10. INDEMNIFICATION

10.1    Each Party (the "Indemnifying Party") shall defend, indemnify, and hold harmless the other Party and its affiliates and their officers, directors, employees, agents, successors, and assigns ("the Indemnified Party") from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: (1)  bodily injury, death of any person, or damage to real or tangible, personal property resulting from the Indemnifying Party's acts or omissions; and (b) the Indemnifying Party's breach of any representation, warranty, or obligation under this Agreement.

10.2    The Indemnified Party shall give notice to Indemnifying Party promptly after receiving actual knowledge of any claim for which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim, or any litigation resulting from it, provided that counsel for the Indemnifying Party, who shall conduct the defense of the claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may, at its own expense, participate in the defense, and provided further that the failure of any Indemnified Party to give the required notice shall not relieve the Indemnifying Party of its obligations under the Agreement unless the failure to give notice is materially prejudicial to an Indemnifying Party's ability to defend the action.

10.3    The Indemnified Party shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld) unless suit has been instituted against it and the Indemnifying Party has not, after notification, taken control of the suit.

**EX 23**
**2254** Page 9 of 15

**10.4**    Notwithstanding the foregoing, however, (i) if the Indemnified Party reasonably determines that there may be a conflict between the positions of the Indemnifying Party and of the Indemnified Party in connection with the defense of an action, suit, investigation, inquiry or other proceeding, or that there may be legal defenses available to the Indemnified Party different from or in addition to those available to the Indemnifying Party, then counsel for the Indemnified Party shall be entitled to conduct a defense to the extent it reasonably determines necessary to protect the interest of the Indemnified Party, and (ii) in any event, the Indemnified Party shall be entitled to have counsel of its choice participate in, though not to conduct, the defense. No Indemnifying Party, in the defense of any claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term the giving by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect to the claim or litigation.

## 11. MISCELLANEOUS

**11.1 Authority to Act**.    Client authorizes Manager to act for Client by performing the Services, as defined in Section 1.1 of this agreement.

**11.2 Notices.**    All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the following addresses:

If to Manager:    Ascend Ecom LLC
2219 Main Street
Santa Monica, CA, 90405
support@ascendecom.com

If to Client:    ▇▇▇▇▇▇▇ / Pro Venture LLC

▇▇▇▇▇▇▇

▇▇▇▇▇ CO ▇▇▇▇

▇▇▇▇▇ @gmail.com

(Or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only if (a) the receiving party has received the Notice and (b) the party giving the Notice has complied with the requirements of this Section.

**11.3 Rescission and Refund.**    Client is entitled to a three (3) calendar day rescission period and entitled to cancel the contract. After the three (3) calendar day rescission period has passed the Client will not be entitled to a refund.

**EX 23**
**2255**

**11.4 Assignment.**    Neither Client nor Manager has the right to assign this Agreement or any rights or obligations under the Agreement without the express written consent of the other, except that either party may assign this Agreement without the other party's consent to any firm, corporation or other entity of which either party is an officer, partner, employee, or consultant. Subject to the preceding restriction, upon receiving the express written consent of the other party to this Agreement, the Agreement shall be binding on, inure to the benefit of, and be enforceable against the parties and the respective successors and assigns.

**11.5 No Encumbrances.**    Each Party warrants that it is free to enter into and to perform under this Agreement and to grand the rights, options, powers and privileges herein granted, and to perform every service described in this Agreement, and neither Party is a party to any presently existing contract, nor has or will have any obligation, that would interfere with full performance of the terms of this Agreement.

**11.6 Additional Services.**    Any additional Services provided by Manager may be requested by Client at any time. Any additional Services added shall be defined in the attached SOW. The SOW maybe modified at any time, if agreed to by both Parties. These additional services include but are not limited to; drop shipping, private label and additional wholesale brands.

**11.7 Limitation of Liability.**    Manager shall not be liable for any incidental, consequential, indirect or special damages, or for the loss of profits or business interruptions caused or alleged to have been caused by the performance or nonperformance of Manager's services. Client agrees that, in the event that Manager is determined to be liable for any such loss, Client's sole remedy against Manager is limited to a refund of payments made by Client for services. Manager is not responsible for errors which result from faulty or incomplete information supplied to Manager by Client. Manager shall not be liable to Client for any costs, damages or delays due to causes beyond its control, expressly including without limitation, unknown site characteristics; changes in policies, changes in terms of service, and viruses.

**11.8 Disputes and Governing Law.**    The Parties agree that any dispute regarding this Agreement, including any claim made by Client for return of fees paid to Manager, shall be construed and enforced in accordance with the laws of the United States of America and of the State of Florida, Palm Beach

Document Ref: 8LVKU-S6EXO-8NFRK-YI2PV

County. Florida shall be the site of any legal proceeding arising out of or relating to this Agreement. NEITHER CLIENT NOR COMPANY SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS BY OR AGAINST OTHER CLIENTS, OR PURSUE ANY CLAIM AS A REPRESENTATIVE OR CLASS ACTION OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

**11.9 Arbitration.**    Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, on behalf of the Client shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**11.10 Entire Agreement.**    This Agreement constitutes the entire agreement between the Parties. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force and effect. Any amendment to this Agreement shall be of no force and effect unless it is in writing and signed by the Parties.

**11.11 Severability.**    Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, and shall not in any manner affect the remaining provisions hereof in such jurisdiction or render any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**11.12 Independent Counsel.**    The parties acknowledge that they had the right and adequate time to have independent legal counsel of their own choosing review and advise on this Agreement prior to execution.

**11.13 Counterparts.**    This Agreement may be executed in one or more counterparts. All such counterparts shall constitute one agreement binding on the Parties notwithstanding that both of the Parties are not signatories to the original or same counterpart. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the Parties. The Agreement shall be considered executed and binding once one of the Parties possesses an Agreement that expresses signatures by all Parties.

**EX 23**
**2257** Page 12 of 15

By signing below, the undersigned acknowledge reading, understanding, and agreeing to the terms of this Agreement thereby causing it to be executed once signed by all Parties.

IN WITNESS WHEREOF, by the execution of both parties below, this consulting agreement is declared valid and will form a part of the Contract in conjunction with any other relevant documents and agreements presented on behalf of either party.

K███ E██████                                    Ascend Ecom LLC

X                            X

By:   K████ B██████                             By:   Ascend Ecom LLC

Date: 2022-09-22                                Date: 2022-09-22

Document Ref: 8LVKU-S6EXO-8NFRK-YI2PV

# EXHIBIT A

## Statement of Work

This Statement of Work ("**SOW**"), adopts and incorporates by reference, and shall be subject to, the terms and conditions of the Amazon Master Services Agreement (the "**Agreement**"), dated and effective as of the last date identified on the signature lines below to this SOW ("**Effective Date**").  Any Services performed under this SOW will be conducted in accordance with the Agreement.

The Manager agrees that it shall provide the Client with Management services including the skills, guidance, expertise, know-how, and deliverables for which it is commissioned.

As part of this agreement, the Manager and Client agree to the following Items and associated Amount(s):

| SERVICES | COST TO CLIENT |
|---|---|
|  |  |
| Amazon Store Build + FBA product sourcing ("Initial Service Fee") | $ 30,000 |
| Amazon Store Management + Growth ("Revenue Share") | 40% |
| Reseller Certificate | $ 50.00 - 100.00 |
| Ungating | $ 0 |
| Private Label* | $ 10,000 |
| Monthly Software Fee (subject to change) | $ 89 - 300 |
| Minimum Monthly Available Capital Balance | $ 30,000 |

*Client to receive 100% profits for Private Label products until investment of $10,000 is recouped. PL profit split becomes 80/20 after.

**EX 23**

**2259** Page 14 of 15

Both parties agree that the services, duties and deliverables listed above represent an accurate scope of work as defined by the terms of this agreement.

K█ B█████                                      Ascend Ecom LLC

X    *K█ B████*                                X    ~~signature~~

By:    K██ B█████                             By:    Ascend Ecom LLC

Date:    2022-09-22                           Date:    2022-09-22

**EX 23**
**2260** Page 15 of 15

# Signature Certificate

Reference number: 8LVKU-S6EXO-8NFRK-YI2PV

| Signer | Timestamp | Signature |
|---|---|---|

**K_____.com**

| | |
|---|---|
| Sent: | 21 Sep 2022 18:44:43 UTC |
| Viewed: | 22 Sep 2022 19:46:41 UTC |
| Signed: | 22 Sep 2022 19:58:02 UTC |

**Recipient Verification:**
✔Email verified           22 Sep 2022 19:46:41 UTC

IP address:
Location: _____ United States

---

**Will Basta**
Email: contracts@ascendecom.com

| | |
|---|---|
| Sent: | 21 Sep 2022 18:44:43 UTC |
| Viewed: | 21 Sep 2022 18:45:29 UTC |
| Signed: | 23 Sep 2022 11:36:05 UTC |

IP address: 49.148.204.45
Location: Iligan City, Philippines

Document completed by all parties on:
23 Sep 2022 11:36:05 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



# Composite Attachment B
*Composite Exhibit B*

**EX 23**
**2262**

---------- Forwarded message ---------
From: K██ B███████ <b███████@gmail.com>
Date: Tue, Jan 17, 2023 at 10:32 AM
Subject: Re: Store questions
To: Raymond Villanueva <raymond@ascendecom.com>
Cc: Ascend Support <support@ascendecom.com>

Hi Raymond,

Would you please provide me an update as to when cells in my store are going to begin? It was my understanding that the high frequency reselling would be up and running by this point in time. I understand the private label takes a bit longer. Thank you in advance.

-K██

On Dec 15, 2022, at 4:20 PM, Raymond Villanueva <raymond@ascendecom.com> wrote:


Hi K██

Good dat to you. Please see answers to your questions below:

1. Yes the High-frequency Reselling FBM model is being implemented on your Amazon store but it will not be the only strategy available. The Online Arbitrage model under FBA will still be implemented as soon as product research has completed and the team finds profitable items to be sent over to Amazon. FBM is the one that will fill the gaps of this as it will generate the needed sales on the store while that is being done.

2. It will only be one Amazon store that will house FBA, FBM and Private Label items. Private label  does take some time to complete so while that is being done, the above strategies are active.

3. Correct items may not yet show up as purchasing of inventory is in the way. You should see some items start to show up in the next few days as we receive inventory of our HFR FBM items from suppliers.

4. Yes the new email will be used for different supplier accounts where the purchases will be made moving forward using your card. They will still be listed in ClickUp as soon as they are purchased by your store managers.

On Fri, Dec 16, 2022 at 5:23 AM K██ B███████ <██████@gmail.com> wrote:
Hi Raymond and Ascend support team,

I have a few questions about my store(s):

1) My non-private label store will sell using the FBM method, correct? And, my private label store will sell items the private label teams find and share with me, correct? This means I will not be doing the standard type arbitrage in my non-private label store, correct?

2) On Amazon, will I physically have 2 different stores or will both stores be under one name/store- Class Trend?

3) There are still no products in my non-private label store, and I believe this is because products are being purchased as a group from the FBM. When can I expect sales to begin? Can I pay the invoice for items purchased with FBM method with my credit card since the invoice will be coming from Ascend as I

**EX 23**

**2263**

understand it?

4) Robert asked me to create a new email address for FBM method and it is from this email I will see receipts for products purchased? Is this different from seeing products I can see purchased in the click up app?

Thank you,
K███ B█████
Class Trend Store

On Thu, Nov 3, 2022 at 8:30 AM Raymond Villanueva <raymond@ascendecom.com> wrote:
Yes that works. I'll send an invite via google with a zoom link.



**Raymond Villanueva**
Chief VIP Officer at Ascend Ecom

W www.ascendecom.com   E support@ascendecom.com
A 2219 Main St. Santa Monica, CA

On Thu, Nov 3, 2022 at 9:51 PM K███ B██████ <b██████@gmail.com> wrote:
Would 2pm MST work for you?

-K███

On Nov 3, 2022, at 7:46 AM, Raymond Villanueva <raymond@ascendecom.com> wrote:

Hi K███

Good day to you, we have reached out for your available times today so we can assist you with the permissions for your store. May I know what are your available times today so I can have it plotted on my calendar?

Regards,

**Raymond Villanueva**
Chief VIP Officer at Ascend Ecom

W www.ascendecom.com   E support@ascendecom.com
A 2219 Main St. Santa Monica, CA

On Thu, Nov 3, 2022 at 8:36 PM K███ B████ █████@gmail.com> wrote:
Hi Raymond,

Did you receive my message below?

-K███

Begin forwarded message:

**From:** K███ B█████ <█████@gmail.com>
**Date:** November 1, 2022 at 2:05:58 PM MDT
**To:** Raymond Villanueva <raymond@ascendecom.com>
**Subject: Re: Store questions**

Hi Raymond,

**EX 23**
**2264**

Thank you for your time to speak to me the other day. Unfortunately, I continue to have issues in which the team is not able to log into my store. And the instructions from Robert are not clear. I've sent him screenshots of what I have accomplished, but he is requesting that I double save the permissions, which doesn't make any sense because as seen by the screenshots it's already saved. It is not a solution.

Additionally, I received a logo today for my LLC rather than the logo for my store name, which has been a continued problem with Robert. He is not understanding the difference between my store name and the name of my LLC. He initially was asking me to rename my LLC on my seller certificates to my store name, which was incorrect.

I think I need an experienced representative that is able to help me and better understand the needs of starting my store.

-K

> On Oct 28, 2022, at 7:42 AM, Raymond Villanueva <raymond@ascendecom.com> wrote:

> Hi K

> Good morning. Yes we can do it at 11am MST.

> I'll be sending an invite via zoom. Kindly provide your concerns so we can have them checked if we need to get data from other teams.

> Regards,

> On Fri, Oct 28, 2022 at 9:32 AM K     B
> <          @gmail.com> wrote:
>> Hi,

>> Does 11am MST tomorrow (Friday) work?

>> -K

>>> On Oct 27, 2022, at 6:27 PM, Raymond Villanueva <raymond@ascendecom.com> wrote:

>>> Hi K     ,

>>> Good day to you. We understand that you would like to get a call scheduled regarding your concerns. I can definitely assist you with that as I am part of the management team of Ascend Ecom though I mainly interact with a specific group of clients.

>>> May we please know your availability for tomorrow and next week so we can have it synced with our calendar? Also, if possible, please write down any specific topics you'd like us to discuss so we can go through them on the call.

>>> Hoping to hear from you soon.



Regards,

**Raymond Villanueva**
Chief VIP Officer at Ascend Ecom

W www.ascendecom.com   E support@ascendecom.com
A 2219 Main St. Santa Monica, CA

On Fri, Oct 28, 2022 at 12:24 AM K███ B███
████████ @gmail.com> wrote:

Hi Raymond,

Are you the manager of the client relations team? If so, I would like to set up a call to speak with you live. And if not would you please forward this to the manager of the customer relations team for me?

Thank you,

-K███ B███

--

**Raymond Villanueva**
Chief VIP Officer at Ascend Ecom

W www.ascendecom.com   E support@ascendecom.com
A 2219 Main St. Santa Monica, CA

--

**Raymond Villanueva**
Director of Client Relations, **Ascend Ecom**

www.ascendecom.com   support@ascendecom.com
2219 Main St. Santa Monica, CA

**EX 23**
**2266**

App Banner Image

---------- Forwarded message ---------
From: **K** ⬛⬛⬛⬛⬛ @gmail.com>
Date: Tue, Jan 31, 2023 at 10:14 AM
Subject: Store opening
To: <support@ascendecom.com>, Will Basta <contracts@ascendecom.com>

Hi,

I hope you're having a good day. Thank you for reading and responding to this message. I have asked on several occasions now (via email, click up, and now this email) when sales are going to begin in my store, as well as who is now managing my stores, knowing that several folks have change positions within the company. I would like to know when sales will begin for both non-private label and the private private label stores, as well as who is managing each of my stores please. I have yet to receive a response to these questions that I began to ask several weeks ago, so I appreciate your prompt reply. I believe we are five months into our partnership, and that we are behind the timeline suggested in contracting.

Thank you,
-K⬛ B⬛⬛⬛

---------- Forwarded message ---------
From: **K    B                        @gmail.com>
Date: Fri, Feb 17, 2023 at 12:35 PM
Subject: Re: Store opening
To: Ascend Support <support@ascendecom.com>

Hi Robert,
I do not see a message in click up from you- would you please email me the link?

On Fri, Feb 17, 2023 at 11:34 AM Ascend Support <support@ascendecom.com> wrote:

Hi          ,

I have also left a message on your ClickUp message board. No worries, as soon as I heard from the
team I will update you.

Regards,

**Robert Comanda**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com    support@ascendecom.com
2219 Main St. Santa Monica, CA

App Banner Image



On Sat, Feb 18, 2023 at 2:21 AM K████ B████████ ████████@gmail.com> wrote:
Thank you Robert, I will wait to hear from you.
-K███

On Tue, Feb 14, 2023 at 10:25 AM Ascend Support <support@ascendecom.com> wrote:
Hi K███

Let me consult the management about the best thing we can do to improve and hasten the movement of the store. Please bear with me on this. I will try to the best of my ability to help the store move. Kindly wait for my update. Thank you.

Regards,

**Robert Comanda**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com    support@ascendecom.com
2219 Main St. Santa Monica, CA



App Banner Image

On Wed, Feb 15, 2023 at 1:10 AM K▪▪ B▪▪▪▪▪ ▪▪▪▪▪@gmail.com> wrote:

Hi,

It has been 2 more weeks since I asked about sales starting in my store. I have been contracted since Sept. 21st which is coming up on 5 months since we partnered. If sales via FBM will take longer than the original sales plan we had I can understand, but would like to know what to expect, beyond just being patient. According to our timeline the research on products was supposed to be done by December 3rd.

The timeline for PL seems to be on track.

Thank you,
-K▪▪

On Wed, Feb 1, 2023 at 7:39 AM Ascend Support <support@ascendecom.com> wrote:

Hi K ,

I have updated you through your ClickUp Message board regarding your question about your PL team. Regarding your concerns with your Amazon Store, I am still waiting for new updates from your store managers. I will keep you posted for any news. Thank you.

Regards,

**Robert Comanda**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com    support@ascendecom.com
2219 Main St. Santa Monica, CA

App Banner Image

On Wed, Feb 1, 2023 at 5:33 AM Ascend Support <support@ascendecom.com> wrote:

Hi K███,

The team is still trying to find out if your PL team is still handling your Private Label store. About the store's status, we are frequently communicating with your store managers and reiterating to them the urgency of the concern. We are reminding them to hasten the process to get more items to be sold in our store. Since the team is implementing the FBM method, we should see movement once your team started to procure profitable items. We are just trying to get a clear timeline from them about when the sales could start. Rest assured that once I get the information we are seeking, I will let you know as soon as possible. May we request a little more patience on this one. If you have other concerns, please let us know. Thank you.

Regards,



**Robert Comanda**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com   support@ascendecom.com
2219 Main St. Santa Monica, CA

App Banner Image

On Wed, Feb 1, 2023 at 1:14 AM K████ ████████████@gmail.com> wrote:
Hi,

I hope you're having a good day. Thank you for reading and responding to this message. I have asked on several occasions now (via email, click up, and now this email) when sales are going to begin in my store, as well as who is now managing my stores, knowing that several folks have change positions within the company. I would like to know when sales will begin for both non-private label and the private private label stores, as well as who is managing each of my stores please. I have yet to receive a response to these questions that I began to ask several weeks ago, so I appreciate your prompt reply. I believe we are five months into our partnership, and that we are behind the timeline suggested in contracting.

Thank you,
-K███ B███████

**EX 23**
**2274**

---------- Forwarded message ---------
From: **K**⬛⬛⬛⬛⬛⬛⬛⬛⬛@gmail.com>
Date: Thu, Mar 2, 2023 at 12:54 PM
Subject: Re: Minutes of the Meeting - Pro Venture LLC
To: Ascend Support <support@ascendecom.com>
Cc: Will Basta <will@ascendecom.com>, Jessica Sijan <jessica@ascendecom.com>


Hi Will and team,

My whatsapp is ⬛⬛⬛⬛. You may have to enter +1 for the US. Thank you-

-K⬛⬛


On Mar 2, 2023, at 11:43 AM, Ascend Support <support@ascendecom.com> wrote:


Hello K⬛⬛ !

Thank you for taking the time to join us on a call today.

For your reference, here are the minutes of the meeting that was discussed with you over the phone.

- We will apply a profit split of 75/25 instead of 60/40 until the end of 2023.
- Adding a new performance manager to the store.
- The first batch of purchases is to be assessed and done by next week.
- Create a Whatsapp group chat for more convenient communication between you and the team.

For bullet number 4, please kindly provide us with your Whatsapp phone number. If you do not have a Whatsapp account associated with your phone number, just simply download the Whatsapp application on your mobile phone to set it up.

Please let us know if you have any questions or concerns. We look forward to having a great year for you and your business!

**EX 23
2275**

Best Regards,

**Erwin**
Client Relations Associate, **Ascend Ecom**

☐ www.ascendecom.com    ☐ support@ascendecom.com
☐ 2219 Main St. Santa Monica, CA

App Banner Image

---------- Forwarded message ---------
From: **K** █████████ ████████@gmail.com>
Date: Mon, Apr 17, 2023 at 10:20 AM
Subject: Re: Minutes of the Meeting - Pro Venture LLC
To: Jessica Sijan <jessica@ascendecom.com>
Cc: Ascend Support <support@ascendecom.com>, Will Basta <will@ascendecom.com>

Hi Jessica,

Ascend has already purchased about $30k in inventory for my store. Are you aware? I am concerned my inventory is lost and not accounted for based on your email, or maybe I am misunderstanding what you are asking me. Are you asking if I want to spend more than 30 K at this point? I am making payments already on my inventory and we still have not started sales in my store. Please reply today if possible, because this is very concerning.

-K 

> On Apr 17, 2023, at 10:06 AM, Jessica Sijan <jessica@ascendecom.com> wrote:
>
>
> Hi K███ - we are working to compile your store's historical data.
>
> How much working capital are you comfortable utilizing for an upcoming inventory purchase? This will determine the products selected and the timeframe to sell them.
>
> On Mon, Apr 17, 2023 at 10:43 AM K███ B████ <███████@gmail.com> wrote:
>> Hi Jessica and Will,
>>
>> I am not sure how we are all communicating, but I thought I would respond here as well as my replies on WhatsApp. Checking to see what the plan is for the store, thank you.
>>
>> -K███
>>
>>> On Apr 12, 2023, at 11:43 AM, Jessica Sijan <jessica@ascendecom.com> wrote:
>>>
>>>
>>> Hi K███ - I will have the team take an analysis of your store and we will advise on a plan moving forward.
>>>
>>> Thank you for reaching out and we will have answers soon.
>>> -Jessica
>>>
>>>> On Fri, Apr 7, 2023 at 12:01 PM K███ B████ ████████@gmail.com> wrote:
>>>> Hi Will,
>>>>
>>>> I wanted to check in with you as it has been a month since we last spoke. There are still no sales happening and when I inquire as to start dates there is no information back to me as to an official start date. What happens is that I reach out and someone else is invited to my store from your side and/or orders for Amazon occur, but then nothing happens after that. The only time I see work being conducted on my store is when I reach out and that is very short lived. It has been about 8 months since we partnered, so I want to be reasonable with my expectations, but

this certainly seems like it has been enough time now based on your experience and expertise to run stores that my store should be running/selling. What is the reason(s) that my store is not running? And, are you able to commit to getting my store running by a date?

Thank you,
-K███ B█████

On Thu, Mar 9, 2023 at 10:31 AM K████ B████ ███████@gmail.com> wrote:

Hi Will,

Based on the minutes provided  purchases are supposed to be made for the store by tomorrow. As well as knowing who performance manager of the store will be.

-K███

On Mar 2, 2023, at 1:52 PM, Ascend Support <support@ascendecom.com> wrote:

Hi█████,

This is noted! Thank you for the information, I will forward this to the team. If you have any questions, please let us know.

Regards,

**Robert Comanda**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com    support@ascendecom.com
2219 Main St. Santa Monica, CA

App Banner Image

On Fri, Mar 3, 2023 at 3:55 AM K███ B████ ██████ @gmail.com> wrote:

Hi Will and team,

My whatsapp is ████████ You may have to enter +1 for the US. Thank you-

-K███

> On Mar 2, 2023, at 11:43 AM, Ascend Support <support@ascendecom.com> wrote:

Hello K███ !

Thank you for taking the time to join us on a call today.

For your reference, here are the minutes of the meeting that was discussed with you over the phone.

- We will apply a profit split of 75/25 instead of 60/40 until the end of 2023.
- Adding a new performance manager to the store.
- The first batch of purchases is to be assessed and done by next week.
- Create a Whatsapp group chat for more convenient communication between you and the team.

For bullet number 4, please kindly provide us with your Whatsapp phone number. If you do not have a Whatsapp account associated with your phone number, just simply download the Whatsapp

application on your mobile phone to set it up.

Please let us know if you have any questions or concerns. We look forward to having a great year for you and your business!

Best Regards,

**Erwin**
Client Relations Associate, **Ascend Ecom**

www.ascendecom.com    support@ascendecom.com
2219 Main St. Santa Monica, CA

App Banner Image

# Composite Attachment B
*Exhibit C*

EX 23
2281

---------- Forwarded message ---------
From: **Amazon.com** <<u>notice@amazon.com</u>>
Date: Sun, Aug 6, 2023 at 10:07 AM
Subject: Notice: Policy Warning
To: < ▮▮▮▮▮ @gmail.com>



Hello,

We received a report from a rights owner that you are listing
counterfeit products. Sellers on Amazon.com are not allowed to create
listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you
list this product again if we receive a retraction from the rights
owner. Their contact information can be found below.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @outlook.com

How do I reactivate my listing?
Please visit the Account Health page in Seller Central
(<u>https://sellercentral.amazon.com/performance/dashboard?ref=ah_em_nr</u>) to
appeal this listing deactivation. Please click on the "Appeal" link next
to the listing in the "Product and Policy Violations" section on the
account health page.

If the rights owner does not retract their complaint, or you do not
provide supporting information, we may provide your contact information
to the rights owner upon their request.

1

**EX 23**
**2282**

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B007I8Q3M6
Title: Porsche Black Crest Logo Cap, Official Licensed

Infringement type: Counterfeit
Trademark: 7072767
Complaint ID: 13484651961

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2023 Amazon, Inc, or its affiliates. All rights reserved.

Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210



SPC-USAmazon-1301823583451327

EX 23
2283

# Composite Attachment B

*Exhibit D*

EX 23
2284



## K&L GATES

August 10, 2023

r@klgates.com

**By First Class Mail**

Amazon seller Class Trend
Pro Venture LLC

, CO 80228

**Re:  Fiskars Brands, Inc. d/b/a Gerber Gear — Cease and Desist — Sale of Counterfeit
Products, False Advertising, Unfair and Deceptive Trade Practices**

To Whom It May Concern:

We have been retained by Fiskars Brands, Inc. d/b/a Gerber Gear ("Gerber") with respect
to your improper sale and commercial distribution of counterfeit Gerber products, false
advertising, and unfair and deceptive trade practices.  As you are aware, Gerber develops,
manufactures, and sells products throughout the world, including the United States.  Gerber has
and continues to designate significant resources to develop and maintain its products' national
and international image. Through advertising and promotional efforts, Gerber has ensured that its
products and brand have become renowned in the industry and with the consuming public.

To this end, Gerber sells products bearing severally registered trademarks, including, but not
limited to, the "GERBER" mark, Registration No. 4,481,628, for "sport knives, hunting knives,
fishing knives and camping knives," among other things (the "Gerber Marks"). Gerber advertises,
distributes, and sells various products to consumers under the Gerber Marks.

An investigation has revealed that you are currently involved in the distribution and sale of
counterfeit Gerber products and accessories bearing the Gerber Marks, infringing upon Gerber's
trademarks, and engaging in false advertising of directed at the consuming public, all in violation
of the Lanham Act, § 1051, et seq. Furthermore, all of the aforementioned acts constitute unfair
and deceptive business practices under various state laws throughout the United States.

Accordingly, Gerber demands that you **IMMEDIATELY** cease and desist from the use of the
Gerber Marks in connection with your sale of counterfeit products and false advertising. Should
you fail to do so, Gerber would be entitled to statutory damages of up to **two million dollars
($2,000,000.00) per mark infringed** should this matter proceed to litigation.

L GATES LLP
E CONGRESS STREET SUITE 2900  BOSTON  MA 02114
1 617 261 3100  F +1 617 261 3175  klgates.com

1

## I.    Trademark Counterfeiting and Infringement

An investigation has revealed that you are currently advertising, offering for sale, and selling various products bearing the Gerber Marks on the Internet, including, but not limited to, Amazon.com.  An example of your Gerber product listings is copied below:



An examination of these products immediately revealed that the Gerber products you are selling are materially different from genuine Gerber products and are thus counterfeit goods, as they are not manufactured by Gerber despite bearing the Gerber Marks.  Because the products offered by you are not genuine Gerber products manufactured by Gerber, they constitute counterfeit goods under the trademark laws of the United States.[73]  At all times while you distributed, promoted, sold, or offered for sale counterfeit Gerber products, you passed them off as genuine Gerber products, which they are not.  Accordingly, your conduct constitutes a straightforward case of trademark counterfeiting and infringement.

Additionally, your sale of materially different Gerber products constitutes trademark dilution under the Lanham Act.[74]  Through the sale of counterfeit goods, you have both tarnished and blurred the reputation of Gerber's trademarks amongst the consuming public.  By using the Gerber Marks to sell counterfeit goods, you have placed inferior products bearing Gerber's trademarks into the

---

[73] To succeed on a counterfeiting claim under the Lanham Act, a plaintiff must prove that a seller is "(1) intentionally using a mark or designation; (2) knowing such mark or designation is a counterfeit mark....; (3) in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(b). There is no separate cause of action for counterfeiting under the Lanham Act; "rather, it provides for specific kinds of relief for trademark infringement claims based on the sale of counterfeit goods."  Rovio Entert., Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 545, n.2 (S.D.N.Y. 2015) (citations omitted).

[74] Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 826 (5th Cir. 1998).

2

EX 23
2286

stream of commerce. Consumers, expecting to receive genuine Gerber products and the goodwill and advantages that are associated with Gerber's trademarks, will instead get products that are inferior and lacking the warranty and customer service associated with Gerber's trademarks. This experience threatens to tarnish Gerber's trademarks in the eyes of consumers and creates negative associations with Gerber's trademarks.[75] Moreover, the misuse of Gerber's trademarks in commerce alters consumers' ability to identify goods as true Gerber products. This blurring of Gerber's brand creates confusion with consumers and is the proximate cause of Gerber's trademarks losing the value that Gerber has expended significant resources and worked diligently to maintain. Your trademark counterfeiting and infringement is likely to cause and is actually causing confusion, mistake, and deception amongst consumers.

Because of your counterfeiting and infringement, Gerber would be entitled to statutory damages of up to **two million dollars ($2,000,000.00) per mark infringed** should this matter proceed to litigation.[76] There is little doubt that your counterfeiting and infringing use of the Gerber Marks would be found willful in this case.

## II.    False Advertising

Furthermore, trademark law, specifically the Lanham Act, also prohibits false advertising and, specifically, "any *false designation of origin*, false or misleading description of fact, or false or misleading representation[s] of fact, which... in commercial advertising or promotion, *misrepresents the nature, characteristics, [or] qualities... of his or her or another person's goods,* services, or commercial activities...."[77]

The Supreme Court recently added that the Lanham Act utilizes businesses engaged in commerce as its enforcement mechanisms for such false advertising. The Court explained:

> Competitors who manufacturer or distribute products have detailed knowledge regarding how consumers rely upon certain sales and marketing strategies. Their awareness of unfair competition practices may be far more immediate and accurate than that of agency rulemakers and regulators.... Lanham Act suits draw upon this market expertise by *empowering private parties to sue competitors to protect their interests on a case-by-case basis.*[78]

---

[75] *See* Hormel Foods Corp. v. Jim Henson Prods., 73 F.3d 497, 507 (2d Cir. 1996) (holding that tarnishment occurs when the use of the claimant's mark creates negative associations with the claimants mark).

[76] *See* 15 U.S.C. § 1117(c)(2).

[77] 15 U.S.C. § 1125(a)(1)(B) (emphasis added).

[78] POM Wonderful LLC v. Coca-Cola Co., 573 US 102, 115 (2014) (emphasis added).

3

Accordingly, Gerber has a cause of action for trademark infringement arising out of your false advertisements.[79]

Your use of the Gerber Marks in the advertising of your counterfeit products constitutes a false designation of origin. By using the Gerber Marks, you intend to deceive consumers into believing that your non-genuine, counterfeit products originate from, or are affiliated, authorized, sponsored, or approved by Gerber, or that you and Gerber are otherwise associated, which you are not.

For the foregoing reasons, your actions constitute false advertising and a false designation of origin in violation of federal and state laws, including the Lanham Act, 15 U.S.C. § 1125.

### III.    Unfair Competition and Deceptive Business Practices

In addition to the foregoing, your trademark counterfeiting, infringement, and false advertising constitute unfair methods of competition and deceptive business practices pursuant to various state laws.[80] Certain states provide for double or treble damages, as well as attorney's fees, for violations of unfair competition laws.

### CONCLUSION

In order to avoid the time and expense of litigation and to ensure that your infringing and unlawful conduct immediately and forever ceases, Gerber demands the following:

1.    Immediately remove any and all product listings and advertisements offering Gerber products from the Internet, including, but not limited to, Amazon.com;

2.    Turn over to Gerber all information in your possession relating to the purchase and sale of Gerber products or counterfeit versions thereof that you obtained either domestically and/or abroad, including all source information indicating where such products were obtained, as well as any customer lists and pricing data;

3.    Return to Gerber, at your own cost and expense, all Gerber products and counterfeit versions thereof in your possession;

4.    Agree that you will never sell or deal in counterfeit or authentic Gerber products in the future, either domestically or abroad; and

---

[79] Id. at 116.

[80] See, e.g., R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (finding a 93A violation where Lanham Act violation established); Mobil Oil Co. v. Auto-Brite Car Wash, Inc., 615 F. Supp. 628, 631 (D. Mass. 1984) (finding defendant's trademark infringement constitutes an unfair method of competition or an unfair trade practice)

4

EX 23
2288

5.    Issue Gerber payment of $25,000.00 to cover its investigation and attorney's fees.

These demands are reasonable in light of your conduct.

I strongly urge you not to contact the counterfeit manufacturer or take any action that would interfere with Gerber's ability to eliminate infringing merchandise from the marketplace. Gerber will hold you responsible for its complicity in any such actions to the maximum extent provided by law. Please be advised that any attempt to destroy evidence that is material to this matter may subject you to additional sanctions.

Please confirm within **five (5) days of the receipt of this letter** whether you will comply with Gerber's demands.

This letter does not constitute an exhaustive statement of Gerber's legal position, and nothing contained herein is to be deemed or construed to be a waiver or relinquishment of any of the rights and remedies available to Gerber, all of which are hereby expressly reserved. Should we fail to quickly reach a resolution, Gerber reserves its right to fully protect its intellectual property rights to the fullest extent allowed under the law.

Sincerely,

5

**EX 23**
**2289**

# Composite Attachment B
## *Exhibit E*

EX 23
2290

From: **Amazon.com** <notice@amazon.com>
Date: Sun, Aug 6, 2023 at 10:07 AM
Subject: Notice: Policy Warning
To: < _____@gmail.com>



Hello,

We received a report from a rights owner that you are listing
counterfeit products. Sellers on Amazon.com are not allowed to create
listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you
list this product again if we receive a retraction from the rights
owner. Their contact information can be found below.

@outlook.com

How do I reactivate my listing?
Please visit the Account Health page in Seller Central
(https://sellercentral.amazon.com/performance/dashboard?ref=ah_em_nr) to
appeal this listing deactivation. Please click on the "Appeal" link next
to the listing in the "Product and Policy Violations" section on the
account health page.

If the rights owner does not retract their complaint, or you do not
provide supporting information, we may provide your contact information
to the rights owner upon their request.

1

**EX 23**
**2291**

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B007I8Q3M6
Title: Porsche Black Crest Logo Cap, Official Licensed

Infringement type: Counterfeit
Trademark: 7072767
Complaint ID: 13484651961

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2023 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210



SPC-USAmazon-1301823583451327

**EX 23**
**2292**

# Composite Attachment C

EX 23
2293

# PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
### ATTORNEYS AT LAW

Reply to: Coral Gables office<br>
Sender's Email: ███████@pbyalaw.com

September 21, 2023

**<u>Via Email & FedEx</u>**

Ascend Ecom, LLC d/b/a Ascend      Colin Matthew d/b/a Colin Matthew
CapVentures      Marketing LLC
2219 Main Street      1461 East Whitestone Boulevard
Santa Monica, California 90405      Cedar Park, Texas 78613
Attention: Will Basta      Attention: Colin Matthew
Email: support@ascendecom.com      Email: colin@officialcolinmatthew.com
       will@ascendecom.com
       jeremy@ascendecom.com

<b>Re: Demand for Payment, Demand for Insurance Information, and Litigation Hold</b>

Mr. Basta and Mr. Matthew:

       This firm represents ████ , ████ d/b/a 258 LLC in connection with the matters addressed herein. As explained below, Mr. ████ demands a total payment of ████ (the "Payment") from Ascend Ecom, LLC's ("Ascend" or the "Company") and Colin Matthew Marketing LLC ("CMM")[1] due to Ascends wrongful conduct leading to the gross mismanagement and deactivation of Mr. ████'s online store.

## I.    Demand for Payment

### A.  *Marketing Misrepresentations*

       Mr. ████ is a blue-collar worker in the construction industry. His back problems limited the number of jobs he could take on, so he decided to sign up with Ascend to try and create a second stream of income that could supplement his regular income. Unfortunately, as further explained below, Mr. ████'s experience with Ascend left him in a substantially worse financial situation.

       Mr. ████'s story begins on or around February 17, 2022, when he was first introduced to the Company through a referral source, Colin Matthew d/b/a CMM. Mr. Matthew is a regular referral source for Ascend, having referred over twenty-five clients to the Company as of June 2022. There is no question Mr. Matthew would have received a commission for referring Mr. ████ to the Company. A true and correct copy of Mr. ████ and Mr. Matthew's e-mail correspondence is attached hereto as **Exhibit A**. Trust is always an important part of any referral, and here Mr. ████ placed his trust in Mr. Matthew, and Mr. Matthew accepted such trust.

---

[1] As further explained herein, Mr. Matthew and CMM are parties to this demand because of their willful and voluntary participation in Ascend's fraudulent scheme.

1

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2294

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

When Mr. ▮ was still vetting Ascend, he asked Mr. Matthew specific questions about the background of the Company. In response, Mr. Matthew represented to Mr. ▮ that (1) he booked all of his clients' stores through Ascend[2], and (2) Mr. ▮ could build a seasoned store with Ascend and eventually sell it as an asset because "when a store is seasoned . . . its highly unlikely its ever going to be banned once you make it past the three-month mark." *See id.* at 4:15-4:29. In reliance on Mr. Matthew's representations, Mr. ▮ believed Ascend was trustworthy and proceeded to do business with the Company. Indeed, Mr. Matthew acted as an agent of Ascend and Mr. ▮ reasonably viewed him as such.

On February 21, 2022, Will Basta, the CEO of Ascend, provided Mr. ▮ with marketing materials to induce him into entering into an agreement with Ascend. These marketing materials contained staggering projections that made it appear Ascend outperformed any other consumer-based asset class. For example, Mr. Basta provided the below chart that illustrated that if Mr. ▮ were to invest $50,000 in a single Amazon store with Ascend in Q1 of 2022, then by Q4 of 2023 he would generate $2,119,029 in gross revenue, net profit of $212,748, and hold a store value at $392,095.



An excerpt of the chart provided in Ascend's marketing materials

A copy of the marketing materials Mr. Basta provided to Mr. ▮ are attached hereto as **Composite Exhibit B**. Based on this chart alone, Mr. ▮ was led to believe that his initial investment of $40,000 (further detailed *infra*) would ultimately generate $1,695,223.20 in gross revenue, $170,198.40 in net profit, and provide him a store valued at $313,676 by Q4 of 2023.

Ascend advertised and marketed its business opportunities to Mr. ▮, and others, by making earnings claims that Ascend's customers were experiencing (1) an 827% increase in sales year-to-date, (2) a 710% increase in sales in the last 12 months, (3) a 624% increase in sales in the last 30 days, and (4) a 10,550% increase in sales in the last 30 days, even though virtually none of Ascend's customers have ever made these returns. *See id.* Ascend's marketing materials further reinforce these patently absurd statistics by referring to an Ascend-run store as a "cash cow" and by making the point that "30K inventory *will yield* 6K net." *Id.* (emphasis added).

---

[2] "You can book a call with Ascend Ecom. Um, that's who we do all our stores through." *See* the Loom video enclosed in the e-mail containing this letter at 3:42-3:46.

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2295

# PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
### ATTORNEYS AT LAW



Excerpts of ROI provided in Ascend's marketing materials

To make matters worse, none of the marketing materials provided to Mr. ⬛ contained disclaimers illustrating that the aforementioned results were not typical among Ascend's client base, or even any caution that Mr. ⬛ should not rely on them. Thus, it is clear that Ascend used and continues to use these deceptive marketing tactics to intentionally mislead and induce innocent consumers like Mr. ⬛ into executing an agreement with Ascend. These tactics, and others, give rise to fraud-based claims that Mr. ⬛ reserves the right to bring against Ascend, CMM, and their individual representatives.

## A. Contractual Violations

On or around March 28, 2022, Mr. ⬛ and Mr. Basta, on behalf of Ascend, executed the Amazon FBA Management Agreement (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit C**. Shortly after executing the Agreement, Mr. ⬛ paid Ascend $30,000 for his online store. On April 19, 2022, Mr. ⬛ gave Ascend another $20,000 to purchase inventory from a wholesaler. Mr. ⬛'s problems with Ascend began soon thereafter.

On or around May 17, 2022, Mr. ⬛ e-mailed Mr. Basta directly to express his concern that a critical order Ascend placed for his store was delayed by almost forty-five days. Mr. ⬛ also noted that there was a complete lack of communication from the store manager assigned to his store—a situation that led him to attribute the recent order delay to Ascend. A true and correct copy of Mr. ⬛ and Mr. Basta's e-mail correspondence is attached herein as **Exhibit D**. In response, Mr. Basta told Mr. ⬛ that "you need to know . . . things will be starting off slow" and that "the first 9[0]-120 days are slow as you are a new account. The majority of your business revenue comes after we ramp for 4-6 months." *Id.* This representation of course induced Mr. ⬛ not to cut his losses and to instead keep investing in the business. This representation, among others, would prove to be false, as Mr. ⬛'s store never saw the increased revenue advertised by Mr. Basta.

On February 21, 2023, Mr. ⬛ reached out to Mr. Basta again to inform him of the following issues related to his store: (1) Mr. ⬛ was unable to purchase new inventory because his store's Gmail and Walmart.com accounts were hacked; (2) there were improper purchases

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

EX 23
2296

made to Mr. ███s account that were attributed to Jeremy Lueng, the Co-Founder of Ascend; (3) Mr. ███ discovered he was being charged for items that were returned and for items that he had purchased in December 2022; (4) there were purchases made using Mr. ███'s credit card using the e-mail account hasib@ascend.com; (5) there were items that were purchased on Mr. ███'s Walmart account that never made it to his Amazon store; (6) there were items that were returned that were not put back in his store's inventory; (7) someone named Shanya James made a purchase using Mr. ███s credit card using a different Walmart account; and (8) someone bought a $200 gift card and attempted to purchase an additional $1,000 gift card with Mr. ███'s credit card. *See id*. In short, there is a well-documented list of evidence illustrating how Ascend grossly mismanaged Mr. ███'s online store and personal financial information, and evidencing actual theft from Mr. ███ through the unauthorized use of his credit card.

Frustrated with Ascend's repeated failures and mismanagement, Mr. ███ circled back to Mr. Matthew for assistance. In May 2023, Mr. ███ explained to Mr. Matthew the invoicing issues he was experiencing with Ascend and his overall frustrations with the company. In response, Mr. Matthew simply said "[t]here is nothing I can do, I do not work for this company, please contact them." *See* **Exhibit A**.

In the following months, Mr. ███ continued to experience repeated instances of improper charges and billing issues related to his store in direct contravention to the express representations made by Ascend in the Agreement. A true and correct copy of the e-mail correspondence and charts memorializing the ongoing issues is attached hereto as **Composite Exhibit E**. Mr. ███ attempted to address these issues in good faith with Ascend, but the Company in bad faith chose to do nothing. *Id*. Ultimately, as a direct result of Ascend's mismanagement and willful or grossly reckless misconduct, Mr. ███ received the following correspondence from Amazon on September 17, 2023:

> Your Amazon selling account has been deactivated. Your listings have been removed in accordance with section 3 of the Amazon Services Business Solutions Agreement. We leveraged a combination of automated means and expert human review to make this decision. We are withholding any funds available in your account. If you have FBA inventory of the items causing "inauthentic" complaints, they are currently ineligible for removal.

A true and correct copy of Amazon's e-mail to Mr. ███ is attached hereto as **Exhibit F**. Now that Mr. ███'s store is shut down, he has no way to recoup the funds he invested in inventory or the upfront costs he paid Ascend to run his store.

Based on the forgoing, there is clear evidence proving that Ascend willfully mismanaged Mr. ███ store and breached the Agreement. In particular, the Agreement expressly requires that Ascend will "[p]rovide oversight of the store and its financial performance and provide proper billing for account management services." *See* **Exhibit C** at § 1.1. The Agreement also provides that Ascend will build and manage the store in a "professional manner" and to the "best of its abilities." *See id*. at § 1.5. Ascend has not only failed to meet these basic performance thresholds, it has failed to use even reasonable efforts to manage Mr. ███'s store. Simply put,

# Perlman, Bajandas, Yevoli & Albright, P.L.
Attorneys At Law

Ascend has woefully failed to uphold its end of the bargain and is in clear breach of the Agreement.

### B. *Violations of Federal Consumer Protection Laws*

Ascend not only fraudulently induced Mr. ▮▮ into the Agreement and failed to uphold its obligations therein, but it also flagrantly disregarded well-established federal consumer protection laws. We are well-aware that Ascend is currently under scrutiny by the Federal Trade Commission ("FTC") as part of an ongoing investigation into Roman Cresto and John Cresto, the founders of Automators.AI. In its recent lawsuit against Crestos, the FTC not only highlights Ascend's role as the FBA-provider for Automators.AI, but also Ascend's numerous consumer issues. More specifically, the FTC provides that since "August 1, 2023, the FTC has received approximately 18 consumer complaints against Ascend Ecom. Consumers reported poor sales in their Amazon stores and issues with suspended and/or terminated stores."

Ascend's misconduct associated with Mr. ▮▮ constitutes violations of the Business Opportunity Rule, 16 C.F.R. § 437, and the FTC Act, 15 U.S.C. § 45. The Business Opportunity Rule requires sellers, such as Ascend, to provide prospective purchasers with a disclosure document form together with any required attachments. In this disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). This information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. Ascend failed to adhere to any of these clear federal protocols when it fraudulently induced Mr. ▮▮ into entering into the Agreement.

Further, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." The fraudulent and deceptive representations made by Will Basta and Colin Matthew, as outlined in this demand, constitute a clear violation of the FTC Act.

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

**EX 23**
**2298**

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

ATTORNEYS AT LAW

C. *Demand for Damages*

As demonstrated herein, there is clear evidence that the representations and omissions made by Ascend and CMM were fraudulent and deceptive. The direct result of this fraudulent activity is that Mr. ▯ has and continues to accrue considerable damages amounting to $60,000. A breakdown of my clients' damages calculation is provided as follows:

| Damages Category | Amount |
|---|---|
| Payment to Ascend | $30,000.00 |
| Improper Walmart Purchases Made to Credit Card for Inventory | |
| Missing Inventory Purchased Using Mr. A▯ 's Credit Card | |
| Frozen Inventory Due to Product Authenticity Complaints | |
| Webstaurant Missing Products and Loss From Sales | |
| Credit Card Interest Charges and Fees | |
| Lost Profits from Alternative Business Opportunities | |
| **Total Damages to Date:** | |

The aforementioned documents, representations, and omissions made by Ascend against Mr. ▯ serves as clear evidence of fraud, and we have no doubt that we will not only be successful in pursuing claims against Ascend and CMM, but also in piercing the corporate veil and bringing individual claims against Mr. Basta and Mr. Matthew, respectively, for their own tortious conduct and participation in and furtherance of Ascend's fraudulent scheme.

With that said, while my client recognizes the strength of his case, he also acknowledges the benefit of a pre-suit settlement. **If you wish to avoid parties expending substantial funds litigating this matter, we demand that you remit Payment to my clients no later than by Friday, September 29, 2023**. If you fail to comply with this demand, my client shall pursue all available legal and equitable remedies against Ascend and CMM. Your prompt response is anticipated and encouraged.

II.    **Demand for Insurance Information**

Mr. ▯ is also hereby serving a statutory demand for professional liability insurance information and documentation on Ascend and CMM. Please be advised that Section 627.4137(1), Florida Statutes, provides as follows:

Disclosure of certain information required.

1. Each insurer which does or may provide liability insurance coverage to pay all or a portion of any claim which might be made shall provide, within 30 days of the written request of the claimant, a statement, under oath , of a corporate officer or the insurer's claim manager or superintendent setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance:

200 South Andrews Avenue | Suite 600 | Fort Lauderdale, Florida | 33301 | (954) 566-7117
283 Catalonia Avenue | Suite 200 | Coral Gables, Florida 33134 | (305) 377-0086

**EX 23**
**2299**

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

ATTORNEYS AT LAW

a.      The name of the insurer.
b.      The name of each insured.
c.      The limits of the liability coverage.
d.      A statement of any policy or coverage defense, which such insurer reasonably believes is available to such insurer at the time of filing such statement.
e.      A copy of the policy.

In addition, the insured, or his or his insurance agent, upon written request of the claimant or the claimant's attorney, shall disclose the name and coverage of each known insurer to the claimant and shall forward such request for information as required by this subsection to all affected insurers.  The insurer shall then supply the information required in this subsection to the claimant within 30 days of receipt of such request.

2.      The statement required by subsection (1) shall be amended immediately upon discovery of facts calling for an amendment to such statement.
3.      Any request made to self-insured corporation pursuant to this section shall be sent by certified mail to the registered agent of the disclosing entity.

We look forward to Ascend and CMM's timely compliance with the above statutory demand.

### III.      Litigation Hold to Preserve Documents and ESI

In anticipation of litigation, this communication also constitutes a demand that Ascend and CMM immediately take affirmative steps to preserve all documents and ESI.

This letter also constitutes my client's formal demand that you immediately take all steps necessary to identify, retain, and preserve all documentary evidence and all electronic media in your possession, custody, or control that contain information or data relevant to any statements you have made verbally or in writing regarding the issues referenced herein, ***including any emails or text messages related to the specific conduct mentioned in this letter (including such emails or text messages between Mr. Basta, Mr. Matthew, and Mr.        )***. My client further demands that you avoid spoliation of all such relevant information and data. Data includes not only information that can be perceived and read by Ascend and/or CMM's computers, computer systems, and programs installed thereon (including any personal computers, tablets and smart phones which you hold and/or use), but also all data on relevant electronic media that cannot be perceived by Ascend and/or CMM's computers, computer systems, or programs but can be recovered and analyzed using computer forensic techniques. Data that cannot be perceived by the computer operating systems include deleted, hidden, and orphaned data and artifacts and residual data created in the normal course of using a computer system.

Further, this communication constitutes formal notice and demand that all relevant data, information, records, invoices, and any other media that may contain or reference content

**EX 23**
**2300**

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

relevant to the matter referenced above be safeguarded from destruction from any cause, including destruction caused by any of their policies related to retention of electronic data, including backup, restoration, deletion, destruction, and tape recycling. Destruction of relevant data under any professed corporate document retention policy may be spoliation.

**Nothing herein is intended to limit, waive, restrict or otherwise alter any of Mr. ▮▮▮'s rights and/or remedies under any applicable agreement, at law, and/or in equity, and same are hereby expressly reserved and preserved.**

Sincerely,

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L

Nima Tahmassebi

Cc: ▮▮▮▮▮

8

EX 23
2301

# Composite Attachment C
## *Exhibit A*

**EX 23**
**2302**



⟨ ▮▮▮▮▮▮▮ @gmail.com⟩

---

# Re: New member questions
1 message

R▮▮▮▮▮▮▮▮▮ @gmail.com⟩          Tue, May 9, 2023 at 12:09 PM
To: Colin Matthew <colin@officialcolinmatthew.com>

Ok. Thanks anyway!

Hopefully I don't lose my money.

At least you're aware of how they are dealing with investors over there.

Be careful of sending people there.

Have a great day!

On Tue, May 9, 2023, 12:02 PM Colin Matthew <colin@officialcolinmatthew.com> wrote:
> Hi ▮▮▮▮,
>
> There is nothing I can do, I do not work for this company, please contact them
>
> On Tue, May 9, 2023 at 10:25 AM ▮▮▮▮▮▮▮▮▮ @gmail.com> wrote:
>> Hey Colin,
>>
>> At this point I don't know what else to do!
>>
>> They sent me an invoice for April claiming the store made $2048.09 in profit.  I asked them to send me a breakdown on how they arrived at that number. They sent me the attached excel sheet. Whomever drafted this invoice just added the profit column and didn't notice the unit cost was blank!
>>
>> In addition to that they sent me another bill for shipping cost which was suppose to be deducted from the profits.
>>
>> see attached.
>>
>>
>> On Sat, May 6, 2023 at 6:17 PM ▮▮▮▮▮▮▮▮ @gmail.com> wrote:
>>> Thank you Colin!
>>>
>>> We'll see what happens. I'll keep you posted on the situation.
>>>
>>> On Thu, May 4, 2023 at 9:10 AM Colin Matthew <colin@officialcolinmatthew.com> wrote:



>>>> **Will Basta**
>>>> to Ascend, Raymond, me ▾
>>>>
>>>> Raymond -
>>>>
>>>> Let's get ▮▮▮▮▮ on an an accelerator plan and get his biz back on track please
>>>>
>>>> •••
>>>>
>>>> --
>>>> **Will Basta**

>>> On Thu, May 4, 2023 at 8:10 AM Colin Matthew <colin@officialcolinmatthew.com> wrote:
>>>> Hi ▮▮▮▮
>>>>
>>>> I'm sorry to hear your experience is a lot different than mine and others.

I forwarded your email to Will so he can look into your situation and get it handled!



### Colin Matthew
to Will ⌄

Hi Will,

Can we please assist ▮▮▮▮?

•••

On Thu, May 4, 2023 at 7:31 AM ▮▮▮▮ <▮▮▮▮@gmail.com> wrote:
Good Morning Colin,

I'm writing to you to let you know this entire amazon FBA experience has been a nightmare from the beginning.

Below is the month to month breakdown as we approach one year from when the store opening

June $53.33
July $156.03
August $284.97
September $155.58
October $-46.79
November FBA $165.64
November FBM $113.42
December FBA $143.96
December FBM $996.52
January FBA $44.78
January FBM $1389.96
February FBA $-158.93
February FBM $641.44
March ???
April ???

Total $3939.91 - minus storage fees

- In December, I placed orders that never made it to the store and they were billing for products that were returned to their warehouse. It's now May and they are still trying to figure this out.

- In February, someone hacked the email and the walmart account and started making unauthorized purchases.

- On March 1st, I spoke to a gentleman named Roland. He admitted that they had dropped the ball on my store and told me that he's going to make sure the store will be back up and running by April. (We're in May now and after almost 1 year I only have 3 products being sold in my store)

- They moved away from the excel sheet to track daily sales and for the past two months they haven't provided me with any records of sales. That's why March and April are in question marks.

- On April 19th I gave them another $20k to buy some inventory from a wholesaler and it's been two weeks and they haven't provided me with a receipt!

- At this point I have  50k invested so far plus inventory that is not moving and nothing to show for it.

- I tried to reach out to them and I always get the same answer!  I'll talk to the store manager.

- I know you are busy, But $50k is a lot of money for me.  Please see what you can do to either have them refund the money or make sure they get a competent person to manage my store.


To answer your previous question about other business opportunities, I was going to buy trucks and machinery and rent them out.  I had a connection to get the equipment at a discount and a free place to store them when not in use.
With $30k I could have made a whole lot more than $4000 in a year.

Again, Please talk to Will and see what can be done.

Thank you again!


On Sat, Oct 1, 2022 at 4:14 PM Colin Dedely <colin@officialcolinmatthew.com> wrote:

> ▢▢▢▢,
>
> I will ask around with other members who have stores with them, we haven't gotten any other complaints and as for me, it Ecom Automation was much better when I first started over a year ago and my account too has slowed down but still yields me a monthly 5 figure return. I've had shipping label issues among many other issues and my account has been flagged but everything was fixed with a good plan of action on behalf of the team and I haven't had any other issues since then. Hopefully it is just growing pains and you will hit multiple 5 figure monthly profits which would result in an ROI within a years time instead of 2.
>
> What other opportunities are you considering? Have you considered getting more funding for those opportunities?
>
> Thank you for sharing.
>
> On Wed, Sep 28, 2022 at 6:04 PM ▢▢▢▢ ▢▢▢ < ▢▢▢▢@gmail.com> wrote:
> > Hey Colin,
> >
> > Thanks for your reply.
> >
> > Someone did reach out to me; it wasn't Will.  After I complained they told me that they were temporarily changing the profit split from 60/40 to 75/25 for the rest of the year and they were going to waive the profit split invoices up until now.
> > Which isn't really helping me since the store is barely making any money.  Not sure what he meant by being happy with the results.   It's been almost 3 weeks now and they have not answered any of my questions. I tried to resolve it with them to avoid having to reach out to you because I know you're busy. But I didn't have anywhere else to go. Honestly I feel I'm not the only one having issues because these seem like basic mistakes that shouldn't happen. Especially when we're only selling 7 items.
> >
> > In addition to the above, they want to put the store in FBM. Which raises more questions. To my knowledge the store managers will now have to manage shipments, customer returns, and customer service.
> > My concern is if they did a poor job managing FBA what makes them think they can manage FBM better?
> >
> > As of now they have to not provide me with a realistic gross earning projection.  I've asked them on September 12 and I'm still waiting.  I have no way of evaluating the store progress of profitability. I understand there's a 24 month guarantee.  But to be honest with you I didn't invest $30k to get $30k back in 24 months.  There were other business opportunities that were available to me.

As far as the balance transfer. I paid 3% and it didn't register as a cash advance.    I requested a balance transfer with 0 percent interest. from Wells Fargo personal, Citi Bank, and Elan bank to my Wells Fargo Business Account Checking

Thank you.

On Wed, Sep 28, 2022 at 6:00 PM Colin Dedely <colin@officialcolinmatthew.com> wrote:

I spoke with Will and he said he addressed the issues and made sure that you we're happy with the result.

Lately there has been a huge increase to competition from when I signed up over a year ago, so things we're much different in my experience.

It has slowed down for me as well, as it is FBA model now in order to be compliant.

There will be hiccups at times with the products as Will had explained to me early on as well, but you'll see over time some of the common issues that arise with it
as just like with anything it is not perfect.

Q4 is here and this is the best time of the year for E-commerce stores, last year was some of the most profitable months for my store and you should see a jump in profits that you are looking for.

Are you sure it did not register as a cash advanced?
Keep in mind there is a balance transfer fee on some cards of 3% to 5%, did you transfer to the same bank account ex: Wells Fargo CC Balance transfer to wells fargo business checking?
Or did you balance transfer from from one card to a different bank account?

Thank you for sharing!

On Fri, Sep 23, 2022 at 3:09 PM                    @gmail.com> wrote:

Good morning Colin.

Hope all is well.  Just wanted to give you an update on how the Amazon store is doing.

We're about to finish the 3rd month since the store has been active and  I had some concerns. I voice my concern to them and they haven't given me the answer. Just the usual "we'll reach out to your store manager and get back to you".

Before I signed the contract and released the funds to them. They sent me a projection spreadsheet and also screenshot of case studies. It showed on the 3rd month the store  would be earning at least $3k.  We're about to close the third month and we're barely hitting $300 in profit.  I provided them with $40k to purchase inventory.   That's a huge difference from $3k to barely $300
Are other member experiencing the same thing?

Also, it seems that they are dropping the ball on simple things which raises some concerns. One of my products got blocked and they didn't seem to know until 5 days later after I had to tell them.
I have products that I purchased back in May and hasn't reached Amazon after they told me it takes about 15-17 days to reach Amazon store. Still

haven't received an answer to most of these questions and it's been over a week since I've asked.

In our last email you mentioned you had issues with them at the beginning. I was wondering if I'm just overreacting or if I need to be concerned.

Also.  I wanted to share with you that I was able to cash out money from my credit card by requesting a balance transfer and Instead of paying the credit card I had it  transferred to my bank account.
It worked with Wells Fargo, Citibank and the Elan banks.

Thanks again for everything.

On Thu, Jun 16, 2022, 10:21 AM [redacted] @gmail.com> wrote:
Good morning Colin,

Thanks for the reply. They switched my store manager. We'll see what happens from now on.

I'll keep you posted.

Thanks again for your help!!

On Tue, Jun 14, 2022 at 11:50 AM Colin Dedely <colin@officialcolinmatthew.com> wrote:
[redacted],

It does take time for them to get things ramped up, I did have some issues at the beginning as well and perhaps they are experiencing an influx of customers at the time.

My store does have some complaints from customers and shipping delays / sold out products that we're already on ordered, it is very common in E-commerce at scale, but so long as the 95% of orders are made in a timely manner, the profit makes up
for the few orders that don't go as planned and keep us in the customer service rating Walmart and Amazon want.

No other members have had any complains thus far with Ascend and we have over 25 stores with them.

How have things been? We're they able to clear things up? I can speak with the owner if not.

On Mon, Jun 6, 2022 at 5:05 PM [redacted] @gmail.com> wrote:
Good evening Colin,

I know you are very busy but I wanted to share my experience with Ascend so far.

First, they gave me a timeframe on when things were going to happen. Below is the timeframe.

1. Product Research and uploading - 2 days
2. Purchasing - 1 day.
3. Wait for the delivery - 7-10 days.
4. Prep - approximately 3 days
5. Wait for Amazon to pick the boxes.

They made the first purchase 9 days after the store manager had access. 12 days after they made the purchase I found out that the order was delayed 45 days. I was very much concerned about why this wasn't caught.

Secondly, After i brought this to their attention, They should have purchased more products right away while we waited for this order. It took them 9 days to make a second purchase after I started complaining.

Thirdly, Today I found out that part of that first order that was delayed arrived May 6 (30 days ago), and no one seems to want to tell me why this product has not gone live.

I asked for an update on Friday, And no one seems to tell me what's going on. All I get is a bunch of "we apologize" and "sorry for the inconvenience."

Based on the timeframe they provided, they were looking at 15-17 days to go live and it's been 32 business days and no one can tell me anything. The person running the store is either managing too many stores or he's not very good at his job.

But I wanted to get your thoughts on this. I think I remember you saying that you had issues with them at the beginning or do you know of other members having the same problems?

Thanks .

On Wed, Feb 23, 2022 at 9:14 AM Colin Dedely <colin@officialcolinmatthew.com> wrote:
> Hey ▓▓▓▓ ,
>
> I have 1 store with Ascend and my wife's store with a team I've built out myself.
>
> 1. One of my client's got funded and his store was with them and doing $15k a month net profit after share on month 10. This is what made me pull the trigger. There is a contract as well!
> 2. Just 1 store with them in my 5th month.
> 3. See above.
> 4. I'll recoup the investment by the end of this month.
> 5. I have not visited their warehouse in Dallas, I can ask a few others members if they have.
>
> Looking forward to it brother!
>
> Respectfully,
>
> Colin Matthew
>
> On Tue, Feb 22, 2022 at 2:36 PM ▓▓▓▓ ▓▓ ▓▓▓▓ @gmail.com> wrote:
>> Hey Colin,
>>
>> We spoke to Will Basta from Ascend Ecom and we had a few questions to ask you if you don't mind. The wholesale online option starts at $30k up front. Honestly, I'm just a bit concerned about handing out that type of money to someone on the internet.
>>
>> 1) You mentioned that you were skeptical at the beginning. What made you pull the trigger?
>> 2) Do you currently have any stores with them and how many?

3) How long have you had these stores

4 How long did it take to recoup your initial investments

5) Did you get a chance to visit their warehouse in Dallas?

I would be available for a phone call if you have time to discuss.

FYI - On the Fund and Grow side. We're still waiting for Truist to come to a decision. Once that comes in I'll send you the screenshot and the credit report to discuss the next steps.

Thank you!

On Thu, Feb 17, 2022 at 4:15 PM Colin Dedely <colin@officialcolinmatthew.com> wrote:

R████

Here is a video response to your questions!



**New member questions - colin@officialcolinmatthew.com - LIFELONG LEARNING LLC Mail - 17 February 2022** - Watch Video



https://www.ascendecom.com/

Respectfully,

Colin Matthew

On Thu, Feb 17, 2022 at 11:08 AM █████ ███ @gmail.com> wrote:

account - █████@gmail.com

Hello. Good afternoon,

We just purchased your credit mastery course.  I have a few questions.

1) I just finished the last round of funding with Fund and Grow. I have a total of $44,600 in personal credit. $59,500 in business.  Is it possible for me to open a new company and season it for a year (if necessary) and apply for business credit with the new company?  Will that raise any red flags with the banks?

2) I watched a couple of your videos on automation investment and we are very interested.  We have some questions. We have had bad experiences with Amazon in the past. We've had an account with them and in our experience it only takes a couple of unreasonable customers to close your account. Amazon is not trying to hear or are interested in your side of your story.   In a case where we invest $15k for an automation store and god forbids Amazon closes the account will we lose

that $15k?    Also, when Amazon pays (every two weeks) Who gets the money and who gets to distribute it? What control do you have as an investor? What is exactly you own with the $15k?
I read that we can schedule a presentation about this topic? Can we schedule that next week?

3) Will the credit bureau notify the lender if we attempt to dispute a business credit card inquiry of a card that's been approved? If they do, how would the lender view it?


--
Respectfully,

Colin Matthew
Colin Matthew Marketing LLC
███████████████
Cedar Park, TX 78613


--
Respectfully,

Colin Matthew
Colin Matthew Marketing LLC
███████████████
Cedar Park, TX 78613


--
Respectfully,

Colin Matthew
Colin Matthew Marketing LLC
███████████████
Cedar Park, TX 78613

# Composite Attachment C
*Composite Exhibit B*





EX 23
2313



EX 23
2314

# Our Infrastructure and Team is Unparalleled in the Industry

With over 350 direct employees, NO VA'S and EXCLUSIVELY on Ascend payroll, our specialized teams handle each functional area from product research to customer service to ensure your business thrives




**4+** designated managers exclusively assigned to your account with 24/7 communication access via a mobile/web app

**10+** years experience in the eCommerce Industry

Proprietary software and algorithms for pricing, product sourcing and store management

**175** Managing stores for over 175 clients and partners

Access to thousands of exclusive vendors for name brand products

Exclusive Ascend Warehouse Facility in Dallas,TX **(come visit)**

**24** month money-back guarantee on all stores

ASCEND



Overview

# Put your money to work with a fully-managed eCommerce store on the Amazon Marketplace that drives passive income and appreciates in value over time



**Amazing Potential and Digital Asset Appreciation**

3rd party selling provides high earning opportunities for entrepreneurs and investors alike.

**Passive Income**

This "done for you" program is entirely passive. We have the whole process systemized so you can sit back and watch your stores grow

**Wholesale & Online Arbitrage FBA**

Securing reseller contracts with dozens of vendors and utilizing "Fulfillment by Amazon" is a long term, highly scalable model that drives profit & LTV

**Private Label FBA**

Private label has rapidly emerged as the most valuable business model in the eCommerce space. Building brands and scaling on Amazon creates highly valuable assets

ASCEND

EX 23
2316

# Our Amazon FBA Revenue Models

We focus on sustainability and profitability

## FBA / Wholesale

We reach out to thousands of trusted US based wholesalers on your behalf to establish reseller relationships with name-brands, all viewable from your own CRM in HubSpot. Amazon then stores products from relationships we secure for you in Amazon's fulfillment centers, ships all orders, and provides customer service

### 2X TO 10X

Stores sell between 2x to 4x annual net profit, or 2ox to 4ox monthly revenue for Private Label

## FBA/Online Arbitrage

O.A. is a fusion between dropshipping and wholesale. Small orders of 10-30 units are placed on platforms such as Home Depot, Zappos, Walmart, etc., and sent to our warehouses for repackaging. We then send into FBA facilities to be sold at higher per-unit prices on Amazon. Fully within Amazon TOS, O.A. is a way to scale account revenue quickly, and keep inventory turnover time low

### $100K

Over 100 Amazon stores are producing over $100k in sales.

Don't know about the Amazon buy box?  Learn more _here_

## Private Label

Our designated research team is constantly vetting products for our clients to sell through stores. This model includes supplier outreach, product research & development, and marketing strategy. Private label generates significantly higher profit margins on average, and adds a high valuation multiple if you decide to sell a store for a large exit

### 25% to 55%

Our buy box percentage is between 25-55% where the average is 20%!

EX 23
2317



## Amazon FBA, Simplified
## Step 1>>

We research and source profitable products to sell for you at margin of 20% or higher. These can be from wholesalers / brands or bi... retailers

You then fund the purchase of this inventory with your working capital (our team handles the purchasing process)

Products then get shipped to our warehouses and we prep the packaging for Amazon and ship to Amazon's warehouse

### AMZ FBA Supply Chain

Product is then a Prime eligible product on amazon.com...Customer purchases the product..

Amazon then pays you out Bi-weekly on your sales with a margin :)

EX 23
2318

# Revenue Goal for Your Stores

On Amazon Marketplace, the most important variable for growing a store is the availability of working capital.

Because Amazon pays you for your sales every two weeks, you need access to Working Capital to place inventory orders and purchase from wholesalers or manufacturers in-between payouts. Product inventory sells within 30 days and average margins are 20% net on inventory spend.(30K inventory  will yield 6K net).

With our partnerships such as Amex and fundwise we help our clients build their pool of working capital to scale their stores to full capacity

**Numbers per store - $25k** working capital (have by month 3-4 the latest)

## $ 5 Figure monthly profit

With the correct working capital, the goal is to get you there within the first 12-16 months at most

## Fast Results:

Average break-even in 12 – 14 months

## $50k-$100k

Average store valuation at year two (range due to rev model valuation)

ASCEND

EX 23
2319

# TWO YEAR TIMELINE

Build an asset you can sell at the 24 Month mark for an exit.

Or keep the cash cow driving monthly passive revenue.

Your call!

**1 Month**

Store set-up go live, stores are live within 1st mo

**1 Year**

Break-even point, 12-16 mo avg. break even point across 100+ stores

**2 Years**

Money-back Guarantee, If you do not see net profit, full money back at 24 mo

**2-3 Years**

Years: Sell or Scale, Sell for 2-4x annual revenue or scale for monthly $$

A S C E N D

Digital Real Estate

# It's not just sales that can make money in eCommerce anymore - You can sell your mature store for a big pay-day

While most investors and entrepreneurs have known about the growth of eCommerce in the last decade, its the new wave of money entering the discussion that is making eCommerce store owners big profit.

For perspective: You can sell your store to a buyer on Empire Flippers for 2-4x annualized profit within two years, where the buyer purchases 100 stores and IPOs for 20-30x annualized profit. That's a lot of room for profit on both sides!

Thrasio – the fastest US company to reach a $1B valuation - led the charge of, to date, 28 companies acquiring established eCommerce stores (specifically Amazon FBA). This flagship model has surged the demand for quality stores, and our programs are designed for our clients to enter on the ground level and sell big into this wave within a two year timeline.

MORE INFO ON THRASIO

Thrasio Reaches **$1B** Valuation

ASCEND

EX 23

2321

# Pricing (2022)

Programs for all budgets. All include money-back guarantee. The more you spend upfront, the higher level of diversification you establish.

Ask us about our custom offerings, private label add-ons + Walmart packages



**Amazon FBA Store Base**
## $20K
Online arbitrage FBA
Profit share fee=50%

**Amazon FBA Store hybrid**
## $30K
Wholesale, Online
Arbitrage -FBA Hybrid
Profit share fee=40%

**Amazon FBA  Store Hybrid**
## $35K
Wholesale, Online
Arbitrage -FBA  Hybrid
Profit share fee=35%

**Premier FBA Hybrid Package**
## $40K
Wholesale, Online
Arbitrage - FBA Hybrid
Profit share fee=30%

*Portfolios of $30k+ qualify for exclusive warehouse tours at our Dallas Facility

ASCEND

EX 23
2322



# Thank You

For more information please
contact your Ascend Ecom
representative, or message us via
email, website, or social!

WWW.ASCENDECOM.COM
Support@ascendecom.com
@ascend_ecom

EX 23
2323

# Composite Attachment C
*Exhibit C*

**EX 23**

**2324**



# Amazon FBA Management Agreement

**Prepared for:**

**Created by:**
Ascend Ecom LLC

Document Ref: XWGIY-9EVZX-SWBLB-57YGT

# 1. Services & Deliverables

The Manager agrees that it shall provide the Client with Management services including the skills, guidance, expertise, know-how, and deliverables for which it is commissioned.

As part of this Management agreement, the Manager agrees to the following deliverables:

| Services (from Manager) | Cost (to client) |
|---|---|
| Amazon Store Build + FBA product sourcing | 30000 |
| Amazon Store Management + Growth | 40% Of Monthly Net Profits" |
| Reseller Certificate | $50.00-100.00 |
| Ungating | N/A |
| Private Label Product ( Optional) | N/A |
| Monthly Software fee (subject to change, first two months waived) | $89-$300 |

By signing this Consulting Agreement, it is the agreement of both parties that the services and deliverables listed above represent an accurate scope of work as defined by the terms of this agreement.

**AMAZON MASTER SERVICES AGREEMENT**

This Amazon Master Services Agreement (this "Agreement"), dated and effective as of the last date identified on the signature page below to this Agreement ("Effective Date"), is entered into by and between Ascend Ecom LLC, a Wyoming Limited Liability Company (hereafter referred to as "Manager"), and the individual or entity set forth on the signature page attached hereto (hereafter referred to as "Client").    Manager and Client are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

**BACKGROUND**

Document Ref: XWGIY-9EVZX-SWBLB-57YGT

WHEREAS, Amazon.com is a website that allows users to buy and sell products. Amazon.com uses an infrastructure that permits, buying, selling, storage, and shipping.

WHEREAS, Manager is engaged in providing Amazon.com seller account management services. Manager desires to provide Client with  Amazon.com seller account management services, and Client is willing and desires to retain Manager to provide Amazon.com seller account management services as outlined in this Agreement.

NOW, THEREFORE, for and in consideration of mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties here to, intending to be legally bound, hereby agree as follows:

# AGREEMENT

## 1. MANAGER SERVICES

**1.1   Services.**   The Manager agrees to provide, but is not limited to, the following services to fully prepare, manage, and operate a Amazon.com store on behalf of Client:

· Amazon.com Store Approval Services

· Reseller Certificate Services

· Product research, sourcing, selecting and listing of products for sale on amazon.com

· Sourcing Wholesale Contracts on behalf of client,  (tracked via CRM)

· Handling customer service, returns, issuing refunds, bookkeeping, and handling all issues that arise concerning Client's Amazon.com seller account including customer claims, chargebacks, and negative feedback

· Provide oversight of the store and its financial performance and provide proper billing for account management services as described in Section 2.5.

· In the rare and unlikely event Client's amazon.com store becomes suspended, Manager will handle all duties to reinstate store for active sales, but there are no guarantees of reinstatement.  If amazon.com permanently suspends Client's store for any reason, Manager will build Client another e-commerce store (whether that be another amazon.com store, Walmart Store or other) at no additional cost.

The Manager retains the right to provide and use an outside contractor at the Manager's discretion without notifying the Client as long as the services are being provided as stated above (the "Services").

**1.2  Independent Contractor Status.** The Parties are not entering into a partnership or joint venture by virtue of this Agreement. In all matters covered by this Agreement, Manager will act as an independent contractor. Accordingly, Manager will not be required to devote its full time to representing Client. Manager may perform the same or similar services for others, as well as engage in any other business activities.

**1.3  Non-Exclusive Services.** Manager's services hereunder shall not be exclusive to Client, and at all times Manager shall be free to perform the same or similar services for others, as well as to engage in any and all other business activities, provided that such other activities do not interfere with Manager's services to Client hereunder.

**1.4  No Financial Responsibility.** In no event shall Manager be responsible for payment of any kind or any other obligation under Client's credit cards or working capital, all of which payment obligations shall be solely that of Client.  Manager also does not provide financial or tax advice to Client.

**1.5 Best Efforts.** Manager will service Client in a professional manner and to the best of its abilities. Manager cannot and does not guarantee the outcome of its services. Manager cannot and does not guarantee that Client will generate a certain amount of income.

## 2. CLIENT REQUIREMENTS

**2.1 Account Setup Requirements.** Prior to Manager's performance of the Services outlined above, Client shall assist Manager with establishing a Amazon.com seller account (the "Account") to be owned by Client and prepare and execute the necessary documentation and fulfill all other requirements necessary in order to establish Manager and its representatives as an "authorized user" on the Account, with full access and privileges to the Account.

**2.2 Access to Working Capital.** Client will use best efforts to obtain and maintain, for the duration of this Agreement, credit cards issued through the United States federally insured banking institution or other working capital with a minimum credit line of at least $30,000 USD to be used to purchase goods for resale on Client's amazon.com store.  Client shall notify Manager if Client uses this credit / working capital for any reason outside the scope of this agreement.  This minimum credit must be maintained and fully accessible to Manager throughout the duration of the term in order for the buyback guarantee to remain valid.  Client must provide the Manager with credit/debit card and billing information for the Manager to fulfill orders and monthly supplier / third party software and Amazon.com professional seller fees. Client shall pay off the credit cards / working capital fully to the extent possible from

Amazon.com store revenues within 3 business days after Amazon.com remits payments to Client, typically every two weeks.

**2.3 Initial Service Fee.**   Client will pay Manager an initial service fee of $   30000   USD, of which $   30000   is due upon signing of this agreement to initiate Manager's services to build Client's Amazon.com store and obtain Amazon.com store approval, in conjunction with Section 2.1 above.   This initial service fee is fully refundable if client is unsuccessful  obtaining approval to become an Amazon.com Seller.   Manager is not obligated to initiate any work until this upfront service fee is paid by Client.

**2.5 Ongoing Compensation.**   Manager provides ongoing services to maintain and operate Client's Amazon.com store in exchange for a commission share of Net Profits, as defined below.  Commission is payable on all net compensation/profits when it is received by Client or by any third Party on Client's behalf minus returns & supplier software cost. Manager will provide the Client with a written statement of account showing the net compensation/profits received by Manager on Client's behalf and the expenses (if any) incurred by Manager under this Agreement. Client's payment to Manager is due upon receipt that is earned from selling on Amazon.com.

**2.6 Optional Payment for Additional Profit Share.**   After Client's Amazon.com store has been operational for at least 3 months, Client has the option to pay Manager an additional $5,000 to reduce Manager's ongoing compensation commission share by 5%.   Client may additionally offer to pay Manager an additional $5,000 for another 5% commission share, which Manager has sole discretion whether to accept.  To enact this optional payment to reduce Manager's commission share, Client must submit this notice in writing and submit payment to Manager no less than 30 days prior to enactment, but in all cases the change in Manager's commission share will be enacted at the beginning of the following month after 30 days from Client's written request.

**2.7 Store Access and Functionality.**  Client must provide Manager with full access to its Amazon.com account via Amazon.com's "User Permissions" to grant Manager "admin access" to the Amazon.com account.  Unless Manager provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the amazon website or in other written materials made available to Client, and (ii) Client shall not allow its Store to remain shut down for more than sixty (60) days during the term of this Agreement.

**2.8 Engagement.**  Client agrees to not engage any other person or entity to act for Client in the same capacity in which Client has engaged Manager for Amazon.com account management services or

otherwise. Client shall reasonably inform Manager of inquiries concerning Manager's services so that Manager may advise Client whether the same are compatible with and in the interests of Client's.

**2.9 Entity Formation.** Client is responsible for any business formation/management concerning its own affairs, including but not limited to: entity formation, obtaining an employer identification number, and obtaining a resale certificate.

## 3. TERM, TERMINATION, AND REFUND OPTION

**3.1 Term and Termination.** The initial term of this Agreement will be for 24 months to begin once Client's Amazon.com store has been approved and launched with products actively listed for sale. The term shall pause if for any reason the Client's Amazon.com store becomes suspended or no longer active, or if client is not providing at least $30,000 in working capital monthly for inventory after the 6 month mark since launch, the term will then continue to run once Client once again has an active ecommerce store operating with products actively listed for sale and sufficient working capital of $30,000. The term will automatically renew for an additional 12 months, unless Client or Manager provide written notice of termination for any reason with 60 days notice.

**3.2 Option to Request Buyback.** After the initial 24-month term, if the Client has not made back their initial service fee of $ ___30000___ in their allocated share of Net Profits, Client has the option to request the Manager to buy the Client's amazon.com account store within a 45-day period following the 24th month. To exercise this buyback option, Client must notify Manager of that election in writing. Manager will refund the remaining portion of the initial service fee that was not recovered by Client from any Net Profit and "cash back" credits earned from Client's credit cards used on Client's Amazon.com store business, provided that (1) Client has not engaged in any act that interferes or interfered with the operation of the Client's Amazon.com store or of the Manager's services or which would be in material breach of this Agreement, including, without limitation, a suspension of Client's Amazon.com store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises this refund option. The Parties further agree that under no circumstances shall this refund amount exceed the initial service fee.

**3.3 Client's Sale of Store.** If Client decides to sell the store to a buyer at any time during or after term of agreement, Manager will provide a " transitional period" of 45 days where Manager will provide business plan and educational /transfer services of Amazon operation to said buyer as well as assistance in sourcing a buyer. Manager will be owed 10% commission of the sale of the store.

## 4. NET PROFIT STATEMENT

**4.1   Statement of Invoice.**  Clients will receive a statement with an invoice on the first of the month detailing Client's Net Profits and Manager's commission share to be paid by Client. Payment to Manager from Client will be due no later than 5 days (five days) from receipt of invoice. If client fails to pay within 5 days (five days) a late fee of 5% (five percent) will be incurred on payment due.

**4.2 Net Profit.**  Net Profit is defined as total sales, less cost of goods sold, less Amazon.com professional seller fees, less supplier / third party software costs, multiplied by the commission percentage as per Section 2.5 of this Agreement.

**4.3 Seller Fees and Software Costs.**  The Amazon.com professional seller fees and supplier / third party software costs are taken into account within the Net Profit calculation before Manager's commission rate as stated in Section 2.5 is applied. Amazon.com professional seller fees are outlined on Amazon.com's seller website and are not subject to Manager's control.  The supplier / third party software costs start at $0/month for the first 30 days but are not guaranteed to remain constant throughout the term.

## 5. DEFAULT

**5.1 Manager Default.**   Manager will not be liable or deemed in default under this agreement for any failure to perform or delay in performing any of its obligations due to, or arising out of any act not within its control, including, without limitation, unexpected Amazon Seller Central termination or suspension of clients store by Amazon.com.  No refunds will be given; Client will be provided alternative options such as a new ecommerce store with no upfront commission cost.

**5.2 Client Default.**  Client shall be considered in default and material breach of this contract if it engages or permits any conduct that results in Manager being unable to access Client's Amazon.com account for a period of three (3) days, or does not pay Manager the ongoing commission share earned within thirty (30) days of invoice.

## 6. MISCELLANEOUS

**6.1 Authority to Act.**  Client authorizes Manager to act for Client by doing the following: product research; listing products for sale; fulfilling orders when products are sold; handling customer service; handling returns; issuing refunds; bookkeeping; and handling all issues that arise concerning Client's Amazon.com account including A to Z claims, chargebacks, and negative feedback.

**EX 23**
**2331**

**6.2 Rescission and Refund.**  Client is entitled to a three (3) calendar day rescission period and entitled to cancel the contract. After the three (3) calendar day rescission period has passed the Client will not be entitled to a refund.

**6.3 Assignment.**  Neither Client nor Manager has the right to assign this Agreement or any rights or obligations under the Agreement without the express written consent of the other, except that Manager may assign this Agreement without Client's consent to any firm, corporation or other entity of which Manager is an officer, partner, employee, or consultant.

**6.4 No Encumbrances.**  Each Party warrants that it is free to enter into and to perform under this Agreement and to grand the rights, options, powers and privileges herein granted, and to perform every service described in this Agreement, and neither Party is a party to any presently existing contract, nor has or will have any obligation, that would interfere with full performance of the terms of this Agreement.

**6.5 Indemnification.**  In the event that either Party hereto does not fully perform or cause to be performed any agreement or obligation undertaken by such Party hereunder (the "Indemnitor"), the Indemnitor agrees to indemnify, defend and hold the other Party hereto (the "Indemnitee") harmless from any and all claims, demands, actions, judgments and awards against the Indemnitee by third Parties in connection with such non-performance. In connection with the foregoing indemnity, the Indemnitee agrees to give the Indemnitor prompt written notice of any claim against the Indemnitee. Further, the Indemnitor shall not be liable for such indemnity unless such claim has been adjudicated in a court of competent jurisdiction and reduced to a final adverse judgment, arbitrated pursuant to any agreement requiring arbitration and resulting in a final binding award, or settled with the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

**6.6 Additional Services.**  All services outside the scope of this Agreement that are requested by Client and which Manager agrees to perform will be billed at a separate negotiated rate.  Client will be notified and must approve in writing additional services before they will be performed, although Manager may not necessarily be able to inform Client in advance of the total cost of such additional services.  These additional services include but are not limited to; dropshipping, private label , additional wholesale brands.

**EX 23**

**2332** Page 8 of 10

**6.7 Limitation of Liability.**  Manager shall not be liable for any incidental, consequential, indirect or special damages, or for the loss of profits or business interruptions caused or alleged to have been caused by the performance or nonperformance of Manager's services.  Client agrees that, in the event that Manager is determined to be liable for any such loss, Client's sole remedy against Manager is limited to a refund of payments made by Client for services, less expenses paid to subcontractors or to third parties.  Manager is not responsible for errors which result from faulty or incomplete information supplied to Manager by Client.   Client also agrees to not seek damages in excess of the contractually agreed upon limitations directly or indirectly through suits by or against other parties.  Manager shall not be liable to Client for any costs, damages or delays due to causes beyond its control, expressly including without limitation, unknown site characteristics; changes in policies, changes in terms of service, and viruses.

**6.8 Disputes and Governing Law.**  The Parties agree that any dispute regarding this Agreement, and any claim made by Client for return of fees paid to Manager, shall be handled in accordance with applicable State and Federal Laws.  This Agreement and the rights and obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the laws of Sheridan County in the State of Wyoming applicable to contracts made and to be performed wholly within such state.

**6.9 Arbitration.**  Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, on behalf of the Client shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**6.10 Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force and effect. Any amendment to this Agreement shall be of no force and effect unless it is in writing and signed by the Parties.

**6.11 Severability.**  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, and shall not in any manner affect the remaining provisions hereof in such jurisdiction or render any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**6.12 Independent Counsel.**  The Parties acknowledge that they had the right and adequate time to have independent legal counsel of their own choosing review and advise on this Agreement prior to

execution.

**6.13 Counterparts.**  This Agreement may be executed in one or more counterparts.  All such counterparts shall constitute one agreement binding on the Parties notwithstanding that both of the Parties are not signatories to the original or same counterpart. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the Parties. The Agreement shall be considered executed and binding once one of the Parties possesses an Agreement that expresses signatures by all Parties.

By signing below, the undersigned acknowledge reading, understanding, and agreeing to the terms of this Agreement thereby causing it to be executed once signed by all Parties.

**IN WITNESS WHEREOF**, by the execution of both parties below, this consulting agreement is declared valid and will form a part of the Contract in conjunction with any other relevant documents and agreements presented on behalf of either party.

R█████ A██                                              Ascend Ecom LLC

X ▒▒▒▒▒▒▒▒▒▒                                          X _____

By: ▒▒▒▒▒▒                                              By:   Ascend Ecom LLC

Date:   2022-03-28                                       Date:   2022-03-28

**EX 23**
**2334** Page 10 of 10

# Signature Certificate

Reference number: XWGIY-9EVZX-SWBLB-57YGT

| Signer | Timestamp | Signature |
|---|---|---|
| Email: ████@gmail.com | | |
| Sent: | 28 Mar 2022 21:26:34 UTC | |
| Viewed: | 28 Mar 2022 21:33:40 UTC | |
| Signed: | 28 Mar 2022 22:02:12 UTC | IP address: ████ States |

| Signer | Timestamp | Signature |
|---|---|---|
| **Will Basta** Email: will@ascendecom.com | | |
| Sent: | 28 Mar 2022 21:26:34 UTC | |
| Viewed: | 28 Mar 2022 21:58:25 UTC | |
| Signed: | 29 Mar 2022 14:10:54 UTC | IP address: 120.28.216.145 Location: Davao City, Philippines |

Document completed by all parties on:
29 Mar 2022 14:10:54 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 30,000+ companies worldwide.



**EX 23**
**2335**

# Composite Attachment C

*Exhibit D*

EX 23
2336

 Gmail

████ ████ @gmail.com>

## Fwd: Ascend Ecom: Amazon FBA Partnership
1 message

████ @gmail.com>
████ @gmail.com                                        Mon, Feb 21, 2022 at 8:29 PM

---------- Forwarded message ---------
From: **Will Basta** <will@ascendecom.com>
Date: Mon, Feb 21, 2022, 8:27 PM
Subject: Ascend Ecom: Amazon FBA Partnership
To: ████ @gmail.com>, Partnerships Ascendecom <partnerships@ascendecom.com>, Grace Dalaygon <grace@ascendecom.com>, Raymond Villanueva <raymond@ascendecom.com>

Hey ████ !

Great to chat with you. I think there is potential for a strong partnership here. I have attached and sent some follow up links below. Let me know if you'd like to review a contract and if so, what investment tier you are interested in.

1) Attached brief overview deck (attached) and on pagers
2) Financial model (Rough estimate)  https://docs.google. com/spreadsheets/d/1uJ-bSOUlCwVukKzGLq7mtJaooBMeyqzFD 4gHkJVz_ro/edit?usp=sharing
3)  Video walk through of wholesale side
**Password:** ████

**Testimonials:**  https://drive. google.com/drive/folders/ 1cHJGivYG3lMutEqImCpPOXFvst- VO-HO?usp=sharing

All the best,

Attachment: Ascend Partnership Journey.heic

Attachment: __Ascend Ecom - Amazon FBA Program (6).pdf

Attachment: One Pager Ascend.heic

--

**Will Basta**
Co-Founder & CRO at Ascend Ecom

**M** 8453990676   **W** www.ascendecom.com   **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

Book time with me here: My Calendar

 Gmail

███████████ @gmail.com

---

## Re: Ascend Ecom: Amazon FBA Partnership

1 message

---

**Will Basta** <will@ascendecom.com>                           Mon, Feb 28, 2022 at 2:02 PM
To: ███████████
          com, Grace Dalaygon <grace@ascendecom.com>

Thanks ████

@Grace - can you send ████ an agreement to review ?

Best ,

Will

Sent from my iPhone

On Feb 28, 2022, at 08:37, ███████████ @gmail.com> wrote:

Will,

Please the Contract/documents for us to review.

Peter

On Tue, Feb 22, 2022, 5:57 PM Will Basta <will@ascendecom.com> wrote:
Hey ████!

Answers to your questions in red. Please let us know if you have any other questions or want to see an agreement.

best,

Will

On Mon, Feb 21, 2022 at 6:00 PM ███████████ @gmail.com> wrote:
Good evening,

We had a few additional questions,

1) How much credit do we need to float in order to recoup our investments? There is no specific amount, Amazon pays out bi weekly but the first couple months its fragmented payouts. Haveing a 0 percent card to start is good, payouts should line up with inventory charges around month 4-5

2) Who receives the payment from Amazon and how is the split distributed? You get paid, then we invoice you directly.

3) Do we have a system to acquire customer's information  so we can market to them in case Amazon closes the store? No, amazon holds that.

4) Can we start with a $20k plan and upgrade to a $40k plan? Upgrades are allowed on the 30K and above for the same cost, if you start at 20K and upgrade will cost your 10 percent more, if you start at 30K its 5K per 5 percent.

5) What happens to the initial investment of $40k if we sell the store within 24 months? We don't guarnatee your investment before 24 months, if you sell bvefore that timeframe, youll have to write to

EX 23
2338

1/2

us that your doing that and you will exit the contract prematurely.

Thank you.

On Mon, Feb 21, 2022 at 8:27 PM Will Basta <will@ascendecom.com> wrote:

> Hey !
>
> Great to chat with you. I think there is potential for a strong partnership here. I have attached and sent some follow up links below. Let me know if you'd like to review a contract and if so, what investment tier you are interested in.
>
> 1) Attached brief overview deck (attached) and on pagers
> 2) Financial model (Rough estimate)  https://docs.google. com/spreadsheets/d/1uJ-bSOUlCwVukKzGLq7mtJaooBMeyqzFD 4gHkJVz_ro/edit?usp=sharing
> 3) Video walk through of wholesale side
> **Password:** ▮▮▮▮▮▮▮▮▮▮
>
> **Testimonials:** https://drive. google.com/drive/folders/ 1cHJGivYG3lMutEqlmCpPOXFvst- VO-HO? usp=sharing
>
>
> All the best,
>
>
> Attachment: Ascend Partnership Journey.heic
>
> Attachment: __Ascend Ecom - Amazon FBA Program (6).pdf
>
> Attachment: One Pager Ascend.heic
>
>
> --
> 
> **Will Basta**
> Co-Founder & CRO at Ascend Ecom
>
> **M** 8453990676   **W** www.ascendecom.com   **E** will@ascendecom.com
> **A** 2219 Main St. Santa Monica, CA
>
> Book time with me here: My Calendar

--
**Will Basta**
Co-Founder & CRO at Ascend Ecom

**M** 8453990676   **W** www.ascendecom.com   **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

Book time with me here: My Calendar

 Gmail

[REDACTED] @gmail.com>

## Re: Will Basta sent you Ascend: Amazon FBA Services Agreement

1 message

[REDACTED] @gmail.com>                                    Thu, Mar 3, 2022 at 11:51 AM
To: Will Basta <will@ascendecom.com>
Cc: [REDACTED] @gmail.com>

Will,

Please amend the agreement/contract to:

Name: [REDACTED]
Company Name: 258 LLC
Address: [REDACTED]

Additionally, can you accept a credit card payment for the initial fee of $30,000.00?

[REDACTED]

On Mon, Feb 28, 2022 at 3:39 PM Will Basta <docs@email.pandadoc.net> wrote:



**Will Basta** sent you **"Ascend: Amazon FBA Services Agreement"**.

OPEN THE DOCUMENT

⊙ Report spam

PandaDoc is an application to send, track, annotate, and sign documents online in a fast, secure, and professional way.

 Gmail

                                           @gmail.com>

---

## Re: Will Basta sent you Ascend: Amazon FBA Services Agreement
1 message

**Will Basta** <will@ascendecom.com>                        Thu, Mar 3, 2022 at 11:53 AM
To:            @gmail.com>, Grace Dalaygon <grace@ascendecom.com>, Raymond Villanueva <raymond@ascendecom.com>
Cc:            @gmail.com>

Hey ████,

I cc'd the team they will amend the agreement. We bill through bill.com / ACH for upfront payment, credit card will be used for everything else. We stopped using CC for this first cost because fees are way too high from vendor we used. But your Credit will be used for the rest of the business. Does that make sense?

@ray and grace, please change agreement to details below.

Thanks,

Will

> On Mar 3, 2022, at 8:51 AM, ████████████ @gmail.com> wrote:
>
> Will,
>
> Please amend the agreement/contract to:
>
> Name: ████████
> Company Name: 258 LLC
> Address: ████████████, FL████
>
> Additionally, can you accept a credit card payment for the initial fee of $30,000.00?
>
> ████
>
>
> On Mon, Feb 28, 2022 at 3:39 PM Will Basta <docs@email.pandadoc.net> wrote:

ASCEND

👤  **Will Basta** sent you "Ascend: Amazon FBA Services Agreement".

OPEN THE DOCUMENT

⊘ Report spam

PandaDoc is an application to send, track, annotate, and sign documents
online in a fast, secure, and professional way.

 Gmail

@gmail.com>

## Re: Will Basta sent you Ascend: Amazon FBA Services Agreement
1 message

**Raymond Villanueva** <raymond@ascendecom.com>                                    Fri, Mar 4, 2022 at 11:50 AM
To: ███████████ @gmail.com>
Cc: Will Basta <will@ascendecom.com>, ████ <███████@gmail.com>, Grace Dalaygon
<grace@ascendecom.com>

Hi ████,

Thank you for your email.

You are correct, Bill.com does have pay by card option. You are in control as to what source of funds you will be using on this platform to pay the invoice that we sent. Just be advised that if you do this, Bill.com will charge your card for the payment plus a transaction fee.

Hope this helps. Let us know if you have any questions and we'd be happy to help.

Regards,

On Fri, Mar 4, 2022 at 3:34 AM ████████ @gmail.com> wrote:
> Good afternoon,
>
> We noticed that bill.com has a pay by card option.
>
> Are we able to pay the upfront fee through bill.com using this option?
>
> Thank you.

On Thu, Mar 3, 2022, 11:53 AM Will Basta <will@ascendecom.com> wrote:
> Hey ████,
>
> I cc'd the team they will amend the agreement. We bill through bill.com / ACH for upfront payment, credit card will be used for everything else. We stopped using CC for this first cost because fees are way too high from vendor we used. But your Credit will be used for the rest of the business. Does that make sense?
>
> @ray and grace, please change agreement to details below.
>
> Thanks,
>
> Will
>
> > On Mar 3, 2022, at 8:51 AM, ████████ @gmail.com> wrote:
> >
> > Will,
> >
> > Please amend the agreement/contract to:
> >
> > Name: ████████
> > Company Name: 258 LLC
> > Address: ████████, FL ████
> >
> > Additionally, can you accept a credit card payment for the initial fee of $30,000.00?

**EX 23**
**2343**

1/2

On Mon, Feb 28, 2022 at 3:39 PM Will Basta <docs@email.pandadoc.net> wrote:



Will Basta sent you "**Ascend: Amazon FBA
Services Agreement**".

OPEN THE DOCUMENT

ⓘ Report spam

PandaDoc is an application to send, track, annotate, and sign documents
online in a fast, secure, and professional way.

--



**Raymond Villanueva**
Client Services and Communication | Support at **Ascend Ecom**

W www.Ascendecom.com

 Gmail

███████████ @gmail.com>

---

## Fwd: Ascend Ecom: Amazon FBA Partnership
1 message

███████ @gmail.com>                                      Mon, Mar 28, 2022 at 12:07 PM
To: Grace Dalaygon <grace@ascendecom.com>, Raymond Villanueva <raymond@ascendecom.com>,
partnerships@ascendecom.com

---------- Forwarded message ---------
From: ████████ <█████████ @gmail.com>
Date: Sun, Mar 27, 2022 at 8:43 AM
Subject: Re: Ascend Ecom: Amazon FBA Partnership
To: Will Basta <will@ascendecom.com>

Good morning Will,

I'm ready to move forward.  Can you walk me through the next steps?

FYI - I recently just opened a new amazon store under my business name and I applied for the resellers license here in Florida.

Thank you.


On Tue, Feb 22, 2022 at 10:34 PM ███████ <████████ @gmail.com> wrote:

> ---------- Forwarded message ---------
> From: **Will Basta** <will@ascendecom.com>
> Date: Tue, Feb 22, 2022, 5:57 PM
> Subject: Re: Ascend Ecom: Amazon FBA Partnership
> To: ███████████ @gmail.com>, Raymond Villanueva <raymond@ascendecom.com>, Partnerships
> Ascendecom <partnerships@ascendecom.com>
>
> Hey ████!
>
> Answers to your questions in red. Please let us know if you have any other questions or want to see an agreement.
>
> best,
>
> Will
>
> On Mon, Feb 21, 2022 at 6:00 PM ██████████ @gmail.com> wrote:
>> Good evening,
>>
>> We had a few additional questions,
>>
>> 1) How much credit do we need to float in order to recoup our investments? There is no specific amount, Amazon pays out bi weekly but the first couple months its fragmented payouts. Heaving a 0 percent card to start is good, payouts should line up with inventory charges around month 4-5
>>
>> 2) Who receives the payment from Amazon and how is the split distributed? You get paid, then we invoice you directly.

**EX 23**
2345

3) Do we have a system to acquire customer's information so we can market to them in case Amazon closes the store? <span style="color:red">No, amazon holds that.</span>

4) Can we start with a $20k plan and upgrade to a $40k plan? <span style="color:red">Upgrades are allowed on the 30K and above for the same cost, if you start at 20K and upgrade will cost your 10 percent more, if you start at 30K its 5K per 5 percent.</span>

5) What happens to the initial investment of $40k if we sell the store within 24 months? <span style="color:red">We don't guarnatee your investment before 24 months, if you sell bvefore that timeframe, youll have to write to us that your doing that and you will exit the contract prematurely.</span>

Thank you.

On Mon, Feb 21, 2022 at 8:27 PM Will Basta <will@ascendecom.com> wrote:

Hey ▓▓ !

Great to chat with you. I think there is potential for a strong partnership here. I have attached and sent some follow up links below. Let me know if you'd like to review a contract and if so, what investment tier you are interested in.

1) Attached brief overview deck (attached) and on pagers
2) Financial model (Rough estimate) https://docs.google. com/spreadsheets/d/1uJ-bSOUlCwVukKzGLq7mtJaooBMeyqzFD 4gHkJVz_ro/edit?usp=sharing
3) Video walk through of wholesale side
**Password:** ▓▓▓▓▓▓▓▓▓▓▓

**Testimonials:** https://drive. google.com/drive/folders/ 1cHJGivYG3lMutEqlmCpPOXFvst- VO-HO?usp=sharing

All the best,

Attachment: Ascend Partnership Journey.heic

Attachment: __Ascend Ecom - Amazon FBA Program (6).pdf

Attachment: One Pager Ascend.heic

--
 **Will Basta**
Co-Founder & CRO at Ascend Ecom

**M** 8453990676   **W** www.ascendecom.com   **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

 

Book time with me here: My Calendar

--
 **Will Basta**
Co-Founder & CRO at Ascend Ecom

**M** 8453990676   **W** www.ascendecom.com   **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA



Book time with me here: My Calendar

EX 23
2346



███████████████ @gmail.com>

---

## Re: Ascend Ecom: Amazon FBA Partnership
1 message

---

**Raymond Villanueva** <raymond@ascendecom.com>                                             Mon, Mar 28, 2022 at 5:31 PM
To: ████████ @gmail.com>
Cc: Will Basta <will@ascendecom.com>, Ascend Ecom Partnerships <partnerships@ascendecom.com>

Hi ████,

Thanks for your quick response.

I have sent you the $30k contract for your review. Please let us know if you have any questions.

Regards,

On Tue, Mar 29, 2022 at 5:06 AM ███████ < ██████ @gmail.com> wrote:
> Good evening,
>
> The $30k Amazon FBA Store hybrid.
>
>
> On Mon, Mar 28, 2022, 4:57 PM Raymond Villanueva <raymond@ascendecom.com> wrote:
>> Hi ████
>>
>> I hope this email finds you well.
>>
>> May we know which program are you currently interested in so we may provide you with the details and the contract?
>>
>> We hope to hear from you soon.
>>
>> Regards,
>>
>> On Tue, Mar 29, 2022 at 4:10 AM ███████ < ██████ @gmail.com> wrote:
>>> Thank you.
>>>
>>> On Mon, Mar 28, 2022, 4:09 PM Will Basta <will@ascendecom.com> wrote:
>>>> Hey ████
>>>>
>>>> Great to hear!
>>>> I am out of the office today, but looping in Raymond and Gian.
>>>>
>>>> They can let you know how to proceed.
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On Mar 27, 2022, at 05:43, ███████ < ██████ @gmail.com> wrote:
>>>>>
>>>>>
>>>>> Good morning Will,
>>>>>
>>>>> I'm ready to move forward.  Can you walk me through the next steps?
>>>>>
>>>>> FYI - I recently just opened a new amazon store under my business name and I applied for the resellers license here in Florida.

EX 23
2347

Thank you.

On Tue, Feb 22, 2022 at 10:34 PM                    @gmail.com> wrote:

---------- Forwarded message ---------
From: **Will Basta** <will@ascendecom.com>
Date: Tue, Feb 22, 2022, 5:57 PM
Subject: Re: Ascend Ecom: Amazon FBA Partnership
To:                    @gmail.com>, Raymond Villanueva
<raymond@ascendecom.com>, Partnerships Ascendecom <partnerships@ascendecom.com>

Hey        !

Answers to your questions in red. Please let us know if you have any other questions or want to see an agreement.

best,

Will

On Mon, Feb 21, 2022 at 6:00 PM                    @gmail.com> wrote:
Good evening,

We had a few additional questions,

1) How much credit do we need to float in order to recoup our investments? There is no specific amount, Amazon pays out bi weekly but the first couple months its fragmented payouts. Haveing a 0 percent card to start is good, payouts should line up with inventory charges around month 4-5

2) Who receives the payment from Amazon and how is the split distributed? You get paid, then we invoice you directly.

3) Do we have a system to acquire customer's information  so we can market to them in case Amazon closes the store? No, amazon holds that.

4) Can we start with a $20k plan and upgrade to a $40k plan? Upgrades are allowed on the 30K and above for the same cost, if you start at 20K and upgrade will cost your 10 percent more, if you start at 30K its 5K per 5 percent.

5) What happens to the initial investment of $40k if we sell the store within 24 months? We don't guarnatee your investment before 24 months, if you sell bvefore that timeframe, youll have to write to us that your doing that and you will exit the contract prematurely.

Thank you.

On Mon, Feb 21, 2022 at 8:27 PM Will Basta <will@ascendecom.com> wrote:
Hey        !

Great to chat with you. I think there is potential for a strong partnership here. I have attached and sent some follow up links below. Let me know if you'd like to review a contract and if so, what investment tier you are interested in.

1) Attached brief overview deck (attached) and on pagers
2) Financial model (Rough estimate)  https://docs.google. com/spreadsheets/d/1uJ-bSOUlCwVukKzGLq7mtJaooBMeyqzFD 4gHkJVz_ro/edit?usp=sharing
3)  Video walk through of wholesale side
**Password:** ███████████

**EX 23**
**2348**

**Testimonials:** https://drive. google.com/drive/folders/ 1cHJGivYG3lMutEqlmCpPOXFvst-VO-HO?usp=sharing

All the best,

Attachment: Ascend Partnership Journey.heic

Attachment: __Ascend Ecom - Amazon FBA Program (6).pdf

Attachment: One Pager Ascend.heic

--



### Will Basta
Co-Founder & CRO at Ascend Ecom

**M** 8453990676    **W** www.ascendecom.com    **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

 

Book time with me here: My Calendar

--



### Will Basta
Co-Founder & CRO at Ascend Ecom

**M** 8453990676    **W** www.ascendecom.com    **E** will@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

 

Book time with me here: My Calendar

--

A S C E N D↑

### Raymond Villanueva
Client Relations Associate at Ascend Ecom

**W** www.ascendecom.com    **E** support@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

--

A S C E N D↑

### Raymond Villanueva
Client Relations Associate at Ascend Ecom

**W** www.ascendecom.com    **E** support@ascendecom.com
**A** 2219 Main St. Santa Monica, CA

# Composite Attachment C

*Composite Exhibit E*

 Gmail

x@gmail.com>

## Re: My store is being mismanaged!!!!!! HELP!!!!!! HELP!!!!!!!!!
1 message

**Will Basta** <will@ascendecom.com>                                        Tue, May 9, 2023 at 12:19 PM
To: ▊▊▊▊▊▊▊▊▊▊▊▊ @gmail.com>
Cc: Ascend Support <support@ascendecom.com>, billing@ascendecom.com, Joyce Agustin <joyce@ascendecom.com>,
Roland Aguilar <roland@ascendecom.com>, Raymond Villanueva <raymond@ascendecom.com>

Team-

Please clear this up for ▇▇▇▇ asap

Thx

Sent from my iPhone

> On May 9, 2023, at 12:05, ▇▇▇▇▇ ▇ ▇▇▇▇ @gmail.com> wrote:
>
>
> Good morning.
>
> I received an invoice for April claiming the store made $2048.09 in profit.  I asked for a breakdown on how you arrived at that number. Kelvin sent the attached excel sheet. Whomever drafted this invoice just added the profit column and didn't notice the unit cost was blank!   So the products that we are selling in the store are now free of charge?!?!  I also received a separate invoice for shipping fees which should of been deducted from the profits.
>
> We're approaching  one year of the store opening and just based on your excel sheet we've only we've only earned $3939.91. This amount doesn't count storage fees. I even wonder if we're even positive at this point.  We only have three items being sold at the store.   This is not what I expected when I got on the phone call with Will last year.   If I knew this is how you guys did business I wouldn't of never invested with you guys.
>
> I've been crying out my store is being mismanaged and yet nothing is improving. Either you guys don't care because you already have my money or the person managing the store doesn't know what they are doing.
>
> I just spent $20k on some inventory that will arrive in Amazon in two months. I was told this was separate from the FBM/FBA. I asked if we were going to wait for this inventory or are we going to start buying items since its suppose to be separate.   Of course I got a no answer from my amazing team!
>
> We have over $50k invested with your company.  All I ask is for you guys to be professional and to do what Will promised.
>
>
>
>
>
> <Invoice_SLC0423-050523-C01.pdf>
> <Invoice_PSA0423-050823-C01.pdf>
> <April.xlsx>

EX 23
2352

**Ascend Ecom**
1309 Coffeen Avenue, Suite 2784
Sheridan, WY 82801
8453990676

INVOICE

A S C E N D ↑
SUSTAINABLE·TRANSPARENT·INNOVATIVE

| | |
|---|---|
| **Invoice #:** | PSA0423-050823-C01 |
| **Invoice Date:** | 05/08/23 |
| **Amount Due:** | $657.92 |

**Bill To:**

258, LLC
▓▓▓▓▓▓▓, FL ▓▓▓▓
United States

| **Due Date** |
|---|
| 05/15/23 |

| Item | Description | Quantity | Price | Amount |
|---|---|---|---|---|
| Ascend Share (%) | Store Profit for Apr 2023 (1,644.79) - Profit split is calculated at 60%% / 40%% | 1 | $657.92 | $657.92 |

Apr 2023 AMZ 258, LLC store profit was $2048.09, we deducted $403.3 (software cost) which brings the Net to $1644.79 then apply the profit split of 60%/40% for the invoice total of  $657.92

Note (applicable to monthly profit share only):
Please be advised that there is a 5 percent late charge if the payment is not made within 5 days.
For accounts that have a payment delay of longer than 14 days, the 5 percent late charge will not be applied and you have a month to pay the total amount due.

Bank Details:
Bank Name: Chase
Account Name: Ascend Ecom LLC
Account Number: ▓▓▓▓1339
Routing Number:
If ACH: ▓▓▓▓▓▓
If Wire: ▓▓▓▓▓▓
Address: 1309 Coffeen Avenue Suite 2784
Sheridan, Wyoming 82801

To pay online, go to https://app02.us.bill.com/p/ascendecom

| | |
|---|---|
| **Subtotal:** | $657.92 |
| **Sales Tax:** | $0.00 |
| **Total:** | $657.92 |
| **Payments:** | $0.00 |
| **Amount Due:** | $657.92 |

**EX 23**

**2353**

**Ascend Ecom**
1309 Coffeen Avenue, Suite 2784
Sheridan, WY 82801
8453990676

INVOICE

ASCEND↑
SUSTAINABLE-TRANSPARENT-INNOVATIVE

| | |
|---|---|
| **Invoice #:** | SLC0423-050523-C01 |
| **Invoice Date:** | 05/05/23 |
| **Amount Due:** | $649.00 |

**Bill To:**

258, LLC

[REDACTED], FL
United States

| Due Date |
|---|
| 05/12/23 |

| Item | Description | Quantity | Price | Amount |
|---|---|---|---|---|
| FBM SHIP | FBM Shipping Label Cost for April 2023 | 1 | $649.00 | $649.00 |

Shipping Label Cost - April 2023 (258, LLC)
Please see attachments for a detailed breakdown.

Note:
For immediate posting of payments, please send wire to bank details
listed below as it can take up to 4 business days for payments thru
bill.com to get verified.

Bank Name: Chase
Account Name: Ascend Ecom LLC
Account Number: [REDACTED] 1339
Routing Number: [REDACTED]
If ACH: [REDACTED]
If Wire: [REDACTED]
Address: 1309 Coffeen Avenue Suite 2784, Sheridan, Wyoming 82801

| | |
|---|---|
| **Subtotal:** | $649.00 |
| **Sales Tax:** | $0.00 |
| **Total:** | $649.00 |
| **Payments:** | $0.00 |
| **Amount Due:** | $649.00 |

To pay online, go to https://app02.us.bill.com/p/ascendecom

**EX 23**
**2354**