Exhibit A



# E-COMMERCE MARKETPLACE CONSULTING AGREEMENT

Prepared for: _____
Created by: ACV

1. **Background and Recitals.**

   1.1. **WHEREAS**, Consultant is a specialist in elevating Marketplace strategies across a variety of platforms, including but not limited to e-commerce and online marketplaces, social media storefronts, and other digital sales and e-commerce channels (collectively referred to as the "Marketplace" and further

detailed in **Schedule A**), providing tailored programs to boost clients' digital presence and sales performance (as defined more fully below, the "Services").

1.2. **WHEREAS**, Client seeks the specialized expertise of Consultant to develop and enhance its Marketplace operations, leveraging innovative strategies and the comprehensive suite of Services offered by Consultant for product discovery, market positioning, and sustainable online growth.

1.3. **WHEREAS**, Client recognizes the necessity of assuming all associated costs and risks tied to its Marketplace endeavors across diverse platforms, valuing Consultant's role in providing direct support, strategic market insights, and assistance in product listing and digital storefront optimization.

1.4. **WHEREAS**, Client commits to fairly compensate Consultant for its bespoke consultancy services, reflecting Consultant's contribution towards achieving targeted business outcomes and Marketplace expansion, as outlined within this Agreement.

1.5. **NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

2. **Definitions.**

2.1. "Additional Services" refers to the suite of specialized services provided by Consultant that are not included in the standard Services outlined in this Agreement. These services are available to Client for additional fees and are detailed in **Schedule B** of this Agreement.

2.2. "Marketplace Fees" encompasses all charges levied by the Marketplace directly to Client's Seller Account. These fees include, but are not limited to, charges for listing items, storing inventory, and other related activities as specified by the Marketplace .

2.3. "Marketplace Terms" consist of the full spectrum of rules, guidelines, policies, and procedures that are instituted by the Marketplace. These govern the operation and conduct of Client's Seller Account and Store and are subject to change as per Marketplace's periodic updates. The terms include the Marketplace's general user Terms of Service, Selling Policies, Seller Code of Conduct, and Payment terms, all as applicable.

2.4. "Client" collectively identifies the signatory individual(s) and any associated Client Entity(ies) that have ownership and operational control over the Seller Account and Store .

2.5. "Client Entity" denotes any business entity established or utilized by Client for the ownership and operation of the Seller Account and Store. The specific details and operational scope of Client Entity are expounded in Section 4.1 .

2.6. "Expenses" are the costs incurred directly by Consultant for third-party services or products that are essential for the provision of the Services under this Agreement. These include verifiable out-of-pocket payments to software providers and other vendors, as stipulated within the scope of this Agreement. Client is obligated to reimburse such Expenses to Consultant solely as per the agreed terms hereof or preapproved by Customer in writing ."Inventory" signifies the collection of finished goods owned by Client and available for sale in the Store .

2.7. "Inventory" signifies the collection of finished goods owned consigned or licensed by Client and available for sale in the Store .

2.8. "Net Profit" is defined as the gross sales revenue accrued from the Seller Account, not including VAT or any other sales or customs tax within a specified payment

period, after deducting the cost of goods sold, Marketplace Fees, any rebates, commissions, finder's fees, agent's fees, freight, postage, shipping and insurance charges, any retroactive price reductions or allowance, chargeback's or similar price concessions and reimbursable Expenses. It is understood that any costs arising from product returns or goods deemed unsellable are excluded from the Net Profit calculation .

2.9. "Seller Account" is the registered user account with the Marketplace, established by Client, which enables the sale of goods to consumers. The term "Seller Account" inherently includes Client's Store, which is the digital platform within the Marketplace where the goods are listed and sold .

2.10. "Services" comprises all the tasks and functions performed by Consultant for Client as stipulated under this Agreement and elaborated upon in Section 3.1 .

2.11. "Store" is the digital retail space operated by Client within the Marketplace, which is accessible to consumers for viewing and purchasing products .

2.12. "Store Open Date" means the first date on which a Marketplace customer may purchase products from Client's Store.

2.13. "Working Capital Account" is the designated financial account maintained by Client, from which Consultant is authorized to draw funds for purchasing Inventory, covering Marketplace Fees, and settling Expenses relevant to the Services provided. The management and use of the Working Capital Account are detailed in Section 5.2 .

3. **Consultant's Services & Responsibilities.**

3.1. **The Services.** During the term of this Agreement, Consultant shall, while at all times reporting to Client, Client's Entity, or Client's designated representative, provide such consulting and other services as detailed on **Schedule A** (collectively referred to herein as the "Services")

3.2. **Exclusions.**

3.2.1. ***Advisory Limitations.*** Consultant is engaged to assist solely with the setup and operational management of Client's Seller Account and Store on the Marketplace. Consultant is not authorized to provide, and hereby expressly disclaims, any legal or financial advice. Client bears the responsibility to consult with licensed legal and financial experts for guidance on legal obligations and tax responsibilities, including liabilities stemming from the operations of the Seller Account.

3.2.2. ***Financial Obligations***. Consultant shall bear no responsibility for any of Client's financial liabilities. This exclusion extends to all debts, whether or not associated with Client's Working Capital or Seller Account, including credit card debts, lines of credit, or loans. Fulfillment of all such financial obligations shall remain the exclusive duty of Client.

3.2.3. ***Ownership & Rights.*** The services rendered by Consultant under this Agreement do not confer any ownership interest in Client's Seller Account or Store. Consultant is contracted to provide consultative assistance only, with no equitable or legal claim to ownership or co-ownership.

3.2.4. ***Entity Management.*** Consultant's responsibilities are confined to the Seller Account management. Consultant has no obligation to engage in the formation, registration, or administrative management of Client Entity, nor to submit any business filings on behalf of Client Entity.

3.3. **Diligence and Professionalism.** Consultant commits to delivering the Services with due diligence, in a professional manner, and in adherence to prevailing industry standards. Consultant shall abstain from any deliberate misrepresentation or willful misconduct in the execution of the Services provided.

3.4. **Vendors.** Vendor Engagement. Consultant retains the right, at its discretion and at its own cost, to engage third-party vendors or contractors (collectively referred to as "Vendors") to aid in the provision of the Services. Such engagements will be conducted in a manner that supports the Services outlined in this Agreement.

3.5. **Service Non-Exclusivity.** Consultant's services are non-exclusive, allowing Consultant to provide similar services to other entities, including direct competitors of Client in the Marketplace, as long as such services do not impair Consultant's ability to fulfill its obligations to Client under this Agreement. Client acknowledges and accepts this condition.

3.6. **Independent Status & Compliance with Statutes.** Consultant operates as an independent entity and nothing in this Agreement shall be construed to create a partnership, joint venture, agency, franchise, sales representative, or employment relationship between the parties. Specifically, the services provided under this Agreement do not establish a "business opportunity" as defined by the Federal Trade Commission's Business Opportunity Rule, 16 CFR Part 437, ensuring no implied obligations under the said Rule. Consultant expressly disclaims any representation or conduct that could be interpreted contrary to this clause, thereby mitigating any potential applicability of the Business Opportunity Rule or similar state regulations. The parties affirm their commitment to adhere strictly to the roles and boundaries defined within this Agreement, with Consultant providing services in a capacity that is entirely distinct and separate from the business activities and operations of Client.

4. **Client Obligations & Responsibilities**

4.1. **Client Entity Formation & Oversight.** Client, if operating as an individual, who opts to manage the Seller Account and Store via a distinct business entity ("Client Entity"), shall solely bear the responsibility for its establishment, including the procurement of an Employer Identification Number (EIN). Client is tasked with the complete management of Client Entity which includes, but is not limited to, maintaining current business registrations, timely tax filings, and adherence to relevant regulatory requirements. Should Client form such a Client Entity, this Agreement will automatically extend to include Client Entity as a signatory party, thereby bestowing upon it all corresponding rights and responsibilities ascribed to Client as per the Definitions articulated in this Agreement.

4.2. **Seller Account Configuration**. At Consultant's behest, Client is obliged to cooperate in the initiation and configuration of the Seller Account, which encompasses the preparation and completion of all pertinent documentation. Client must undertake all necessary measures to appoint Consultant and its Vendors as 'authorized users' and to provide 'admin access' to the Seller Account, ensuring Consultant is granted full operational capabilities as delineated in the Definitions section.

4.3. **Utilization of Client Resources.** Client is permitted, though not obliged, to employ their own resources, such as vendors, analysis tools, or financial

tracking systems (collectively referred to as "Client Resources"), to support the operations of the Seller Account and Store. These resources should complement and not undermine Consultant's Services. Client shall assume full accountability for the deployment of Client Resources and will indemnify, defend, and exonerate Consultant from any liabilities that may emerge from their use, maintaining the protection of Consultant as outlined in the Definitions.

4.4. **Preservation of Service Integrity**. Client is prohibited from engaging in any activities that would disrupt or undermine the efficacy of Consultant's Services. Without the express written consent from Consultant, Client is precluded from suspending operations of the Store, inducing a Suspension of the Seller Account, revoking sales, or setting the Seller Account or Store to Vacation Mode, with these terms as defined within the Marketplace's stipulations. Client must ensure the Store remains operational and accessible for transactions for the duration of this Agreement, barring a closure exceeding thirty (30) consecutive days.

5. **Consulting Fee Structure, Capital Account, & Expenses**

5.1. **Initial Consultation & Setup Fee.** Initial Consultation & Setup Fee and Consultant Compensation. Client shall remit an "Initial Consultation & Setup Fee" detailed in **Schedule C** of this Agreement. This fee, due upon the execution of this Agreement, is allocated partially for Consultant's services—including account setup, strategy development, and other initial operational activities—and partially for operational overhead. This fee excludes costs for product procurement, with no portion used for inventory acquisition. A comprehensive breakdown specifying the division of this fee between service remuneration and allocated operational expenses is provided in Schedule C. Additionally, Client agrees to compensate Consultant with a commission on the Net Profit as defined and structured in Schedule C, with an option to modify this commission structure under the terms set forth therein.

5.2. **Working Capital Account**.

5.2.1. ***Establishment.*** Client agrees to establish and maintain a "Working Capital Account" throughout the term of this Agreement. The account shall be funded with readily available funds meeting or exceeding the "Minimum Available Funds" as specified in Schedule A. The Working Capital Account should be constituted as either a bank account with cash reserves, a line of credit, or a credit card account, all of which must be issued by an FDIC-insured banking institution. Client is committed to employing best efforts to sustain the Working Capital Account at or above the prescribed minimum threshold as detailed in Schedule A, to facilitate the smooth operation of the Services outlined in this Agreement.

5.2.2. ***Application of Funds.*** Client shall provide Consultant with access to the Working Capital Account and hereby authorizes Consultant to apply the funds in the Working Capital Account for the sole purposes of: (i) purchasing Inventory for the Store, (ii) paying any Expenses, and (iii) paying any Marketplace Fees that are not deducted by the Marketplace directly from the Seller Account revenue.  Neither Client nor Consultant shall commingle the funds in the Working Capital Account with any other funds, or use the Working Capital Account for any purpose other than that stated in this Section.  Client will provide Consultant with account and billing details for the Working Capital Account so that Consultant may apply the funds therein as authorized in this Section.

5.2.3. ***Replenishment.*** Client will replenish the available funds in the Working Capital Account as needed to maintain the Minimum Available Funds. If the Working Capital Account is a credit card or line of credit, Client will pay down the balance owed as needed to maintain the Minimum Available Funds. Client agrees that, within seven (7) days of remission of any payment by the Marketplace to Client for Store revenues (typically, every two weeks), Client will apply said payment to replenish/pay down the Working Capital Account to maintain the Minimum Available Funds before making any other disbursement from the payment.

5.2.4. ***No Chargebacks.*** Client agrees not to dispute or initiate a chargeback in relation to any Inventory purchases made by Consultant on behalf of Client from the Working Capital Account. Any dispute or chargeback initiated in relation to such Inventory purchases will constitute a material breach of this Agreement. Client understands and acknowledges that, if Client initiates a chargeback for an Inventory purchase, it affects Consultant's wholesale relationships, reputation and goodwill, and ability to purchase Inventory for all its clients. In the event of such a breach, Consultant shall have the right to immediately terminate this Agreement, without prejudice to any other rights or remedies that Consultant may have under this Agreement or under applicable law. Client shall also be liable for any costs, expenses, damages, or losses incurred by Consultant as a result of such breach, including but not limited to any fees or penalties imposed by financial institutions or payment processors in connection with the disputed transaction or chargeback.

5.2.5. ***Effect on Buyback Program.*** As stated in Section 8 below, the Minimum Available Funds must be maintained and fully accessible in the Working Capital Account in accordance with this Section for the duration of the Term of this Agreement in order for Client to invoke the benefits of the Buyback Program.

5.3. **Expenses.** During the Term, Client shall promptly reimburse Consultant for all reasonable and necessary out-of-pocket business expenses incurred directly by Consultant on behalf of Client in connection with the performance of Consultant's services under this Agreement. Reimbursement shall be issued by Client immediately upon Client's receipt of an invoice from Consultant, which will be accompanied by receipts or other satisfactory evidence of such expenses. Consultant is required to obtain explicit written pre-approval from Client before incurring any out-of-pocket expenses in an amount greater than $500.00. Any expenses incurred without such pre-approval will not be subject to reimbursement by Client.

5.4. **Invoicing and Payment.** Within ten (10) business days after the close of a given calendar month, Consultant will send Client an invoice delineating Client's Net Profits and the amount of Commission owed to Consultant. Client will remit payment of the full Commission to Consultant within seven (7) business days of receipt of the invoice. Late payments will be assessed a late fee of five percent (5%) of the outstanding amount, or the maximum amount permitted by law, whichever is less. Payments that are overdue by thirty (30) days or more are deemed a material breach of this Agreement, and (i) Consultant will be entitled, at its sole discretion, to suspend the Services without penalty until payment is made, and (ii) Client will forfeit its right to participate in the Buyback Program. In addition, Consultant provides ongoing services to maintain and operate Client's Marketplace store in exchange for a commission share of Net Profits, as defined below. Commission is payable on all net compensation/profits when it is received by Client or by any third Party

on Client's behalf minus returns & supplier software cost. Consultant will provide Client with a written statement of account showing the net compensation/profits received by Consultant on Client's behalf and the expenses (if any) incurred by Consultant under this Agreement. Client's payment to Consultant is due upon receipt.

5.5. **Taxes.** Client is exclusively responsible for paying all sales, use, VAT, customs, and other taxes and tariffs arising out of this Agreement, exclusive of taxes on Consultant's income. Client is responsible for hiring its own tax professionals and preparing, filing and paying all tax returns for Client Entity.

5.6. **Client's Sale of Store.** Notwithstanding any other provision of this Agreement, Client shall have the full right and authority to sell its business, including the Seller Account and Store (a "Third-Party Sale"). In the event of a Third-Party Sale during the Term of this Agreement, Client will pay Consultant a Commission of ten percent (10%) of the purchase price for the Third-Party Sale. Consultant shall provide reasonable assistance to Client in conjunction with the Third-Party Sale, including by providing the books and records for the Seller Account.

6. **Term & Termination.**

6.1. **Term.** This Agreement shall commence on the Effective Date and shall continue for a period of thirty-six (36) months from the Store Open Date (the "Initial Term").

6.2. **Continuation and Renewal**. Upon expiration of the Initial Term, this Agreement shall not automatically renew. Instead, either Party may propose an extension of the Agreement for subsequent twelve (12) month periods (each a "Renewal Term"), subject to mutual written agreement.

6.3. **Suspension Strategy**. In the event of a suspension of Client's Store or Seller Account, Consultant and Client will collaboratively develop a go-forward strategy within sixty (60) days to address the suspension. The suspension of the Store or Seller Account, in itself, shall <u>not</u> constitute grounds for automatic termination of this Agreement.

6.4. **Termination.**

6.4.1. **Termination for Cause**. If either Party materially breaches this Agreement and fails to cure said breach within thirty (30) days after receiving written notice from the non-breaching Party, the non-breaching Party may terminate the Agreement upon written notice.

6.4.2. **Termination for Convenience**. Following the Initial Term, either Party may terminate this Agreement without cause upon providing sixty (60) days' written notice to the other Party.

6.5. **Effect of Termination.** Upon termination of this Agreement, Consultant shall cease all access to the Seller Account and Working Capital Account. If any Inventory belonging to Client is in the possession of Consultant, Client shall make arrangements, at Client's expense, to pick up the Inventory within thirty (30) days after the date of termination. Any inventory remaining in Consultant's possession after such time will be deemed abandoned and Consultant may sell, use, or dispose of it as Consultant sees fit. Sections 5.2.4, 5.5, 8.3, 9.2 and 10 through 16 shall survive termination of this Agreement.

7. **Suspension & Interference.**

7.1. **Management of Seller Account Suspension or Termination.**

7.1.1. **Suspension Response Plan**. In the event of a suspension of Client's Store, Consultant will employ reasonable efforts to restore the Store

to active status. However, Consultant cannot guarantee the reinstatement of the Store. In cases where the Store is permanently suspended by the Marketplace, Consultant will collaborate with Client to develop an alternative Marketplace solution, considering Client's preferences and required authorizations. This may include establishing a new storefront on the Marketplace or an alternative marketplace platform. This service will be provided without an additional Initial Consultation & Setup Fee.

7.1.2. **Limitation of Liability**. Both parties acknowledge that certain events beyond their control, including but not limited to the suspension or termination decisions made by the Marketplace, shall not be grounds for deeming either party in material breach of this Agreement. Client recognizes that such suspensions or terminations by the Marketplace could inhibit the creation of a subsequent Marketplace Seller Account or Store.

7.1.3. **Specific Contingency for TikTok Ban.** In the event that TikTok is officially banned or rendered inoperable by any regulatory action, Consultant will collaborate with Client to develop an alternative Marketplace solution, considering Client's preferences and required authorizations. This may include establishing a new storefront on a different Marketplace or an alternative marketplace platform. This service will be provided without an additional Initial Consultation & Setup Fee. Consultant shall not be held liable for the unavailability or restriction of any Marketplace due to external regulatory actions, and no refund shall be provided except as explicitly stated in this subsection.

7.2. **Client Obligations in Case of Interference**. Client agrees not to engage in any conduct, nor to omit any action, that would inhibit Consultant's access to Client's Seller Account. Should Client's actions or omissions directly or indirectly prevent Consultant's access to the Seller Account for a continuous period exceeding three (3) days, such interference will constitute a material breach of the Agreement.

8. **Buyback Program.**

8.1. **Initial Consultation & Setup Fee Buyback.**

8.1.1. *Offer.* After the conclusion of the Initial Term, defined as (_24_____) months following the Store Open Date, Client may be eligible for a buyback option if Client's net share of total Net Profits—post Consultant's Commission—is less than the Initial Consultation & Setup Fee paid as per Schedule C.

8.1.2. *Execution.* To activate the Initial Consultation & Setup Fee Buyback, Client must notify Consultant in writing within forty-five (45) days after the end of the Initial Term.

8.1.3. *Ineligibility.* Client forfeits eligibility for the Initial Services Fee Buyback under the following conditions:

8.1.3.1. There is a material breach of the Agreement by Client;

8.1.3.2. Client fails to maintain the Minimum Available Funds in the Working Capital Account;

8.1.3.3. Client hinders sufficient Inventory stocking;

8.1.3.4. Client initiates unauthorized chargebacks or fraud claims related to payments authorized under this Agreement;

8.1.3.5. Client's actions, or lack thereof, disrupt Consultant's access to the Seller Account or Working Capital Account;

8.1.3.6. In the event of a suspension of the Seller Account or Store, Consultant is committed to implementing the remedial actions outlined in Section 7.1.1. During this period, Client retains their right to participate in the Buyback Program while Consultant endeavors to reinstate the Store or facilitates the establishment of an alternative Marketplace presence;

8.1.3.7. Should the Agreement be terminated prior to the completion of the Initial Term for reasons not ascribable to Consultant, such termination will preclude Client from participating in the Buyback Program. Exceptions to this disqualification include situations where Consultant has not adhered to the Suspension Response Plan stipulated in Section 7.1.1 or if the Agreement's termination results from a material violation by Consultant.

8.1.4. ***Limitations.*** The buyback payment from Consultant to Client will not exceed the difference between the Initial Consultation & Setup Fee and Client's Net Profits. This Buyback is strictly limited to the initial fee paid and does not extend to cover any additional operational costs, including Inventory procurement.

8.2. **Inventory Buyback for Wholesale FBA Products.**

8.2.1. ***Option.*** Consultant guarantees that any Inventory purchased via Wholesale Fulfilled by the Marketplace for Client's business, with a total purchase price of $5,000 USD or more, will generate gross sales revenue ("Inventory Revenue") that is equal to or greater than the amount spent on the Inventory (the "Inventory Cost") within 90 days of the inventory first being listed and available for purchase in the Store (the "90-day Window"). If the Inventory does not generate Inventory Revenue equal to or greater than the Inventory Cost within the 90day Window, Client has the option to sell the remaining Inventory to Consultant for the difference between the Inventory Cost and Inventory Revenue.

8.2.2. ***Exercise.*** Client must notify Consultant in writing no later than ten (10) days after the close of the 90-day Window that Client is exercising its option for the Inventory Buyback.

8.3. **NO OTHER REFUNDS OR GUARANTEES. THE INITIAL SERVICES FEE BUYBACK AND INVENTORY BUYBACK (COLLECTIVELY, THE "BUYBACK PROGRAM") ARE THE ONLY MEANS OF OBTAINING A REFUND FROM CONSULTANT. OUTSIDE OF THE BUYBACK PROGRAM, ALL SALES ARE FINAL AND NO REFUNDS ARE AVAILABLE.**

9. **Business Opportunity Disclosures; Rescission**

9.1. **Clarification Regarding Business Opportunity Rule Application.** This Agreement, as construed by Consultant and Client, is not considered an offer or sale of a business opportunity as defined by the Business Opportunity Rule administered by the Federal Trade Commission (FTC). The services provided by Consultant under this Agreement do not require disclosures applicable to traditional business opportunities. Nonetheless, to ensure full transparency and to align with the spirit of the FTC's regulations, Consultant provides the following disclosures:

1. **BOR Disclosures.** Client acknowledges that Consultant has provided Client with the Business Opportunity Disclosures, which are attached hereto as Schedule D and incorporated by reference, at least seven (7) days prior to Client's execution of this Agreement.

1. **Appearance in future BOR Disclosures.** Under the FTC's Business Opportunity Rule, Consultant is required to disclose the name, state of residence, and telephone number of at least 10 people who have purchased a business opportunity from Consultant to potential buyers. Client understands that, in order to comply with the Business Opportunity Rule, Consultant may disclose Client's name, state of residence, and telephone number to potential clients to comply with this requirement.

2. **Rescission and Refund.** After executing this Agreement, Client is entitled to a three (3) calendar day rescission period and entitled to cancel the contract. After the three (3) calendar day rescission period has passed, Client will not be entitled to a refund.

3. **No Revenue or Performance Guarantees.** The Business Opportunity Disclosures and the Rescission and Refund period are provided to Client to give Client the opportunity to investigate the pros and cons of a Marketplace business and impress upon Client the importance of understanding the risks involved. **ALL BUSINESS INCLUDES RISK AND MARKETPLACE STORES ARE NO EXCEPTION.** Client understands and agrees that Consultant has not made any promises or guarantees regarding the performance of Client's Store, the amount of revenue to be earned, or the period it will take Client to recoup the Initial Consultation & Setup Fee and other investments. **EXCEPT AS EXPRESSLY PROVIDED HEREIN, CLIENT BEARS ALL RISK ASSOCIATED WITH CLIENT'S STORE. CONSULTANT IS PROVIDING MANAGEMENT SERVICES TO CLIENT, BUT CONSULTANT IS NOT ASSUMING CLIENT'S BUSINESS RISK.**

4. **Independent Contractors.** Consultant is an independent contractor in providing the Services.   Consultant's employees or agents shall not be considered Client's employees for any purpose and shall have no authority to act or purport to act on Client's behalf.   Consultant and Client do not intend by the Agreement to confer any right or benefit on any third party or to create a partnership, joint venture or other similar relationship.

5. **Intellectual Property Rights.**

   5.1. **Client's Rights and License.** As between the Parties, Client shall own all right, title, and interest in and to the Seller Account, Store, associated Marketplace business, Client's name, trademarks, logos, and copyrights, including in and to any Client Testimonial as defined in section 11.2 below (collectively, the "Client IP").   Client hereby grants to Consultant a non-exclusive, irrevocable, worldwide, assignable and sublicensable right to use Client IP solely to provide the Services and for any other purpose identified in this Agreement.

   5.2. **Testimonials and Release.** From time to time, Consultant may ask Client to provide a written or video testimonial describing Client's experience working with Consultant.   Client may choose, in its sole discretion, whether or not to provide a testimonial to Consultant.   In the event Client provides Consultant with a testimonial ("Client's Testimonial"), Client consents to Consultant's use of Client's Testimonial on Consultant's website, social media and YouTube channels, in seminars, presentations, brochures, and marketing materials, and in any and all advertising for Consultant's services.   Client understands that Client's name, image, voice, likeness, comments and/or other identifying factors may be revelated to the public as part of Client's Testimonial. Client

hereby irrevocably authorizes Consultant to copy, exhibit, publish, or distribute Client's Testimonial for any lawful purpose; provided, however, that Consultant shall not use Client's Testimonial in a manner that creates a misleading impression of Client's views. Client waives any right to inspect or approve the finished media, including written copy, wherein Client's likeness or my Client's Testimonial appears.

5.3. **Consultant's Rights.** Client shall have no rights to or interests in Consultant's IP. "Consultant's IP" shall consist of proprietary information of Consultant and its third-party Vendors including, without limitation, any materials, trademarks, methods, inventions, information, reports, practices, procedures, equipment, ideas, documentation, business plans, databases, software, or processes licensed to or developed or used by Consultant for its general business and not developed specifically as part of the Services for Client.

6. **Confidential Information.**

6.1. **Defined.** As used herein, the term "Confidential Information" means any information of either Party that should reasonably have been understood by the Party receiving the information, because of legends or other markings, the circumstances of disclosure or the nature of the information itself, to be proprietary and confidential to the Party disclosing the information, including, but not limited to, all ideas, designs, methods, discoveries, improvements, trade secrets, programming and source code, systems, product data, product development, user relationships, user information, finances.

6.2. **Non-Disclosure.** Each Party shall treat as confidential all Confidential Information of the other Party, shall not use such Confidential Information except as contemplated under this Agreement, and neither Party shall disclose such Confidential Information to any third party or use it for any purpose other than performance of its obligations hereunder. However, Confidential Information may be disclosed to directors, officers, employees, attorneys, accountants, contractors or representatives (collectively, "Representatives") of the recipient, but only if such Representatives need to know the Confidential Information for the performance of Services under this Agreement, it being understood that either (i) such Representatives shall be informed by the recipient of the confidential nature of the Confidential Information and the requirement that it not be used other than for the purpose described above, or (ii) the recipient shall be responsible for ensuring that its Representatives take at least the same level of care as the recipient in safeguarding against the improper disclosure of Confidential Information.

6.3. **Non-Disparagement.** The Parties mutually agree to conduct themselves with professional courtesy and respect toward one another. In light of this, the following non-disparagement terms are agreed upon: (a) Client agrees not to make any statements, conveyed orally or in writing, or engage in any conduct that is disparaging or could be construed as disparaging to Consultant, its practices, services, or reputation. Specifically, Client is prohibited from posting negative reviews or comments on online platforms, including but not limited to sites such as Yelp, Google Reviews, and Better Business Bureau, or engaging in negative discussions on social media channels such as Facebook, Twitter, or Reddit. Client is further obligated to maintain a positive representation of Consultant and refrain from any commentary that could negatively affect Consultant's reputation or professional standing. In the spirit of mutual respect, both Parties agree not to undertake any actions or communications that could disrupt or defame the other's online presence or reputation on digital or social platforms. This clause also requires Client to withdraw from any social media groups or discussions that are derogatory towards Consultant and to avoid joining new groups or discussions that may involve disparaging or negative

conversations related to Consultant. For clarity, 'disparage' encompasses all forms of negative statements, whether written, oral, or otherwise expressed, and is intended to be interpreted in its broadest sense. Upon entering into this Agreement, Client must take proactive measures to remove any previously posted disparaging remarks, comments, or reviews across all mediums mentioned above. This includes retracting any formal complaints or negative reports made to any regulatory or oversight bodies. Failure to comply with these terms, particularly if disparaging material is not removed or appropriately addressed, may result in immediate cessation of any ongoing services or relationships, and could also lead to a demand for the return of any fees paid by Consultant to Client as part of any settlement or service arrangement.

6.4. **Exclusions.** Notwithstanding the foregoing, neither Party shall have liability to the other with regard to any Confidential Information of the other which: (i) was in the public domain at the time it was disclosed or enters the public domain without violation of this Agreement by the receiver; (ii) was known to the receiver, without restriction, at the time of the disclosure as shown by the files of the receiver in existence at the time of disclosure; (iii) was independently developed by the receiver without any use of the Confidential Information; or (iv) becomes known to the receiver, without restriction, from a third party without breach of this Agreement by the receiver and otherwise not in violation of the discloser's rights. The Parties' obligations under this paragraph shall terminate five (5) years from disclosure.

7. **Disclaimers and Limitations.**

7.1. **Disclaimer of Warranties.** THE SERVICES ARE PROVIDED "AS IS" AND THE WARRANTIES EXPRESSLY STATED HEREIN SHALL BE IN LIEU OF ANY AND ALL OTHER WARRANTIES, CONDITIONS OR REPRESENTATIONS (WHETHER EXPRESSED OR IMPLIED, ORAL OR WRITTEN) INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE (WHETHER OR NOT CONSULTANT KNOWS OR HAS REASON TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN ADDITION, CONSULTANT EXPRESSLY DISCLAIMS ANY WARRANTIES TO ANY PERSON OR ENTITY OTHER THAN CLIENT.

7.2. **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY OR RESPONSIBILITY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES TO THE OTHER PARTY, INCLUDING FOR INTERRUPTED COMMUNICATIONS, RE-RUN TIME, INACCURATE INPUT, WORK DELAYS, LOST DATA OR LOST PROFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE SERVICES OR THE USE OF THE SERVICES EVEN IF THE PARTIES HAVE BEEN ADVISED OF (OR KNOW OR SHOULD KNOW OF) THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR THEIR CONFIDENTIALITY AND INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY'S LIABILITY UNDER THIS AGREEMENT, INCLUDING FOR DIRECT DAMAGES, EXCEED THE AMOUNT CONSULTANT HAS BEEN PAID BY CLIENT UNDER THIS AGREEMENT IN THE TWELVE (12) MONTHS PRECEDING THE EVENT GIVING RISE TO LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE, WITH ALL PAYMENTS TO THE OTHER PARTY FOR CLAIMS OR DAMAGES UNDER THIS AGREEMENT BEING AGGREGATED TO DETERMINE SATISFACTION OF THE LIMIT. THE EXISTENCE OF ONE OR MORE CLAIMS OR SUITS WILL NOT ENLARGE THE LIMIT. THESE LIMITATIONS APPLY TO ALL

**CAUSES OF ACTION UNDER OR RELATING TO THIS AGREEMENT (CONTRACT, TORT OR OTHERWISE).**

8. **Indemnification.**

   8.1. **Duty.** In the event that either Party hereto does not fully perform or cause to be performed any agreement or obligation undertaken by such Party hereunder (the "Indemnitor"), the Indemnitor agrees to indemnify, defend and hold the other Party hereto (the "Indemnitee") harmless from any and all claims, demands, actions, judgments and awards against the Indemnitee by third Parties in connection with such non-performance.

   8.2. **Procedure.** In connection with the foregoing indemnity, the Indemnitee agrees to give the Indemnitor prompt written notice of any claim against the Indemnitee. Further, the Indemnitor shall not be liable for such indemnity unless such claim has been adjudicated in a court of competent jurisdiction and reduced to a final adverse judgment, arbitrated pursuant to any agreement requiring arbitration and resulting in a final binding award, or settled with the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

9. **Disputes.**

   9.1. **Arbitration Agreement.** In the unlikely event that the Parties cannot resolve such problems between themselves, the Parties believe that such disputes can be resolved more expeditiously and with less expense to all concerned by binding arbitration than by court action. By signing this Agreement, the Parties agree that, to extend permitted by law, any dispute arising out of or relating to this Agreement, shall be resolved by submission to confidential, single-arbitrator, binding arbitration in Cheyenne, Wyoming in accordance with the Comprehensive Arbitration Rules & Procedures then in effect of the Judicial Arbitration and Mediation Services, Inc. ("JAMS") and judgment on the award rendered may be entered in any court having jurisdiction thereof. Notwithstanding the above, for any claims or counterclaims equal to or less than $200,000.00, exclusive of interest, arbitration fees, and attorney's fees, the Parties agree that the arbitration shall proceed under JAMS' Comprehensive Arbitration Rules & Procedures with the maximum scope and duration of discovery permitted by those rules. **IF THE PARTIES AGREE TO ARBITRATION, THEY WILL ALSO BE AGREEING TO: (A) WAIVE ANY RIGHT TO A JURY TRIAL OR COURT TRIAL, (B) WAIVING ANY RIGHT TO AN APPEAL, AND (C) WAIVER OF THE RIGHT TO BROAD DISCOVERY UNDER THE ILLINOIS CODE OF CIVIL PROCEDURE AND/OR FEDERAL RULES OF CIVIL PROCEDURE.** Client acknowledges that arbitration has benefits and disadvantages. The benefits of arbitration typically include lower costs, quicker resolution of disputes, the ability to resolve disputes privately, and Consultant and Client's ability, depending on the arbitration association rules and the type of arbitration, to sometimes participate in the selection of the decision maker/arbitrator. The disadvantages of arbitration include the potential expense since both Consultant and Client will be required to pay a portion of the arbitrator's fees, there is potentially limited discovery, the loss of a trial by jury, and the loss of the right to appeal the arbitrator's decision. In the event of default in payment by Client to Consultant for Consultant Fees billed by Consultant, Client will pay all reasonable attorney's fees and costs incurred by Consultant in obtaining an arbitration award and/or judgment for the amount which is due and owing and for collecting and enforcing such judgment. Consultant may hire independent attorneys or act as their own attorneys in obtaining an arbitration award and/or judgment for the amount which is due and owing and for collecting and enforcing such judgment. Client agrees to pay Consultant if they represent themselves, or are represented by Hart David

Carson LLP, at their current hourly billing rates ($850.00/hour). If you do <u>not</u> wish to agree to arbitration of any disputes, claims, or controversies, please draw a line through and initial this paragraph.

9.2. **<u>Governing Law.</u>** The laws of the State of Wyoming govern this Agreement. The arbitrator will apply Wyoming law to the claims in arbitration.

9.3. **<u>Costs and Fees.</u>** The costs of the arbitration will be split equally between the Parties. Unless otherwise provided for in any governing statute, each side will bear its own attorneys' fees and costs.

9.4. **<u>Restriction on Joinder.</u>** The Parties, and each of them, agree that they will only bring claims against the other individually and not as a plaintiff or class member in a representative proceeding. Notwithstanding the foregoing, nothing in this restriction on joinder should be interpreted to prevent any claim brought by or against both Client and Client Entity.

10. **General Provisions.**

10.1. **<u>Authority to Act.</u>** Client provides Consultant with express authorization to perform various actions on behalf of Client's Marketplace account. This authorization permits Consultant to engage in product research to determine suitable listings, manage the posting and sales of products, fulfill orders upon their sale, and interact with customers to provide service, including the handling of queries and concerns. Further, Consultant is empowered to oversee the returns process, execute necessary refunds in compliance with the relevant terms and policies, and manage the account to ensure its good standing by resolving issues such as general claims, chargebacks, and addressing negative feedback. In carrying out these duties, Consultant is expected to undertake any additional activities deemed reasonably necessary to maintain and enhance Client's Marketplace account effectively. Consultant's actions pursuant to this authority shall be considered as having been performed by Client.

10.2. **<u>Assignment.</u>** Neither Client nor Consultant has the right to assign this Agreement or any rights or obligations under the Agreement without the express written consent of the other, except that Consultant may assign this Agreement to any firm, corporation or other entity of which Consultant is an officer, partner, employee, or consultant. In case of such assignment, Consultant shall give due consideration to Client's interest and provide notice to Client.

10.3. **<u>No Encumbrances.</u>** Each Party warrants that it is free to enter into and to perform under this Agreement and to grant the rights, options, powers and privileges herein granted, and to perform every service described in this Agreement, and neither Party is a party to any presently existing contract, nor has or will have any obligation, that would interfere with full performance of the terms of this Agreement.

10.4. **<u>Force Majeure.</u>** Neither Party shall be held accountable for any breach or delay in fulfilling its duties as set out in this Agreement when such an inability is due to a Force Majeure event. "Force Majeure" refers to occurrences beyond a Party's reasonable control, which prevent, impede, or significantly increase the difficulty or cost of the Party's performance. Such events include, but are not limited to, acts of God, war, terrorism, civil disturbances, labor unrest, epidemics, pandemics (such as COVID-19), governmental orders or actions, natural catastrophes, or any other circumstances that make the fulfillment of obligations under this Agreement unfeasible, unlawful, or of untenable commercial viability. The Party impacted by Force Majeure must promptly inform the other Party in writing, detailing the event's specifics and its anticipated impact on their obligations. Despite the occurrence of a Force

Majeure event, the affected Party is expected to strive within commercially reasonable bounds to diminish any adverse effects and to recommence the execution of its obligations as soon as it is feasible to do so. Should the Force Majeure event persist unabated for a stretch of 180 consecutive days, Consultant reserves the unilateral right to terminate this Agreement upon issuing written notice to Client. In this event, Consultant shall be relieved of all contractual liabilities, including but not limited to, the delivery of services or products, the attainment of performance metrics, or the fulfillment of any buyback commitments previously stipulated.

10.5. **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force and effect. Any amendment to this Agreement shall be of no force and effect unless it is in writing and signed by the Parties.

10.6. **Severability.** Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, and shall not in any manner affect the remaining provisions hereof in such jurisdiction or render any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

10.7. **Independent Counsel.** The Parties acknowledge that they had the right and adequate time to have independent legal counsel of their own choosing review and advise on this Agreement prior to execution.

10.8. **Counterparts.** This Agreement may be executed in one or more counterparts. All such counterparts shall constitute one agreement binding on the Parties notwithstanding that both of the Parties are not signatories to the original or same counterpart. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the Parties. The Agreement shall be considered executed and binding once one of the Parties possesses an Agreement that expresses signatures by all Parties.

10.9. **Privacy Policy.** Client understands and agrees that all collection, use, and disclosure of any personal information of Client will be performed in accordance with Consultant's Privacy Policy, which is available on Consultant's website at acvpartners.ai and incorporated herein by reference.

10.10. **Notices.** All notices or other communications required or permitted under the Agreement shall be deemed duly given either (a) when delivered in person to the contact person for the recipient Party, (b) upon transmittal of an email communication to the contact person for the recipient Party at the email address designated in the recipient Party's contact information in the Agreement, or (c) three business days after being sent to the Party's address of record by either certified U.S. mail or overnight delivery service (e.g., FedEx), with tracking confirming delivery.

## E-COMMERCE SELLER CONSULTING AGREEMENT

This E-Commerce Marketplace Consulting Agreement (the "Agreement") is entered into as of the date executed by Client below (the "Effective Date") by and between AC Ventures Global Inc. d/b/a ACV Ventures, a Wyoming corporation with its principal place of business located in Sheridan, Wyoming ("Consultant") and the undersigned "Client." Consultant and Client are each referred to herein as a "Party" and collectively as the "Parties."

**IN WITNESS WHEREOF**, by the execution of both parties below, this consulting agreement is declared valid and will form a part of the Contract in conjunction with any other relevant documents and agreements presented on behalf of either party.

**FOR CONSULTANT**

**FOR CLIENT**

AC Ventures Global Inc.
1309 Coffeen Ave., Ste 12351
Sheridan, WY 82801
partnerships@acceleratedecom.io

Full Name: _Baldwin Dunner_____

Address: _____

_____

Email: _____

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

## <u>Schedule A – Scope of Services</u>

This Schedule A outlines the detailed scope of services and responsibilities associated with the Consulting Agreement dated <u>2024-08-16</u> ("Agreement") between <u>P.J. Rocca</u> ("Client") and AC Ventures Global Inc. ("Consultant").

**Consultant's Services and Responsibilities:**

    a.  Marketplace Storefront Setup: Consultant will guide Client through the setup of their Marketplace platform(s) on:

    b. <u>Tiktok</u> [SINGLE PLATFORM] [<u>70/30</u>]

    c. <u>n/a</u> [MULTI PLATFORM] [<u>n/a</u>]

    d. <u>n/a</u> [ACV NEXUS] [Ask Your Representative]

      Collectively herein referred to as the "Marketplace".

    e. Compliance and Certifications: Consultant will advise Client on obtaining and maintaining necessary permits, certifications, or compliance documents required for Marketplace operations as per relevant laws or platform terms.

    f. Product Research and Sourcing: Consultant will conduct comprehensive product research, advise on sourcing strategies, assist in selecting inventory, and provide guidance on maintaining appropriate inventory levels for Client's digital storefront on the Marketplace Store.

    g. Customer Relations Management: Consultant will support Client in developing strategies for customer service, including managing returns, issuing refunds, and handling customer feedback and inquiries on Marketplace Store.

    h. Financial Oversight and Reporting: Consultant will oversee the financial performance of the Marketplace activities on Marketplace Store, offering advice on bookkeeping practices and financial tracking.

    i. Platform Communication: Consultant will assist Client in establishing communication protocols to respond effectively to inquiries and updates from Marketplace Store.

    j. Additional Consulting Services: Consultant will offer additional services as set forth in **Schedule B**. Any services requested by Client outside the scope of this Agreement on Marketplace Store will be negotiated and agreed upon separately and further delineated in Schedule B.

k. Performance Strategy and Monitoring: Consultant will work with Client to establish realistic performance targets for Marketplace Store and monitor progress, offering strategic advice to align with Client's business goals.

**Client's Working Capital Account & Communication:**

a. Working Capital Account Provisioning: In accordance with Section 5.2 of this Agreement, Client is obligated to establish and maintain a Working Capital Account. Client shall ensure the account is funded with readily available funds that meet or exceed 10,000.00 (hereinafter "Minimum Available Funds"). Client will utilize these funds to manage inventory reflective of the performance strategy mutually developed with Consultant.

b. Active Engagement and Communication: Client commits to actively engage with the services provided by Consultant, maintaining regular communication, and implementing recommended strategies for Marketplace Store.

**Mutual Expectations:**

a. Collaborative Partnership: Consultant and Client commit to a partnership that ensures a unified approach to strategy implementation on Marketplace Store, with Consultant providing advisory guidance and Client responsible for operational execution.

b. Adaptive Strategies: Both Consultant and Client will regularly review and, if necessary, adjust the performance targets and strategies to adapt to the evolving Marketplace landscape on Marketplace Store.

c. Performance Guarantee Conditions: Consultant's performance guarantee, if offered, is conditional upon Client meeting the agreed-upon criteria within the specified timeframe for Marketplace Store

**THIS SCHEDULE A REPRESENTS A COMMITMENT FROM BOTH CONSULTANT AND CLIENT TO WORK COLLABORATIVELY TOWARDS THE SUCCESS OF CLIENT'S MARKETPLACE BUSINESS ON THE MARKETPLACE STORE, UNDERPINNED BY ACTIVE PARTICIPATION, CONSISTENT ENGAGEMENT, AND SHARED GOALS.**

## Schedule B – Additional Services & Incentives

## <u>Schedule C – Fee Schedule</u>

This Schedule C specifies the financial commitments of _____ ("Client") and the remuneration of AC Ventures Global Inc. ("Consultant") in accordance with the Consulting Agreement and details provided in Section 5.1.

1. **Initial Consultation & Setup Fee:** Client shall pay a one-time Initial Consultation & Setup Fee upon execution of this Agreement in the amount of $ _____;

2. **Monthly Maintenance Fee:** Subsequent to the one-time initial fee, Client will incur a monthly service fee of $69.00. This fee covers the provision of technology solutions, software licenses, and access to proprietary tools necessary for the maintenance and support of the Marketplace general operations. This fee is subject to change based on market conditions, logistics and IT resources used.

    a. This fee will be automatically charged to the Client's designated payment method. The Client acknowledges this automatic recurring charge and agrees not to initiate any chargebacks or disputes. Initiating a chargeback or dispute over this fee is a violation of the Agreement and will lead to service suspension, termination, and legal action to recover damages and costs.

3. **Consultant Commission**: Client agrees to compensate Consultant with a commission equivalent to _____ (_____%) of the monthly Net Profit derived from the Marketplace Store operations during the Term of this Agreement.

4. **[Optional] Private Label Brand Development**: Should Client opt to engage in Private Label Brand Development services provided by Consultant, Client agrees to compensate Consultant with a commission specific to the revenue generated from the Private Label Brand.

The specific terms and conditions governing the development, marketing, and sale of the Private Label Brand will be detailed in Schedule B, which shall outline the scope of services, timelines, and additional responsibilities of both parties related to this optional service.

## **Schedule D – Business Opportunity Rule Disclosures**

## DISCLOSURE OF IMPORTANT INFORMATION ABOUT BUSINESS OPPORTUNITY
### Required by the Federal Trade Commission, Rule 16

Name of Seller: AC Ventures Global Inc.        941 Avenue A Grand Prairie TX 75050

Phone:_____    Salesperson: Date:_____

_____ has completed this form, which provides important information about the business opportunity it is offering you. The Federal Trade Commission, an agency of the federal government, requires that _____ complete this form and give it to you. However, the Federal Trade Commission has not seen this completed form or checked that the information is true. **Make sure that this information is the same as what the salesperson told you about this opportunity.**

---

**LEGAL ACTIONS:** Has _____ or any of its key personnel been the subject of a civil or criminal action, including any FTC Rule, involving misrepresentation, fraud, securities law violation, or unfair or deceptive practices, including any FTC Rule, within the past 10 years?

☐ YES → *If the answer is yes, _____ must attach a list of all such legal actions to this form.*
☐ NO

---

**CANCELLATION OR REFUND POLICY:** Does _____ offer a cancellation or refund policy?

☐ YES → *If the answer is yes, _____ must attach a statement describing this policy to this form.*
☐ NO

---

**EARNINGS:** Has _____ or its salesperson discussed how much money purchasers of this business opportunity can earn or have earned? In other words, have they stated or implied that purchasers can earn a specific level of sales, income, or profit?

☐ YES → *If the answer is yes, _____ must attach an Earnings Claims Statement to this form. Read this statement carefully. You may wish to show this information to an advisor or accountant.*
☐ NO

---

**REFERENCES:** In the section below, _____ must provide you with contact information for at least 10 people who have purchased a business opportunity from them. If fewer than 10 are listed, this is the total list of all purchasers. **You may wish to contact the people below to compare their experiences with what _____ told you about the business opportunity.**

Note: If you purchase a business opportunity from _____, your contact information can be disclosed in the future to other potential buyers.

| | Name | State | Telephone Number | | Name | State | Telephone Number |
|---|---|---|---|---|---|---|---|
| 1. | Mi | | | 6. | M | | |
| 2. | Cat | | | 7. | Lo | | |
| 3. | Ter | | | 8. | Kr | | |
| 4. | Mi | | | 9. | De | | |
| 5. | Ric | | | 10. | Lu | | |

Signature: _____    Date: _____

By signing above, you are acknowledging that you have received this form. This is not a purchase contract. To give you enough time to research this opportunity, the Federal Trade Commission requires that after you receive this form, _____ must wait at least seven calendar days before asking you to sign a purchase contract or make any payments.

**For more information about business opportunities in general:** Visit the FTC's website at   www.ftc.gov/bizopps
or call 1-877-FTC-HELP (877-382-4357). You can also contact your state's Attorney General.