JOSHUA A. DEL CASTILLO (BAR NO. 239015)
E-Mail: jdelcastillo@allenmatkins.com
MATTHEW D. PHAM (BAR NO. 287704)
E-Mail: mpham@allenmatkins.com
ALPHAMORLAI L. KEBEH (BAR NO. 336798)
E-Mail: mkebeh@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax:  (213) 620-8816

Attorneys for Receiver
STEPHEN J. DONELL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ASCEND CAPVENTURES INC., et al.,<br><br>Defendants. | Case No. 2:24-CV-07660-SPG-JPR<br><br>**FIRST INTERIM REPORT AND PETITION FOR INSTRUCTIONS OF RECEIVER, STEPHEN J. DONELL**<br><br>Date: December 18, 2024<br>Time: 1:30 p.m.<br>Ctrm: 5C<br>Judge Hon. Sherilyn Peace Garnett |

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE THAT** Stephen J. Donell (the "Receiver"), the Court-appointed receiver for defendants Ascend Capventures Inc., Ascend Ecom LLC, ACV, ACV Partners, Accelerated Ecommerce Ventures; Ascend Distribution LLC (California), Ethix Capital, ACV Nexus, Ascend Ecommerce Inc., Ascend Administration Inc., Ascend Ecom LLC, Ascend Distribution LLC (Texas), and their collective dbas, subsidiaries, and affiliates, including Global Marketing Development, Inc., Eaglemont Capital, Paradyme Capital Inc. and AC Ventures Global Inc (collectively, the "Receivership Entities" or "Entities"), hereby submits

this *First Interim Report and Petition for Instructions* (the "Report")[1] in order to detail the tasks undertaken by the Receiver and his professionals for the period from his appointment on September 13, 2024 through October 31, 2024 (the "Reporting Period"), as well as the period of time between the Reporting Period and the filing of this Report.

## I.  PRELIMINARY STATEMENT.

Pursuant to this Court's September 13, 2024 *Order on Plaintiff's Ex Parte Application For (1) Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue; (2) Waiver of Notice Requirement; (3) Appointment of a Temporary Receiver, Freezing of Assets; and other Equitable Relief* (the "Initial Appointment Order") [ECF No. 30], as extended by subsequent orders of the Court, the Receiver has been charged with, among other things, assuming control over the Receivership Entities and their assets ("Receivership Assets" or "Assets") and taking those actions he deems necessary or appropriate to administer the Entities and their Assets; performing an analysis of the business and financial activities of the Entities; preparing an accounting; and marshaling recoverable Receivership Assets for the benefit of the receivership estate established by the Initial Appointment Order (the "Estate") and its potential creditors.

As detailed below, and while the Receiver has made substantial progress in some of these areas—including taking steps to prevent ongoing harm to allegedly defrauded consumers, completing preliminary accounting analyses of the business and financial activities of a number of Receivership Entities, designating four (4) non-parties as Receivership Entities pursuant to his authority under the Initial Appointment Order, identifying potentially millions in diversions of consumer funds (including for the purchase of real properties against which the Estate has a claim),

---

[1] This Report is preliminary and based upon the limited information presently available to the Receiver. It, and any conclusions presented herein, are subject to change as additional information is obtained.

and preliminarily concluding that the operations of the Receivership Entities may not have been engaged in a legitimate enterprise—his investigative and Asset recovery efforts remain ongoing and the Receiver believes a potentially significant amount of work remains outstanding, provided that this Court elects to continue the receivership. Because the Receiver's efforts remain incomplete, the conclusions presented in this Report should be viewed as preliminary, and may be affected by the discovery and review of additional relevant information.

## II.  GENERAL BACKGROUND.

The Court and all interested parties are invited to review the following materials for a more detailed summary of the relevant facts underlying the above-entitled action and the instant receivership:

- *Complaint for Permanent Injunction, Monetary Judgment, and Other Relief* (the "Complaint") [ECF No. 1], filed on September 9, 2024;
- *Plaintiff's Ex Parte Application for (1) Temporary Restraining Order And Order to Show Cause Why A Preliminary Injunction Should Not Issue, And (2) Order Waiving Notice Requirement* [ECF No. 4], filed on September 9, 2024;
- *Initial Appointment Order* [ECF No. 30], entered on September 13, 2024;
- *Initial Report And Recommendations Of Receiver, Stephen J. Donell* (the "Initial Report") [ECF No. 34], filed on September 23, 2024;
- *Supplement To Initial Report And Recommendations Of Receiver, Stephen J. Donell* (the "Supplement") [ECF No. 60], filed October 18, 2024;
- *Notice of Designation of Non-Party, Global Marketing Development, Inc., As a Receivership Entity* [ECF No. 45], filed October 1, 2024;
- *Notice of Designation of Non-Party, Eaglemont Capital, As a Receivership Entity* [ECF No. 58], filed October 15, 2024;

- *Notice of Designation of Non-Party, Paradyme Capital Inc., As a Receivership Entity* [ECF No. 59], filed October 15, 2024; and

- *Notice of Designation of Non-Party, AC Ventures Global, As a Receivership Entity* [ECF No. 63], filed October 22, 2024.

As reflected in the above-identified pleadings and orders, the plaintiff Federal Trade Commission (the "FTC") has alleged that the Receivership Entities and their principals engaged in a fraudulent e-commerce scheme whereby consumers were fraudulently induced to make payments to the Receivership Entities in exchange for e-commerce services which were rarely, if ever, provided, and the proceeds from which were diverted by the Receivership Entities and their principals for their unilateral benefit. On the basis of their allegations, and on motion to the Court, the FTC secured the appointment of the Receiver, who has diligently pursued his objectives as set forth in the Initial Appointment Order, including with respect to a preliminary analysis of the business and financial activities of the Receivership Entities, the viability of their business operations, and their use of funds paid by consumers.

### III.   SUMMARY OF RECEIVER'S ACTIVITIES AND EFFORTS.

The following reflects a summary of the Receiver's activities and efforts since the entry of the Initial Appointment Order, including with respect to some matters briefly addressed in the Receiver's previously filed Initial Report and Supplement:

**A.   Notifications To Consumers And Efforts To Prevent Further Harm.**

Given that, as detailed below, the Receiver has been unable to obtain records sufficient to establish conclusively that the Receivership Entities were consistently engaged in legitimate business operations, and in light of evidence indicating that millions of dollars obtained from consumers were diverted for purposes unrelated to the Entities' operations, including for the apparent unilateral benefit of defendants

Basta and Leung, the Receiver has taken numerous measures to mitigate any potential harm to the Entities' consumers.

In addition to the Receiver's outreach efforts to financial institutions to identify any accounts or other Assets that might provide a source of funding for the Estate and restitution to injured consumers (discussed below), the Receiver has worked diligently to prevent harm to consumers by, among other things:

- Contacting internet web hosting servicers and other platforms to disable websites used to solicit clients, or to prevent further public access. The Receiver is also presently investigating the communication platforms utilized by the Receivership Entities to communicate with and potentially solicit customers, including, but not limited to, Slack, Gmail, and HubSpot, each of which was provided with a copy of the Initial Appointment Order and instructed by the Receiver to preserve all documents and disable further access by all defendants. As of the date of this Report, the defendants have represented through counsel that they no longer have access to any known pre-receivership communication platforms. The Receiver has been unable to verify defendants' representations.
- Immediately establishing a website portal for the instant receivership to provide consumers with updates regarding the status of the receivership, including a list of consistently updated frequently asked questions and announcements, including announcements regarding the pendency of the instant receivership and warning consumers about persons apparently still engaged in improper solicitation of customers in violation of the Initial Appointment Order;
- Created an online document portal for consumers to upload relevant materials to assist the Receiver in the ongoing investigation; and

- Issued numerous cease and desist letters to apparent former employees of the Receivership Entities, and others engaged in conduct which the Receiver deemed to be improper, or involving misleading consumer solicitation efforts, notifying them that their activities violate the Initial Appointment Order and demanding that they immediately cease such communications and consumer solicitations.

Additionally, the Receiver has learned that some pre-receivership Entity consumers have encountered difficulty in closing down their accounts with the Entities or with the e-commerce platforms hosting their online storefronts. Specifically the Receiver understands that some consumers (1) continue to receive invoices from an online billing platform, Bill.com, based on pre-receivership agreements with the Entities or their affiliates; and (2) are encountering resistance from e-commerce platforms through which consumers sought to market products via the Receivership Entities – such as Amazon, Wal-Mart, and Etsy – in connection with consumer efforts to shut down their storefronts. In order to assist consumers terminate their relationships with the Entities and related e-commerce platforms, the Receiver has provided notice of the Initial Appointment Order to these platforms and demanded that they cease all billing activity related to the Entities pre-receivership operations, as well facilitate storefront closure of other cancellation requests from consumers seeking to terminate their agreements and close their virtual marketplaces.

**B.  Document Recovery And Analysis.**

To maximize efficiency and reduce the cost of discovery, the Receiver has obtained access to some documents obtained by the plaintiff Federal Trade Commission (the "FTC") through its own document requests. The Receiver understands that, collectively, the Receiver and FTC have dispatched over seventy-five (75) demand letters to title companies, banks, billing platforms, and other entities, seeking the turnover of documents believed to be related or critical to his

1  ongoing investigation.  Documents have already begun to be received and are under
2  review by the Receiver's office and his forensic accountant, SL Biggs.
3          In addition, the Receiver has issued over twenty-five (25) subpoenas to
4  entities suspected of possessing Entity documents and materials, or information
5  related to the operations of the Receivership Entities.  Responses to these subpoenas
6  have begun to arrive, and the Receiver and SL Biggs are currently processing and
7  reviewing the thousands of pages of responsive documents that have recently been
8  turned over.  Thus far, the Receiver's analysis has confirmed that the Receivership
9  Entities maintained an unusually large number of bank accounts, which accounts
10 were used both to receive consumer funds and to transact with other Entity and non-
11 Entity accounts.  The Receiver's forensic accountant is actively engaged in an
12 extensive accounting analysis of these transactions and as, as a result and as further
13 detailed below, traced Entity funds originating from consumers and thereafter
14 transferred to numerous potential Assets, including additional bank accounts and
15 multiple real properties in both California and Florida purchased with Entity funds.
16 The Receiver's professionals continue to work diligently to identify additional
17 potential Receivership Assets and to confirm the Estate's interest in the identified
18 Assets.
19         The Receiver's document recovery efforts included requests for records from
20 several individuals and entities confirmed to have pre-receivership relationships
21 with the Receivership Entities, and to have received transfers from Entity accounts.
22 These individuals and entities include: (1) Kristi Crowley, a principal of TaxCite as
23 well as Global Marketing Development, Inc. (which is now a designated
24 Receivership Entity); (2) former attorneys for the Receivership Entities; and (3) Ben
25 Ralph, believed to have served as an accountant and director of operations for the
26 Receivership Entities.  While only some of these individuals and entities have
27 responded to the Receiver's requests, the Receiver has begun to receive productions
28 from a combination of these sources that have aided his understanding of the

Receivership Entities, their financial relationships with other entities and individuals, the business operations of the Receivership Entities, and – critically – the nature and amounts of any Assets recoverable for the benefit of the Estate.

### C. Accounting, Receivership Asset Identification, And Asset Recovery.

As reflected in the Receiver's Initial Report, immediately upon his appointment, the Receiver transmitted notice of the Initial Appointment Order (including the asset freeze and turnover provisions thereof) to multiple banks and financial institutions, requesting the turnover of any accounts maintained by, in the name of, or for the benefit of the Receivership Entities. To date, the funds recovered from Entity accounts exceeds $270,000, including approximately $173,511.41 recently turned over by UBS.

In addition to Assets identified and marshaled from various Receivership Entity accounts, the Receiver's investigation has identified several real properties located in California and Florida which were purchased with funds traced to Entity consumers, located at the following addresses:

- 2010 Linden Ave, Venice, California 90291;
- 2012 Linden Ave, Venice, California 90291;
- 25 Brooks Ave, APT 2, Venice, California 90291;
- 5604 7th St SE, Lakeland Florida 33812; and
- 2304 119th Steet, Largo, Florida 33778

The Receiver has concluded, based on information reviewed to date, that any equity held in these real properties is an asset of the Estate and subject to turnover in accordance with the provisions of the Initial Appointment Order. In the coming weeks as he finalizes his analysis of certain real properties, the Receiver intends to work with the FTC and counsel for the defendants to facilitate the turnover of funds (or control of real property) in connection with each of these identified Assets.

Notably, one of these real properties – located at 2012 Linden Avenue, Venice, California 90291 ("Linden 1") – title to which was held individually by defendants Basta and Leung – was sold on or around September 24, 2024, after the entry of the Initial Appointment Order and after defendants Basta and Leung were advised of the order and the pendency of the receivership, meaning the sale was concluded in violation of the order. Upon receipt information tying consumer funds to this Asset, the Receiver successfully contacted Granite Escrow & Settlement Services ("Granite"), which was holding at least $300,000 in net proceeds from the sale, and to advise Granite of the pendency of the receivership and the Initial Appointment Order and request that such proceeds remain frozen. Through counsel, Granite has confirmed to the Receiver that it will hold these proceeds pending a further disposition order from this Court. The Receiver intends to petition this Court for just such an order, ideally by stipulation but on motion if necessary, in order to obtain the turnover of these funds for the benefit of the Estate.

Inclusive of the Linden 1 sales proceeds, the Receiver presently believes that the California properties have or had equity exceeding $1 million. Additionally, the Receiver is in the process of obtaining title documents relating to the Florida properties to confirm last date of sale, present ownership, and any relationship to the Receivership Entities or their principals. The Receiver has requested recordation of *Notices of Pendency of Receivership* against all identified real properties, pending the completion of his analysis regarding their status as Estate Assets. The Receiver will vigorously pursue the collection of all net equity associated with these properties, for the benefit of the Estate.

**D.  Review And Analysis Of Receivership Entities Business And Financial Activities.**

  1.  Analysis of Financial Documents and Other Records.

As of the date of this Report, the Receiver has served at least twenty-five (25) subpoenas on banks, financial institutions, escrow companies, title companies, web

hosting platforms, and other entities believed to be maintaining accounts or records for, or on behalf of, or engaging in transactions with the Receivership Entities and their principals and agents. While only some subpoena recipients have produced documents in response to the Receiver's requests, initial document productions have commenced. Critically, certain of these documents reflect significant diversions of millions of dollars in Entity funds derived from consumers to the Entities' principals and agents, in a manner suggesting that the diversions: (1) were unrelated to the Entities' claimed business purposes and operations; and (2) unilaterally benefited the recipients of the transfers, with no corresponding benefit to the Entities. The documents produced by various entities and individuals, including the defendants, support the Receiver's initial conclusion that significant amounts of Entity funds were diverted to the Entities' principals and agents in a manner wholly inconsistent with the ordinary customs and practices of a commercial enterprise.

As noted in the Supplement, the Receiver's investigation has also included a review of QuickBooks records from Intuit, Inc. The Receiver has recently begun to receive these documents pursuant to a subpoena and anticipates that such materials will provide invaluable insight into the Receivership Entities' business operations.

SL Biggs, the Receiver's forensic accountant, has been instrumental in analyzing the financial records obtained by the Receiver thus far. SL Biggs' analysis has unveiled a complex network of complex fund transfers involving multiple entities that have been designated as Receivership Entities after the commencement of the above-entitled action, such as Paradyme Capital Inc. and Eaglemont Capital. By way of example, Paradyme Capital Inc. alone received approximately $881,000 directly from defendant Entities and over $2 million from related sources with strong ties to the defendants, with portions of such transfers allocated to the purchase of real estate and subsequent transfers to other affiliated entities. Additionally, Eaglemont Capital's financial records have reflected approximately $1.4 million in transfers, with notable transfers to foreign bank

accounts exceeding $1 million in value. Based on a review of the documentation presently available to the Receiver, and in his business judgment, these transfers are not consistent with legitimate business practices.

SL Biggs also identified considerable cryptocurrency transactions and international fund transfers likely tied to consumer funds. These findings have reinforced the Receiver's preliminary conclusion that the Receivership Entities were not engaged in a legitimate business enterprise, but rather an illegitimate scheme to defraud innocent consumers. SLBiggs continues its diligent efforts to trace these transactions comprehensively and continues to provide the Receiver with critical analysis to support his administration of the Estate.

### 2. Site Visits.

As noted in the Initial Report, the Receiver is continuing to analyze documentation obtained at the Receivership Entities' place of business in Auburn, California, and their warehouses in Dallas, Texas. Should any valuable information be discovered through this review, the Receiver will provide such information in his next report.

Regarding the facilities in Texas, the Receiver has investigated two (2) known warehouse locations. The first is a warehouse located at 941 Avenue N, Grand Prairie, Texas 75050 (the "Warehouse") operated by the e-commerce shipper Walzon, which claims to service multiple entities apart from those of the Receivership Entities. The Receiver has attempted to work with Walzon's on-site manager to identify which items at the Warehouse belong to the Receivership Entities and which do not. As stated in the Initial Report, at the time of the Receiver's site visit to the Warehouse, the inventory at the Warehouse was extremely disorganized and mixed with inventory apparently belonging to non-receivership parties, making it virtually impossible to determine ownership of inventory or to assess the value of the Assets. Notably, the Walzon manager represented to the Receiver that no reliable inventory of Entity Assets existed.

1  Consequently, the Receiver is undertaking a cost-benefit analysis regarding the
2  expense necessary to determine exactly what items belong to the Receivership
3  Entities and which belong to Walzon or its other customers.  The Receiver also
4  notes that the Warehouse is subject to a lease that requires payment of rent.  As
5  such, the value of the relatively sparse inventory is a diminishing asset; much of the
6  inventory at the Warehouse appeared to be worth little or nothing.  For example,
7  some boxes contained paper towels, which others contained items like dog food or
8  cleaning supplies.
9       Should the Receiver determine that the liquidation value of such inventory is
10 insufficient to justify the expense of the process, he may elect to abandon the
11 Receivership Entities' interest in the Walzon inventory and reject any lease
12 obligation for the Warehouse.  Even so, due to the individual defendants' connection
13 with Walzon's management as noted in the Initial Report, the Receiver has issued a
14 subpoena to Walzon demanding all records and documents relating to the parties'
15 communications.  The Receiver anticipates that these documents will aid him in
16 determining whether further investigation is warranted concerning the Warehouse.
17 As previously noted, the Receiver has personally visited, inspected, and reviewed
18 the contents of the Warehouse, and has personally interviewed the on-site manager
19 through a Russian interpreter.  The Receiver has endeavored to use reasonable care
20 in his analysis of the relatively nominal value of Warehouse inventory.
21      The second facility, also located in Dallas, Texas, is managed by Jones Lang
22 LaSalle ("JLL").  The Receiver was unable to assess this facility because the
23 Receivership Entities had apparently been evicted for non-payment of rent in or
24 about July 2024.  Since then, the Receiver has provided notice of the receivership to
25 JLL and the owner of the facility, and has been communicating with JLL in order to
26 obtain an inventory of any Receivership Entity inventory left at the facility post-
27 eviction.  Based on the information received thus far, the Receiver has determined
28 that the total value of any items stored in this facility – which appear to include dog

treats, home goods, and similar items of nominal individual value – is likely insufficient to justify the expense of liquidation. It is therefore likely that the Receiver may elect to abandon such inventory in accordance with his authority under the Initial Appointment Order.

### 3. Efforts to Access Pre-receivership Communication Platforms.

The Receiver has taken aggressive steps to gain access to various business and communication platforms used by the Entities, their principals, and employees, which were apparently used to communicate internally and with consumers in the pre-receivership period. By way of example, such platforms include, without limitation, Slack, Gmail, and HubSpot. Access to these platforms has been complicated by additional layers of security, such as two-factor authentication protocols, that appear to be tied to individual accounts of pre-receivership Entity personnel to which the Receiver does not have access. The Receiver has requested that the defendants assist him in obtaining access to these platforms; unfortunately, through counsel, they have advised that they, too, lack access to the devices necessary to satisfy the security protocols. The Receiver considers these claims suspect, but is endeavoring to overcome these obstacles by coordinating with the communications platforms directly, and hopes to obtain access to these platforms in the near future. Based on the defendants' stated inability to provide access, the Receiver believes securing access to these platforms may take longer, and require greater expense that might otherwise be necessary had defendants been able to provide the Receiver will functional log-in credentials.

### 4. Designation of Additional Receivership Entities.

To date, the Receiver's analysis of records relating to the Receivership Entities has revealed four (4) non-parties that were affiliates of the Receivership Entities, controlled by the Entities' principals, and through which certain of the Receivership Entities' or their principals' activities were undertaken, including the purchase of Assets with funds improperly diverted from consumers. These four

entities – Global Marketing Development, Inc., Eaglemont Capital, Paradyme Capital Inc., and AC Ventures Global Inc. – have since been designated as additional Receivership Entities in accordance with the Receiver's authority under Section XII(U) of the Initial Appointment Order. An analysis of documents recently produced to the Receiver suggests that there are additional non-parties that are likely to be designated as Receivership Entities, upon the Receiver's conclusion of certain document review and analysis efforts.

        5.     <u>Evaluation of the Receivership Entities Operations.</u>

While the Receivership Entities appear to have provided limited e-commerce services to some consumers, the information obtained and reviewed by the Receiver to date suggests a number of fundamental problems with the Entities' operations, including, among other things:

- Defendants Basta's and Leung's professed limited familiarity with the day-to-day operations of the Receivership Entities and their personnel;
- Defendants Basta's and Leung's professed lack of access to Entity books and records;
- The volume and value of transfers of consumer funds among the Entities, their apparent affiliates, and entities having no discernible relationship to the Entities' operations or business purpose;
- The use of funds diverted from consumers to pay personal expenses or to purchase real properties owned by defendants Basta and Leung, as individuals;
- The unresponsiveness of pre-receivership Entity employees to the Receiver's document or access requests;
- Post-receivership communications with consumers from (apparently overseas) personnel allegedly affiliated with the Receivership Entities intended to induce consumers to make new or additional payments to

        payees not under the Receiver's control[2] or to provide false reassurance to consumers, without the Receiver's knowledge or permission, regarding the continued operations of the Entities; and

- Suspect communications to the Receiver's office from at least one purported consumer who has claimed that profitable commerce relating to the Entities ceased upon the Receiver's allegedly terminating operations, including claims of wildly exaggerated profits, notably without documentary support.  The Receiver views this claim as bogus and rejects it in its entirety as an apparent effort by unknown persons to establish a false record suggesting that the instant receivership is harmful to consumers.  In the Receiver's view, any such claim is baseless given the documents and information reviewed to date.

The information obtained by the Receiver to date strongly suggests that funds obtained from consumers were diverted for, at least, the unilateral benefit of defendants Basta and Leung, and were likely also transferred to several non-parties only tangentially affiliated with the Receivership Entities (if at all), in a manner inconsistent with the stated business purpose of the Entities.  Based on this information, the Receiver does not presently believe that the Entities operated an entirely legitimate business, and is unconvinced that their operations can be maintained as a legitimate going concern.  In summary, based on the Receiver's personal inspection of business premises, his analysis of financial and other records, the preliminary results of the forensic accounting – including as related to transactions engaged in by defendants Basta and Leung – he has concluded that consumer funds were utilized in a manner that deviated from defendants' stated business model, was inconsistent with industry standards and customs and practices, and involved transfers that unilaterally benefited defendants Basta and Leung.

---

[2] The Receiver has transmitted multiple cease and desist demands in connection with such efforts.

## IV. RECOMMENDATION AND PETITION FOR FURTHER INSTRUCTIONS.

Based on the information presented herein, and given the Receiver's ongoing efforts under the Initial Appointment Order, the Receiver believes that there is still significant work to be performed and that certain identified Assets appear to remain subject to turnover to or collection by the Receiver for the benefit of the Estate, in an amount sufficient to both cover the cost of the continued administration of the receivership and yield a surplus that could be used to make partial restitution to injured consumers. In addition, the Receiver has grave concerns regarding continued solicitations of Entity consumers, in direct violation of the Initial Appointment Order, by persons affiliated with the Receivership Entities. The Receiver continues to endeavor to educate consumers regarding the likely fraudulent nature of these solicitations and to prevent further harm. Accordingly, the Receiver recommends that the Court authorize him to continue performing his duties as established under the Initial Appointment Order and any subsequent order that the Court may issue, for a further ninety (90) days, at the conclusion of which the Receiver further proposes to submit a *Second Interim Report and Petition for Instructions* reporting the status of his efforts and further administrative recommendations regarding the pendency of the instant receivership.

Dated: November 13, 2024

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
JOSHUA A. DEL CASTILLO
MATTHEW D. PHAM
ALPHAMORLAI L. KEBEH

By:  /s/   *Joshua A. del Castillo*
JOSHUA A. DEL CASTILLO
Attorneys for Receiver
STEPHEN J. DONELL